UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

HOWARD PERRY,

                           Plaintiff,
                                                          9:10-CV-01033
v.
                                                          (LEK/TWD)

AMANDA RUPERT, MARY CORYER, LAWRENCE
SEARS,

                           Defendants.
_____

APPEARANCES:                                    OF COUNSEL:

HOWARD PERRY
Plaintiff, *pro se*
1760 Lexington Avenue
#4H
New York, New York 10029

HON. ERIC T. SCHNEIDERMAN                        RYAN E. MANLEY, ESQ.
Attorney General of the State of New York        Assistant Attorney General
Attorney for Defendants
The Capitol
Albany, New York 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## <u>REPORT-RECOMMENDATION AND ORDER</u>

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has

been referred to me for Report and Recommendation by the Honorable Lawrence E. Kahn,

Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

Plaintiff Howard Perry, a former inmate of the New York State Department of Corrections and

Community Supervision ("DOCCS"), alleges that Defendants Amanda Rupert ("Rupert"), Mary

Coryer ("Coryer"), and Lawrence Sears ("Sears") violated his Eighth Amendment rights by acting with deliberate indifference to his serious medical needs. (Dkt. No. 32.) As relief, Plaintiff seeks compensatory and punitive damages in the amount of ten million dollars. *Id.*

This matter is now before the Court on the parties' cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. Nos. 77, 80.) For the following reasons, the Court recommends granting Defendants' motion for summary judgment (Dkt. No. 77) and denying Plaintiff's cross-motion for summary judgment (Dkt. No. 80).

## I.    BACKGROUND AND PROCEDURAL HISTORY

At all times relevant to this action, Plaintiff was an inmate in the custody and control of DOCCS and housed at Ogdensburg Correctional Facility ("Ogdensburg"). (Dkt. No. 32 at 8. [1]) Plaintiff alleges that nurses Rupert[2] and Coryer[3] repeatedly denied him medical care for painful abdominal injuries and that they were deliberately indifferent to his serious medical needs. *Id.* Specifically, Plaintiff claims that on July 9, 2008, after complaining of abdominal pain and vomiting, he was wrongly transferred to Clinton Correctional Facility ("Clinton") for psychiatric evaluation, instead of receiving emergent medical care for his abdominal pain. *Id.*[4] Plaintiff further claims that Sears, as Superintendent of Ogdensburg, was responsible for the actions of the medical staff. (Dkt. No. 32 at 2-3, 10.)

---

[1]  Page numbers in citations refer to the page numbers assigned by the Court's electronic filing system rather than to the page numbers in the original document.

[2]  Rupert declares that she is a Registered Nurse licensed to practice in the State of New York. (Dkt. No. 78-1 at 1.) In 2008, she held the position of Nurse II at Ogdensburg. *Id.*

[3]  Coryer declares that she is a Registered Nurse licensed to practice in the State of New York. (Dkt. No. 78-2 at 1.) In 2008, she held the position of Nurse II at Ogdensburg. *Id.*

[4]  Plaintiff refers to both July 8, 2008, and July 10, 2008, as the date of the onset of symptoms in his Amended Complaint. (Dkt. No. 32 at 8.) However, the medical records attached to the Amended Complaint indicate July 9, 2008, as the onset date. *Id.* at 19. Plaintiff correctly states July 9, 2008, as the onset date in his cross-motion for summary judgment. (Dkt. No. 80.)

In June 2007, while in DOCCS custody, Plaintiff underwent ventral hernia reconstructive surgery. (Dkt. No. 32 at 8.) Thereafter, on or about July 9, 2008, Plaintiff experienced severe stomach pains, vomiting, and fatigue. *Id.* He was escorted to Ogdensburg's infirmary by two inmates. *Id.* Plaintiff alleges that the medical staff treated him "unprofessionally" and that he was refused proper care. *Id.* Plaintiff claims that "in deliberate spite," his condition was "treated like minor stomach pain." *Id.* Plaintiff alleges that the nursing staff had "indifferent attitudes" toward Plaintiff, and as a consequence, he received "poor treatment and disregard." *Id.* In addition, because Rupert and Coryer failed to promptly transfer Plaintiff to a medical doctor, Plaintiff alleges that he experienced major pain and suffering, including additional complications and surgeries, which "almost" cost him his life. *Id.* at 8, 10. Plaintiff further alleges that Rupert and Coryer were "unruly arrogant and deliberately manipulated the records and [their] colleagues to ensure the delay in his condition." *Id.* at 8.

Plaintiff filed his original Complaint on August 26, 2010. (Dkt. No. 1.[5]) Plaintiff subsequently filed an Amended Complaint, which is the operative complaint in this action, on April 22, 2013. (Dkt. No. 32.) Rupert and Coyer filed an Answer on May 24, 2013. (Dkt. No. 37.) Sears filed an Answer on July 3, 2013. (Dkt. No. 43.)

On July 9, 2013, Defendants moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rule of Civil Procedure 12 on the grounds that Plaintiff failed to exhaust his administrative remedies under the Prison Litigation Reform Act. (Dkt. No. 44.) By Report and

---

[5] The original Complaint named Ogdensburg Correctional Facility, Superintendent Carl Hunt, Upstate Medical University, and Dr. Mustafa Hassan, and Ogdensburg Correctional Medical Staff as Defendants. *Id.* Upon initial review, the Court *sua sponte* dismissed all Defendants except for Defendant Superintendent Hunt. (Dkt. No. 4.) On August 31, 2012, the Court ordered Defendant Hunt to provide Plaintiff with the names of Ogdensburg's medical staff. (Dkt. No. 17.) On September 10, 2012, the Court denied Defendant Hunt's motion for summary judgement made on the grounds of lack of personal involvement subject to reconsideration after the completion of discovery. (Dkt. No. 26.) On April 22, 2013, the Court granted Plaintiff's motion to amend the Complaint naming Rupert, Coryer, and Sears as Defendants. (Dkt. No. 31.) The Court denied Plaintiff's request to further amend the Complaint to name Carl Hunt as a Defendant, and directed the Clerk to terminate Hunt from this action. *Id.*

Recommendation dated October 16, 2013, this Court recommended denying Defendants' motion for judgment on the pleadings and further recommended scheduling an evidentiary hearing on the exhaustion issue.  (Dkt. No. 48.)  Judge Kahn approved and adopted the October 16, 2013, Report and Recommendation in its entirety.  (Dkt. No. 49.)

This Court conducted an evidentiary hearing on August 12, 2014.  (Dkt. No. 67.) Plaintiff represented himself at the hearing, having been previously assigned pro bono counsel (Dkt. No. 50), but then later refusing the assigned counsel.  (Dkt. Nos. 60, 61, 62.)  By Report and Recommendation dated May 27, 2015, this Court recommended that Plaintiff be permitted to pursue the claims in his Amended Complaint (Dkt. No. 32) because Rupert was estopped from asserting the failure to exhaust defense and special circumstances existed preventing Plaintiff from exhausting his administrative remedies.  (Dkt. No. 68.)  Judge Kahn approved and adopted the May 27, 2015, Report and Recommendation in its entirety.  (Dkt. No. 69.)

Defendants have now moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (Dkt. No. 77.)  Plaintiff has opposed Defendants' motion and has cross-moved for summary judgment.  (Dkt. Nos. 80, 81.)  Defendants filed a reply brief, along with their opposition to Plaintiff's cross-motion for summary judgment.  (Dkt. No. 84.)  For reasons explained below, the Court recommends granting Defendants' motion for summary judgment (Dkt. No. 77), denying Plaintiff's cross-motion for summary judgment (Dkt. No. 80), and dismissing the Amended Complaint (Dkt. No. 32) in its entirety with prejudice.

## II.    APPLICABLE LEGAL STANDARD

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 251-52 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 273 (citations omitted). The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (citation and internal quotation marks omitted). In *Jeffreys v. City of New York*, the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." 426 F.3d 549, 554 (2d Cir. 2005) (emphasis in original). To defeat summary judgment, "nonmoving parties may not rely on conclusory allegations or unsubstantiated speculation." *Id.* (citation and internal quotation marks omitted). "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that [his] version of the events is not wholly fanciful." *Id.* (citation and internal

quotation marks omitted). Statements "that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP)(JCF), 1999 WL 983876 at *3, 1999 U.S. Dist. LEXIS 16767 at *8 (S.D.N.Y. Oct. 28, 1999[6]) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

When considering cross-motions for summary judgment, a court "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Hotel Employees & Rest. Employees Union, Local 100 of New York, N.Y. & Vicinity v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 543 (2d Cir. 2002) (quoting *Heublein v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993) (internal quotation marks omitted)).

## III.    DEFICIENCIES IN PLAINTIFF'S CROSS-MOTION AND OPPOSITION

As required under Local Rule ("L.R.") 7.1, Defendants have filed a statement of material facts with citations to the summary judgment record. (Dkt. No. 77-2.) Although Plaintiff has opposed Defendants' motion, Plaintiff failed to respond to the statement of material facts filed by

---

[6] The Court will provide Plaintiff with copies of unpublished decisions in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76, 76 (2d Cir. 2009) (per curium).

Defendants as required under L.R. 7.1(a)(3). (*See* Dkt No. 81.) Under the rule, the opposing party's response to the movant's statement of material facts "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises." L.R. 7.1(a)(3).

Where, as in this case, a party has failed to respond to the movant's statement of material facts in the manner required under L.R. 7.1(a)(3), the L.R. provides that facts in the movant's statement will be accepted as true (1) to the extent they are supported by evidence in the record,[7] and (2) the nonmovant, if proceeding *pro se*, has been specifically advised of the possible consequences of failing to respond to the motion.[8] *See Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).

However, the Second Circuit, acknowledging a court's broad discretion to determine whether to overlook a failure to comply with local rules, has held that "while a court is not required to consider what the parties fail to point out in their [local rule statements of material facts], it may in its discretion opt to conduct an assiduous review of the entire record even where one of the parties has failed to file such a statement." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and internal quotation marks omitted).

The Court has opted to review the entire record in this case. Moreover, because Plaintiff's Amended Complaint (Dkt. No. 32) is verified, the Court will treat it as an affidavit in

---

[7] L.R. 7.1(a)(3) provides that "The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." *But see Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d. Cir. 2004) ("[I]n determining whether the moving party has met his burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts in the moving party's [Statement of Material Facts]. It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted).

[8] Defendants provided Plaintiff with the requisite notice of the consequences of his failure to respond to their summary judgment motion. (Dkt. Nos. 77, 77-1.)

opposition to Defendants' motion. *See Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995). However, Plaintiff's cross-motion for summary judgment (Dkt. No. 80) and opposition to Defendants' motion for summary judgment (Dkt. No. 81) are unsworn, and unsworn statements are generally inadmissible in opposition to a motion for summary judgment. *See, e.g.*, *Witzenburg v. Jurgens*, No. CV-05-4827 (SJF)(AKT), 2009 WL 1033395, at *11, 2009 U.S. Dist. LEXIS 32126, at *5 (E.D.N.Y. Apr. 14, 2009) (unsworn declarations are inadmissible for purposes of Rule 56 and cannot be considered by the court in deciding the motion for summary judgment). Even so, on summary judgment motions involving *pro se* plaintiffs, courts have been known to consider unsworn submissions in opposition. *See, e.g.*, *Hamm v. Hatcher*, No. 05 Civ. 503(ER), 2013 WL 71770, at *7, 2013 U.S. Dist. LEXIS 2203, at *19-20 (S.D.N.Y. Jan. 7, 2013) (to afford *pro se* plaintiff special solicitude, the court considered unsworn statements in his opposition papers but only to the extent based on personal knowledge or supported by other admissible evidence in the record, on the assumption that if the allegations were sufficient to raise an issue of fact, plaintiff would be given the opportunity to submit an affidavit properly attesting to the allegations); *Robles v. Khahaifa*, No. 09CV718 (HBS), 2012 WL 2401574, at *7, 2012 U.S. Dist. LEXIS 87834, at *20-22 (W.D.N.Y. June 25, 2012).

In deference to Plaintiff's *pro se* status, the Court will consider Plaintiff's unsworn opposition to Defendants' motion for summary judgment (Dkt. No. 81), and unsworn cross-motion for summary judgment (Dkt. No. 80). Plaintiff's statement of material facts largely consists of legal arguments and conclusory allegations, with few specific facts and limited citations to the record. (*See* Dkt. No. 80 at 8-10.) Thus, it fails to comply with the requirements of L.R. 7.1(a)(3). Under the rule, "failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion." L.R. 7.1(a)(3); *but*

*see Holtz*, 258 F.3d at 73 (district court has broad discretion to overlook a *pro se* litigant's failure to fully comply with local rules). Given that Plaintiff, a *pro se* litigant, made a good faith effort to comply with L.R. 7.1, and Defendants were able to provide a response despite the deficiencies (Dkt. No. 84-2), the Court has concluded that Plaintiff's cross-motion should not be denied on the basis of failure to comply with the local rule.

However, the Court's review has revealed that Plaintiff's submissions contain very little in the way of admissible evidence. "Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998); *Smith v. Rosati*, No. 9:10-CV-1502 (DNH/DEP), 2013 WL 1500422, at *12, 2013 U.S. Dist. LEXIS 54402, at *39 (N.D.N.Y. Feb. 20, 2013) ("Mere conclusory allegations that are unsupported by any record evidence are insufficient to give rise to a genuine dispute of material fact."). Evidence must be based on personal knowledge. *See Patterson v. Cnty. of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004); *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988).

## IV. ANALYSIS

### A. Eighth Amendment Right to Receive Adequate Medical Care

Claims that prison officials have intentionally disregarded an inmate's serious medical needs fall under the Eighth Amendment umbrella of protection from the imposition of cruel and unusual punishments. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Prison officials must ensure that inmates receive adequate medical care. *Id.* (citing *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)).

A claim that prison officials have intentionally disregarded an inmate's serious medical needs has both objective and subjective elements. *See Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d

Cir. 2009). "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003) (citation omitted). "The plaintiff must show that she or he had a serious medical condition and that it was met with deliberate indifference." *Id*. at 72 (citation and internal quotation marks omitted). "[N]ot every lapse in medical care is a constitutional wrong. Rather, a prison official violates the Eighth Amendment only when the two requirements are met." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006).

A "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly*, 912 F.2d 605, 607 (2d Cir. 1990) (Pratt, J. dissenting) (citations omitted); *accord Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994); *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998). Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance*, 143 F.3d at 702-03.

In order to meet the objective requirement, the alleged deprivation of adequate medical care must be "sufficiently serious." *Salahuddin*, 467 F.3d at 279 (citing *Farmer*, 511 U.S. at 834). Determining whether a deprivation is sufficiently serious also involves two inquiries. *Id*. The first question is whether the plaintiff was actually deprived of adequate medical care. *Id*. The standard to which prison officials are held in that regard is one of reasonableness. *Id*.

The second question is whether the purported inadequacy in the medical care was "sufficiently serious." *Id*. at 280. The court must examine how the care was inadequate and what harm the inadequacy caused or is likely to cause the plaintiff. *Id*. "In cases where the inadequacy is in the medical treatment given, the seriousness of the inquiry is narrower. For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." *Salahuddin*, 467 F.3d at 280 (citation and internal quotation marks omitted).

Under the subjective element, medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act . . . that evinces 'a conscious disregard of a substantial risk of serious harm.'" *Id*. at 703 (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)). "Deliberate indifference requires more than negligence but less than conduct undertaken for the very purpose of causing harm." *Hathaway*, 37 F.3d at 66. To establish deliberate indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need and (2) the medical care provider actually drew that inference. *Farmer*, 511 U.S. at 837; *Chance*, 143 F.3d at 702. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer*, 511 U.S. at 835.

An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976). Moreover, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim . . . under the Eighth Amendment." *Id*. at 106. Stated another way, "[m]edical malpractice

does not become a constitutional violation merely because the victim is a prisoner." *Id.*; *see also Smith*, 316 F.3d at 184 ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation.").  Disagreements over medication, diagnostics, forms of treatment, and the need for specialists are not adequate grounds for a § 1983 claim, since those issues implicate medical judgment and at worst negligence constituting malpractice. *See Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001). Only medical malpractice that rises to the level of culpable recklessness constitutes deliberate indifference.  *Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011).

Prison officials can deprive inmates of medical treatment by unnecessarily delaying adequate medical treatment.  *Smith*, 316 F.3d at 185.  Where a plaintiff's claim is one of a temporary delay in the provision of otherwise adequate treatment, "it is appropriate to focus on the challenged delay . . . in treatment rather than the prisoner's underlying medical condition alone in analyzing whether the alleged deprivation is, in objective terms, sufficiently serious to support an Eighth Amendment claim." *Id.*

The Second Circuit has made it clear that while whether or not a defendant acted with a specific state of mind is frequently a question for resolution by a jury, "summary judgment can be appropriate on the subjective prong of an inadequate-medical-care claim, and Plaintiff must point to actual evidence in the record permitting the inference that Defendants acted with deliberate indifference; he cannot rely on conjecture or speculation." *Castillo v. Rodas*, No. 09 Civ. 9919(AJN), 2014 WL 1257274, at *6, 2014 U.S. Dist. LEXIS 41282, at *18 (S.D.N.Y. Mar. 25, 2014).

**B.    The Events of July 9, 2008 to July 11, 2008**

Plaintiff's Ambulatory Health Records ("AHR" [9]) indicate that on July 9, 2008, at approximately 11:40 a.m., Plaintiff presented to the infirmary complaining of abdominal pain. (Dkt. No. 78 at 3.)  Plaintiff informed Rupert that he had vomited three times.  *Id*.  The AHR indicates that Rupert attempted to examine Plaintiff and ask him questions about his symptoms, but Plaintiff demanded to see a sergeant.  *Id*.  Rupert advised Plaintiff that if this was an emergency, he needed to be examined and treated.  *Id*.  Plaintiff jumped up, and left the medical unit without being examined.  *Id*.

Plaintiff returned to the infirmary approximately one hour later, at 12:30 p.m.  *Id*.  He arrived via stretcher and was examined by Coryer.  *Id*.  The AHR indicates that Plaintiff was "vague" about his symptoms but did complain of vomiting.  *Id*.  Upon examination, Plaintiff had active bowel sounds, stable vital sounds, and no fever.  *Id*.  Plaintiff was admitted to an observation room.  *Id*.  At 1:10 p.m., Coryer observed Plaintiff resting quietly on his left side. *Id*.  Coryer checked on Plaintiff again at 1:30 p.m., and noted that Plaintiff was not in distress, even though he claimed to have vomited six times.  *Id*.

Later that day, while still in medical observation, Plaintiff screamed for help from staff, was crying uncontrollably, and begging people "not to leave him [there]."  *Id*. at 4.  The AHR indicates that Plaintiff was unable to control his emotions, was yelling, and appeared to be in a "manic state."  *Id*.  Plaintiff was crying "sounds," but did not form words.  *Id*.  Plaintiff then became very calm and requested to return to his unit.  *Id*.  Plaintiff became increasingly agitated, was laughing hysterically, and refused to answer questions.  *Id*.  Plaintiff dozed for five minutes,

---

[9] The AHR is a DOCCS document in which an inmate's medical care is recorded, based on the date of the services. (Dkt. No. 78-2 at 2.)

then woke up and began pacing in the observation room. *Id.* Plaintiff continued to vary from being agitated to serene, and paced and slept intermittently. *Id.*

In light of Plaintiff's behavior, Rupert tried to conduct a suicide screening with Plaintiff. *Id.* However, Plaintiff refused to answer the suicide questionnaire, and refused to speak or acknowledge any staff. *Id.* Later that evening, Plaintiff was transferred to Clinton for a mental health evaluation. *Id.* Plaintiff was examined by mental health staff at approximately 7:13 p.m. *Id.* at 5. At that time, his vitals were stable, and no injuries were indicated or noted. *Id.* Plaintiff's history of ventral hernia repair was noted on the AHR. *Id.* Plaintiff complained of nausea. *Id.* Plaintiff was encouraged to rest, drink lots of fluids, and let staff know if his condition worsened. *Id.* The next day, on July 10, 2010, Plaintiff was discharged from Clinton and transferred back to Ogdensburg. *Id.* at 6.

Plaintiff was next seen by Ogdensburg medical staff on July 11, 2008, at approximately 7:45 a.m. *Id.* at 7. Plaintiff again complained of vomiting. *Id.* Upon examination, Coryer noted that Plaintiff's vital signs were normal. *Id.* He did not have a fever. *Id.* Coryer admitted Plaintiff to an observation room to be evaluated by a medical doctor. *Id.* Coryer observed Plaintiff sleeping at 8:30 a.m. *Id.*

Thereafter, Plaintiff was examined by Dr. Chalom, Ogdensburg's Facility Health Services Director. (Dkt. No. 78-1 at ¶ 23.[10]) The AHR indicates that Plaintiff was complaining of epigastric issues for three days, and that Plaintiff described his pain as "muscle pulling." (Dkt. No. 78 at 7.) Plaintiff stated that he had many episodes of vomiting, and that he had not had a bowel movement or eaten in three days. *Id.* Upon examination, Dr. Chalom noted Plaintiff's abdomen was soft and not tender, and that his bowel sounds were active. *Id.* Dr.

---

[10] Dr. Chalom is not a party to this action. (Dkt. No. 32.)

Chalom ordered Plaintiff Zantac[11] and Dulcolax.[12]  *Id.*  Dr. Chalom observed Plaintiff drinking juice.  *Id.*

At 10:15 a.m., Coryer observed Plaintiff drink approximately four ounces of apple juice. *Id.* at 8.  As ordered, Coryer gave Plaintiff Zantac and Ducolax.  *Id.*  At that time, Plaintiff did not appear in any distress and had been sleeping.  *Id.*  At 10:30 a.m., Plaintiff vomited clear liquids onto the floor and at 10:40 a.m., was given a Compazine[13] suppository per the doctor's order.  *Id.*  The AHR indicates that Plaintiff was ordered to have clear liquids for twenty-four hours, Zantac two times per day, and Compazine three times per day as needed.  *Id.*

Plaintiff was transferred to Riverview Correctional Facility ("Riverview") to be admitted to their infirmary for evaluation and treatment.  *Id.*  Plaintiff was received by Riverview by 12:15 p.m. on July 11, 2008.  *Id.*  At that time, Plaintiff complained of abdominal discomfort and severe pain.  *Id.*  Plaintiff began writhing in bed and vomited green bile.  *Id.*  Plaintiff was then transferred from Riverview to Claxton-Hepburn Medical Center ("Claxton").  (Dkt. No. 78 at 9.)

Once admitted to Claxton, Plaintiff was examined by Dr. V. Prasad Yitta.  (Dkt. No. 78 at 9.[14])  Upon examination, Plaintiff's abdomen was distended but soft.  *Id.*  He had no tenderness, no guarding, no rigidity, and no rebound tenderness.  *Id.*  He had hyperactive bowel sounds and no obvious hernia at that time.  *Id.*  Plaintiff's CT scan revealed evidence of small bowel obstruction.  *Id.* at 10.  Abdominal x-rays revealed "still persistent obstruction."  *Id.*

Dr. Yitta determined the best course of treatment was to treat Plaintiff with non-operative measures, including hospitalization, intravenous fluids, and nasogastric decompression.  *Id.*  Dr.

---

[11] Zantac is commonly used to treat acid reflux.  (Dkt. No. 78-1 at 5.)

[12] Dulcolax is commonly used to treat constipation.  (Dkt. No. 78-1 at 5.)

[13] Compazine suppository is commonly used to treat severe nausea and vomiting.  (Dkt. No. 78-1 at 5.)

[14] Dr. Yitta is not a party to this action.  (Dkt. No. 32.)

Yitta explained to Plaintiff that it was "better to avoid surgery as long as possible." *Id*. Dr. Yitta further explained to Plaintiff that any surgery would be difficult because of Plaintiff's previous operations and potential adhesions. *Id*. The AHR reflects that Plaintiff understood and was agreeable to the plan. *Id*. Four days later, on July 15, 2008, Plaintiff underwent an exploratory laparotomy with a small bowel resection. *Id*. at 11. Plaintiff was discharged from Claxton on August 14, 2008, in improved condition. *Id*. at 11-12.[15]

### C. Defendants Rupert and Coryer

Defendants appear to concede that Plaintiff had a serious medical need. (*See* Dkt. No. 77-3.) Defendant dispute the allegations that Rupert and Coryer did not provide Plaintiff any medical treatment and that they were deliberately indifferent to Plaintiff's serous medical needs. *Id*. at 10.

Here, contrary to Plaintiff's claim that the medical staff at Ogdensburg did not provide adequate medical care, as detailed above, Plaintiffs' medical records are replete with instances of the medical staff tending to his complaints from July 9, 2008 to July 11, 2008. (*See* Dkt. No. 78 at 3-8.) Although Plaintiff describes the treatment that he received from Rupert and Coryer as lacking empathy and their attitude toward him indifferent and unprofessional, the record shows that Rupert and Coryer, along with other medical staff, were attentive to Plaintiff's needs, performing several examinations, keeping Plaintiff for observation, prescribing medications, transferring Plaintiff to a DOCCS facility for a mental health examination, and ultimately transferring Plaintiff to a DOCCS facility for further medical treatment. *Id*. Plaintiff's conclusory allegations that Rupert and Coryer denied him medical care cannot negate Plaintiff's

---

[15] While at Claxton, Plaintiff also underwent (1) a laparotomy and end ileostomy on July 17, 2008, (2) an abdominal exploration and washout and packing for temporary closure on July 19, 2008, and (3) an abdominal wound washout and closure of large ventral hernia with biological mesh on July 23, 2008. (Dkt. No. 78 at 11.)

medical records which show Defendants' almost continuous care of his abdominal issues. *See Wright v. Genovese*, 694 F. Supp. 2d 137, 156-57 (N.D.N.Y. 2010) ("Plaintiff's . . . conclusory allegations of deliberate indifference do not negate the extensive evidence that [the doctor] and others reasonably and diligently addressed plaintiff's medical needs over an extended period of time."); *Williamson v. Goord*, No. 9:02–CV–00521 (GLS/GHL), 2006 WL 1977438, at *21, 2006 U.S. Dist. LEXIS 46828, at *14 (N.D.N.Y. July 11, 2006) (recommending dismissal where the defendants "promptly and dutifully" provided care and requested necessary testing). In sum, no genuine issue of material facts exists that Rupert and Coryer withheld medical care from Plaintiff or delayed his treatment.

Plaintiff argues that he should have received emergent medical care on July 9, 2008, when he first presented to the infirmary with abdominal pain, instead of being transferred to Clinton for mental health evaluation. (Dkt. No. 32 at 8.) However, a mere disagreement as to the medically proper course of treatment is not a sufficient basis for a deliberate indifference claims. *See Chance*, 143 F.3d at 703. An inmate does not have the right to treatment of his choice. *See Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986). "[D]eliberate indifference [will not] be found when an inmate simply prefers an alternative treatment or feels that he did not get the level of medical attention that he desired." *Cherry v. Edwards*, No. 01 Civ. 7886(FM), 2005 WL 107095, at *8, 2005 U.S. Dist. LEXIS 702, at *22-23 (S.D.N.Y. Jan. 18, 2005) (citation omitted), *aff'd*, 155 F. App'x 529 (2d Cir. 2005).

In support of Defendant's motion for summary judgment, Rupert declares that out of concern for Plaintiff's mental well-being, she attempted to conduct a suicide screening with Plaintiff. (Dkt. No. 78-2 at 3.) However, Plaintiff refused to answer the suicide questionnaire, and refused to speak or acknowledge any staff. *Id*. Rupert declares that Central New York

Psychiatric Center ("CNYPC") does not have a satellite unit at Ogdensburg. *Id*. at 4. However, CNYPC does have a satellite unit located at Clinton. *Id*. Based upon Plaintiff's mental state, the lack of a mental health unit at Ogdensburg, Plaintiff's inability to cooperate with medical staff, and the fact that Plaintiff's only physical ailment appeared to be nausea, it was decided that CNYPC at Clinton was best equipped to treat Plaintiff. *Id*. Rupert contacted Clinton, and they advised that they had a bed available for Plaintiff. *Id*. Accordingly, Plaintiff was transported to Clinton for a mental health evaluation on July 9, 2008. *Id*.

In this case, Plaintiff disagrees with the medical decision to send him to Clinton on July 9, 2008. (Dkt. No. 32 at 8.) However, a difference of opinion between a prisoner and prison officials regarding medical treatment does not constitute deliberate indifference. *See Chance*, 143 F.3d at 709. Given the evidence of treatment Plaintiff received July 9, 2008 through July 11, 2008, no reasonable jury could find that either Rupert or Coryer had been deliberately indifferent to Plaintiff's serous medical needs. *See Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (finding summary judgment appropriate where the nonmovant fails to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim") (internal quotation marks omitted).

Moreover, Plaintiff cannot show that the minimal delay in diagnosing his small bowel obstruction was deliberate, or caused a worsening of his condition. *See, e.g.*, *Warren v. Corcoran*, No. 9:09-CV-1146 (DNH/ATB), 2011 WL 5599587, at *6, 2011 U.S. Dist. LEXIS 135012, at *17-18 (N.D.N.Y. Oct. 20, 2011) (finding no delay in treatment or care where an inmate complained of and was provided treated for abdominal pain with varying degrees of success over the course of a six-month period of time before the inmate was diagnosed with a small bowel obstruction and had surgery). Here, even though Plaintiff was diagnosed with a

small bowel obstruction on July 12, 2008, immediate surgery was not recommended. (Dkt. No. 78 at 9-10.) Rather, Dr. Yitta recommend treating Plaintiff with nonoperative measures. *Id.* at 10. Plaintiff agreed with Dr. Yitta's treatment plan. *Id.* Accordingly, Plaintiff cannot show that Rupert or Coryer were responsible for any delay in diagnosis, or any resulting complications from the July 16, 2008, surgery.

In light of the foregoing, the Court recommends that Defendants Rupert and Coryer be granted summary judgment on the merits on Plaintiff's Eighth Amendment claim.

### D.     Defendant Sears

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia*, the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013) (citations omitted). "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior."). "Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement." *Groves v. Davis*, No. 9:11–CV–1317 (GTS/RFT), 2012 WL 651919, at *6, 2012 U.S. Dist. LEXIS 25367, at *22-23 (N.D.N.Y. Feb. 28, 2012) (citing *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977)); *see also Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (a "mere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections . . . in a § 1983 claim") (quoting *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir.

1985)). Therefore, "a plaintiff must . . . allege a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

The Second Circuit has held that personal involvement by a supervisor necessary to state a claim under § 1983 may be found where: "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon*, 58 F.3d at 873.[16]

Here, Plaintiff brings an Eighth Amendment supervisory liability claim against Sears. (Dkt. No. 32.) Plaintiff fails to allege that Sears was personally involved in any of the alleged events. Rather, Plaintiff claims that Sears, as Superintendent, is liable for the actions of Ogdensburg's medical staff. (Dkt. No. 32 at 10.) At his deposition, Plaintiff testified that he named Sears as a Defendant because he was the supervisor of Ogdensburg and "supervised somebody that supervised [Rupert and Coryer]." (Dkt. No. 77-7 at 15.) Plaintiff further testified that he had no interactions with Sears. *Id*. at 15-16.

In support of Defendants' motion for summary judgment, Sears declares he held the position of Superintendent of Ogdensburg from July 2007, through June 2010. (Dkt. No. 77-8 at 1.) As Superintendent, he was responsible for the overall supervision of and management of the facility. *Id*. at 2. Sears declares that he delegated responsibility to Deputy Superintendents and

---

[16] The Second Circuit has expressly declined to determine whether *Iqbal* eliminated any of the *Colon* bases for liability. *See Grullon*, 720 F.3d at 139.

subordinate staff. *Id*. Decisions made regarding the medical care and course of treatment for inmates were ultimately the responsibility of the Facility Health Services Director. *Id*.

In July 2008, Rupert and Coryer each held the position of Nurse II at Ogdensburg, and reported directly to the Facility Health Services Director. *Id*. Sears declares that he did not participate in decisions regarding whether an inmate should be transferred or moved out of Ogdensburg for medical reasons. *Id*. Finally, Sears declares that he did not participate in any decision regarding Plaintiff's medical care in July 2008. *Id*.

Here, there is no evidence of any personal involvement by Sears under the *Colon* categories. Plaintiff concedes as much, and requests that Sears be dismissed from this action. (Dkt. No. 80 at 7; Dkt. No. 81 at 2.)

In light of the foregoing, the Court recommends that Defendant Sears be granted summary judgment on the merits on Plaintiff's Eighth Amendment claim.

### E. Qualified Immunity

Defendants contend that if the Court were to find that their actions violated Plaintiff's Eighth Amendment rights, they are entitled to qualified immunity. (Dkt. No. 77-3 at 14-17.) Inasmuch as the Court is recommending that Defendants be granted summary judgment on other grounds, it finds it unnecessary to reach the qualified immunity argument.

**ACCORDINGLY** it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 77) be **GRANTED IN ITS ENTIRETY**; and it is further

**RECOMMENDED** that Plaintiff's cross-motion for summary judgment (Dkt. No. 80) be **DENIED**; and it is further

**RECOMMENDED** that Plaintiff's Amended Complaint (Dkt. No. 32) be **DISMISSED IN ITS ENTIRETIY WITH PREJUDICE**; and it is further

**ORDERED** that the Clerk provide Plaintiff with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2008) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

Dated: April 19, 2016
      Syracuse, New York

Therese Wiley Dancks
United States Magistrate Judge

2014 WL 1257274
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Pedro CASTILLO, Plaintiff,

v.

Byron RODAS and Carl Koenigsmann, Defendants.

No. 09 Civ. 9919(AJN).
|
Signed March 25, 2014.

*MEMORANDUM & ORDER*

ALISON J. NATHAN, District Judge.

**\*1** Plaintiff Pedro Castillo, an inmate at the Green Haven Correctional Facility ("Green Haven"), brings claims under 42 U.S.C. § 1983 alleging that Defendants Byron Rodas and Carl Koenigsmann were deliberately indifferent to his serious medical needs, in violation of the Eighth Amendment, and that Rodas retaliated against him for filing a grievance, in violation of the First Amendment. Before the Court is Defendants' motion for summary judgment. Dkt. No. 75. For the following reasons, Defendants' motion is granted.

## I. BACKGROUND

The Court will first describe the record evidence relevant to Plaintiff's claims, and then briefly summarize this action's procedural history.

### A. Factual Background

The following facts and disputes of fact are based on the Court's review of the record, undertaken with particular attention to the evidence cited in the parties' Local Rule 56.1 statements. [1] *See Monahan v. N.Y.C. Dep't of Corr.,* 214 F.3d 275, 292 (2d Cir.2000); *Agence Fr. Presse v. Morel,* 934 F.Supp.2d 547, 551 (S.D.N.Y.), *superseded on other grounds on reconsideration,* 934 F.Supp.2d 584 (S.D.N.Y.2013). The facts are undisputed unless otherwise noted. Because the Court discusses certain facts in more detail later in this opinion, a general overview suffices here.

Plaintiff is an inmate at Green Haven, in Stormville, New York. Pl. 56.1 Resp. ¶ 1. Under the terms of the consent decree

governing the provision of inmate medical care at Green Haven, each inmate is assigned a primary care provider, who can be a physician assistant, a nurse practitioner, or a primary care physician. *Id.* ¶ 15. The "primary interface" between inmates and the medical staff is "sick call," at which an inmate, after seeking permission from a corrections officer, can make an appointment with a nurse, who can then refer them to their primary care provider for further treatment or distribute certain over-the-counter medications. *Id.* ¶ 16. If an inmate's primary care provider is unavailable, the inmate will be seen by another primary care provider. *Id.* An inmate can also make an "emergency sick call" to receive treatment immediately. *Id.* ¶ 18.

For an inmate to receive specialty care, the primary care provider must initiate a "request for consultation." Pl. 56.1 Resp. ¶ 25. Such requests describe the patient's condition and indicate a level of urgency indicating how soon a consultation with a specialist is needed. *Id.* ¶ 26. They are reviewed by a Regional Medical Director ("RMD") responsible for the medical care at several correctional facilities. *Id.* ¶¶ 7–8, 28. After the RMD approves a request for consultation, the request goes to a "quality review company" to determine whether the request meets the applicable standard of care. *Id.* ¶ 31. If the company preliminarily declines the request, it goes back to the RMD for a final decision, but if the company approves the request, it bypasses the RMD and goes to a centralized state coordination system for the scheduling of specialty care. *Id.* ¶¶ 32–34.

**\*2** After a consultation request is approved, the inmate sees a specialist, who sends a report with any recommendations to the inmate's primary care provider for review. Pl. 56.1 Resp. ¶ 35. The primary care provider then fills out a new request for consultation based on the specialist's report, and then submits it according to the same process. *Id.* ¶ 36.

At all relevant times, Rodas was a physician's assistant on Green Haven's medical staff and was Plaintiff's primary care provider. [2] Pl. 56.1 Resp. ¶¶ 2–4. Rodas is not a licensed physician. Bendheim Dep., Youngwood Decl. Ex. C, at 154–55. Koenigsmann was the RMD for Green Haven and responsible for reviewing its consultation requests. Pl. 56.1 Resp. ¶ 7.

In August 2005, Plaintiff began experiencing hemorrhoid symptoms. Pl. 56.1 Resp. ¶ 49. Hemorrhoids occur in four stages: Stage I is the least severe and Stage IV is the most severe. *Id.* ¶ 42. Stage IV hemorrhoids generally require

surgery—a "hemorrhoidectomy"—relatively quickly, but patients with milder symptoms ordinarily "will have relief with conservative or minimally invasive treatment." *Id.* ¶¶ 45, 43. Stage III hemorrhoids do not always require surgery, and depending on the circumstances, they can also be treated with "topical creams and suppositories." *Id.* ¶ 46. Additionally, "hemorrhoid symptoms are 'notoriously waxing and waning,' and there can be months when symptoms do not present themselves." Pl. 56.1 Resp. ¶ 41 (quoting Freed Dep., Dawkins Decl. Ex. K, at 64).

On August 29, 2006, Plaintiff was seen by Rodas at sick call for complaints of blood in his stool and lower back pain; Rodas prescribed Tucks wipes and ordered a "stool occult blood test," which came back negative for blood. Pl. 56.1 Resp. ¶¶ 50–51; Pl. Decl., Youngwood Decl. Ex. D, ¶ 8. From that appointment through May 1, 2007, Plaintiff did not complain about hemorrhoids to the medical staff. Pl. 56.1 Resp. ¶ 52, Pl. Decl., Youngwood Decl. Ex. D, ¶ 9. Plaintiff was seen numerous times by the medical staff between May 1, 2007 and February 25, 2008 for various ailments, and at several of these appointments he was given hemorrhoid cream. Pl. 56.1 Resp. ¶¶ 53–72.

On April 25, 2008, Plaintiff "bled while defecating and felt 'tremendous pain.' " Pl. 56.1 Resp. ¶ 73. On April 28, he saw a nurse during sick call; he complained of "hemorrhoids and bleeding from the rectum during bowel movements," and the nurse gave him a pass to go to the clinic that afternoon. *Id.* ¶ 74. There, he saw Dr. John Bendheim, who diagnosed hemorrhoids, prescribed "a basin with Epsom salts for soaks and Preparation H and Dibucaine ointment," and noted in Plaintiff's records that Plaintiff "may benefit from" a general surgery consultation. *Id.* ¶ 75. Rodas saw Plaintiff on May 1, 2008 and submitted a consultation request for Plaintiff to see a surgeon for follow-up. *Id.* ¶ 78. He wrote in his request that Plaintiff was experiencing "rectal bleeding with pain in the rectum on and off for four years," and that conservative treatments were "no longer effective." *Id.*

**\*3** On May 22, 2008, Plaintiff was seen by a general surgeon, Dr. Aaron Roth, who conducted a physical examination and referred Plaintiff for "evaluation under anesthesia." Pl. 56.1 Resp. ¶ 80. (That meant surgery. *Id.*) Roth also recommended that Plaintiff undergo a colonoscopy. *Id.* On May 23, 2008, Rodas submitted a request for consultation for further evaluation based on Roth's recommendation. That request stated that "conventional treatment was no longer effective" and reported that Roth's

examination had found a "stage III internal hemorrhoid." *Id.* ¶ 81. From May 22 to August 5, Plaintiff states that he complained of "severe" pain to Rodas and nurses on the medical staff. *Id.* ¶ 80.

On May 23, 2008, Koenigsmann denied Rodas's request for consultation and determined that Plaintiff should be referred for a colonoscopy to rule out more serious causes of his left lower quadrant pain and rectal bleeding. Pl. 56.1 Resp. ¶ 82; Koenigsmann Dep., Youngwood Decl. Ex. B, at 158–59. From a medical standpoint, a colonoscopy is not part of a course of treatment for hemorrhoids, nor is it an effective means of diagnosing hemorrhoids. Pl. 56.1 Resp. ¶¶ 82–83; Freed Dep., Youngwood Decl. Ex. F, at 95–97.

On June 16, 2008, Rodas referred Plaintiff for a colonoscopy. Pl. 56.1 Resp. ¶ 86. The colonoscopy was performed on August 5, 2008, by Dr. Robert Antonelle. *Id.* ¶ 89. Antonelle wrote a report following the procedure, which described "internal hemorrhoids [and] minimal rectal prolapse" that was "easily reducible" and noted internal bleeding. *Id.* ¶ 90 (alteration in original). Antonelle prescribed "Anusol hydrocortisone cream and follow-up as needed," and recommended a follow-up colonoscopy in ten years. *Id.* ¶¶ 90–91. Antonelle's report did not say anything about whether Plaintiff's hemorrhoids required surgery.

In a declaration submitted by Plaintiff, Antonelle indicates that he did not intend for his report to suggest that hemorrhoid surgery was not necessary; in fact, it was his understanding that the treatments he prescribed would be supplemental to the surgery that he anticipated would be taking place. Pl. 56.1 Resp. ¶¶ 91–94; Antonelle Decl., Youngwood Decl. Ex. H. However, "Rodas did not believe surgery was necessary because it was not prescribed in Dr. Antonelle's plan."[3] Pl. 56.1 Resp. ¶ 93; *accord* Rodas Dep., Youngwood Decl. Ex. A, at 229–31. As a result, he did not request a hemorrhoidectomy on Plaintiff's behalf, and Plaintiff continued to receive conservative treatments from the medical staff. Pl. 56.1 Resp. ¶¶ 96, 101–103.

On February 17, 2009, Plaintiff saw a general surgeon, Dr. Bhopale, for complaints of rectal bleeding; the rectal exam was "normal," and Plaintiff was given two containers of laxatives. Pl. 56.1 Resp. ¶ 104. The nature of Bhopale's examination is disputed: Plaintiff claims that Bhopale asked him to lower his underwear but did not examine his rectum, and he asserts on information and belief that "Dr. Bhopale ... regularly diagnos[e]s his patients or inmates referred to him

with normal findings, even when an inmate has a condition worthy of medical attention." *Id.;* Castillo Decl., Youngwood Decl. Ex. D, ¶¶ 41–42.

**\*4** On February 27, 2009, Plaintiff saw Rodas and requested surgery for his hemorrhoids. Rodas denied the request and told Plaintiff that his rectal examination had been normal. Pl. 56.1 Resp. ¶ 105. According to Plaintiff, Rodas also told him that "the director of the clinic" had denied his surgery, that he would have to file a grievance if he wanted surgery, and that Rodas was "not going to do anything else." *Id.;* Castillo Decl., Youngwood Decl. Ex. D, ¶ 44.

Plaintiff filed a grievance requesting surgery on March 6, 2009, and on March 17, 2009, Dr. Frederick Bernstein, who reviewed the grievance, responded to it by stating that Plaintiff would be sent to a general surgeon to determine whether he was an "appropriate candidate for surgical treatment." Pl. 56.1 Resp. ¶¶ 108, 110. Rodas then requested a surgical consultation, which Koenigsmann approved. *Id.* ¶ 111. Rodas placed Plaintiff in the infirmary on March 27, 2009. *Id.* ¶ 118. Roth saw Plaintiff and made arrangements for a hemorrhoidectomy, Rodas scheduled the procedure, and Koenigsmann approved it. *Id.* ¶¶ 142, 144. According to Plaintiff, during his consultation with Roth, "Roth became upset because his recommendation was ignored." Pl. Decl., Youngwood Decl. Ex. D, ¶ 67. Plaintiff finally received a hemorrhoidectomy on July 2, 2009, more than a year after Roth initially recommended the procedure. Pl. 56.1 Resp. ¶ 147.

**B. Procedural History**

Plaintiff filed a pro se complaint on December 3, 2009, naming Rodas and Bernstein as Defendants, and the case was assigned to Judge Jones. Following an initial discovery period, Rodas and Bernstein moved for summary judgment. In his brief opposing that motion, Plaintiff conceded that he had named Bernstein as a defendant on the mistaken belief that Bernstein, and not Koenigsmann, was responsible for denying his surgery after Rodas requested it in May 2008. Dkt. No. 31, at 12–13. On September 19, 2011, Judge Jones denied the contested portion of Defendants' motion without a written opinion and granted Plaintiff leave to amend his complaint to add Koenigsmann as a Defendant. Dkt. No. 38.

After Plaintiff filed an amended complaint and Defendants answered, counsel appeared on Plaintiff's behalf, and the case was reassigned to the undersigned. The Court granted Plaintiff leave to file a Second Amended Complaint (the "2AC"), which was filed on May 2, 2012. Dkt. No. 56. After Defendants answered, the parties engaged in additional discovery, and Defendants again moved for summary judgment on April 1, 2013. That motion is fully submitted.

## II. LEGAL STANDARD

Summary judgment is properly granted when, construing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in its favor, "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(a); *Ramos v. Baldor Specialty Foods, Inc.,* 687 F.3d 554, 558 (2d Cir.2012). "A fact is material if it might affect the outcome of the suit under the governing law, and an issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Ramos,* 687 F.3d at 558 (quoting *Niagara Mohawk Power Corp. v. Hudson River—Black River Regulating Dist.,* 673 F.3d 84, 94 (2d Cir.2012)) (internal quotation marks omitted).

**\*5** As the moving party, Defendants bear the burden of demonstrating the absence of a genuine issue of material fact. *See Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1223 (2d Cir.1994). When the burden of proof at trial would fall on the non-moving party, a movant can carry its burden by pointing to a lack of record evidence on an essential element of its opponent's claim. *Cordiano v. Metacon Gun Club, Inc.,* 575 F.3d 199, 204 (2d Cir.2009). "In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Id.* "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986).

## III. DISCUSSION

Plaintiff brings two claims under § 1983: an Eighth Amendment claim against both Rodas and Koenigsmann, and a First Amendment claim against Rodas. 2AC at 7–8. Defendants move for summary judgment with respect to both of Plaintiff's claims. The Court will address these two claims in turn.

**A. Eighth Amendment Claim**

In Count 1, brought pursuant to § 1983, Plaintiff alleges that Defendants denied him adequate medical treatment in

violation of the Eighth Amendment. 2AC ¶¶ 34–36. A prison official's failure to provide adequate medical treatment can constitute " 'deliberate indifference' to a substantial risk of serious harm to an inmate," and thereby violate the Eighth Amendment's prohibition against cruel and unusual punishments. *Farmer v. Brennan,* 511 U.S. 825, 828 (1994); *see Estelle v. Gamble,* 429 U.S. 97, 104 (1976). Courts evaluating deliberate indifference claims must conduct two inquiries. The first is an objective inquiry that asks whether the alleged deprivation of medical care was "sufficiently serious." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006). The second inquiry is a subjective one that asks whether the charged official acted "with a sufficiently culpable state of mind." *Id .* at 280. Defendants argue that no genuine issue of material fact exists concerning either inquiry, and that they are therefore entitled to summary judgment.

### 1. *Qualified Immunity*

The Court will first address Defendants' contention that even if they violated the Eighth Amendment, they are entitled to qualified immunity. Def. Br. at 24. The doctrine of qualified immunity protects government officials from civil liability for conduct that "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Following the Supreme Court's decision in *Pearson v. Callahan,* 555 U.S. 223 (2009), lower courts have discretion to decide whether the right a plaintiff invokes was "clearly established" at the time of the defendant's conduct before addressing whether that right was actually violated. *See id.* at 236. If the right was not clearly established, then the defendant is immune from suit, and whether his conduct in fact violated the plaintiff's rights is irrelevant.

**\*6** In this case, however, the Court will not address the question of whether the Eighth Amendment rights Defendants allegedly violated were "clearly established." That question is a difficult one, which depends on the level of generality at which the rights are defined. For example, Plaintiff assumes that the relevant right is defined by "the elements" of his claim, Pl. Opp. at 25, but in stripping away all the facts constituting the alleged violation, his approach appears to be too broad. *See Saucier v. Katz,* 533 U.S. 194, 202–03 (2001); *Anderson v. Creighton,* 483 U.S. 635, 639–40 (1987). For their part, Defendants argue that they are immune because no precedent suggests that hemorrhoids are a sufficiently serious medical condition. But their focus on symptoms—rather than, for instance, the pain or danger associated with the symptoms—is likely too narrow. The parties' briefing on this issue is sparse. As a result, "there would be little if any conservation of judicial resources to be had beginning and ending with a discussion of the 'clearly established' prong," *Pearson,* 555 U.S. at 236, and the Court will proceed to consider whether there are genuine issues of material fact concerning whether Defendants violated the Eighth Amendment. There are not.

### 2. *Deliberate Indifference*

As noted above, the parties contest both the objective and subjective elements of Plaintiff's Eighth Amendment claim. For purposes of this motion, the Court will assume that the objective prong is met—i.e., that Plaintiff "was actually deprived of adequate medical care" and that the deprivation was "sufficiently serious," *Salahuddin,* 467 F.3d at 279–80–because Defendants are entitled to summary judgment on the subjective prong. That is, no reasonable jury could conclude that Defendants acted with deliberate indifference.

The Eighth Amendment forbids only cruel and unusual *punishments* . As a result, the Supreme Court has described the "deliberate indifference" standard carefully, taking pains to distinguish it from less culpable mental states. *See Farmer,* 511 U.S. at 835–47; *Wilson v. Setter,* 501 U.S. 294, 296–304 (1991). The mental state required for an Eighth Amendment violation in the context of prison medical care is "subjective recklessness as used in the criminal law." *Farmer,* 511 U.S. at 839. That is, the defendant must "know [ ] of and disregard[ ] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837; *accord Salahuddin,* 467 F.3d at 280 (defendant must "act or fail to act while actually aware of a substantial risk that serious inmate harm will result").

Although the question of whether a defendant acted with a particular state of mind is frequently a factual one appropriate for resolution by a jury, the Second Circuit has made clear that summary judgment can be appropriate on the subjective prong of an inadequate-medical-care claim, and Plaintiff must point to actual evidence in the record permitting the inference that Defendants acted with deliberate indifference; he cannot rely on conjecture or speculation. *See Salahuddin,* 467 F.3d at 281–82; *Brock v. Wright,* 315 F.3d 158, 164–65 (2d Cir.2003); *see also Hernandez v. Keane,* 341 F.3d 137, 145–47 (2d Cir.2003) (affirming Rule 50 judgment for defendants). For the reasons that follow, the Court concludes that Plaintiff has failed to introduce sufficient evidence to

create a triable issue of fact regarding deliberate indifference, so Defendants are entitled to summary judgment.

### 3. *Rodas Was Not Deliberately Indifferent*

**\*7** The Court will assess the claims against Rodas first. *See, e.g .., Brock,* 215 F.3d at 162 (deliberate indifference must be shown for "each defendant"). Plaintiff characterizes the record as establishing that he consistently suffered from severe and worsening hemorrhoid symptoms, that he repeatedly complained of these severe symptoms to Rodas, and that Rodas continued to provide the same non-surgical treatments whose ineffectiveness was evident from the very symptoms of which Plaintiff complained. Pl. Opp. at 5–11, 15–16. In several respects, however, that is not what the evidence actually shows. To explain why, the Court must review the record in significant detail.

As an initial matter, in asserting that he "consistently complained about his hemorrhoids," Pl. Opp. at 15, Plaintiff points to certain complaints that did not concern hemorrhoids at all. For example, on May 8, 2007, Plaintiff complained that he "felt a burning sensation while urinating" and was diagnosed with a urinary tract infection. Pl. 56.1 Resp. ¶ 57. On June 18, 2007, he complained of "left lower quadrant pain" and told the nursing staff that hemorrhoid cream—the treatment that he now argues was inadequate—"relieved the pain." *Id.* ¶ 58. And with respect to many of his complaints that were, in fact, "about his hemorrhoids," the record does not always indicate that Plaintiff complained to Rodas, as opposed to someone else. *See* Pl. 56.1 Resp. ¶¶ 63, 65, 66, 71, 74, 79 (describing sick calls or meetings with a nurse). [4] Focusing on Rodas's own response to Plaintiff's symptoms, the record reveals the following:

Plaintiff's hemorrhoid symptoms began in August 2005, but he did not seek medical attention until August 2006, at which point Rodas ordered a blood test and prescribed Tucks wipes. Pl. 56.1 Resp. ¶¶ 49, 50. In his Rule 56.1 response, Plaintiff disputes Defendants' assertion that he did not complain about hemorrhoids following that appointment, noting that his complaints were not always noted in his medical records. *Id.* ¶ 52. But Plaintiff's own declaration states that "between ... August 29, 2006 and February 2007, it is true that I did not complain of hemorrhoids, because I was keeping up with defendant Rodas' treatment directions." Pl. Decl., Youngwood Decl. Ex. D, ¶ 9. Plaintiff also does not dispute that between February 2007 and August 3, 2007, he did not complain about hemorrhoids, although

he sought medical attention for other ailments. [5] Pl. 56.1 Resp. ¶¶ 53–59. On August 3, 2007, a nurse referred Plaintiff to Rodas for hemorrhoid symptoms, and on August 10, Rodas met with Plaintiff, requested a "stool guaiac test," which came back negative, and prescribed hemorrhoid cream and Bacitracin ointment. *Id.* ¶¶ 60–62. It is disputed whether Rodas performed a "physical examination" during that appointment. *Id.* ¶ 60.

From August 2007 to February 2008, it is true that the medical staff—both nurses and Rodas—continued treating Plaintiff with hemorrhoid cream. Pl. 56.1 Rep. ¶¶ 63–72. But in at least one instance, Plaintiff himself requested the cream that he now alleges was inadequate, *id.* ¶ 68, and there also is no indication either that Plaintiff's symptoms were severe or getting worse [6] or, more importantly, that he complained to the medical staff of any severe symptoms. The record simply reflects that Plaintiff saw the medical staff several times and received hemorrhoid cream. No reasonable jury could conclude that, during this period, Rodas was "actually aware" that the treatments he was prescribing put Plaintiff at a "substantial risk" of "serious harm." *Salahuddin,* 467 F.3d at 280; *see Youngblood v. Glasser,* No. 9:10–CV–1430 (NAM/DEP), 2012 WL 4051846, at \*8–9 (N.D.N.Y. Aug. 22, 2012) (no deliberate indifference where inmate complaining of hemorrhoids was given "stool softeners and ointment" by a nurse), *adopted,* 2012 WL 4051890 (N.D.N.Y. Sept. 13, 2012); *Domenech v.. Taylor,* No. 9:09–CV–162 (FJS/DEP), 2010 WL 6428459, at \*8 (N.D.N.Y. Sept. 8, 2010) (same where inmate was given "hemorrhoidal cream, cleansing pads, suppository pads, and a stool softener"), *adopted,* 2011 WL 1214431 (N.D.N.Y. Mar. 31, 2011).

**\*8** On April 25, 2008, Plaintiff's symptoms surely did become more severe: he "bled while defecating and felt 'tremendous pain.' " Pl. 56.1 Resp. ¶ 73. He saw a nurse during sick call on April 28, who referred him to Dr. Bendheim in the clinic. Bendheim prescribed Epsom salts, Preparation H, and an ointment, and indicated that Plaintiff "may benefit" from a surgery consultation—a question ultimately to be determined by Rodas, his primary care provider. *Id.* ¶ 75. The very next time that Rodas met with Plaintiff—on May 1, 2008, three days after Bendheim did —it is undisputed that he "submitted a consultation request for plaintiff to see a surgeon for follow-up." *Id.* ¶ 78. At that point, Rodas recognized (and wrote in his consultation request) that the conservative course of treatment he had previously recommended was "no longer effective." *Id.* But at that point, of course, Rodas also altered that conservative

course of treatment by requesting that Plaintiff see a surgeon. And after the surgeon, Roth, recommended surgery and a colonoscopy, Rodas "submitted a request for consultation for further evaluation based on the surgeon's recommendation." *Id.* ¶ 81. No reasonable jury could find that in taking these steps, Rodas was simply "persist[ing] in a course of treatment known to be largely ineffective," as Plaintiff claims. Pl. Opp. at 15.

It is undisputed that Koenigsmann initially denied the request for surgery because he believed a colonoscopy should be performed first in order to rule out more serious causes of Plaintiffs symptoms. Pl. 56.1 Resp. ¶ 82. And at that point, the evidence plausibly suggests that Rodas made a mistake. Antonelle's report stated that Plaintiff's hemorrhoids were "easily reducible," and he prescribed "Anusol hydrocortisone cream and follow-up as needed." He also recommended a "[f]ollow up [c]olonoscopy in 10 years." *Id.* ¶¶ 90, 91. Rodas asserts that he interpreted this report, which did not mention surgery, as an indication that Antonelle believed that surgery was unnecessary, and he therefore did not submit a further request for Plaintiff to undergo surgery. *Id.* ¶ 93; Rodas Supp. Decl., Dawkins Decl. Ex. F, ¶ 8 ("Dr. Antonelle, an expert in the field of gastroenterology, did not write ... that the surgery was necessary after the colonoscopy. I interpreted Dr. Antonelle's written report to mean that since the colonoscopy revealed that plaintiff's hemorrhoids were easily reducible, the Anusol cream was sufficient and further surgical procedures [were] unnecessary.") (citations omitted).

Plaintiff disputes Rodas's interpretation because Antonelle did not intend for his report to have any bearing on whether Plaintiff needed surgery, and because a colonoscopy is not part of a course of treatment for hemorrhoids. Pl. 56.1 Resp. ¶¶ 83, 91–94. But because the deliberate indifference standard is subjective, *see Farmer,* 511 U.S. at 837, neither what Antonelle intended nor what Rodas objectively should have understood the colonoscopy results to mean can suffice to establish that Rodas was "actually aware" that Plaintiff still required surgery in order to address a "substantial risk" of "serious harm." *See Salahuddin,* 467 F.3d at 282 ("the mental-state inquiry does not include an objective-reasonableness test"). At most, the evidence presented by Plaintiff suggests that Rodas was negligent, which is insufficient.

**\*9** Plaintiff points to no direct evidence to counter Rodas's testimony that he interpreted Antonelle's report as indicating that surgery was not required. Nor could a reasonable

jury infer from other evidence in the record that Rodas's explanation is pretextual. *See Salahuddin,* 467 F.3d at 282 (asking, in the absence of direct evidence, whether "circumstantial evidence" contradicted defendant's showing "that [he] was not aware of a substantial risk that postponing [plaintiff's] liver biopsy would cause serious harm"). Rodas is not a doctor, and in any case Plaintiff never suggests that Rodas's interpretation of Antonelle's report was so egregiously incorrect from a medical standpoint that his explanation is implausible. [7] Nor was Plaintiff's condition so severe as to suggest that Rodas must have known surgery was necessary. *See Farmer,* 511 U.S. at 842 ("a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious"). Plaintiff describes reporting severe pain to Rodas and the medical staff before his colonoscopy, but not after. Pl. 56.1 Resp. ¶ 80. On September 16, 2008, roughly a month after his colonoscopy, Plaintiff complained to Rodas that his hemorrhoid condition was "deteriorating," but although he now claims that he was in severe pain at the time, he does not say that he communicated the extent of his pain to Rodas-his September 16 appointment dealt primarily with "complaints of pain in the left side of his abdomen." *Id.* ¶ 96. Additionally, while Plaintiff complained of hemorrhoids on other occasions after his colonoscopy and was given hemorrhoid cream, there is no evidence that he complained of severe pain. [8] *Id.* ¶¶ 98, 101, 103. He did not complain about not receiving surgery until February 2009. *Id.* ¶ 106. And throughout this period, Rodas continued to treat Plaintiff for other ailments, including requesting a surgical consult for a growth on Plaintiff's forehead. *Id.* ¶ 100. Plaintiff does not explain why Rodas, who filled out several consultation requests on his behalf—including the May 23, 2008 and June 16, 2008 requests related to hemorrhoids— would refuse to request a hemorrhoidectomy that he actually believed was necessary.

Plaintiff's hemorrhoid condition worsened again in February and March of 2009. On February 17, 2009, he saw Bhopale, who reported that Plaintiff's "rectal exam was normal." Pl. 56.1 Resp. ¶ 104. Plaintiff then saw Rodas ten days later and requested surgery, which Rodas denied because Plaintiff's "rectal examination had been normal." *Id.* ¶ 105. Plaintiff attempts to cast doubt on Rodas's motivations by claiming that Bhopale's examination was inadequate, but he does not explain why Rodas would have known about any inadequacy. *Id.* ¶ 104. Thus, there is no evidence suggesting that Rodas actually thought Plaintiff required surgery. That Rodas allegedly said that Plaintiff's surgery had been denied and that Plaintiff would have to file a grievance if he wanted

surgery is somewhat troubling, *id.* ¶ 105, but the most straightforward interpretation of Rodas's behavior is that, in light of Antonelle's and Bhopal's reports, he strongly believed that Plaintiff did not need surgery. The Court cannot conclude that a reasonable jury could infer the opposite. At most, Rodas's statement that he was "not going to do anything else" on Plaintiff's behalf suggests that *if* he thought Plaintiff faced a risk of serious harm, he still would not request surgery. But it does not by itself suggest that he *did* believe that Plaintiff faced such a risk at the time, and, as explained above, there is no other evidence from which to infer that he did. Rodas also ordered "a complete blood count and stool samples" following the appointment, negating any inference that his comments evidenced a complete refusal to treat Plaintiff. Pl. 56.1 Resp. ¶ 105.

**\*10** Plaintiff filed a grievance requesting surgery on March 6, 2009, and on March 17, 2009, Bernstein responded to the grievance by stating that Plaintiff would be sent to a general surgeon to determine whether he was an "appropriate candidate for surgical treatment." Pl. 56.1 Resp. ¶¶ 108, 110. As a result, Rodas requested a surgical consultation, which Koenigsmann approved. *Id* . ¶ 111. The fact that Bernstein reached a different conclusion than Rodas is not sufficient to establish Rodas's deliberate indifference. *See, e.g., Chapman v. Parke,* 946 F.2d 894 (Table), 1991 WL 203080, at \*1–2 (6th Cir.1991) (disagreement between doctors over plaintiff's need for hemorrhoid surgery did not evidence deliberate indifference); *Webb v. Jackson,* No. 92 Civ. 2149(SS), 1994 WL 86390, at \*3 (S.D.N.Y. Mar. 16, 1994) ("It is well established that a mere difference[ ] in opinion, whether between doctors or laymen, based on medical care does not give rise to an Eighth Amendment violation ...."). Between March 17 and July 2, when Plaintiff received a hemorrhoidectomy, Rodas admitted Plaintiff to the infirmary, and while the parties characterize Plaintiff's condition during that period in different ways, there is nothing from which a jury could infer that Rodas himself delayed Plaintiff's surgery or otherwise could have done anything differently to reduce Plaintiff's risk of harm.

To summarize, the Court's review of the record has uncovered no basis for concluding that at any point, Rodas himself subjectively believed that his prescribed course of treatment for Plaintiff's hemorrhoid symptoms put Plaintiff at a substantial risk of serious harm. Plaintiff never claims that he was denied treatment. *See, e.g., Estelle,* 429 U.S. at 107–08 (no deliberate indifference where plaintiff was treated many times by medical staff); *Poole v. Koehler,*

No. 87 Civ. 6881(PNL), 1992 WL 316179, at \*1 (S.D.N.Y. Oct. 19,1992) (no deliberate indifference where defendants introduced "several affidavits and numerous medical records demonstrating that plaintiff received on-going medical attention and care"). And Plaintiff's argument that Rodas persisted in prescribing non-surgical treatments that he knew to be inadequate does not accurately describe the record. No reasonable jury could conclude that Rodas ever believed Plaintiff required surgery but prescribed non-surgical treatment instead. When Plaintiff's condition worsened in 2008, Rodas requested a surgical consultation, and when it worsened in 2009, nothing suggests that Rodas actually believed that Plaintiff faced a significant risk of serious harm without surgery. Even assuming that Rodas interpreted Antonelle's colonoscopy report incorrectly, that is at most evidence from which a reasonable jury could conclude that Rodas acted negligently, and not that he acted with deliberate indifference. As a result, the Court concludes as a matter of law that Rodas did not have a sufficiently culpable state of mind to support Plaintiff's Eighth Amendment claim against him.

**\*11** The case law that Plaintiff relies upon does not require a different result. First, Plaintiff cites two cases purportedly establishing that a defendant acts with deliberate indifference by "fail[ing] to investigate the cause of an inmate's medical condition." Pl. Opp. at 13–14, 14–15 (citing *Liscio v. Warren,* 901 F.2d 274 (2d Cir.1990), *overruled by Caiozzo v. Koreman,* 581 F.3d 63 (2d Cir.2009); and *Burton v. Lynch,* 664 F.Supp.2d 349, 364 (S.D.N.Y.2009)). Plaintiff argues that there is a factual dispute regarding whether Rodas "appropriately examined" Plaintiff, because despite Rodas's testimony to the contrary, Plaintiff maintains that Rodas never conducted a "physical examination of [his] rectum" throughout the course of his treatment. Pl. Decl., Youngwood Decl. Ex. D, ¶ 17. On its own, however, the question of whether Rodas's examination techniques were objectively "appropriate" as a medical matter is only tangentially relevant to his subjective culpability.

As an initial matter, *Liscio v. Warren,* 901 F.2d 274, has been overruled—the Second Circuit recently described it as applying an "objective standard" that is no longer "good law" after *Farmer.* [9] *Caiozzo,* 581 F.3d at 70. In any event, the defendant in *Liscio* had seen medical records suggesting that the plaintiff was suffering from alcohol withdrawal—a condition that was "both life-threatening and fast-degenerating"—yet he failed to examine the plaintiff *at all* for three days. *Id.* at 276–77. From those facts,

a jury could arguably infer that the defendant knew the plaintiff was in danger, yet did nothing. The second case that Plaintiff cites, *Burton v. Lynch,* 664 F.Supp.2d 349, is readily distinguishable too: the defendant there knew the plaintiff's elbow was in severe pain, did not examine it, brusquely told the plaintiff there was "nothing wrong with" it, and prescribed Motrin, to which he knew the defendant was allergic. *Id.* at 355, 355–56. In this case, even if the nature of Rodas's examinations is disputed, he clearly knew that Plaintiff had hemorrhoids, and nothing suggests that he subjectively believed that the treatments he was prescribing were inappropriate. In this context, Plaintiff's complaint that Rodas should have conducted a physical examination is the kind of difference in opinion that cannot establish deliberate indifference. *See Estelle,* 429 U.S. at 107 ("the question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment"); *Joiner v. Greiner,* 195 F.Supp.2d 500, 504–05 (S.D.N.Y.2002) (failure to perform an MRI did not establish deliberate indifference).

Second, Plaintiff cites several cases supporting his argument that Rodas knew non-surgical treatments were largely ineffective yet continued prescribing them anyway. Pl. Opp. at 14, 16. In *Hathaway v. Coughlin,* 37 F.3d 63 (2d Cir.1994), the Second Circuit held that a rational jury could find [10] deliberate indifference where the defendant knew an inmate was in pain because of two broken pins in his hip, did not tell him about the pins, and waited two years to seek a surgical consultation despite receiving more than fifty complaints of severe pain. 37 F.3d at 67–69. The court put significant weight on the non-disclosure: one could infer that the defendant knew the plaintiff would elect surgery had he known about the pins, and that withholding that information effectively denied him the surgery. *See also Hernandez,* 341 F.3d at 146 (discussing *Hathaway* ). By contrast, Rodas did not withhold information, nor did he deliberately withhold surgery: he referred Plaintiff for a surgical consult in 2008, when Plaintiff's complaints first became severe, and the evidence shows that he believed that surgery was unnecessary after Antonelle's report.

**\*12** Additionally, unlike in *Hathaway,* where the plaintiff "continued to experience great pain over an extended period of time" and complained of that pain to the defendant, 37 F.3d at 67, 68, there is no evidence that Plaintiff's hemorrhoid complaints were accompanied by reports of severe pain between his colonoscopy and February 2009, shortly before he was again referred for surgery. And even assuming that

Rodas was, in fact, aware that Plaintiff was in pain, the delay for which he is responsible is at most seven months: from the time of Antonelle's colonoscopy on August 5, 2008, to March 17, 2009, when Rodas again requested a surgical consultation. Plaintiff received treatment over that interval. The delay in his surgery does not evidence deliberate indifference under these circumstances. *See Demata v. N.Y. State Corr. Dep't of Health Servs.,* 198 F.3d 233 (Table), 1999 WL 753142, at \*1, \*2 (2d Cir. Sept. 17, 1999) (although plaintiff did not receive knee surgery for three years and "complained of knee pain on multiple occasions," he received other treatment and the delay did not "rise to the egregious level identified in *Hathaway"* ); *cf. Harrison v. Barkley,* 219 F.3d 132, 138 (2d Cir.2000) (one-year delay in treating plaintiff's cavity, where there was no evidence that defendants would have treated it absent plaintiff's consent to unwanted procedure on another tooth, raised factual issue as to deliberate indifference); *Stevens v. Goord,* 535 F.Supp.2d 373, 388–89 (S.D.N.Y.2008) (unfounded assertion that plaintiff's chest pain and respiratory symptoms were "essentially untreatable," which led to no treatment at all for nine months, raised factual issue). [11]

Finally, Plaintiff argues that Rodas disregarded the recommendations of Plaintiff's treating physicians. Pl. Opp. at 17–18 (citing *Johnson v. Wright,* 412 F.3d 398 (2d Cir.2005); and *Jones v. Simek,* 193 F.3d 485 (7th Cir.1999)). Again, however, disregarding a treating physician's recommendation demonstrates deliberate indifference only if it permits an inference of subjective culpability. In *Johnson,* it was "beyond cavil that all of plaintiff's treating physicians, including two prison physicians, expressly recommended that the plaintiff be prescribed Ribaviran," and the defendants ignored them. 412 F.3d at 405; *see also Jones,* 193 F.3d at 490 (defendant "knew that something might be seriously wrong," failed to give him pain medication for six months before referring him to specialists, and then failed to follow the specialists' prescriptions). In this case, the only available inference to be drawn from the record is that Rodas thought he was *following* Antonelle's recommendation by not scheduling surgery. In short, Plaintiff's efforts to squeeze the facts of this case into favorable doctrinal boxes fail; the evidence of subjective culpability is insufficient as a matter of law, and Rodas is entitled to summary judgment on Plaintiff's Eighth Amendment claim.

### 4. *Koenigsmann Was Not Deliberately Indifferent*

**\*13** The Court also concludes that the evidence is insufficient to permit a reasonable jury to conclude that Koenigsmann was deliberately indifferent. Unlike Rodas, Koenigsmann was not involved in Plaintiff's day-to-day medical care. Thus, Plaintiff's argument that Koenigsmann violated the Eighth Amendment centers on just one decision: his denial of Rodas's request that Plaintiff receive surgery for his hemorrhoid condition. [12] Pl. Opp. at 18, 24.

Plaintiff suggests that Koenigsmann should not have denied the request for surgery. But to say that he "denied" the request is to oversimplify: it is undisputed that he did so because he believed that it was medically necessary for Plaintiff to undergo a colonoscopy to rule out more severe causes of his symptoms. *See* Pl. 56.1 Resp. ¶¶ 82–83; Koenigsmann Dep., Youngwood Decl. Ex. B, at 158–64. According to Plaintiff, Defendants' assertion that "all medical professionals agree" that Koenigsmann's decision was correct is unsupported, Pl. Opp. at 18, but at least two other doctors agreed that a colonoscopy was appropriate. *See* Freed Report, Dawkins Decl. Ex. B, at 3 ("Ordering the colonoscopy ... was good medical practice in view of the persistent bleeding to rule out other more potentially dangerous conditions like cancer."); Bendheim Dep., Dawkins Decl. Ex. H, at 249 (opining that it would have been "irresponsible" not to conduct a colonoscopy first). Had he known that Antonelle's colonoscopy had come back normal, Koenigsmann (unlike Rodas) might well have interpreted it to mean that surgery was necessary. But there is no evidence that he received or knew about Antonelle's report. *See* Koenigsmann Decl., Dawkins Decl. Ex. G, ¶ 15 ("It would not have been necessary for ... Rodas to notify me of Dr. Antonelle's recommendations.").

Perhaps Koenigsmann can be faulted for not following up on Rodas's initial request, since denying it meant that another surgery request should have been forthcoming if the colonoscopy came back normal. But his failure to do so was at most negligent, and therefore insufficient to support an Eighth Amendment claim. *See Salahuddin, 467 F.3d at 282* (postponing biopsy was not evidence of deliberate indifference because no one "aroused [the defendant's] suspicion that postponing the biopsy rather than allowing treatment to proceed would be seriously harmful"); *Hernandez, 341 F.3d at 147* (defendants' failure to "follow up on the duties of others" to put a medical hold on plaintiff "arguably could support a finding of negligence," but plaintiff "presented no evidence that the defendants had any reason to doubt [the others'] reliability"). The same is true of Plaintiff's

argument that Koenigsmann could have approved the surgery while simultaneously ordering a colonoscopy to be performed first. Pl. Opp. at 18. Whether or not his failure to do so was a mistake, it does not demonstrate deliberate indifference. As a result, Koenigsmann is entitled to summary judgment on Plaintiff's Eighth Amendment claim.

**B. Retaliation Claim**

**\*14** In Count 2, brought pursuant to § 1983, Plaintiff alleges that Rodas retaliated against him for filing a grievance by confining him to Green Haven's infirmary, in violation of the First Amendment. 2AC ¶¶ 38–40. Defendants concede that filing a grievance is a protected activity, but the parties dispute whether Plaintiff suffered any "adverse action," and, if so, whether there was a "causal connection between the protected [activity] and the adverse action." *Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) (setting forth the elements of a retaliation claim) (quoting *Morales v. Mackalm,* 278 F.3d 126, 131 (2d Cir.2002)) (internal quotation mark omitted). As explained below, however, the Court need not reach these arguments because Plaintiff failed to exhaust his administrative remedies with respect to his retaliation claim.

*1. Plaintiff Failed to Exhaust His Administrative Remedies*
In most § 1983 cases, the plaintiff need not exhaust administrative remedies before bringing suit. *See Patsy v. Bd. of Regents of Fla.,* 457 U.S. 496, 516 (1982). But this general rule does not apply to prisoners. Under the Prison Litigation Reform Act of 1995 ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 of this title ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). [13] The failure to exhaust administrative remedies is an affirmative defense to a prisoner's claim, *Jones v. Bock,* 549 U.S. 199, 216 (2007), and Defendants bear the burden of demonstrating that Plaintiff's claim is not exhausted, *Key v. Toussaint,* 660 F.Supp.2d 518, 523 (S.D.N.Y.2009).

To satisfy the PLRA's exhaustion requirement, a plaintiff must invoke all available administrative mechanisms, including appeals, "through the highest level for each claim." *Varela v. Demmon,* 491 F.Supp.2d 442, 447 (S.D.N.Y.2007); *Veloz v. New York,* 339 F.Supp.2d 505, 514 (S.D.N.Y.2004). These mechanisms are prescribed by the applicable prison grievance process, and not by the PLRA itself. *See Jones, 549 U.S. at 218.* In New York, where Plaintiff is incarcerated, there is a three-tiered process for adjudicating inmate

complaints: "(1) the prisoner files a grievance with the Inmate Grievance Resolution Committee ('IGRC'), (2) the prisoner may appeal an adverse decision by the IGRC to the superintendent of the facility, and (3) the prisoner then may appeal an adverse decision by the superintendent to the Central Officer Review Committee ('CORC')." *Espinal v. Goord,* 558 F.3d 119, 125 (2d Cir.2009); *see* N.Y. Comp.Codes R. & Regs., tit. 7, § 701.5(b)-(d).

The facts related to Defendants' exhaustion defense are not contested. On April 3, 2009, after Plaintiff was discharged from the infirmary, he filed grievance GH–67076–09, which alleged that his confinement to the infirmary was retaliatory. Pl. 56.1 Resp. ¶ 126. Plaintiff does not dispute Defendants' statement that he "did not file an appeal of GH–67076–09 to the Superintendent's office." *Id.* ¶ 128. As a result, Defendants have established as a matter of law that Plaintiff failed to invoke the second level of review required by New York law. Nor does Plaintiff suggest that further review was somehow not "available" to him. *See Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004) ("Depending on the inmate's explanation for the alleged failure to exhaust, the court must ask whether administrative remedies were in fact 'available' to the prisoner."). [14] Indeed, the record shows that he appealed another grievance regarding his medical treatment to both the superintendent and the CORC. Pl. 56.1 Resp. ¶¶ 132–136. But because he did not do the same for his retaliation claim, the PLRA's exhaustion requirement bars him from asserting that claim in this Court.

**\*15** The Court rejects Plaintiff's argument that his exhaustion of *another* grievance—GH–67116–09—should excuse his failure to exhaust GH–67076–09. Pl. Opp. at 23. In support of that argument, Plaintiff cites a single decision from the Eastern District of Pennsylvania, *Thomas v. Zinkel,* 155 F.Supp.2d 408 (E.D.Pa.2001). In *Thomas,* the plaintiff fell and grieved both the working conditions leading to his fall and his subsequent medical care, but he exhausted only the latter grievance. The court deemed the plaintiff's working-conditions claim exhausted nonetheless, because it was "evident" from his medical-care claim that "he was also grieving the dangerous conditions." *Id.* at 413.

In this case, the Court is at a loss to see how the allegations in GH–67116–09 have anything to do with Plaintiff's retaliation claim. That grievance concerned an appointment with Rodas on April 6, 2009, in which Rodas asked Plaintiff to provide a urine sample. Plaintiff complained that Rodas's "attitude ... was very unprofessional and hostile," asserted

that Plaintiff was having trouble communicating with Rodas, and asked for Rodas to no longer be his primary care provider. Pl. 56.1 Resp. ¶ 132. As Plaintiff notes, the PLRA's exhaustion requirement is intended to allow prison officials an opportunity to address complaints before the federal courts do. *See Woodford v. Ngo,* 548 U.S. 81, 93 (2006); *Porter v. Nussle,* 534 U.S. 516, 524–25 (2002). For that reason, "inmates must provide enough information about the conduct of which they complain to allow prison officials to take appropriate responsive measures." *Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004), *overruled on other grounds by Woodford,* 548 U.S. at 94–95. The officials evaluating Plaintiff's exhausted claim on appeal would not have had any inkling that Rodas had even placed Plaintiff in the infirmary, much less that his doing so was allegedly retaliatory. The Court therefore concludes as a matter of law that Plaintiff did not exhaust his retaliation claim.

*2. Rodas Did Not Waive His Exhaustion Defense*

Plaintiff also argues that any failure to exhaust his administrative remedies is irrelevant because Rodas waived his exhaustion defense. Indeed, the PLRA's mandatory exhaustion requirement is not jurisdictional: because the failure to exhaust administrative remedies is an affirmative defense, it can be waived. *See Johnson,* 380 F.3d at 695. Plaintiff contends that Rodas waived this defense by failing to raise it in his first summary judgment motion, in 2011. Pl. Opp. at 22. The Court disagrees.

Plaintiff has amended his complaint twice since Judge Jones denied the initial summary judgment motion filed by Rodas and Bernstein. "[A]n amended complaint ordinarily supersedes the original and renders it of no legal effect." *Int'l Controls Corp. v. Vesco,* 556 F.2d 665, 668 (2d Cir.1977). When Plaintiff amended his complaint, Defendants were entitled to amend their answer to assert new defenses. *See, e.g., Die sel Props S.r.L. v. Greystone Bus. Credit II LLC,* No. 07 Civ. 9580(HB), 2008 WL 4833001, at \*5 (S.D.N.Y. Nov. 5, 2008). Defendants raised Plaintiff's failure to exhaust as an affirmative defense in answering the 2AC, thereby preserving that defense for purposes of this motion. *See, e.g., Avent v. Solfaro,* No. 02 Civ. 914(DAB) (RLE), 2010 WL 2985904, at \*3 (S.D.N.Y. July 29, 2010) ("Having raised the defense in their Answer, Defendants clearly have not waived the exhaustion defense."); *see also Massey v. Helman,* 196 F.3d 727, 735 (7th Cir.1999) (holding that exhaustion defense was not waived despite defendants' failure to raise it in answering plaintiff's earlier pleadings); *Legal Aid Soc'y v. City of New York,* 114 F.Supp.2d 204, 222 (S.D.N.Y.2000)

(same). [15] Moreover, Plaintiff does not argue that he was prejudiced by Rodas's failure to raise exhaustion earlier. The parties were able to take discovery after Defendants answered the 2AC, at which point Plaintiff was on notice that his failure to exhaust was at issue. *See* Dkt. No. 53 (providing that discovery would extend for three months after Defendants' answer); *Shariff v. Coombe,* 655 F.Supp.2d 274, 287 (S.D.N.Y.2009) (rejecting plaintiffs' waiver argument because it was "apparent to the Court that the parties have produced discovery on the exhaustion issue").

**\*16** Plaintiff's reliance on *Handberry v. Thompson,* 436 F.3d 52 (2d Cir.), *amended on other grounds on reh'g,* 446 F.3d 335 (2d Cir.2006), is unavailing. In *Handberry,* the Second Circuit affirmed the district court's conclusion that certain defendants could not raise an exhaustion defense on summary judgment because all the information relevant to that defense was available before discovery—at which time the defendants *denied* that the defense applied, suggesting to the plaintiffs that "prison grievance procedures were not available" for them to invoke. *Id.* at 60. Unlike in this case, there were no intervening amendments that altered the set of claims and defenses subject to litigation. Also unlike in this case, the plaintiffs in *Handberry* were given the impression that discovery would be irrelevant to exhaustion.

Accordingly, the Court concludes that Rodas has not waived his failure-to-exhaust defense. And because the undisputed record evidence establishes that Plaintiff failed to exhaust his administrative remedies, the Court grants Defendants' motion for summary judgment with respect to Plaintiff's retaliation claim.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED in its entirety. The Clerk of Court is requested to terminate this case.

SO ORDERED.

**All Citations**

Slip Copy, 2014 WL 1257274

---

Footnotes

1    Plaintiff has filed only a response to Defendants' 56.1 statement, not his own statement.

2    Plaintiff presents evidence that Rodas has been suspended since October 2011 after being indicted and pleading guilty to criminal charges unrelated to this action. Pl. 56.1 Resp. ¶ 2. The Court questions Plaintiff's choice to describe those charges in detail since it is well established that "[e]vidence of a crime ... is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed.R.Evid. 404(b); *see also Raskin v. Wyatt Co.,* 125 F.3d 55, 65 (2d Cir.1997) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment.").

3    This statement of fact is listed as disputed in Plaintiff's response to Defendants' 56.1 statement, because Antonelle did not intend for his report to be interpreted in the way that Rodas interpreted it. However, as explained later in this opinion, Antonelle's intentions alone are not a valid basis for disputing Rodas's subjective thought process.

4    At sick calls, inmates are initially "triaged by a nurse," who may then refer them to their primary care provider or another primary care provider if their own is not available. Bendheim Dep., Youngwood Decl. Ex. C, at 104–05. With respect to the portions of Plaintiff's Rule 56.1 response cited in the text, the paragraphs describing Plaintiff's sick calls do not state whether Plaintiff was referred to Rodas after being triaged by a nurse.

5    Indeed, Plaintiff's description of his condition, and the medical staff's response to his complaints, must be understood in the context of the undisputed fact that "hemorrhoid symptoms are 'notoriously waxing and waning,' and there can be months when symptoms do not present themselves." Pl. 56.1 Resp. 141 (quoting Freed Dep., Dawkins Decl. Ex. K, at 64).

6    In August 2007, Plaintiff's symptoms included "burning, itching, and irritation," and "always bleeding during bowel movements." Pl. 56.1 Resp. ¶ 61.

7    In fact, Bernstein, who denied Plaintiff's grievance requesting that Rodas be relieved as his primary care provider, concluded that Plaintiff was receiving "good medical care" in part because "plaintiff's colonoscopy ... was normal," suggesting that at least one doctor also believed that Antonelle's colonoscopy report indicated that Plaintiff did not require surgery. Pl. 56.1 Resp. ¶ 127; *see* Mauro Decl., Hawkins Decl. Ex. O.

8    Consistent with the lack of evidence supporting Plaintiff's claim with respect to Rodas's mindset, Rodas testified that Plaintiff's lack of complaints in the aftermath of his colonoscopy confirmed his interpretation of Antonelle's report. *See* Rodas Dep., Youngwood Decl. Ex. A, at 229–30 (stating that because "the GI ... recommended to use cream for the

hemorrhoids" and "didn't recommend any surgery," and because Plaintiff "didn't complain" about hemorrhoids after his colonoscopy, Rodas believed "that the hemorrhoids [were] resolved.").

9    Plaintiff describes *Liscio* as "overruled on other grounds." Pl. Opp. at 14. But he cites it for the proposition that failing to examine an inmate can constitute deliberate indifference, despite the fact that the deliberate indifference standard that the *Liscio* court employed is no longer good law. *See Caiozzo,* 581 F.3d at 70. Thus, the case appears to have been overruled on very much the same ground for which Plaintiff cites it.

10    *Hathaway* was decided on appeal of the district court's order denying the defendant's Rule 50 motion following a trial at which the jury was deadlocked. *See* 37 F.3d at 66.

11    The other cases Plaintiff cites are readily distinguishable. *See Rodriguez v. Downstate Corr. Facility,* No. 00 Civ. 9337(LAP), 2003 WL 1698204, at *6–7 (S.D.N.Y. Mar. 31, 2003) (defendant expressed fear that plaintiff would die without a transfer to another facility but did not seek such a transfer); *Ruffin v. Deperio,* 97 F.Supp.2d 346, 354 (W.D.N.Y.2000) (plaintiff's deterioration, which included "blackening of his toes" and "glycerin levels which were regularly three to five times the normal levels," was "sufficiently obvious to infer the defendants' actual knowledge of a substantial risk"); *Pugliese v. Cuomo,* 911 F.Supp. 58, 62–63 (N.D.N.Y.1996) (upon transfer to a new facility, plaintiff's treatment was discontinued against his doctors' advice, and his condition deteriorated to the point that he could not lift a one-pound weight with his left arm). Both *Rodriguez* and *Pugliese* also rely on *Liscio,* which, as noted in the text, is no longer good law.

12    The 2AC includes a claim of "supervisory liability" alleged against Koenigsmann. 2AC ¶¶ 41–13. Except insofar as the denial of Plaintiff's surgery is concerned, Plaintiff has abandoned any claim premised on Koenigsmann's role as supervisor. Pl. Opp. at 24; *see also Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (where a defendant does not participate personally in a violation, he may be liable under § 1983 only if he refused to remedy the violation after learning of it, implicitly sanctioned it, or was grossly negligent in supervising subordinates who caused it).

13    Plaintiff correctly does not contest that his retaliation claim is a claim "brought with respect to prison conditions." The Supreme Court has clarified that the "PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002); *see also, e.g., Espinal v. Goord,* 558 F.3d 119, 127 (2d Cir.2009) (assessing whether plaintiff exhausted retaliation claim).

14    *Hemphill* set forth a framework governing PLRA exhaustion defenses that asks (1) whether administrative remedies were actually available, (2) whether the defendants forfeited or waived their exhaustion arguments, and (3) whether any "special circumstances" justify the plaintiff's failure to exhaust. 380 F.3d at 686; *see also, e.g., Macias v. Zenk,* 495 F.3d 37, 41 (2d Cir.2007). *But cf. Smith v. City of New York,* No. 12 Civ. 3303(CM), 2013 WL 5434144, at *9 (S.D.N.Y. Sept. 26, 2013) (questioning *Hemphill'* s continued vitality in light of subsequent Supreme Court decisions requiring strict compliance with grievance procedures but following it "in the absence of a clear indication that [it] has been overruled"). The parties do not explicitly invoke *Hemphill'* s three-part approach, which seems most relevant where the plaintiff advances some reason for not exhausting his remedies—which Plaintiff does not do. In any case, the Court has addressed whether administrative remedies were available, the next section of this opinion discusses waiver, and Plaintiff does not argue that any "special circumstances" are present.

15    The Second Circuit has held that defenses involving "core issue [s] of a party's willingness to submit a dispute to judicial resolution," are not revived by the filing of an amended complaint. *Gilmore v. Shearson/Am. Exp. Inc.,* 811 F.2d 108, 112 (2d Cir.1987), *overruled on other grounds by Gulfstream Aerospace Corp. v. Mayacamas Corp.,* 485 U.S. 271 (1988). But that principle appears to be applicable only to the kinds of defenses listed in Federal Rule of Civil Procedure 12(b) (2)-(5), which are subject to stricter waiver rules. *See* Fed.R.Civ.P. 12(h); *Rosenberg v. City of New York,* No. 09 Civ. 4016(CBA)(LB), 2011 WL 4592803, at *15–16 (E.D.N.Y. Sept. 30, 2011); *Pruco Life Ins. Co. v. Wilmington Trust Co.,* 616 F.Supp.2d 210, 215 (D.R.I.2009).

---

**End of Document**　　　　　© 2016 Thomson Reuters. No claim to original U.S. Government Works.

2005 WL 107095
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Eric CHERRY and Thomas Robinson, Plaintiffs,

v.

Mr. Ernest EDWARDS, Superintendent,
Otisville Correctional Facility, et al., Defendants.

No. 01 Civ. 7886(FM).
|
Jan. 18, 2005.

*MEMORANDUM DECISION* [*]

[MAAS](), Magistrate J.

## I. *Introduction*

**\*1** Plaintiffs Eric Cherry and Thomas Robinson (together, "Plaintiffs") bring this *pro se* civil rights action, pursuant to [42 U.S.C. § 1983](), to recover compensatory and punitive damages allegedly arising out of the indifference of the defendants (collectively, "Defendants") to their medical needs while they were lodged at the Otisville Correctional Facility ("OCF"). More specifically, the Plaintiffs claim that they became infected with Heliobacter Pylori ("H.pylori") bacteria when they were exposed to contaminated drinking water at OCF, and that they subsequently received inadequate medical treatment for this condition.

The Defendants are Glenn S. Goord, the Commissioner of the New York State Department of Correctional Services ("DOCS"); Ernest Edwards, the former OCF Superintendent; Thomas Eagen, Director of the DOCS Inmate Grievance Program; and Dr. Robert Sarreck and Nurse Administrator Hilda Miller ("N.A.Miller"), two members of the OCF medical staff.

The Defendants have now moved for summary judgment pursuant to [Rule 56 of the Federal Rules of Civil Procedure](). In addition, as part of his opposition papers, plaintiff Robinson seeks to amend his complaint to allege that defendants Sarreck and N.A. Miller were deliberately indifferent to his medical needs by failing to inform him that he had [colitis]() which needed to be treated at an outside hospital.

For the reasons set forth below, the Defendants' motion for summary judgment is granted, Robinson's motion to amend the complaint is denied, and the Clerk of the Court is requested to close this case. [1]

## II. *Relevant Facts*

Unless otherwise noted, the following facts are undisputed:

### A. *Plaintiffs*

The Plaintiffs are state prisoners. (*See* Dep. of Eric Cherry, taken on Mar. 18, 2003 ("Cherry Dep."), at 27-28; Dep. of Thomas Robinson, taken on Mar. 21, 2003 ("Robinson Dep"), at 17). In the course of serving their sentences, Cherry was housed at OCF from 1996 to 2002, and Robinson was there from November 1999 to October 2001. (*Id.*). Both Plaintiffs have since been transferred to other DOCS facilities. (Id.).

### B. *Complaints About OCF Water Quality*

The Plaintiffs contend that they were exposed to drinking water at OCF that was contaminated with H. pylori. (Compl.¶¶ 4-6, 9). An H. pylori infection can cause considerable discomfort, but, by itself, is not life-threatening. (*See* Decl. of Dr. Frank, dated Oct. 7, 2003 ("Frank Decl."), ¶ 6). Exposure to H. pylori often occurs in childhood through fecal matter, and people from low socio-economic backgrounds are more likely than others to be infected. (*Id.* ¶ 5). In the United States, a majority of adults are infected with H. pylori by the time they reach their 40s, although most are asymptomatic. (*Id.* ¶ 3).

The Defendants' gastrointestinal expert, Dr. Michael S. Frank, concedes that the H. pylori bacterium, which was first discovered in 1982, can lead to ulcers and other medical conditions. (*See* Frank Decl. ¶¶ 3, 4). Although Dr. Frank opines that "[i]t is not likely that [H. pylori] is ingested through contaminated water," (*id.* at ¶ 5), OCF officials previously have suggested otherwise. (*See* Declaration of Lisa E. Fleischmann, Esq., dated Oct. 9, 2003 ("Fleischmann Decl."), Ex. K at 1 (Mem. dated Apr. 13, 2001 ("April 13 Memo"), from Sup't Edwards to Inmate Liaison Committee ("ILC") (stating that H. pylori is spread through "fecal-o[r]al routes" when "infected stool comes in contact with hands, food *or water*") (emphasis added). In view of this factual dispute, I have assumed, as the Plaintiffs contend, that H. pylori can be transmitted through water.

**\*2** Prior to June 10, 1998, OCF obtained its water from a reservoir and treated it at a plant located on prison grounds. (Aff. of Lee Scott Bergus, sworn to on Oct. 8, 2003 ("Bergus Aff."), ¶¶ 7, 8)). The OCF treatment plant also provided water for the Village of Otisville. (*Id.* ¶ 8). On January 22, 1998, however, the Village converted to well water. (*Id.* ¶ 8). OCF continued to use the reservoir as its source of supply until it switched to the Village well in or around June 1998. (*Id.*). Following the change, the well water has been pumped to a booster station and then to OCF. [2] (*Id.* ¶ 7).

In Orange County, where OCF is located, community water supplies are required to be chlorinated to destroy any harmful bacteria in the water. (*Id.* ¶ 3). Additionally, the water must, at a minimum, be tested monthly. (*Id.* ¶ 4). In keeping with these requirements, the Village water destined for OCF is tested by the Village twice a day, once as it leaves the booster station and again when it arrives at OCF. (*Id.* ¶ 7). OCF also conducts its own water tests on a daily basis to check chlorine and pH levels. (Aff. of Robert Heyward, sworn to on Oct. 8, 2003 ("Heyward Aff."), ¶ 3).

The Plaintiffs allege that in or around May 1997, the OCF water began to turn dark brown and "some type of fungus looking slime" appeared in it. (Aff. of Eric K. Cherry, sworn to on Nov. 21, 2003 ("Cherry Aff."), ¶ 1). After the inmates complained about visible organisms in the water, which were later determined to be larvae of "midges" (commonly known as "blood worms"), Superintendent Edwards had tankers of water delivered to OCF on January 14, 1998. (*See* Fleischmann Decl. Ex. E (Mem. from Plant Sup't Reiff to Sup't Edwards, dated Jan. 14, 1998 ("Reiff Memo"), & Attach. (OCL Analytical Services Report dated Jan. 14, 1998)). [3] In a memorandum to OCF inmates and staff, dated January 29, 1998, Superintendent Edwards advised that "the presence of these larvae in a drinking water distribution system is highly unusual," but, according to the New York State Department of Health, did not present a health risk to consumers. (Edwards Aff. Ex. 1).

The Defendants contend that the water trucks were cancelled after a few weeks, at which point OCF resumed using the reservoir water until June 1998, when the facility water source was switched to the Otisville well. (*See* Answer ¶ 4; Defs.' Mem. of L. in Supp. of Mot. for Summ. J. ("Defs.' Mem. of L."), at 8). The Plaintiffs disagree, stating that the water trucks were actually at OCF for four to five months. (*See* Cherry Aff. at 3 ¶ 5). There is some evidentiary support for the Plaintiffs' position since Superintendent Edwards indicated in a February 13, 1998 response to a February 1, 1998 grievance by Cherry that OCF "will continue to use outside tanker water until [it] is receiving water from [the] new system of Village of Otisville." (Pls.' Mem. of L. Ex. H). On the other hand, Cherry's February 1, 1998, grievance complained that "the water has bugs in it," suggesting that OCF may have reverted to reservoir water by that date. (*Id.*).

**\*3** The Plaintiffs allege that, approximately one week after the water trucks departed, the water began to "turn colors again." (Cherry Aff. ¶ 6). OCF inmates continued to express concerns about water contamination even after the switch to well water in June 1998 . [4] (*Id.* ¶¶ 8, 9). For example, on October 13, 2000, the inmates complained at an ILC meeting that the quality of the water had been "compromised due to the continuing discoloration and [ ] continuous smelly odor," and they alleged that the piping system was to blame. (Pl.'s Mem. of L. Ex. P at 1). The inmates also complained about the facility's failure to post the results of monthly water tests for the prison population. (*Id.*). Interestingly, the minutes of the meeting note that some OCF inmates "*in the past* have complained about stomach cramps and diarrhea.*" (*Id.*) (emphasis added). The administration agreed to post the Health Department water testing results in the future, but maintained that the water was safe to consume. (*Id.*).

On March 27, 2001, the inmates again raised the issue of water quality at an ILC meeting. (*Id.* Ex. E). During that meeting, the inmates alleged that an "unprecedented number" of OCF inmates had contracted H. pylori, and that it was reasonable to infer that the "common agent of infection" was the water. (*Id.*). The administration rejected this claim, noting that the OCF water was tested monthly, the reports were posted in the housing units, and the OCF water was the same as that supplied to the Village of Otisville. (*Id.*). N.A. Miller also attended the meeting to explain that H. pylori "doesn't come necessarily from the water." (*Id.*).

The Plaintiffs both filed grievances regarding the OCF water in 2001. (Fleischmann Decl. Exs. H, I, J). On February 21, 2001, Cherry filed a grievance, in which he noted his recent H. pylori diagnosis and requested that the water trucks be brought back to OCF and that the water in the housing units be tested. (*Id.* Ex. H). On April 4, 2001, Cherry filed a second similar grievance in which he requested that two or three of the water pipes flowing to the housing units be tested for bacteria "up by the blocks." (*Id.* Ex. I at 2). Both grievances ultimately were denied by Superintendent Edwards. (*Id.* Exs.

H at 10, I at 6). As he explained in response to the February grievance:

> Currently, there are no plans to truck tank water into facility. Facility water is tested monthly from random areas throughout [the] facility. Tests are not tampered with by any staff and [the] facility water is [the] same water that [the] town uses from [the] same wells. There is no proof that [the] water at [the] facility is causing any type of virus and [the] inmate population does not need to be warned of anything.

(*Id.* Ex. H). Cherry appealed Edwards' decisions with respect to both grievances to the DOCS Central Office Review Committee ("CORC"), which unanimously denied both appeals. [5] (*Id.* Exs. H at 10, I at 8).

**\*4** On July 23, 2001, Robinson also filed a grievance. (*Id.* Ex. J). Robinson noted that "many men here have caught 'H. pylori,' " and he asked that the water piping system be dug up and tested. (*Id.* at 5). Robinson also complained about the inadequacy of his medical treatment. (*Id.*). After interviewing N.A. Miller, the OCF Inmate Grievance Committee denied Robinson's requests, and its decision was affirmed by Superintendent Edwards. (*Id.* at 6, 8). There is no indication in the record that CORC addressed Robinson's grievance. For present purposes, however, I have assumed that CORC affirmed Superintendent Edwards' decision, and that Robinson, therefore, has exhausted his administrative remedies.

In addition to the problems experienced by the Plaintiffs, at least ten other OCF inmates (out of a total population of approximately 500) tested positive for H. pylori in 2001. (*See* Aff. of N.A. Miller, sworn to on Oct. 6, 2003 ("H. Miller Aff."), ¶¶ 6, 8; Pls.' Mem. of L. Ex. J (affidavits of six OCF inmates diagnosed with H. pylori in 2001)).

C. *Complaints About Medical Treatment*
At OCF, H. pylori usually is treated with large doses of antibiotics and antacids over a seven-to fourteen-day period. (Decl. of Dr. Robert Sarreck, sworn to on Oct. 7, 2003 ("Sarreck Aff."), ¶ 4). Because this regimen can produce unpleasant side effects, the OCF medical staff typically requires patients to remain in the infirmary throughout the

course of the treatment so that staff can monitor their progress. (*Id.*).

Both Plaintiffs were prescribed the H. pylori treatment protocol while at OCF. (Fleischmann Decl. Exs. M, N). The details of their treatment are described below.

1. *Cherry*
In or around February 2001, Dr. Sarreck diagnosed Cherry with H. pylori. (Cherry Dep. 39-40; Fleischmann Decl. Ex. M (OCF Ambulatory Health Record entry dated Feb. 26, 2001)). Thereafter, in February and March 2001, Cherry received the standard H. pylori protocol, at first on an outpatient basis (at his insistence), and later in the infirmary. (Cherry Dep. 45; Fleischmann Decl. Ex. M (Health Provider Order Sheet dated Mar. 6, 2001; Ambulatory Health Record entries dated Feb. 6, Feb. 16, and Mar. 5, 2001; and Refusal of Medical Examination or Treatment dated Feb. 16, 2001); H. Miller Aff. ¶ 11). The medications dispensed to him included Flagyl, Tetracyclene, Bismuth and Prevacid. (Fleischmann Decl. Ex. M (Ambulatory Health Record entry dated Feb. 6, 2001)).

Cherry alleges that the heavy doses of medication he received "affected the chemical balance" of his stomach, resulting in stomach cramps, diarrhea, gas, and "black ashy like stuff" on his tongue (Cherry Dep. at 45-48; Cherry Aff. ¶ 13). According to Cherry, his repeated attempts to obtain appropriate after-care for these symptoms from Dr. Sarreck and N.A. Miller were unavailing. (Cherry Aff. ¶ 14). Cherry's medical records indicate, however, that after his initial diagnosis, Dr. Sarreck twice referred Cherry to a gastrointestinal specialist for diagnosis and treatment. (Fleischmann Decl. Ex. M (Requests and Reports of Consultations dated Mar. 2 and Apr. 25, 2001)).

**\*5** On June 3, 2001, Cherry filed a grievance which alleged that he was "continually being denied proper rehabilitation and therapy after being diagnosed and treated for H. pylori." (Pls.' Mem. of L. Ex. C (Grievance No. 6689)). Cherry complained that the H. pylori treatment had caused such symptoms as weight loss and lack of energy, and he requested "proper recovery therapy, vitamins and [a] weight gain diet." (*Id.*). On June 7, 2001, the OCF Inmate Grievance Review Committee ("IGRC") unanimously recommended that Cherry be seen by facility doctors for appropriate rehabilitative treatment. (*Id.*). Subsequently, Cherry was tested at least once to confirm that he no longer had an active infection. [6] (Fleischmann Decl. Ex. M (Ambulatory Health

Record entries dated June 25 and July 6, 2001)). Although Cherry alleges that he was "refused" any after-care (Cherry Aff. ¶ 15), the OCF records show that he was given Maalox on March 19 and July 6, 2001. (Fleischmann Decl. Ex. M (Ambulatory Health Record entries dated Mar. 19 and July 6, 2001)). He also apparently was prescribed Prevacid by a consulting gastrointestinal specialist. (*Id.* (Request & Report of Consultation dated Apr. 24, 2001)).

2. *Robinson*

Robinson tested positive for H. pylori at the Coxsackie Correctional Facility on November 2, 1999, a few days before he was transferred to OCF. (Fleischmann Decl. Ex. N (Ambulatory Health Record entries dated Nov. 2, 1999 and February 2, 2000); Frank Aff. ¶ 10; Robinson R. 56.1 Stmt. ¶¶ 5, 6).) The Coxsackie infirmary first received Robinson's test results on November 9, 2001, three days after his transfer. (Robinson R. 56.1 Stmt. ¶¶ 5,6).

On March 16, 2000, the OCF medical staff prescribed an H. pylori protocol for Robinson. (Fleischmann Decl. Ex N (Order Sheet dated Mar. 16, 2000)). Although OCF records indicate that Robinson refused to be treated as an inpatient and repeatedly failed take his medication, Robinson contends that he complied with the regimen. (*Compare id.* (Ambulatory Health Record entries dated Feb. 7 ("inmate signed refusal to stay in infirmary"), Feb. 9 (Robinson "claims that he did not take medication for H. pylori as directed-took it only when he 'needs it.' "), and May 5, 2000 ("noncompliant [with] meds;" refused admission to infirmary) *with* Robinson Dep. at 35 ("I never refused to take medication.")).

On May 5, 2000, after he collapsed in the bathroom, Robinson was taken from OCF to the emergency room at the Horton Medical Center. (Fleischmann Decl. Ex. N at 47). The following day, he was seen by Dr. Robert Walker, who noted, in part, as follows:

> The potential etiology of the patient's presentation include[s] colitis (ulcerative colitis or Crohn's colitis), or colonic carcinoma. The patient has had treatment for [H. pylori] antibody in the past; this can remain positive after treatment. The [H. pylori] may have been eradicated.

(*Id.* at 311). The discharge summary for Robinson's hospital stay, dated May 10, 2000, also suggests that Robinson may have been suffering from colitis. (*Id.* at 285).

**\*6** In July 2001, Robinson filed a grievance in which he complained about OCF's failure to test the "piping system" for H. pylori and claimed that he had received no rehabilitative treatment for the stomach problems he developed as a result of his H. pylori infection. (Fleischmann Decl. Ex. J). The IGRC directed Robinson to follow proper sick call procedures and noted that there were no plans to dig up the OCF pipes as he had requested. (*Id.*). On appeal, Superintendent Edwards agreed with the IGRC's conclusions. (*Id.*).

D. *Procedural History*

The Plaintiffs' complaint was received by the Pro Se Office of this Court on July 18, and was filed on August 23, 2001. (*See* Docket No. 2). The complaint originally was brought on behalf of nine plaintiffs, including Cherry and Robinson, but Judge Schwartz, to whom the case then was assigned, dismissed the claims of seven of the plaintiffs on November 20, 2002, on the ground that they had failed to exhaust their administrative remedies. (*See* Docket Nos. 45, 47) (orders dated May 28 and Nov. 20, 2002).

Following the close of discovery, the Defendants moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (*See* Docket Nos. 77-80). The Defendants contend that the Plaintiffs have not shown that the conditions at the OCF violated their Eighth Amendment rights and are precluded from recovering damages because the Defendants are entitled to qualified immunity. (*See* Defs.' Mem. of L. at 4-5). The Plaintiffs oppose the motion, arguing that genuine issues of material fact remain. (*See* Docket Nos. 85, 86).

In addition, Robinson seeks leave to amend the complaint to allege that defendants Sarreck and Miller were deliberately indifferent to his medical needs because they failed to inform him that he had "colitis in his blood and had to be treated in an outside hospital" and failed to treat him properly for that condition. (Proposed Am. Compl. ¶¶ 12, 13, 16-18). [7]

III. *Discussion*

A. *Summary Judgment Standard*
Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate only when

> the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

In deciding a motion for summary judgment, the court must "view the evidence in the light most favorable to the party against whom summary judgment is sought and ... draw all permissible inferences in favor of that party." *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997). The Court also must accept as true the non-moving party's evidence, if supported by affidavits or other evidentiary material. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). Moreover, assessments of credibility, choosing between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court. *Id.; see also* Fed.R.Civ.P. 56(e) 1963 Advisory Committee Note. Thus, "[t]he court's function is not to resolve disputed issues of fact but only to determine whether there is a genuine issue of material fact to be tried." *Fischl,* 128 F.3d at 55; *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986).

**\*7** To defeat a motion for summary judgment, the non-moving party cannot merely rely upon the allegations contained in the pleadings that raise no more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). Rather, the non-moving party must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson,* 477 U.S. at 256.

Although the same summary judgment rules are applicable when a party is proceeding *pro se,* "special latitude" is appropriate to ensure that a meritorious claim is not foreclosed simply because the papers submitted in opposition to the motion are worded inartfully. *See Morris v. Citibank, N.A.,* No. 97 Civ. 2127, 1998 WL 386175, at \*2 (S.D.N.Y. July 8, 1998); *see also Estelle v. Gamble,* 429 U.S. 97, 106 (1976) (*pro se* complaint should be held to a "less stringent standard than formal pleadings drafted by lawyers"); *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (pleadings should be read liberally and interpreted to "raise the strongest arguments they suggest") (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). By the same token, however, "a *pro se* party's 'bald assertion,' completely

unsupported by evidence, is not sufficient toovercome a motion for summary judgment." *Odom v. Keane,* 1997 WL 576088, at \*3 (S.D.N.Y. Sept. 17, 1997) (quoting *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1995)).

## B. *Deliberate Indifference*

To establish a violation of the Eighth Amendment arising out of inadequate medical treatment, a prisoner is required to prove "deliberate indifference to serious medical needs." *Estelle,* 429 U.S. at 104. The deliberate indifference standard consists of both an objective and a subjective prong. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994).

Under the objective prong, the alleged medical need must be "sufficiently serious." *Id.* (internal quotation marks and citation omitted). A "sufficiently serious" medical need is one that produces "a condition of urgency ... that may produce death, degeneration or extreme pain." *Id.* (internal quotation marks and citation omitted).

Under the subjective component, the prisoner must demonstrate that the defendants acted with a "sufficiently culpable state of mind" in depriving the prisoner of medical treatment. *Id.* The subjective element of deliberate indifference "entails something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with the knowledge that harm will result." *Farmer v. Brennan,* 511 U.S. 825, 835 (1994)); *see also Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (likening deliberate indifference to "the equivalent of criminal recklessness") (internal quotation marks and citation omitted). In other words, to meet the subjective element of the test, an official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Hathaway,* 37 F.3d at 66 (quoting *Farmer,* 511 U.S. at 837).

**\*8** While medical care received by inmates must be adequate, an inmate is not entitled to receive treatment by every available medical alternative. *See generally Estelle,* 429 U.S. at 105-107. A difference of opinion between an inmate and medical personnel regarding medical treatment does not rise to the level of a constitutional violation. *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998); *Veloz v. New York,* 35 F.Supp.2d 305, 313 (S.D.N.Y.1999) (citing *Corby v. Conboy,* 457 F.2d 251, 254 (2d Cir.1972)). Nor will deliberate indifference be found when an inmate simply prefers an alternative treatment or feels that he did not get the level

of medical attention that he desired. *See Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir1986). Thus, "disagreements over medications, diagnostic techniques ..., forms of treatment or the need for specialists or the timing of their intervention, are not adequate grounds for a *Section 1983* claim." *' Sonds v. St Barnabus Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001). Instead, to establish deliberate indifference, a plaintiff must show that "prison officials 'intentionally den[ied] or delay[ed] access to medical care or interfer[ed] with the treatment once prescribed." ' *Muhammed v. Francis,* No. 94 Civ. 2244(SS), 1996 WL 657922 at *5 (S.D.N.Y. Nov. 13, 1996) (quoting *Estelle,* 429 U.S. at 104-05).

1. *OCF Water Quality*

As part of their Eighth Amendment claim, the Plaintiffs contend that defendants Edwards, Goord and Eagen were deliberately indifferent to the health risks posed by the water at OCF. (Pls. Mem. of L. at 7 ¶ 5) The Plaintiffs further allege that the OCF administration failed to take corrective action with respect to the water supply despite their repeated complaints. (*Id.* at 8 ¶ 9)

In an effort to show that the water system at OCF was contaminated, the Plaintiffs cite Superintendent Edwards' April 13 Memo, which seemingly acknowledges that the H. pylori bacterium can be spread through water. The Plaintiffs also have submitted the affidavits of six other inmates who were diagnosed with H. pylori in 2001. Contrary to the Plaintiffs' assertion, the fact that eight inmates out of a total population of more than 500 inmates tested positive for the H. pylori antibody in a single year does not suggest that there was a particular problem at OCF, much less that the spread of the bacterium was attributable to the OCF water system. Indeed, even the statistics maintained by OCF, which reflect a dozen or fewer confirmed cases in each of the years between 2000 and 2003, do not support the notion that there was an H. pylori outbreak at OCF. To the contrary, because it appears undisputed that H. pylori is "the most common infection worldwide," that more than half the people in the United States are infected by the time they reach their 40s, and that persons from lower socio-economic groups are particularly at risk, the evidence adduced by the Plaintiffs is plainly insufficient to show that there was a greater than normal incidence of infection at OCF and, hence, some reason to believe that the water distribution system was fostering its spread.[8] (*See* Frank Decl. ¶ 8) ("H. pylori is not a water bourne bacteria."). Nor can the plaintiffs show that any of the

Defendants were deliberately indifferent to problems with the water system at OCF since Superintendent Edwards brought in tanker water when organisms were discovered in the water, kept the tanks trucks at OCF until the water was found to be potable, and ensured that procedures were in place to monitor the quality of the OCF water.

**\*9** For these reasons, the Defendants are entitled to summary judgment insofar as the Plaintiffs contend that defendants Edwards, Goord and Eagen were deliberately indifferent to the prospect that H. pylori bacteria were being spread throughout the OCF inmate population through the OCF water supply.[9]

2. *Medical Treatment*

The Plaintiffs' second claim is that Dr. Sarreck and N.A Miller violated the Plaintiffs' Eighth Amendment rights by failing to provide them with proper treatment and after-care for their H. pylori infections.

Assuming that an H. pylori infection rises to the level of a sufficiently serious medical condition, to prevail on their deliberate indifference claims, the Plaintiffs must show that Dr. Sarreck and N.A. Miller acted with a sufficiently culpable state of mind. In this case, however, it is undisputed that Cherry received the H. pylori protocol within one month after his condition was diagnosed. Additionally, although Cherry alleges that he was "refused after care medical treatment" in connection with his recovery from the effects of the medications administered to him as part of the protocol (Cherry Aff. ¶ 15), the OCF records establish that he was seen and treated for continuing gastrointestinal complaints on March 19 and June 25, 2001. (Fleischmann Decl. Ex. M at 6-7). Dr. Sarreck also referred Cherry for a gastrointestinal consultation both before and after his completion of the H. pylori protocol. (*Id.* at 8-10). Finally, Dr. Frank has reviewed Cherry's medical records and opined that he "received good and proper medical care as the treatment provided ... was consistent with acceptable medical standards in treating patients infected with the H, pylori bacterium." (Frank Aff. ¶ 12). Given the course of treatment that Cherry received, and Dr. Frank's unchallenged expert opinion, no reasonable juror could find, on the basis of Cherry's conclusory assertions, that the medical personnel at OCF were deliberately indifferent to a serious medical condition that continued to afflict Cherry after he completed the H. pylori protocol.

Turning to Robinson, there is no dispute that the OCF medical staff prescribed to him the medications comprising the H. pylori protocol after learning that he had a positive H. pylori titer. The OCF medical records further disclose that Robinson continued to test positive for H. pylori after he was given those medications on an outpatient basis at his insistence. Although the Defendants allege and Robinson denies-that he continued to test positive because he failed to follow the entire protocol, the fact remains that Robinson was given access to the appropriate medications. (*See, e.g.,* Frank Aff. ¶ 11) ("Robinson was offered the appropriate treatment for H. pylori infection.")). The Eighth Amendment plainly does not guarantee that an inmate's medical treatment will be successful. Accordingly, even if the medications prescribed to Robinson were ineffective, that does not entitle him to recover any damages in this civil rights suit.

 **\*10** In his proposed amended complaint, Robinson seeks to allege that defendants Sarreck and N.A. Miller were deliberately indifferent to his medical needs because they failed to inform him that he had a "colitis in his blood and had to be treated in an outside hospital" and failed to treat him properly for that condition." (*See* Docket No. 87 (Proposed Am. Compl. ¶¶ 12, 13, 16-18)). It is somewhat difficult to understand this claim since colitis is an "inflammation of the colon," not a blood disorder. *See* Sloane-Dorland Annotated Medical Legal Dictionary 155 (1987). In any event, even if the Plaintiffs' complaint were deemed amended to incorporate Robinson's new allegations, the record is devoid of any evidence to suggest that Dr. Sarreck or N.A. Miller were deliberately indifferent to Robinson's colitis. Quite to the contrary, in addition to prescribing the H. pylori protocol, Dr. Sarreck referred Robinson for a gastrointestinal consultation at least twice after he learned that Robinson had a positive H. pylori titer. In these circumstances, a reasonable juror could not find that any of the Defendants were deliberately indifferent to Robinson's alleged colitis prior to his May 5, 2000 hospital admission.

For the foregoing reasons, the Defendants are entitled to summary judgment with respect to the Plaintiffs' Eighth Amendment deliberate indifference claims against Dr. Sarreck and N.A. Miller.

### C. *Goord*

"In this Circuit ... personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 254 (2d Cir.2001) (quoting

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)). *Accord Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). The doctrine of *respondeat superior* does not suffice to establish liability. *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 692-94 (1978); *Blodwen v. Mancuso,* 186 F.3d 252, 264 (2d Cir.1999); *Johnson v. Glick,* 481 F.2d 1028, 1034 (2d Cir.1973). Rather, to recover damages from a supervisor based upon an alleged constitutional violation, a plaintiff must show that the supervisor (1) directly participated in the violation, (2) learned of the situation through a report or appeal but failed to take action, (3) created or maintained the policy or custom which gave rise to it, or (4) was grossly negligent in the supervision of subordinates who caused the violation to occur. *See Newburgh Enlarged Sch. Dist.,* 239 F.3d at 254.

Here, the only allegations with respect to defendant Goord are that, as a supervisor of OCF's superintendent, he should have "investigate[d] the situation do [sic] to the fact that[ ] the situation ha[d] already caused imm [i]nent danger in the past here at OCF" and ordered tests "pertaining to the problem." (Compl.¶¶ 8, 10). Thus, the Plaintiffs have not alleged, nor have they shown, that Goord directly participated in any violation of their civil rights (assuming there was one), or learned of such a violation through a report or appeal. The Plaintiffs also have neither alleged nor shown that any of the wrongs that they contend occurred were the product of a policy or practice for which Goord was responsible. Finally, because the defendants who were principally responsible for the actions about which the Plaintiffs complain did not violate the Plaintiffs' constitutional rights, there is no basis to hold Goord liable on the theory that he was grossly negligent in the supervision of other defendants.

 **\*11** Accordingly, because the Plaintiffs have failed to demonstrate any personal involvement on the part of defendant Goord, he is entitled to summary judgment on this ground as well. [10]

### IV. *Conclusion*

The Defendants' motion for summary judgment is granted, and plaintiff Robinson's cross motion to amend the complaint is denied. [11] In light of these rulings, the Clerk of the Court is requested to close this case.

### All Citations

Not Reported in F.Supp.2d, 2005 WL 107095

Footnotes

\*     Heather Southwell, a third-year student at Northeastern Law School, provided substantial assistance in the research and drafting of this Memorandum Decision.

1     In August 2003, the parties consented to my exercise of jurisdiction over this matter for all purposes pursuant to 28 U.S.C. § 636(c). (*See* Docket No. 73).

2     Thus, OCF has used the same water supply as the Village of Otisville at all relevant times other than the period between January 22 and approximately June 1998. (*Id.* ¶ 8).

3     Although the Plaintiffs suggest that the tankers were brought into OCF on a date unknown which they believe is "in the middle of 1997," (Cherry Aff. at 3 ¶ 3), the Reiff Memo establishes that this actually occurred in early 1998.

4     The Defendants concede that a water main at OCF was compromised in or around 1999 or 2000, leading to insufficient water levels. On that occasion, the OCF administration again had water shipped into the facility. (*See* Aff. of Russell Miller, sworn to on Oct. 3, 2003, ¶ 4).

5     The CORC decision regarding the April grievance indicates in a heading that Cherry's grievance was "unanimously accepted in part." (*Id.* Ex. I at 8) (block capitalization omitted). The text of the CORC decision establishes, however, that Cherry's grievance was denied. (*Id.*).

6     The Defendants contend that Cherry was tested a second time in August 2001. (*See* Defs.' R. 56.1 Stmt. ¶ 66). In his papers, Cherry does not dispute this assertion. Nevertheless, I do not see any August 2001 entry on his medical records. (*See* Fleischmann Decl. Ex. M).

7     Robinson's proposed amended complaint is not part of his motion papers. It is, however, annexed to a December 10, 2003 letter from Ms. Fleischmann to the Court. (*See* Docket No. 87).

8     At his deposition, Cherry testified that he believed that "ten other inmates" were diagnosed with H. pylori before he was transferred from OCF. (Cherry Dep. at 42). In his opposition papers, Cherry suggests that "thirty or forty men (inmates) were diagnosed with H-pylori" around this time. (Cherry Aff. ¶ 11). Even if the latter numbers were correct, they do not suggest that there was an H. pylori epidemic at OCF, or that the bacterium was being spread through the water system.

9     Summary judgment may, of course, be denied when the nonmovant has been denied required discovery. *See* Fed.R.Civ.P. 56(f). In that connection, the Plaintiffs complain that the Defendants allegedly did not produce sufficient documents concerning the testing of the OCF water supply prior to the conclusion of discovery on June 3, 2003. (*See,* Pls.' Mem. of L. at 7; Cherry Aff. ¶ 23).

     During an April 22, 2003 telephone conference, when I inquired as to the status of discovery, Cherry stated that his requests had been fully satisfied. Similarly, Robinson asked only for his medical records, which I directed be produced within ten days. (*See* Docket No. 67).

     Notwithstanding these representations, the Plaintiffs contend that the Defendants have failed to produce sufficient documentation concerning the second occasion when water trucks were brought to OCF. (*See supra* n. 4). For that reason, in December 2004, I directed the Defendants to make a further search for any documentation concerning that incident. (*See* Docket Nos. 98, 99).

     The documents produced by the Defendants both before and after my December orders confirm that water trucks were brought to OCF a second time following a water main break. Nevertheless, despite an extensive search, there is no documentation suggesting that there was an H. pylori problem associated with this incident. Accordingly, contrary to the Plaintiffs' suggestion, the fact that water trucks were brought to the facility twice does not suggest that the Plaintiffs are entitled to the denial of the Defendants' summary judgment motion.

10    Although Eagen concededly learned of the Plaintiffs' allegations through their grievances, it is by no means clear that this is enough to give rise to personal liability on his part. *See McKenna v. Wright,* 386 F.3d 432, 437 (2d Cir.2004) ("it is questionable whether an adjudicator's rejection of an administrative grievance would make him liable" for a violation of a prisoner's rights).

11    Because the Defendants are entitled to summary judgment on other grounds, there is no need to address the defense of qualified immunity upon which they also rely.

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

 © 2016 Thomson Reuters. No claim to original U.S. Government Works.

1999 WL 983876
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Craig COLE, Plaintiff,

v.

Christopher P. ARTUZ, Superintendent, Green
Haven Correctional Facility, R. Pflueger, A.
Glemmon, Sgt. Stevens, Lt. Haubert, Capt.
W.M. Watford, Capt. T. Healey, and John
Doe # 1–5, all as individuals, Defendants.

No. 93 Civ. 5981(WHP) JCF.
|
Oct. 28, 1999.

**Attorneys and Law Firms**

Mr. Craig Cole, Bare Hill Correctional Facility, Malone, New York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of the Attorney General of the State of New York, New York, New York, for Defendant.

*MEMORANDUM & ORDER*

PAULEY, J.

 **\*1** The remaining defendant in this action, Correction Officer Richard Pflueger, having moved for an order, pursuant to Fed.R.Civ.P. 56, granting him summary judgment and dismissing the amended complaint, and United States Magistrate Judge James C. Francis IV having issued a report and recommendation, dated August 20, 1999, recommending that the motion be granted, and upon review of that report and recommendation together with plaintiff's letter to this Court, dated August 28, 1999, stating that plaintiff does "not contest the dismissal of this action", it is

ORDERED that the attached report and recommendation of United States Magistrate Judge James C. Francis IV, dated August 20, 1999, is adopted in its entirety; and it is further

ORDERED that defendant Pflueger's motion for summary judgment is granted, and the amended complaint is dismissed; and it is further

ORDERED that the Clerk of the Court shall enter judgment accordingly and close this case.

*REPORT AND RECOMMENDATION*

FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green Haven Correctional Facility, brings this action pursuant to 42 U.S.C. § 1983. Mr. Cole alleges that the defendant Richard Pflueger, a corrections officer, violated his First Amendment rights by refusing to allow him to attend religious services. The defendant now moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, I recommend that the defendant's motion be granted.

*Background*

During the relevant time period, Mr. Cole was an inmate in the custody the New York State Department of Correctional Services ("DOCS"), incarcerated at the Green Haven Correctional Facility. (First Amended Complaint ("Am.Compl.") ¶ 3). From June 21, 1993 to July 15, 1993, the plaintiff was in keeplock because of an altercation with prison guards. (Am.Compl.¶¶ 17–25). An inmate in keeplock is confined to his cell for twenty-three hours a day with one hour for recreation. (Affidavit of Anthony Annucci dated Dec. 1, 1994 ¶ 5). Pursuant to DOCS policy, inmates in keeplock must apply for written permission to attend regularly scheduled religious services. (Reply Affidavit of George Schneider in Further Support of Defendants' Motion for Summary Judgment dated September 9, 1996 ("Schneider Aff.") ¶ 3). Permission is granted unless prison officials determine that the inmate's presence at the service would create a threat to the safety of employees or other inmates. (Schneider Aff. ¶ 3). The standard procedure at Green Haven is for the captain's office to review all requests by inmates in keeplock to attend religious services. (Schneider Aff. ¶ 3). Written approval is provided to the inmate if authorization is granted. (Affidavit of Richard Pflueger dated April 26, 1999 ("Pflueger Aff.") ¶ 5). The inmate must then present the appropriate form to the gate officer before being released to attend the services. (Pflueger Aff. ¶ 5).

 **\*2** On June 28, 1993, the plaintiff submitted a request to attend the Muslim services on July 2, 1993. (Request to Attend Scheduled Religious Services by Keep–Locked Inmate dated June 28, 1993 ("Request to Attend Services"),

attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Order dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

### A. Standard for Summary Judgment

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material

fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249–50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

**\*3** Where a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International, Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at *3 (S.D .N.Y. July 22,

1998); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at [*] 5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se's*] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

### B. *Constitutional Claim*

It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shaabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent individuals posing an active threat to security from being

released. The procedure is not overbroad since it does not permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

**\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated. [1]

### *Conclusion*

For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

### All Citations

Not Reported in F.Supp.2d, 1999 WL 983876

Footnotes

1      In light of this finding, there is no need to consider the defendant's qualified immunity argument.

**WESTLAW**   © 2016 Thomson Reuters. No claim to original U.S. Government Works.      4

2012 WL 651919
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Kenneth Carl GROVES, Sr., Plaintiff,

v.

Brett DAVIS, Secure Care Treatment Aid; David
W. Sill, Secure Care Treatment Aid; Thomas
Nicolette, RN, Ward Nurse; Charmaine Bill,
Treatment Team Leader; Jill E. Carver, Social
Worker, Primary Therapist; Edwin Debroize,
Psychologist Assist; Jeff Nowicki, Chief of Mental
Health Treatment Serv.; Terri Maxymillian,
Ph.D., Dir. of Mental Health Serv.; Sgt. Sweet,
Security Services, CNYPC; Michael Hogan,
Comm'r, Dep't of Mental Health, Defendants.

No. 9:11–CV–1317 (GTS/RFT).
|
Feb. 28, 2012.

**Attorneys and Law Firms**

Kenneth Carl Groves, Sr., Marcy, NY, pro se.

***MEMORANDUM DECISION and ORDER***

Hon. GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se* civil rights
action filed by Kenneth Carl Groves, Sr. ("Plaintiff"), against
numerous employees of New York State or the Central
New York Psychiatric Center ("Defendants"), are Plaintiff's
motion to proceed *in forma pauperis,* his motion for a
temporary restraining order and preliminary injunction, and
his motion for appointment of counsel. (Dkt.Nos.2, 3, 4.) [1]
For the reasons set forth below, Plaintiff's motion to proceed
*in forma pauperis* is granted; his motion for a preliminary
injunction is denied; his motion for appointment of counsel
is denied; Plaintiff's claims of deliberate indifference to his
mental health needs against Defendants Bill, Carver, and
DeBroize are *sua sponte* dismissed with prejudice; Plaintiff's
claims against Defendants Bill, Carver, DeBroize, Nowicki,
Maxymillian, and Hogan arising from their alleged personal
involvement in the August 8, 2011 assault are *sua sponte*
dismissed without prejudice and with leave to amend in this

action in accordance with Fed.R.Civ.P. 15; Sgt. Sweet is *sua
sponte* dismissed without prejudice as a Defendant in this
action; the Clerk is directed to issue summonses, and the U.S.
Marshal is directed to effect service of process on Defendants
Davis, Sill, and Nicolette.

**I. RELEVANT BACKGROUND**

On November 7, 2011, Plaintiff commenced this action
*pro se* by filing a civil rights Complaint, together with a
motion to proceed *in forma pauperis.* (Dkt. Nos.1, 2.) [2]
Liberally construed, Plaintiff's Complaint alleges that the
following constitutional violations against him occurred
during his confinement at Central New York Psychiatric
Center ("CNYPC"): (1) Defendants Davis and Sill used
excessive force against him under the Eighth and/or
Fourteenth Amendments; (2) Defendant Nicolette knew of
and failed to take action to protect Plaintiff from the
assault under the Eighth and/or Fourteenth Amendments;
(3) Defendants Bill, Carver, and DeBroize were deliberately
indifferent to his mental health needs under the Eighth and/
or Fourteenth Amendments; and (4) Defendants Bill, Carver,
DeBroize, Nowicki, Maxymillian, Bosco, and Hogan failed to
"adequately train the staff under their supervision" and to take
appropriate action in response to the incident. (*See generally*
Dkt. No. 1.) For a more detailed description of Plaintiff's
claims, and the factual allegations giving rise to those claims,
the reader is referred to Part III.B of this Decision and Order.

**II. MOTION TO PROCEED *IN FORMA PAUPERIS***

Because Plaintiff sets forth sufficient economic need, the
Court finds that Plaintiff may properly commence this action
*in forma pauperis.* (Dkt. No. 2.)

**III. *SUA SPONTE* REVIEW OF PLAINTIFF'S
COMPLAINT**

In light of the foregoing, the Court must now review the
sufficiency of the allegations that Plaintiff has set forth in
his Complaint in light of 28 U.S.C. § 1915(e)(2)(B). This is
because Section 1915(e)(2)(B) directs that, when a plaintiff
seeks to proceed *in forma pauperis,* "(2) ... the court shall
dismiss the case at any time if the court determines that—...
(B) the action ... (i) is frivolous or malicious; (ii) fails to state a
claim on which relief may be granted; or (iii) seeks monetary
relief against a defendant who is immune from such relief."
28 U.S.C. § 1915(e)(2)(B). [3]

## A. Governing Legal Standard

**\*2** It has long been understood that a dismissal for failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6), can be based on one or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga Cnty.,* 549 F.Supp.2d 204, 211, nn. 15–16 (N.D.N.Y.2008) (McAvoy, J., adopting Report–Recommendation on *de novo* review).

Because such dismissals are often based on the first ground, a few words regarding that ground are appropriate. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain "a *short and plain* statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show[ ]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by Fed.R.Civ.P. 8(a)(2).

On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed.R.Civ.P. 8(a)(2) as "simplified" and "liberal." *Jackson,* 549 F.Supp.2d at 212, n. 20 (citing Supreme Court case). On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed.R.Civ.P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson,* 549 F.Supp.2d at 212, n .17 (citing Supreme Court cases) (emphasis added).

The Supreme Court has explained that such *fair notice* has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court. *Jackson,* 549 F.Supp.2d at 212, n. 18 (citing Supreme Court cases); *Rusyniak v. Gensini,* 629 F.Supp.2d 203, 213 & n. 32 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases). For this reason, as one commentator has correctly observed, the "liberal" notice pleading standard "has its limits." 2 *Moore's Federal Practice* § 12.34[1][b] at 12–61 (3d ed.2003). For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard. *Rusyniak,* 629 F. Supp .2d at 213, n. 22 (citing Supreme Court and Second Circuit cases); *see also Ashcroft*

*v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949–52, 173 L.Ed.2d 868 (2009).

Most notably, in *Bell Atlantic Corp. v. Twombly,* the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In doing so, the Court "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly,* 127 S.Ct. at 1968–69. Rather than turn on the *conceivability* of an actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965–74. The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id .* at 1965. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.*

**\*3** As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949. "[D]etermining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not show[n]—that the pleader is entitled to relief." *Id.* at 1950 [internal quotation marks and citations omitted]. However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id.,* it "does not impose a probability requirement." *Twombly,* 550 U.S. at 556.

Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949.

Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Iqbal,* 129 S.Ct. at 1949 (internal citations and alterations omitted). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citations omitted).

This pleading standard applies even to *pro se* litigants. While the special leniency afforded to *pro se* civil rights litigants somewhat loosens the procedural rules governing the form of pleadings (as the Second Circuit has observed), it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed.R.Civ.P. 8, 10 and 12.[4] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow.[5] Stated more simply, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." *Jackson,* 549 F.Supp.2d at 214, n. 28 [citations omitted].[6]

**B. Analysis of Plaintiff's Complaint**

The Court prefaces its analysis of Plaintiff's Complaint by noting that, although Plaintiff is a civilly committed sex offender and no longer a prisoner, the Court will look to cases addressing prisoner's rights in analyzing Plaintiff's claims, because "confinement of civilly committed patients is similar to that of prisoners." *Holly v. Anderson,* 04–CV–1489, 2008 WL 1773093, at *7 (D.Minn. Apr.15, 2008); *see also Morgan v. Rabun,* 128 F.3d 694, 697 (8th Cir.1997) ("The governmental interests in running a state mental hospital are similar in material aspects to that of running a prison."). Thus, whereas claims of excessive force by convicted criminals are analyzed under the Eighth Amendment to the United States Constitution, because Plaintiff is a civilly committed sex offender and no longer a prisoner, his substantive rights to be free from unsafe conditions of confinement arise under the Due Process Clause of the Fourteenth Amendment. In *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Court stated "[i]f it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional [under the Due Process Clause] to confine the involuntarily committed-who may not be punished at all-in unsafe conditions." *Youngberg,* 457 U.S. at 315–16. As have numerous other courts which have considered the issue, this Court has found that "the standard for analyzing a civil detainee's Fourteenth Amendment [conditions of confinement] claim is the same as the Eighth Amendment standard." *Groves v. Patterson,* 09–CV–1002,

Memorandum–Decision and Order at *15–16 (N.D.N.Y. filed Nov. 18, 2009).[7]

**1. Excessive Force Claims Against Defendants Davis, Still and Nicolette**

**\*4** Plaintiff alleges that on August 8, 2011, Defendant Davis entered Plaintiff's dorm room at CNYPC and "viciously attacked and brutally assaulted and battered" him. (Dkt. No. 1 at 4.) During the course of this assault, Defendant Davis is alleged to have entered Plaintiff's room and "jump[ed] on the plaintiff's legs holding and pinning them as Defendant Davis [continued to beat Plaintiff]." (*Id.*) As alleged in the Complaint, although Defendant Nicolette knew in advance that this assault was planned, he "remained in the Nurses Station" and "did nothing to interceed [sic] or stop the brutal attack on the plaintiff." (*Id.* at 5.)

To validly assert a violation of the Eighth Amendment through the use of excessive force, an inmate must allege the following: (1) subjectively, that the defendants acted wantonly and in bad faith; and (2) objectively, that the defendants' actions violated "contemporary standards of decency." *Blyden v. Mancusi,* 186 F.3d 252, 262–63 (2d Cir.1999) (internal quotation marks omitted) (citing *Hudson v. McMillian,* 503 U.S. 1, 8 [1992] ).

Here, construing the factual allegations of Plaintiff's Complaint with special leniency, the Court finds that Plaintiff appears to have alleged facts plausibly suggesting that he was subjected to excessive force by Defendants Davis and Sill. In addition, by alleging that Defendants Davis, Sill and Nicolette discussed the assault in advance of it occurring, and that Nicolette was in the vicinity of Plaintiff's room and had an opportunity to intervene to prevent it, the Complaint sufficiently alleges that Defendant Nicolette was personally involved and/or failed to protect Plaintiff from the assault. *See Bhuiyan v. Wright,* 06–CV–0409, 2009 WL 3123484, at *7 (N.D.N.Y. Sept.29, 2009) (Scullin, J.) ("The fact that defendant Davis was not in the room, but was acting as a 'lookout' so that no one came into the room while plaintiff was being beaten, would not absolve him from liability for the assault. An officer's failure to intervene during another officer's use of excessive force can itself constitute an Eighth Amendment violation unless the assault is "sudden and brief," and the defendant had no real opportunity to prevent it."); *Jeffreys v. Rossi,* 275 F.Supp.2d 463, 474 (S.D.N.Y.2003) (holding that an officer may be personally involved in the use of excessive force if he either directly participates in the

assault or if he was present during the assault, yet failed to intervene on behalf of the victim, even though the officer had a reasonable opportunity to do so).

As a result, a response to these claims is required from Defendants David, Sill, and Nicolette. In so ruling, the Court expresses no opinion as to whether Plaintiff's claims can withstand a properly filed motion to dismiss or for summary judgment.

## 2. Deliberate Indifference Claims Against Defendants Bill, Carver and DeBroize

Plaintiff alleges that on August 9, 2011, the day after the alleged assault, he attempted to "discuss the incident and what transpired" with Defendants Bill and Carver. (Dkt. No. 1 at 5.) Plaintiff alleges that Defendant Bill told him, "I don't want to discuss this Mr. Groves, we're too busy for your foolishness and the matter is being investigated." (*Id.*) Plaintiff's effort to explain that he was frightened by the incident was rebuffed by Defendant Bill, who told Plaintiff to "grow up." (*Id.* at 5–6.) The following day, Plaintiff attempted to discuss the incident with Defendant Carver, his primary therapist, again without success. A further attempt at discussion later that day was met with Defendant Carver "stating to the plaintiff in a snotty tone 'grow the hell up!' " (*Id.* at 6.) On August 10, 2011, Plaintiff attempted to discuss the incident "and his current fears and feelings," during his Monday afternoon "Process Group," which is facilitated by Defendant DeBroize. As alleged, Defendant DeBroize told Plaintiff and the other group members that the matter was under investigation "so no one could discuss the incident with anyone." (*Id.* at 6.)

 **\*5** To state a claim of deliberate indifference to a serious medical and/or mental health need under the Eighth Amendment, a plaintiff must first allege facts plausibly suggesting that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "[T]he plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (quoting *Estelle v. Gamble,* 429 U.S. at 102, 105–06). The "deliberate indifference standard embodies both an objective and a subjective prong," both of which the plaintiff must establish. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). "First, the alleged deprivation must be, in objective terms, 'sufficiently

serious.' " *Id.* (citations omitted). Second, the defendant "must act with a sufficiently culpable state of mind." *Id.*

With regard to the first element, generally, to be sufficiently serious for purposes of the Constitution, a medical condition must be "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) [citations omitted], *accord, Hathaway,* 37 F.3d at 66; *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).). [8] Under the subjective component, a plaintiff must also allege facts plausibly suggesting that the defendant acted with "a sufficiently culpable state of mind." *Hathaway,* 37 F.3d at 66. The requisite culpable mental state is similar to that of criminal recklessness. *Wilson v. Seiter,* 501 U.S. 294, 301–03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). A physician's negligence in treating or failing to treat a prisoner's medical condition does not implicate the Eighth Amendment and is not properly the subject of a Section 1983 action. *Estelle,* 429 U.S. at 105–06; *Chance,* 143 F.3d at 703. [9]

Here, even when construed with the utmost special liberality, Plaintiff's Complaint fails to allege facts plausibly suggesting that Defendants Bill, Carver, and DeBroize acted with deliberate indifference to Plaintiff's serious mental health condition when they declined to discuss the incident of August 8, 2011. There is nothing in the Complaint that even remotely suggests that the requested conversations were integral to Plaintiff's treatment as a convicted sex offender involuntarily committed to CNYPC, or that Defendants' refusal to discuss the incident with Plaintiff when he requested to do so caused Plaintiff to suffer any harm or worsening of his condition. In addition, Plaintiff does not allege that any of these Defendants acted with the requisite culpable state of mind.

Moreover, the statements made by Defendants Bill and Carver that he should "grow up," even if construed as verbal harassment, do not give rise to a cognizable claim that may be pursued under Section 1983. Allegations of verbal harassment are insufficient to support a Section 1983 claim. *Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001); *see also Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) ("[A]llegations of verbal harassment are insufficient to base a § 1983 claim if no specific injury is alleged .").

 **\*6** For these reasons, Plaintiff's deliberate indifference claims against Defendants Bill, Carver, and DeBroize are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and

Fed.R.Civ.P. 12(b)(6). Moreover, because the Court cannot imagine how Plaintiff might correct this claim through better pleading, he is not granted leave to attempt to do so in an amended pleading. [10] Rather, this claim is hereby dismissed with prejudice.

### 3. Failure to Supervise Claims Against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan

To prevail on a claim under 42 U.S.C. § 1983, a defendant must be personally involved in the plaintiff's constitutional deprivation. *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). Generally, for purposes of 42 U.S.C. § 1983, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. [11]

Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement. *McKinnon,* 568 F.2d at 934. Rather, a plaintiff must demonstrate " 'a tangible connection between the acts of the defendant and the injuries suffered.' " *Austin v. Pappas,* 04–CV–7263, 2008 WL 857528, at *2 (S.D.N.Y. Mar.31, 2008) (quoting *Bass v. Jackson,* 790 F.2d 260, 263 [2d Cir.1986] ) (other citation omitted). An official's failure to respond to grievance letters from inmates, however, "does not establish supervisory liability." *Watson v. McGinnis,* 964 F.Supp. 127, 130 (S.D.N.Y.1997). [12] Moreover, "the law is clear that inmates do not enjoy a constitutional right to an investigation of any kind by government officials." *Pine v. Seally,* 9–CV–1198, 2011 WL 856426, at *9 (N.D.N.Y. Feb.4, 2011). [13]

In his Complaint, Plaintiff alleges in wholly conclusory terms that Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan failed to "adequately train the staff under their supervision and fail[ed] to act within the scope and training of the position and job title they hold." (Dkt. No. 1 at 8.) Plaintiff alleges that he submitted a letter of complaint to Defendant Hogan and wrote to Defendant Nowicki on several occasions expressing concern his complaint had not been responded to, only to be advised that in September, 2011 that an investigation was ongoing. (*Id.* at 6–7.) Plaintiff does

not allege that any of these Defendants personally participated in the alleged assault on August 8, 2011.

Here, even when construed with the utmost special liberality, Plaintiff's Complaint fails to allege facts plausibly suggesting any personal involvement by these Defendants in the alleged used of excessive force on August 8, 2011. As a result, Plaintiff's claims against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan arising from this incident are *sua sponte* dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6). This dismissal is without prejudice to Plaintiff's right to file an Amended Complaint that corrects the above-described pleading defects, and states a viable claim against these Defendants. The Court notes that, at this early stage of the case, Plaintiff has the right—without leave of the Court—to file an Amended Complaint within the time limits established by Fed.R.Civ.P. 15(a)(1)(B). However, if he seeks to file an Amended Complaint after those time limits, he must file a motion for leave to file an Amended Complaint in accordance with Fed.R.Civ.P. 15(a)(2). In either event, Plaintiff is advised that *any Amended Complaint must be a complete pleading that will replace and supersede the original Complaint in its entirety, and that may not incorporate by reference any portion of the original Complaint. See* N.D.N.Y. L.R. 7.1(a) (4).

**\*7** Finally, although Plaintiff names Sgt. Sweet as a Defendant in the caption of the complaint and in the listing of the parties, he has not set forth in the Complaint any allegations of fact regarding the conduct of this Defendant complained of. (*See generally* Dkt. No. 1.) As a result, the Complaint fails to state a claim upon which relief may be granted and Sgt. Sweet is dismissed from this action without prejudice to Plaintiff's right to file an Amended Complaint as set forth above.

### IV. MOTION FOR INJUNCTIVE RELIEF

A preliminary injunction is an "extraordinary remedy that should not be granted as a routine matter." *Patton v. Dole,* 806 F.2d 24, 28 (2d Cir.1986). In most cases, to warrant the issuance of a preliminary injunction, a movant must show (a) irreparable harm and (b) either (1) a likelihood of success on the merits of the claim or (2) sufficiently serious questions going to the merits, and a balance of hardships tipping decidedly in favor of the moving party. *D.D. ex rel. V.D. v. New York City Bd. of Educ.,* 465 F.3d 503, 510 (2d Cir.2006) (quotation omitted). "The purpose of issuing a preliminary injunction is to 'preserve the status quo and prevent irreparable harm until the court has an

opportunity to rule on the ... merits.' " *Candelaria v. Baker,* 00–CV–912, 2006 WL 618576, at *3 (W.D.N.Y. Mar.10, 2006) (quoting *Devose v. Herrington,* 42 F.3d 470, 471 [8th Cir.1994] ). Preliminary injunctive relief " 'should not be granted unless the movant, by a clear showing, carries the burden of persuasion.' " *Moore v. Consolidated Edison Co. of New York, Inc.,* 409 F.3d 506, 510 (2d Cir.2005) (quoting *Mazurek v. Armstrong,* 520 U.S. 968, 972 [1997] ). "Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Moore,* 409 F.3d at 510 (citing *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 381, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992). The same standards govern consideration of an application for a temporary restraining order. *Perri v. Bloomberg,* 06–CV–0403, 2008 WL 2944642, at *2 (E.D.N.Y. Jul.31, 2008) [citation omitted]. The district court has broad discretion in determining whether to grant a preliminary injunction. *Moore,* 409 F.3d at 511.

"The Second Circuit has defined 'irreparable harm' as 'certain and imminent harm for which a monetary award does not adequately compensate,' noting that 'only harm shown to be non-compensable in terms of money damages provides the basis for awarding injunctive relief.' " *Perri,* 2008 WL 2944642, at *2 (citing *Wisdom Import Sales Co., L.L.C. v. Labatt Brewing Co., Ltd.,* 339 F.3d 101, 113–14 [2d Cir.2003] ); *see also Kamerling v. Massanari,* 295 F.3d 206, 214 (2d Cir.2002) ("To establish irreparable harm, a party seeking preliminary injunctive relief must show that there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation.") (internal quotation omitted). Speculative, remote or future injury is not the province of injunctive relief. *Los Angeles v. Lyons,* 461 U.S. 95, 111–12, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); *see also Hooks v. Howard,* 07–CV–0724, 2008 WL 2705371, at *2 (N.D.N.Y. Jul.3, 2008) (citation omitted) ("Irreparable harm must be shown to be imminent, not remote or speculative, and the injury must be such that it cannot be fully remedied by monetary damages.").

 **\*8** Plaintiff has submitted a document entitled "Order to Show Cause for Preliminary Injunction and Tempor[ary] Restraining Order." (Dkt. No. 3.) Construed liberally, Plaintiff's submission seeks a temporary restraining order and injunctive relief enjoining Defendants from "submitting and filing false and untrue statements and reports" regarding the August 11, 2011 incident, and to "stop all retaliatory actions against the plaintiff ...." (*Id.* at 1.) Plaintiff also seeks an

"Order of Separation [sic]" directing that Defendants Davis, Sill, Nicolette, Bill, Carver and DeBroize be "restrained from being within 100 feet from the plaintiff in any form or matter." (*Id.* at 2.)

The Court has reviewed Plaintiff's motion papers thoroughly and considered the claims asserted therein in the light most favorable to Plaintiff, as a *pro se* litigant. Based upon that review, the Court finds that the harm Plaintiff alleges is purely speculative and, therefore, not "irreparable." Plaintiff's motion is supported only by a recitation of the alleged assault in August, 2011. (*Id.* at 1–4.) Plaintiff has not supported the claims of ongoing misconduct set forth in his motion papers with any factual allegations, such as the dates on which the misconduct occurred, the nature of the injuries he claims to have suffered, the identities of the persons responsible for the conduct he seeks to enjoin, or the relationship between those actions and the claims asserted in his Complaint. Simply stated, Plaintiff's alleged fear of future wrongdoing by the Defendants is not sufficient to warrant the extraordinary remedy of preliminary injunctive relief.

The Court further notes that the requested injunctive relief cannot be granted unless there is also proof that Plaintiff has a likelihood of succeeding on the merits of his claim, or evidence that establishes sufficiently serious questions going to the merits of his claim and a balance of hardships tipping decidedly toward him. *See Covino v. Patrissi,* 967 F.2d 73, 77 (2d Cir.1992). Plaintiff has failed to submit *proof or evidence* that meets this standard. Plaintiff's allegations, standing alone, are not sufficient to entitle him to preliminary injunctive relief. *See Ivy Mar Co. v. C.R. Seasons Ltd.,* 907 F.Supp. 547, 561 (E.D.N.Y.1995) ("[B]are allegations, without more, are insufficient for the issuance of a preliminary injunction."); *Hancock v. Essential Resources, Inc.,* 792 F.Supp. 924, 928 (S.D.N.Y.1992) ("Preliminary injunctive relief cannot rest on mere hypotheticals."). Without evidence to support his claims that he is in danger from the actions of anyone at CNYPC, the Court will not credit Plaintiff's conclusory allegations that he will be retaliated against or harmed in the future.

Plaintiff has failed to establish either of the two requisite elements discussed above. As a result, Plaintiff's request for a temporary restraining order and/or injunctive relief is denied.

## V. MOTION FOR APPOINTMENT OF COUNSEL
 **\*9** Courts cannot utilize a bright-line test in determining whether counsel should be appointed on behalf of an indigent

party. *Hendricks v. Coughlin,* 114 F.3d 390, 392–93 (2d Cir.1997). Instead, a number of factors must be carefully considered by the court in ruling upon such a motion:

> [T]he district judge should first determine whether the indigent's position seems likely to be of substance. If the claim meets this threshold requirement, the court should then consider the indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason in that case why appointment of counsel would be more likely to lead to a just determination.

*Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994) (quoting *Hodge v. Police Officers,* 802 F.2d 58, 61 [2d Cir.1986] ). This is not to say that all, or indeed any, of these factors are controlling in a particular case. [14] Rather, each case must be decided on its own facts. *Velasquez v. O'Keefe,* 899 F.Supp. 972, 974 (N.D.N.Y.1995) (McAvoy, C.J.) (citing *Hodge,* 802 F.2d at 61).

Upon due consideration, the Court finds that the relevant factors weigh decidedly against granting Plaintiff's motion at this time. For example, the Court finds as follows: (1) the case does not present novel or complex issues; (2) it appears to the Court as though, to date, Plaintiff has been able to effectively litigate this action; (3) while it is possible that there will be conflicting evidence implicating the need for cross-examination at the time of the trial, as is the case in many actions brought under 42 U.S.C. § 1983 by *pro se* litigants, "this factor alone is not determinative of a motion for appointment of counsel," *Velasquez,* 899 F.Supp. at 974; (4) if this case survives any dispositive motions filed by Defendants, *it is highly probable that this Court will appoint trial counsel at the final pretrial conference;* (5) this Court is unaware of any special reasons why appointment of counsel at this time would be more likely to lead to a just determination of this litigation; and (6) Plaintiff's motion for counsel is not accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector.

For these reasons, Plaintiff's motion for the appointment of counsel is denied without prejudice. After the Defendants have responded to the allegations in the Complaint which survive *sua sponte* review, and the parties have undertaken discovery, Plaintiff may file a second motion for the appointment of counsel, at which time the Court may be better able to determine whether such appointment is warranted in this case. Plaintiff is advised that any second motion for appointment of counsel must be accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector.

**\*10  ACCORDINGLY,** it is

**ORDERED** that Plaintiff's motion to proceed *in forma pauperis* (Dkt. No. 2) is ***GRANTED;*** [15] and it is further

**ORDERED** that Plaintiff's motion for injunctive relief (Dkt. No. 3) is ***DENIED;*** and it is further

**ORDERED** that Plaintiff's motion for appointment of counsel (Dkt. No. 4) is ***DENIED*** without prejudice; and it is further

**ORDERED** that Plaintiff's claims of deliberate indifference against Defendants Bill, Carver and DeBroize are *sua sponte* ***DISMISSED*** with prejudice pursuant to 28 U.S.C. § 1915(e) (2) (B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Plaintiff's claims against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan arising from their alleged personal involvement in the August 8, 2011 incident are *sua sponte* ***DISMISSED*** without prejudice and with leave to amend in this action in accordance with Fed.R.Civ.P. 15 (as described above in Part III.B.3. of this Decision and Order), pursuant to 28 U.S.C. § 1915(e)(2)(B) (ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Defendant Sweet is *sua sponte* ***DISMISSED*** without prejudice and with leave to be reinstated as a Defendant in this action in accordance with Fed.R.Civ.P. 15, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is otherwise accepted for filing (i.e., as to the claims against Defendants Davis, Sill, and Nicolette arising from the August 8, 2011 incident); and it is further

**ORDERED** that Plaintiff provide a summons, USM–285 form and a copy of the complaint for Defendant Davis, Sill and Nicollette for service, and upon receipt from Plaintiff of the documents required for service of process, the Clerk shall (1) issue summonses and forward them, along with copies of the Complaint to the United States Marshal for service upon the remaining Defendants, and (2) forward a copy of the summons and Complaint by mail to the Office of the New York State Attorney General, together with a copy of this Decision and Order; and it is further

**ORDERED** that, after service of process on Defendants, a response to the Complaint shall be filed by the Defendants or their counsel as provided for in the Federal Rules of Civil Procedure; and it is further

**ORDERED** that all pleadings, motions and other documents relating to this action be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261–7367. **Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of it was mailed to all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a certificate of service showing that a copy was served upon all opposing parties or their attorneys will be stricken from the docket .** Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. **Plaintiff is also required to promptly notify, in writing, the Clerk's Office and all parties or their counsel of any change in Plaintiff's address; his failure to so may result in the dismissal of this action.** All motions will be decided on submitted papers without oral argument unless otherwise ordered by the Court.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 651919

Footnotes

1   This is the fourth civil rights action filed by Plaintiff in this District. Generally, two of these actions arose out of Plaintiff's refusal to consent to a strip search and the subsequent actions taken against Plaintiff as a result of his refusal. *See Groves v. New York,* 09–CV–0406, Decision and Order (N.D.N.Y. filed May 11, 2009) (Hurd, J.) (*sua sponte* dismissing complaint pursuant to 28 U.S.C. § 1915[e][2][B] ); *Groves v. The State of New York,* 9:09–CV–0412, Decision and Order (N.D.N.Y. filed Mar. 26, 2010) (Sharpe, J.) (granting defendants' motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12[b][6] ). The third action alleged numerous violations of Plaintiff's constitutional rights during the period July 23, 2009, and August 26, 2009, and was dismissed without prejudice upon Plaintiff's request in October, 2010. *See Groves v. Maxymillian,* 9:09–CV–1002, Decision and Order (N.D.N.Y. filed Oct. 8, 2010) (Suddaby, J.). As a result, it does not appear that the current action is barred because of res judicata, collateral estoppel, and/or the rule against duplicative litigation.

2   At that time, Plaintiff also filed motions for injunctive relief and for appointment of counsel. (Dkt.Nos.3, 4.)

3   The Court notes that, similarly, Section 1915A(b) directs that a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b).

4   *See Vega v. Artus,* 610 F.Supp.2d 185, 196 & nn. 8–9 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

5   *See Vega,* 610 F.Supp.2d at 196, n. 10 (citing Supreme Court and Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

6   It should be emphasized that Fed.R.Civ.P. 8's plausibility standard, explained in *Twombly,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which (when reviewing a *pro se* pleading) the Court stated, *"Specific facts are not necessary"* to successfully state a claim under Fed.R.Civ.P. 8(a) (2). *Erickson v. Pardus,* 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) [emphasis added]. That statement was merely an abbreviation of the often-repeated point of law—first offered in *Conley* and repeated in *Twombly*—that a pleading need not "set out *in detail* the facts upon which [the claim is based]" in order to successfully state a claim. *Twombly,* 127 S.Ct. 1965, n. 3 (citing *Conley,* 355 U.S. at 47) [emphasis added]. That statement did not mean that all pleadings may achieve the requirement of "fair notice" without ever alleging any facts whatsoever. Clearly, there must

still be enough fact set out (however set out, whether in detail or in a generalized fashion) to raise a right to relief above the speculative level to a plausible level. *See Rusyniak,* 629 F.Supp.2d at 214 & n. 35 (explaining holding in *Erickson* ).

7    *See Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) ("[W]hile the Supreme Court has not precisely limned the duties of a custodial official under the Due Process Clause to provide needed medical treatment to a pretrial detainee, it is plain that an unconvicted detainee's rights are at least as great as those of a convicted prisoner."); *Walton v. Breeyear,* 05–CV–0194, 2007 WL 446010, at *8, n. 16 (N.D.N.Y. Feb.8, 2007) (Peebles, M.J.) (noting that pretrial detainees enjoy protections under the due process clause of the Fourteenth Amendment parallel to those afforded to sentenced prisoners by the Eighth Amendment); *Vallen v. Carrol,* 02–CV–5666, 2005 WL 2296620, at ––––8–9 (S.D.N.Y. Sep.20, 2005) (finding that the Eighth Amendment standard of "deliberate indifference" is the correct one for Section 1983 claims brought by involuntarily committed mental patients based on alleged failures to protect them that violated their substantive due process rights); *Bourdon v. Roney,* 99–CV–0769, 2003 WL 21058177, at *10 (N.D.N.Y. Mar.6, 2003) (Sharpe, M.J.) ("The standard for analyzing a pretrial detainee's Fourteenth Amendment [conditions of confinement] claim is the same as the Eighth Amendment standard.").

8    Relevant factors informing this determination include whether the plaintiff suffers from an injury that a "reasonable doctor or patient would find important and worthy of comment or treatment," a condition that "significantly affects" a prisoner's daily activities, or "the existence of chronic and substantial pain." *Chance,* 143 F.3d at 702.

9    Thus, a physician who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not exhibit the mental state necessary for deliberate indifference. *Harrison,* 219 F.3d at 139. Likewise, an inmate who disagrees with the physician over the appropriate course of treatment has no claim under Section 1983 if the treatment provided is "adequate." *Chance,* 143 F.3d at 703. The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is 'reasonable.' " *Jones v. Westchester Cnty. Dept. of Corr.,* 557 F.Supp.2d 408, 413 (S.D.N.Y.2008). In addition, "disagreements over medications, diagnostic techniques (e .g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001). However, if prison officials consciously delay or otherwise fail to treat an inmate's serious medical condition "as punishment or for other invalid reasons," such conduct constitutes deliberate indifference. *Harrison,* 219 F.3d at 138.

10   The Court notes that, generally, leave to amend pleadings shall be freely granted when justice so requires. Fed.R.Civ.P. 15(a). However, an opportunity to amend is not required where amendment would be futile. *John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.,* 22 F.3d 458, 462 (2d Cir.1994). *John Hancock Mut. Life Ins. Co.,* 22 F.3d at 462. The Second Circuit has explained that "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993); *see Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) ("The problem with [Plaintiff's] cause of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied."). This rule is applicable even to *pro se* plaintiffs. *See, e.g., Cuoco,* 222 F.3d at 103.

11   *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright,* 21 F.3d at 501 (adding fifth prong); *Williams v. Smith,* 781 F.2d 319, 323–324 (2d Cir.1986) (setting forth four prongs).

12   *See also Gillard v. Rosati,* 08–CV–1104, 2011 WL 4402131, at *7 (N.D.N.Y. Aug.22, 2011) (Peebles, J.) ("It is well-established that without more, 'mere receipt of letters from an inmate by a supervisory official regarding a medical claim is insufficient to constitute personal liability." [internal quotation marks and brackets omitted] ); *Greenwald v. Coughlin,* 93–CV–6551, 1995 WL 232736, at *4 (S.D.N.Y. Apr.19, 1995) ("it is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations."); *Clark v. Coughlin,* 92–CV 0920, 1993 WL 205111, at *5 n. 2 (S.D.N.Y. Jun.10, 1993) ("Courts in this jurisdiction have consistently held that an inmate's single letter does not constitute the requisite personal involvement in an alleged constitutional deprivation to trigger the Commissioner's liability.")

13   *See also Bernstein v. N.Y.,* 591 F.Supp.2d 448, 460 (S.D.N.Y.2008) ("Courts within the Second Circuit have determined that there is no constitutional right to an investigation by government officials." [internal quotation marks, brackets and ellipsis omitted] ).

14   For example, a plaintiff's motion for counsel must always be accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector, and such a motion may be denied solely on the failure of the plaintiff to provide such documentation. *See Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994); *Cooper v. Sargenti Co., Inc.,* 877 F.2d 170, 172, 174 (2d Cir.1989) [citation omitted].

15     Plaintiff should note that he will still be required to pay fees that he may incur in this action, including but not limited to copying and/or witness fees.

**End of Document**                                     © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 71770
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Jeffrey HAMM, Plaintiff,
v.
Richard HATCHER, and City
of New York, Defendants.

No. 05 Civ. 503(ER).
|
Jan. 7, 2013.

**Attorneys and Law Firms**

Jeffery Hamm, East Elmhurst, NY, pro se.

Kimberly D. Conway, Esq., New York City Law Department, Office of the Corporation Counsel, New York, NY, for Defendants.

***OPINION AND ORDER***

RAMOS, District Judge.

 **\*1** *Pro se* Plaintiff Jeffrey Hamm ("Hamm" or "Plaintiff") brings this action pursuant to 42 U.S.C. § 1983 against Defendants Richard Hatcher ("Hatcher")[1] and the City of New York (the "City," and collectively, "Defendants"). Plaintiff alleges that while he was incarcerated in Rikers Island, Defendants violated his rights under the Fourteenth Amendment to the U.S. Constitution when they suspended his antidepressant medications. Defendants now move for summary judgment pursuant to Federal Rule of Civil Procedure 56 as to all of Plaintiff's claims. For the reasons set forth below, Defendants' motion is GRANTED.

**I. Background**

**A. Undisputed Facts**

Plaintiff is a 52 year-old man with a long history of substance addiction and criminal activity.[2] (Conway Decl. Ex. F ("Hamm Dep.") 9:19–23, 31:15–21, 36:24–37:6.) After serving in the military from 1980–1982, (*id.* 10:24–11:2, 35:2–8), Plaintiff and his ex-wife divorced. (*Id.* 35:15–17.) At that time, he became addicted to crack cocaine and remained addicted through 2000, (*id.* 9:20–10:2, 10:24–11:6), when he completed a twenty-day rehabilitation program and enrolled in New York City College of Technology. (*Id.* 10:4–8.) In December of 2001, on his second day of college, Plaintiff was arrested and released. (*Id.* 11:24–12:2, 13:12–14.) He struggled with substance abuse at that time, and continued to relapse into early 2002. (*Id.* 11:7–17.)

Plaintiff was again arrested in March 2002. (*Id.* 13:15–17.) He was immediately taken into custody at the Manhattan Detention Center. (*Id.* 13:18–25.) On March 15, 2002, while incarcerated there, Plaintiff was issued two antidepressant medication prescriptions for fourteen days each—one for forty milligrams daily of Paxil and the other for fifty milligrams daily of Trazodone. (First Unnumbered Exhibit to the Third Amended Complaint ("TAC") at first unnumbered page.) Plaintiff states that he had been taking antidepressant medications before his arrest, as well.[3] (Hamm Dep. 15:22–16:8; Pl.'s Mem. Opp. Mot. Summ. J. ("Pl.'s Mem.") at first unnumbered page.)

In or about June 2002, Plaintiff was transferred to another detention facility,[4] but remained there for less than two months due to an incident involving an assault.[5] (*Id.* 14:11, 21–25 .) After this incident, in or about August 2002, he was transferred to segregated housing in the Central Punitive Segregation Unit of the Otis Bantum Correctional Center ("OBCC") on Rikers Island. (Conway Decl., Ex. A at 1, 2; Hamm Dep. 14:22–15:2). On August 14, 2002, a mental health clinician, Michele Garden, Ph.D. ("Garden") evaluated Plaintiff, and reported that he presented antisocial behavior, mood changes, persistent anger, and withdrawal symptoms. (Conway Decl., Ex. A at 1.) Garden diagnosed Plaintiff with early onset dysthymic disorder, dependent personality disorder, and polysubstance dependence, and directed that Plaintiff was to undergo biweekly clinician visits. (*Id.* at 1, 2.) On August 14, 2002, Plaintiff was also seen by a psychiatrist, Roberto Caga–Anan, M.D. ("Caga–Anan") at OBCC, who noted that Plaintiff stated, "I am ok," and observed that he did not present a danger to himself or to others. (Conway Decl, Ex. B at 1.) Caga–Anan prescribed Plaintiff with forty milligrams daily of Paxil and fifty milligrams daily of Atarax. (*Id.*) Both prescriptions were to last for fourteen days. (*Id.,* Ex. C.)

 **\*2** On August 22, 2012, Garden and Caga–Anan again observed and evaluated Plaintiff. (Conway Decl., Ex. E.) They confirmed their prior observations, and diagnosed him with opioid dependence and adjustment disorder with

depressed mood. (*Id.* at 1.) They again directed that he was to undergo biweekly clinician and psychiatrist visits. (*Id.* at 2.) On August 28, 2002, Caga–Anan renewed Plaintiff's Paxil prescription and issued him an additional prescription for fifty milligrams of Trazodone daily. (*Id.,* Ex. C.) Caga–Anan discontinued Plaintiff's Atarax prescription. (*Id.*) Again, both prescriptions were to last Plaintiff for fourteen days-until September 11, 2002.[6] (*Id.*)

**B. Facts in Dispute**
In early September 2002, Plaintiff was transferred from segregated housing at OBCC to the George Motchan Detention Center ("GMDC") on Rikers Island. (Hamm Dep. at 15:18–21.) It is at this point where Plaintiff's and Defendants' versions of facts diverge.

**1. Defendant's Version of Facts**
Defendants assert that on September 12, 2002–the day after Plaintiff's prescriptions were due to expire—Vivia Francois, M.D. completed a Consultation Request form on Plaintiff's behalf and referred him to the Mental Health Department at GMDC. (Conway Decl., Ex. G.) There is no evidence in the record, however, that his prescriptions were renewed at that time. On September 13, 2002, Plaintiff was admitted to the Mental Health Department and screened by S. Hernandez ("Hernandez"), a clinical social worker. (*Id.*) Hernandez completed a mental health intake form for Plaintiff, and noted that he had a history of mental illness and that he was taking medication for depression. (*Id.,* Ex. I.) There is no evidence in the record that Plaintiff's prescriptions were renewed at that time, either.

On September 16, 2002, a clinical supervisor reported that Plaintiff's case had been assigned to Hernandez and that a psychological assessment had been scheduled to determine whether Plaintiff was "on the proper medication with the proper dosage." (*Id.,* Ex. J.) On the same day, Hatcher[7] first evaluated Plaintiff in the Mental Health Clinic at GMDC. (Conway Decl., Ex. K.) Hatcher reported that Plaintiff stated he had not received Paxil for *five* days, that he felt mildly to moderately depressed at times due to his "legal problems and not recently getting his scheduled medications," and that Plaintiff stated, "I know I need the medication because as soon as I stop it I start feeling anxious, irritable and depressed." (*Id.*) However, Hatcher also noted that Plaintiff stated "I'm doing alright," that he denied experiencing any hallucinations or side effects of his medications, that he

denied any suicidal or homicidal ideations, that his mood was calm and stable, that he was eating and sleeping well, and that he did not present any paranoia. (*Id.*) Hatcher diagnosed Plaintiff with Dysthymic Disorder, and stated that he would "re-start [Plaintiff's] regimen at 'start doses.' " (*Id.*)

**\*3** Hatcher prescribed Plaintiff twenty milligrams daily of Paxil for depression and fifty milligrams daily of Trazodone for sleep. (*Id* .) Hatcher issued prescriptions for one immediate dose of both of medications on September 16, 2002, (*id.,* Ex. L), and an additional prescription for both medications to being immediately thereafter and to last for fourteen days. (*Id.*) Thus, according to the prison medical records submitted by Defendants, Plaintiff was without his prescribed medications from September 11, 2002 through September 15, 2002–a total of five days.

On September 19, 2002, Hernandez evaluated Plaintiff again. (*Id.,* Ex. N.) A Clinical Assessment and Comprehensive Treatment Plan noting Plaintiff's symptoms, diagnosis, and treatment plan was completed and signed by Hernandez, Gerard Derisse, a psychiatrist, and Gilberto Matta, C.S.W., a clinical supervisor. (*Id.*) Plaintiff was thereafter periodically treated for his psychiatric conditions; the last record of his treatment submitted to the Court is dated January 1, 2003. (Third, Fourth, and Fifth Unnumbered Exhibits to TAC.)

**2. Plaintiff's Version of Facts**[8]
Plaintiff stated in his deposition testimony that when he was transferred from segregated housing at OBCC to GMDC in September 2002 and was first seen by Hatcher, Hatcher told him that GMDC maintained a policy that newly transferred inmates were required to wait ten days before receiving any medical prescriptions. (*Id.* 17:21–25, 22:2–7.) Hatcher then took Plaintiff off of Paxil and Trazodone for ten days despite Plaintiff's statements to Hatcher that he needed the medication.[9] (*Id.* 17:16–18, 22:2–13.)

Plaintiff further stated in his deposition testimony that once he stopped taking his medication, he began to experience the "side effects of withdrawal." (Hamm Dep. 23:2–4.) These symptoms included exacerbated depression, nightmares, hopelessness, and suicidal thoughts. (*Id.* 23:5–16.) He avers that he made frequent attempts to alert the mental health staff to the side effects he experienced while not taking his medication[10]-including filing a grievance at GMDC, (*id.* 41:23–42:8, 42:22–43:4; TAC at 4)-but that he remained without his medication for the duration of his first ten days

there. (Hamm Dep. 23:17–24:2, 24:10–11.) When the ten days expired, Plaintiff testified that Hatcher prescribed him half of his regular dosage of Paxil and his full dosage of Trazodone. (*Id.* 18:1–3, 28:1–8.) Hatcher later prescribed Risperidone to Plaintiff for impulse control. (*Id.* 29:4–8.)

Plaintiff testified in his deposition that he did not tell Hatcher the full extent of the symptoms he was experiencing as a result of going off of his medications. (*Id.* 19:10–14, 21:13–22, 24:8–19.) He believed that because he had recently come out of segregated housing as a result of his involvement in an assault, if he were to explain the nature and degree of his symptoms, he would be placed on suicide watch, be forcibly sedated, or be placed in segregated housing. (*Id.* 21:21–22:1, 24:8–19.)

### 3. The Criminal Prosecution of Plaintiff

**\*4** Pursuant to Plaintiff's guilty plea, he was convicted on February 6, 2003 of attempted criminal sale of a controlled substance in the third degree, and was sentenced to three to six years' imprisonment. (First Unnumbered Exhibit to Second Amended Complaint ("SAC") at 12.) Plaintiff later attempted to withdraw his guilty plea, arguing that he was impaired by his state of withdrawal from medication. (SAC ¶ 6.) On February 6, 2003, Judge Ronald A. Zweibel of the Supreme Court of the State of New York, New York County denied Plaintiff's motion to withdraw his plea, and the Supreme Court, Appellate Division, First Department affirmed the denial of Plaintiff's motion on April 5, 2005. (First Unnumbered Exhibit to SAC at 12–13.) In its Decision and Order, the Appellate Division stated that the record established that Hamm's plea "was knowing, intelligent, and voluntary, and [the record failed] to support his claim that he was incompetent to plead guilty because he had not received his antidepressant medication." (*Id.*) The Appellate Division also noted that the Plaintiff had "freely admitted his guilt, demonstrated his understanding of the terms and consequences of his plea, and specifically denied using any drugs or medication," and that the trial court had "relied on its own recollection of [Hamm's] lucidity at the time of the plea" in rejecting his motion to withdraw his plea. (*Id.*) On June 18, 2005, the Court of Appeals of the State of New York denied Plaintiff's application for leave to appeal. (Second Unnumbered Exhibit to SAC at first unnumbered page.)

### II. Procedural History

Plaintiff filed suit on May 17, 2004 in the Northern District of New York, from where this action was transferred to the

Southern District of New York on January 14, 2005. (Doc. 1.) Then–Chief Judge Michael B. Mukasey determined that the Complaint was facially insufficient and ordered Plaintiff to amend, (*id.*), and Plaintiff filed an Amended Complaint on March 28, 2005. (Doc. 2.) The case was subsequently reassigned to the Honorable Colleen McMahon. (Doc. 3.) Plaintiff filed a Second Amended Complaint on July 31, 2006. (Doc. 9.) The case was again reassigned to the Honorable Kenneth M. Karas on August 6, 2007. (Doc. 18.) Plaintiff, who by that time had completed his prison term, moved for default judgment as to Hatcher on December 6, 2007. (Doc. 24.) On September 5, 2008, Defendants filed a motion to dismiss the Second Amended Complaint, (Doc. 22), and on September 8, 2008, Judge Karas denied Plaintiff's motion for default judgment. (Doc. 27.) On May 5, 2009, Judge Karas issued an Opinion and Order granting in part and denying in part Defendants' motion to dismiss, and granting Plaintiff leave to amend the complaint. [11] (Doc. 31.) On August 7, 2009, Plaintiff filed a Third Amended Complaint. (Doc. 33.) On January 23, 2012, this matter was reassigned to the undersigned, and on June 21, 2012, Defendants filed the instant motion. (Docs.61, 63 .)

### III. Applicable Legal Standards

#### A. Summary Judgment

**\*5** Summary judgment is only appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free Sch. Dist.,* 812 F.Supp.2d 454, 467 (S.D.N.Y.2011) (citing *SCR Joint Venture L.P. v. Warshawsky,* 559 F.3d 133, 137 (2d Cir.2009)). A fact is "material" if it might affect the outcome of the litigation under the relevant law. *Id.*

The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *Cordiano v. Metacon Gun Club, Inc.,* 575 F.3d 199, 204 (2d Cir.2009) (citing *Celotex Corp.,* 477 U.S. at 322–23). "In that event, the nonmoving party must come forward

with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Saenger v. Montefiore Med. Ctr.,* 706 F.Supp.2d 494, 504 (S.D.N.Y.2010) (internal quotation marks omitted) (quoting *Jaramillo v. Weyerhaeuser Co.,* 536 F.3d 140, 145 (2d Cir.2008)). "Summary judgment is properly granted when the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.' " *Abramson v. Pataki,* 278 F.3d 93, 101 (2d Cir.2002) (quoting *Celotex Corp.,* 477 U.S. at 322).

In deciding a motion for summary judgment, the Court must " 'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.' " *Brod v. Omya, Inc.,* 653 F.3d 156, 164 (2d Cir.2011) (quoting *Williams v. R.H. Donnelley, Corp.,* 368 F.3d 123, 126 (2d Cir.2004)). However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture or surmise. *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995). A motion for summary judgment cannot be defeated on the basis of mere denials or unsupported alternative explanations of facts. *Senno,* 812 F.Supp.2d at 467. The non-moving party must do more than show that there is "some metaphysical doubt as to the material facts." *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir.2006) (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)). "[T]he non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor ." *Senno,* 812 F.Supp.2d at 467–68 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256–57 (1986)).

**B. Local Rule 56.1 and *Pro Se* Litigants**
**\*6** Under Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rule 56.1"), a party moving for summary judgment pursuant to Fed.R.Civ.P. 56, must submit a "separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." Local R. 56.1(a). In answering a motion for summary judgment, litigants in this District are required to specifically respond to the assertion of each purported undisputed fact by the movant and, if controverting any such fact, to support its position by citing to admissible evidence in the record. Local Rule 56.1(b), (d); *see also* Fed.R.Civ.P. 56(c) (requiring

reliance on admissible evidence in the record in supporting or controverting a purported material fact). If the moving party seeks summary judgment against a *pro se* litigant, it is also required to notify the *pro se* litigant of the requirements of Federal Rule of Civil Procedure 56 and Local Rule 56.1. Local R. 56.2. Once served with a statement pursuant to Local Rule 56.2, "[p]ro se litigants are then not excused from meeting the requirements of Local Rule 56. 1." *Wali v. One Source Co.,* 678 F.Supp.2d 170, 178 (S.D.N.Y.2009) (citing *Vt. Teddy Bear Co. v. 1–800–BEARGRAM Co.,* 373 F.3d 241, 246 (2d Cir.2004)). Each factual statement set forth in the moving party's Rule 56.1 statement "will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." Local R. 56.1(c); *see also T.Y. v. N.Y. City Dep't of Educ.,* 584 F.3d 412, 418 (2d Cir.2009) ("A nonmoving party's failure to respond to a Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible."), *cert. denied,* 130 S.Ct. 3277 (2010).

In the instant case, the Defendants have complied with their obligations by submitting a Local Rule 56.1 Statement and providing Plaintiff with notice, pursuant to Local Rule 56.2, of his obligations. (Docs.63, 66.) Plaintiff has failed to submit an appropriate response. Instead, he filed an unsworn, handwritten memorandum of law in opposition to the instant motion with several exhibits attached. (Doc. 60.) However, as the Second Circuit has made clear, "special solicitude should be afforded *pro se* litigants generally, when confronted with motions for summary judgment," *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988) (quoting *Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 642 (2d Cir.1988)), and "where a *pro se* plaintiff fails to submit a proper [Local] Rule 56.1 statement in opposition to a summary judgment motion, the Court retains some discretion to consider the substance of the plaintiff's arguments, where actually supported by evidentiary submissions." *Wali,* 678 F.Supp.2d at 178 (citing *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir.2001)). Moreover, courts are to read a *pro se* litigant's submissions "liberally and interpret them 'to raise the strongest arguments that they suggest.' " *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)).

**\*7** Therefore, this Court has endeavored to discern from the record if there is any evidentiary support for the assertions contained in Plaintiff's opposition papers and the documents attached thereto, and to determine if there are any other

material issues of fact based on the evidence in the record. *Geldzahler v. N.Y. Med. Coll .,* 746 F.Supp.2d 618, 620 n. 1 (S.D.N.Y.2010). The Court has considered the present motion in light of the entirety of the record to afford Plaintiff the special solicitude to which he is entitled, *Burke v. Royal Ins. Co.,* 39 F.Supp.2d 251, 257 (E.D.N.Y.1999), as well as the unsworn statements in his opposition papers-but only to the extent that they are based on personal knowledge or supported by other admissible evidence in the record—on the assumption that if his allegations were sufficient to raise an issue of fact, Plaintiff would be given an opportunity to submit an affidavit properly attesting to those allegations. *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 603 n. 1 (S.D.N.Y.2004). However, even in light of Plaintiff's *pro se* status, the Court cannot rely on any assertions for which he has failed to offer proper support. *Goenaga,* 51 F.3d at 18.

## IV. Discussion

### A. Plaintiff's Claim Against Hatcher

### 1. Cruel and Unusual Punishment

The Eighth Amendment to the U.S. Constitution guarantees convicted prisoners the right to be free from cruel and unusual punishment. U.S. Const. amend. VIII. A prisoner's Eighth Amendment rights are violated when he is denied adequate medical care due to a prison official's deliberate indifference to a substantial risk of serious harm. *Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) (quoting *Farmer v. Brennan,* 511 U.S. 825, 828 (1994)). Because the Eighth Amendment only applies where there has been a "formal adjudication of guilt," a pretrial detainee—such as Plaintiff, whose cause of action arose before he was convicted—enjoys a right to adequate medical care pursuant to the Due Process Clause rather than the Eighth Amendment. *City of Revere v. Massachusetts Gen. Hosp.,* 463 U.S. 239, 244 (1983). Nevertheless, the analysis is the same under the Due Process Clause and the Eighth Amendment in this Circuit, because "an unconvicted detainee's rights are at least as great as those of a convicted prisoner." *Weyant,* 101 F.3d at 856; *Cuoco v. Moritsugu,* 222 F.3d 99, 106 (2d Cir.2000) (noting that the Second Circuit has "often applied the Eighth Amendment deliberate indifference test to pre-trial detainees bringing actions under the Due Process Clause of the Fourteenth Amendment"). Thus, an "official custodian of a pretrial detainee may be found liable for violating the detainee's due process rights if the official denied treatment needed to remedy a serious medical condition and did so because of his deliberate indifference to that need." *Weyant,* 101 F.3d at 856.

The standard for a cruel and unusual punishment claim under both the Eighth Amendment and the Due Process Clause includes an objective and a subjective component. *E.g., Mitchell v. Prison Health Services, Inc.,* 07 Civ. 8267(PKC), 2008 WL 5069075, at *3 (S.D.N.Y. Nov. 20, 2008). First, the objective component requires the alleged deprivation of medical care to be sufficiently serious. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citing *Wilson v. Seiter,* 501 U.S. 294, 298 (1991)). A deprivation of medical care is sufficiently serious if two prongs are satisfied: (1) the prisoner was actually deprived of adequate medical care; and (2) the inadequacy in medical care was sufficiently serious. *Salahuddin v. Goord,* 467 F.3d 263, 279–80 (2d Cir.2006). An actual deprivation of adequate medical care occurs only if a prison official denies an inmate reasonable medical care, *Id.* (citing *Farmer,* 511 U.S. at 844–47), and it is sufficiently serious if "a condition of urgency ... that may produce death, degeneration, or extreme pain" is present. *Johnson v. Wright,* 412 F.3d 398, 403 (2d Cir.2005) (internal quotation marks and citations omitted). Relevant factors to this inquiry include "the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (internal quotation marks, brackets, and citation omitted).

**\*8** Second, the subjective component requires the defendant to "act with a sufficiently culpable state of mind." *Hathaway,* 37 F.3d at 66 (citing *Wilson,* 501 U.S. at 298). An official acts with the requisite deliberate indifference when he or she "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837. This is the "equivalent to the familiar standard of 'recklessness' as used in criminal law." *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Phelps v. Kapnolas,* 308 F.3d 180, 186 (2d Cir.2002)).

In the instant case, Plaintiff is unable to satisfy both the subjective and objective components.

### 2. Plaintiff Did Not Sustain a Sufficiently Serious Deprivation of Medical Care.

When a prisoner alleges a complete denial of adequate medical care, courts must evaluate the seriousness of the

prisoner's underlying medical condition. *Bellotto v. Cnty. of Orange,* 248 F. App'x 232, 236 (2d Cir.2007) (citing *Smith,* 316 F.3d at 184–86 .) Alternatively, when—as in the instant case—a prisoner alleges a temporary delay or interruption in the provision of otherwise adequate medical treatment, the seriousness inquiry is "narrower," *Salahuddin,* 467 F.3d at 280, and focuses on the particular risk of harm that resulted from the delay or interruption in treatment rather than the severity of the prisoner's underlying medical condition. *Id.* (citing *Smith,* 316 F.3d at 185); *see also Hill v. Dekalb Reg'l Youth Det. Ctr.,* 40 F.3d 1176, 1188–89 (11th Cir.1994) (explaining that the seriousness of a delay in medical treatment may be decided "by reference to the *effect* of delay in treatment .... [considering] the seriousness of the medical need [and] deciding whether the delay worsened the medical condition") (emphasis in original)). In the latter scenario, the court must examine all relevant facts and circumstances when determining whether a delay in treatment is sufficiently serious. *DiChiara v. Wright,* 06 Civ. 6123(KAM)(LB), 2011 WL 1303867, at *7 (E.D.N.Y. Mar. 31, 2011) (quoting *Smith,* 316 F.3d at 187). Accordingly, because Plaintiff's claim against Hatcher is based on a short-term interruption in the treatment that is otherwise unchallenged,[12] the court must focus on the risk of harm from the challenged delay in analyzing whether the alleged deprivation was sufficiently serious.

"Courts have repeatedly held that treatment of a psychiatric or psychological condition may present a serious medical need." *Cuoco,* 222 F.3d at 106 (internal quotation marks and citation omitted). It is also true that "[f]requently missed doses [of medication] could readily result in adverse medical events." *Mastroianni v. Reilly,* 602 F.Supp.2d 425, 438 (E.D.N.Y.2009). Such a delay or interruption in treatment, however, only gives rise to a violation of a prisoner's constitutional rights if it "reflects deliberate indifference to a serious risk of health or safety, to a life-threatening or fast-degenerating condition or to some other condition of extreme pain that might be alleviated through reasonably prompt treatment." *Amaker v. Coombe,* No. 96 Civ. 1622, 2002 WL 523388, at *8 (S.D.N.Y. Mar. 29, 2002). Although adverse medical effects are not required to prove a constitutional violation, "the absence of ... physical injury will often be probative," and "in most cases, the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm." *Smith,* 316 F.3d at 187, 188.

**\*9** Plaintiff contends that he was deprived of adequate medical care because his access to his medication was interrupted for ten days when he was transferred from OBCC to GMDC. (TAC at 3; Hamm Dep. 18:20–25.) He further avers that the delay was the result of a policy at GMDC that prevented all newly transferred inmates from taking any medication for their first ten days of detention there.[13] (TAC at 3; Hamm Dep. 17:21–25, 21:13–15, 22:2–7.) Plaintiff relies exclusively on the alleged statement made by Hatcher to establish the existence of the ten-day policy. However, he cannot demonstrate that such a purported policy, as applied to him, caused a sufficiently serious deprivation of adequate medical care.

As a result of the delay in access to his medication, Plaintiff avers that he began to experience the "side effects of withdrawal," including exacerbated depression, nightmares, hopelessness, and suicidal thoughts. (Hamm Dep. 23:1–4, 6–16.) Even assuming that Plaintiff's averments were substantiated by admissible evidence, the psychological consequences he alleges to have suffered are insufficient to show that he was subjected to a significant risk of serious harm.[14] Courts have repeatedly refused to find constitutional violations where the harm alleged as a result of a delay in medical care is similar to that alleged here. *Bellotto,* 248 F. App'x at 237 (plaintiff who alleged missed medication dosages and inadequate monitoring of medications did not sustain a constitutional violation "because the risk that [he] faced as a result of the alleged treatment was not substantial," and because the only medical consequence he alleged was an "anxiety attack," which resulted in no physical injuries or acute distress); *Barnard v. Beckstrom,* No. 07–CV–19, 2008 WL 4280007, at *16 (E.D .Ky. Sept. 17, 2008) (doctor's affidavit found no merit in plaintiff's claim that a ten-day delay in making alterations to psychiatric medication rose to the level of a serious medical need as he did not "suffer from any physical injury as the result of any alleged or actual delay in treatment"); *Caldwell v. McEwing,* No. 00–CV–1319, 2006 WL 2796637, at *11 (C.D.Ill. Sept. 28, 2006) (granting summary judgment to defendants where plaintiff saw a doctor for psychiatric assessments, refused to take psychiatric medication, and no physical harm resulted); *cf. Bilal v. White,* 10–4594–PR, 2012 WL 3734376, at *2 (2d Cir. Aug. 30, 2012) (plaintiff who suffered from epilepsy and arthritis—"arguably ... serious underlying conditions"-but failed to demonstrate that his condition worsened due to the delay, was unable to establish a sufficiently serious medical need); *Smith,* 316 F.3d at 181–82 (two separate delays of several days each in provision of medication to

inmate with HIV-positive status—an indisputably serious medical condition—did not cause sufficiently serious injury where plaintiff suffered temporary itching, severe headaches, as well as stress due to the missed medication, but his HIV infection and overall health did not worsen).

 **\*10** The relevant case law makes clear that a greater showing of harm is required in order to meet the high standard of a constitutional violation within the context of a delay in treatment. *Harrison v. Barkley,* 219 F.3d 132, 138 (2d Cir.2000) (dentist's one-year delay in treating a cavity—a condition tending to cause acute pain if left untreated—precluded summary judgment in defendant's favor because of the severity of the risk of harm involved); *Demata v. N .Y. State Corr. Dept. of Health Servs.,* No. 99–0066, 198 F.3d 233 (Table), 1999 WL 753142, at \*2 (2d Cir. Sept. 17, 1999) (a delay in providing necessary medical care may rise to the level of a constitutional violation, but the Second Circuit has reserved such a classification for cases involving deliberate delay of treatment as a form of punishment, disregard for a life-threatening and fast-degenerating condition, and extended delay of a major surgery) (collecting cases); *Hathaway,* 37 F.3d at 67 (plaintiff found to have serious medical need where he suffered from a degenerative hip condition that caused him to have difficulty walking and significant pain over an extended period of time, and corrective surgery was delayed over two years); *Silvera v. Conn. Dept. of Corr.,* 726 F.Supp.2d 183, 191–92 (D.Conn.2010) (plaintiff who suffered from severe mental health issues and was an acute suicide risk, and ultimately committed suicide due to acts and omissions of prison medical staff, was found to have demonstrated a sufficiently serious medical need). The absence of any physical injury to Plaintiff as a result of the ten-day delay underscores the Court's finding. *Smith,* 316 F.3d at 187.

There is no indication in the record that Hatcher's conduct "significantly increased [Plaintiff's] risk for medical injury or similar serious adverse consequences." *Wright v. Genovese,* 694 F.Supp.2d 137, 159 (N.D.N.Y.2010) *aff'd,* 415 F. App'x 313 (2d Cir.2011). Accordingly, Defendants' motion for summary judgment may be granted on this basis alone.

### 3. Hatcher Did Not Act With Deliberate Indifference.
However, even assuming *arguendo* that Plaintiff had been subjected to a "sufficiently serious" deprivation of medical care, his claim for cruel and usual punishment against Hatcher would still fail because he cannot prove that Hatcher acted with deliberate indifference. As discussed above, *see supra*

Part IV.A.1, a prison official cannot be found to have acted with deliberate indifference unless a plaintiff can demonstrate that the official "knew of and disregarded the plaintiff's serious medical needs." *Chance,* 143 F.3d at 703 (citing *Farmer,* 511 U.S. at 837). "The reckless official need not desire to cause such harm or be aware that such harm will surely or almost certainly result," but he must be subjectively aware that his conduct creates a substantial risk of harm. *Salahuddin,* 467 F.3d at 280. Mere negligence, however, even if it gives rise to a medical malpractice claim, is insufficient to sustain a constitutional claim. *Salahuddin,* 467 F.3d at 280; *Hathaway,* 37 F.3d at 68. Thus, in order to establish liability, Plaintiff must demonstrate the Hatcher knew of and disregarded an excessive risk to his safety in delaying Plaintiff's access to his medication for ten days.

 **\*11** While Plaintiff alleges that he was "severely depressed" when Hatcher first evaluated him, (First Unnumbered Exhibit to TAC, second unnumbered page), by his own testimony he never communicated that to Hatcher. (Hamm Dep. 19:10–15.) Indeed, Plaintiff admits that he *purposely* withheld the full extent of his symptoms from Hatcher in order to avoid being placed in segregated housing, on suicide watch, or being sedated. (Hamm Dep. 21:18–22:1, 24:8–21.) Rather, Plaintiff told Hatcher that he was "doing alright," that he was eating and sleeping well, and that he felt only "mild[ly] to moderately depressed due to his legal problems and not recently getting his scheduled medications." (Conway Decl., Ex K.) Hatcher noted that Plaintiff's mood was "calm and stable" at that time. (*Id.*) Therefore, Plaintiff has set forth no facts tending to prove that Hatcher knew of any risk to Plaintiff's health resulting from the short-term delay in his treatment, much less that he disregarded any such risk. Accordingly, any potential risk to Plaintiff's health as a result of the delay in receiving antidepressant medication would not be actionable, because Plaintiff did not properly advise Hatcher of his actual psychological condition.

As there is no evidence in the record before the Court that Hatcher acted with deliberate indifference by failing to prescribe Plaintiff his medications for the first ten days of his detention at GMDC, Plaintiff's claim against Hatcher would fail the subjective test, as well.

### B. Plaintiff's Claim Against the City ("*Monell* Claim")
The Court need not reach the merits of Plaintiff's *Monell* claim. As the Second Circuit has stated, "*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it *extends* liability to a

municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." *Segal v. City of New York,* 459 F.3d 207, 219 (2d Cir.2006) (emphasis in original). When a district court concludes that there is "no underlying constitutional violation," it need not address "the municipal defendants' liability under *Monell.*" *Id.* Therefore, the Court GRANTS Defendants summary judgment on Plaintiff's *Monell* claim against the City.

## V. Conclusion

For the reasons set forth above, Defendants' motion for summary judgment is GRANTED. The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal taken from this Order would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of an appeal. *See Coppedge V. United States,* 369 U.S. 438, 444–45 (1962). The Clerk of the Court is respectfully directed to teminate this motion (Doc. 63), enter judgment in favor of Defendants, and close this case.

It is SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 71770

---

Footnotes

1    Plaintiff has named "Richard Hatcher" as a Defendant in this action. It appears from Defendants' papers, however, that his correct name is "Richard Fletcher." Because the caption of this case names "Richard Hatcher" as a Defendant, the Court will continue to refer to him by what seems to be an incorrect name.

2    Plaintiff, by his own estimation, has been arrested at least 100 times and has been convicted of a crime at least fifty times. (Hamm Dep. 36:24–37:3.) Most of his arrests have been for the possession or sale of marijuana. (*Id.* 37:4–6.)

3    Plaintiff was first diagnosed with depression and anxiety by a psychiatrist in the Department of Corrections, though he does not specify when. (Hamm Dep. 16:8–9.) He believes he suffered from these psychological conditions for many years prior to his diagnosis and that they caused him to begin using narcotics in the first place. (*Id.* 16:10–14.)

4    Plaintiff refers to this detention facility as the "Beacon facility." (Hamm Dep. 14:1–4.)

5    The details of this assault are unclear in Plaintiff's deposition testimony, but it appears to have involved corrections officers. (Hamm Dep. 14:11, 24–25.)

6    Plaintiff states that he was medicated for the entire duration of his detention in segregated housing at OBCC. (Hamm Dep. 15:13–17.)

7    Hatcher's position is unclear from the record. According to a Progress Note and a Medication Order Sheet he completed upon treating Plaintiff, it appears Hatcher may be a Nurse Practitioner, as indicated by his signature "Richard Fletcher NP." (Conway Decl., Exs. K, L.) However, during Hamm's deposition, Defendants' attorney repeatedly referred to Hatcher as "Dr. Fletcher." (*E.g.* Hamm Dep. 17:16.)

8    As set forth more fully below, the Court finds that all such disputed facts are not material, and even construing the facts in a light most favorable to Plaintiff, he cannot defeat Defendants' motion.

9    Plaintiff's evidence regarding the time during which he went without his medication is inconsistent. In his memorandum of law in opposition to the instant motion, he states that he "hadn't had [his] medication in 5 days" when he was first transferred to GMDC and met with Hatcher. (Pl.'s Mem. second unnumbered page.) He further states that Hatcher "took it upon himself to lower [his] dosage" after learning of the five-day delay in receiving treatment. (*Id.*) The Court discusses these inconsistencies below. *See infra* n. 13.

10   Plaintiff's testimony is also inconsistent in this regard. For example, he also stated in his deposition testimony that he did *not* ask to speak to anyone on the mental health staff in his first ten days at GMDC when he was not medicated. (Hamm Dep. 25:25–26:3, 26:22–25, 27:17–19.)

11   In his opinion, Judge Karas dismissed Plaintiff's Fourteenth Amendment claim against Hatcher to the extent that it was based on allegations that Plaintiff received a lower dose of Paxil than he requested. (Doc. 31 at 21.) Accordingly, this Court only addresses herein the portion of Plaintiff's Fourteenth Amendment claim that has survived the motion to dismiss, i.e., that Defendants violated his constitutional rights by depriving him of antidepressant medication for some period of time.

12   To the extent that Plaintiff has argued that Hatcher prescribed him a dosage of Paxil that was too low—and thus inadequate—after the ten-day delay, such a claim has already been addressed and dismissed by Judge Karas. *See supra* n. 11.

**13**   As noted above, *see supra* n. 9, Plaintiff's evidence of GMDC's adherence to this policy is inconsistent. First, in his Third Amended Complaint, dated August 7, 2009, and again in his deposition testimony, dated December 30, 2009, Plaintiff stated that due to a GMDC policy, he was unable to receive his medications for the first ten days after being transferred there. In his opposition papers, dated October 17, 2011, however, Plaintiff states that after not receiving his medication for *five* days upon his transfer to GMDC-with no mention of a prison policy-Hatcher lowered his Paxil dosage. While the Court is well aware that on summary judgment, it may not resolve issues of credibility, it is also well settled that "a party cannot attempt to defeat a summary judgment motion by contradicting factual allegations in his complaint" or in prior sworn testimony. *Rojas v. Roman Catholic Diocese of Rochester,* 783 F.Supp.2d 381, 407 (W.D.N.Y.2010) *aff'd,* 660 F.3d 98 (2d Cir.2011) (citing *Bellefonte Re Ins. Co. v. Argonaut Ins. Co.,* 757 F.2d 523, 528–529 (2d Cir.1985).

The Court is not required to accept Plaintiff's assertion that he was deprived of the medication for ten days, as opposed to five, given that his statements are both equivocal, *see id.,* and unsupported by admissible evidence, *see Wali,* 678 F.Supp.2d at 178 (citing *Holtz,* 258 F.3d at 73.), and in light of the uncontroverted documentary evidence submitted by Defendants. *See Celotex Corp.,* 477 U.S. at 322. However, because the allegations fail even if the Court accepts Plaintiff's assertion that the delay lasted ten days, the Court will analyze the claim based on that version of the facts.

**14**   Although the Court would have greatly benefitted from an affidavit from Hatcher or other medical professionals employed by the City's Department of Corrections—and is perplexed why Defendants failed to submit one—"summary judgment may not properly be based on an absence of a statement from an expert that the care given was [or was not] grossly negligent when inferences drawn from the record could support such a finding." *Pellum v. Burtt,* 9:05–3339–JFA–GCK, 2008 WL 759084, at *33 (D.S.C. Mar. 20, 2008) (citing *Miltier v. Beorn,* 896 F.2d 848, 852 (4th Cir.1990)).

---

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 2401574
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Nicholas ROBLES, Plaintiff,

v.

Warden S. KHAHAIFA, et al., Defendants.

No. 09CV718.
|
June 25, 2012.

**Attorneys and Law Firms**

Nicholas Robles, Albion, NY, pro se.

Kim S. Murphy, NYS Attorney General's Office, Buffalo, NY, for Defendants.

**Order**

HUGH B. SCOTT, United States Magistrate Judge.

**\*1** Before the Court is defendants' motion for summary judgment dismissing this action (Docket No. 37 [1]). Responses to this motion were due by April 3, 2012, and any reply was due by April 16, 2012 (Docket No. 47). After denying (Docket No. 53) plaintiff's motions (Docket No. 47) for appointment of counsel and to stay the defense summary judgment motion (Docket No. 50), responses were due by May 14, 2012, and replies by May 25, 2012 (id.). The parties consented to proceed before the undersigned as Magistrate Judge on August 15, 2011 (Docket No. 30).

Plaintiff filed a renewed motion to stay the defense motion (Docket No. 57); that motion is **denied.**

BACKGROUND

Plaintiff, proceeding *pro se,* commenced this action alleging that defendants were deliberately indifferent to his medical condition while he was incarcerated at the Orleans Correctional Facility ("Orleans") in 2009 (Docket No. 14, Am. Compl.; Docket No. 39, Defs. Statement ¶¶ 1, 3). The Amended Complaint alleges claims against Superintendent S. Khuhaifa, Dr. Winston Douglas and Dr. Dwight Lewis,

inmate grievance supervisor Fitts, Sergeant Austin, and corrections officer Wilson (Docket No. 14, Am. Compl.). He claims that Drs. Douglas and Lewis exhibited deliberate indifference to plaintiff's right shoulder from February 2009 to June 2010 by failing to treat his shoulder and depriving plaintiff of pain medication. He alleges that the original injury arose from a prison assault while he was at Fishkill Correctional Facility, but he alleges here only claims arising in this District surrounding the treatment he received (or did not receive) while at Orleans (id. ¶¶ 16–17). Since plaintiff did not receive what he believed to be adequate pain medication, he substituted illegal marijuana to self-medicate his pain and was disciplined for marijuana possession (id. ¶ 20). Plaintiff moved for leave to proceed *in forma pauperis* (Docket Nos. 2, 5) and leave was granted (Docket No. 7).

*Defense Motion for Summary Judgment*

According to defendants' Statement of Undisputed Facts (Docket No. 39), plaintiff alleges that defendants were deliberately indifferent to the condition of his right shoulder, alleging that Superintendent Khahaifa instituted a policy which forbade prescribing narcotics to inmates (Docket No. 39, Defs. Statement ¶ 3; *see also* Docket No. 14, Am. Compl. ¶ 21). Superintendent Khahaifa states that, because medical decisions are delegated to medical personnel, he disclaims any influence over that decision making and denies that a no antinarcotic policy exists at Orleans (Docket No. 39, Defs. Statement ¶ 4; Docket No. 42, Khahaifa Decl. ¶ 6). Narcotic pain medication is prescribed on a case-by-case basis as needed by an inmate patient (Docket No. 39, Defs. Statement ¶ 5). Khahaifa received five letters and numerous grievances from plaintiff regarding his medical treatment which he forwarded to appropriate office or, with the grievances, he considered the appeal and affirmed denial of relief, with these appealed grievances then appealed to Department of Corrections and Community Supervision ("DOCCS") Albany central office (id. ¶ 9; Docket No. 42, Khahaifa Decl. 12).

**\*2** Defendant Fitts was employed as an inmate grievance resolution program supervisor at Orleans (Docket No. 39, Defs. Statement ¶ 11; Docket No. 41, Fitts Decl. ¶ 1). Plaintiff claims that Fitts circumvented the grievance process (Docket No. 39, Defs. Statement ¶ 12), but Fitts claims that all grievances were filed and processed pursuant to DOCCS directives (id. ¶ 13).

Defendant Austin was a sergeant at Orleans during this time and plaintiff alleges that he mislead and misinformed

unnamed DOCCS officials in Albany by incorrectly telling them that he saw plaintiff lift weights (*id.* ¶¶ 17–18). Austin denies contacting Albany about plaintiff and he disclaims ever seeing plaintiff exercise (*id.* ¶¶ 22, 23).

Defendant Wilson is a corrections officer at Orleans (*id.* ¶ 25) and plaintiff claims that Wilson interfered with plaintiff's medical care by collaborating with nursing staff and Sergeant Austin in misinforming Albany officials about plaintiff's ability to lift weights (*id.* ¶ 26). When Wilson was questioned by medical staff about plaintiff, Wilson told them that he saw plaintiff lift weights daily (*id.* ¶¶ 27–28). A member of medical staff then went to the gym but missed plaintiff because he finished there (*id.* ¶ 29). Wilson never contacted Albany about plaintiff; had such contact been made, it would have been memorialized in a memorandum (*id.* ¶ 31).

Plaintiff alleges that Dr. Douglas, Facility Health Services Director at Orleans, refused to prescribe narcotics to plaintiff and instead chose to treat plaintiff's shoulder differently (*id.* ¶ 35). Dr. Douglas was plaintiff's primary physician at Orleans (*see* Docket No. 43, Dr. Lewis Decl. ¶ 4). Dr. Douglas explains that plaintiff made repeated demands for Percocet and other narcotics that were not medically necessary and plaintiff was not compliant with medical instructions (Docket No. 39, Defs. Statement ¶ 39; *see id.* ¶¶ 36–38, 40–41; Docket No. 48, Dr. Douglas Decl. ¶¶ 17, 18, 15, 20). Knowing plaintiff's history of drug abuse and his medical condition, Dr. Douglas changed plaintiff's medication (Docket No. 39, Defs. Statement ¶ 40; Docket No. 48, Dr. Douglas Decl. ¶ 20). Plaintiff was prescribed a sling and physical therapy as treatment for his shoulder (Docket No. 39, Defs. Statement ¶ 43), but plaintiff did not regularly wear the sling or attend physical therapy sessions, seeking instead imaging of the shoulder (*id.* ¶¶ 44, 42). Plaintiff also lifted weights (*id.* ¶ 45; Docket No. 48, Dr. Douglas Decl. ¶¶ 12–13), despite being told by medical staff to refrain from lifting weights (Docket No. 48, Dr. Douglas Decl. ¶ 12). On plaintiff's almost daily sick calls, medical staff noted plaintiff's "bulky well defined deltoids and bicep muscles, which are signs indicative of continued exercise" (*id.*). Defendants point to plaintiff's failed November 2008 surgery by outside surgeon Dr. Stegamann at Erie County Medical Center as the cause for plaintiff's rotator cuff damage (Docket No. 39, Defs. Statement ¶ 46; Docket No. 48, Dr. Douglas Decl. ¶ 24, Ex. A, at Bates No. 311).

 **\*3** Plaintiff charges that Dr. Lewis, a facility physician at Orleans, was deliberately indifferent (Docket No. 39, Defs. Statement ¶¶ 49–50). Dr. Lewis asserts that plaintiff was

given proper medical care for his shoulder while at Orleans, he was prescribed pain and antiinflammatory medicines, physical therapy, and a sling (*id.* ¶ 51; Docket No. 43, Dr. Lewis Decl. ¶ 3), as well as monitoring images of his shoulder and examinations by outside consulting physicians (Docket No. 39, Defs. Statement ¶ 52; Docket No. 43, Dr. Lewis Decl. ¶ 3).

Defendants argue that both the subjective and objective elements of a deliberate indifference claim are not met here. Subjectively, they argue that plaintiff has not proven a culpable state of mind for any of the defendants (Docket No. 38, Defs. Memo. at 8–13). Objectively, defendants contend that plaintiff was scheduled for shoulder surgery in 2007 but was released and that surgery was never performed. Plaintiff was again incarcerated in 2008 and had two surgeries on his shoulder (Docket No. 48, Dr. Douglas Decl. ¶ 6). In 2009, plaintiff was deemed not to be a candidate for surgery, and was prescribed anti-inflammatory medication instead. Plaintiff, however, was not compliant with medical advice. Plaintiff worked out extensively, with one routine on May 7, 2009, videotaped showing plaintiff lifting weights, punching a heavy bag, and playing basketball, despite medical instruction to avoid such strenuous activity (Docket No. 45, Defs. Atty. Decl. ¶¶ 5–10, Ex. A (videotape) [2]). Defendants conclude that plaintiff's complaints did not rise to the level of serious medical need to meet the objective prong of the deliberate indifference claim (Docket No. 38, Defs. Memo. at 5–7).

Defendants each deny conspiring against plaintiff (Docket No. 39, Defs. Statement ¶¶ 10, 16, 24, 33, 48, 54; Docket No. 38, Defs. Memo. at 19–21) and deny any deliberate indifference on their part to plaintiff's condition (*see* Docket No. 39, Defs. Statement ¶ 54). They also argue that plaintiff fails to establish the personal involvement of Superintendent Khahaifa, Austin, Fitts, or Wilson in plaintiff's medical care (Docket No. 38, Defs. Memo. at 13–19). Defendants alternately argue that they are entitled to qualified immunity if a constitutional violation is found here (*id.* at 21–23).

Plaintiff responds that he complains that he continues to suffer pain in that shoulder due to not being prescribed pain medication (Docket No. 54, Pl. letter response dated Apr. 11, 2012, at 1–2), although he has not amended his Complaint to allege continuous liability. He was prescribed Ibuprofen 800 mg., but plaintiff states that he could not tolerate this medicine in his stomach (*id .* at 1). Plaintiff previously argued that there is conflicting testimony (Docket No. 51, Pl. Memo. in support

of motion for appointment of counsel and stay of defense motion ¶¶ 2, 5) but does not identify these conflicts. Plaintiff denies that he alleges any conspiracy among the defendants (Docket No. 52, Pl. Aff. in support of appointment motion ¶ 3).

**\*4** Plaintiff also complains about an assault that allegedly occurred on April 4, 2012, seeking to have this Court and prison grievance official review videotape of the incident (Docket No. 54, Pl. letter, at 1–2). That incident and others he raises in his papers (some discussed below), however, are beyond the scope of this pending action [3].

In his "Affidavit of Truth" (Docket No. 55), plaintiff describes the injury to his shoulder that lead to the surgeries and pain he suffers (Docket No. 55, Pl. Aff., FACTS ONE, TWO, FOUR, Ex. B; Docket No. 57, Pl. Amend. ¶¶ 7–8) and complains that physical therapy ended with his transfer to Fishkill Correctional Facility prior to his imprisonment at Orleans (Docket No. 55, Pl. Aff., FACT SIX). He faults Dr. Douglas for relying upon other medical personnel in plaintiff's medical record rather than his own assessment (*id.* FACT TEN), in fact plaintiff claims that Dr. Douglas used a purported assessment of plaintiff from Erie County Medical Center in January or February 2011 which claimed that plaintiff was in the Attica Correctional Facility but plaintiff was not confined there at that time (*id.* FACT NINE). Plaintiff states that due to "the medical malpractice of Winston Douglas," plaintiff had undergone severe and excruciating pain (*id.* FACT ELEVEN). He claims that he was denied proper medical assistance at Orleans (*id.* FACT SEVEN) and that a Jane Doe, a nurse administrator at Orleans but not named as a defendant here, violated HIPAA [4] by having security personnel investigate plaintiff's medical claims (*id.* FACT EIGHT). Plaintiff then alleges that, on April 11, 2012, he was assaulted by prison guards during a cell search (*id.* FACT 14).

He submits Junior Cepeda's "Affidavit of Truth" about medical staff disregarding plaintiff's complaints on March 28, 2012 (Docket No. 55, Cepeda Aff. of Truth). Cepeda states that he saw unnamed medical personnel "refuse to listen" to plaintiff on March 28 to his complaints, stating that plaintiff would always "complain about the same right shoulder all the time and everyday" (*id.* FACT 3). Cepeda states that he overhead medical staff talking about plaintiff's medical condition with security personnel at Orleans (*id.* FACT 4). Cepeda also witnessed plaintiff being assaulted by security personnel on April 11, 2012 (*id.* FACT 6).

Because plaintiff was refused pain medication, he claims that he took marijuana and then plead guilty in a disciplinary proceeding to marijuana use when caught (Docket No. 57, Pl. Amend. ¶ 9). He states that he declined what he termed an experimental surgical procedure by Dr. Stegamann in January of 2011 (*id.* [first] ¶ 10). Plaintiff alleges that since his reassignment to Orleans, defendants has been denied appropriate pain medication (*id.* [second] ¶ 10; *see id.* ¶ 11). Plaintiff's condition worsened when he injured his right knee and was then denied pain medication (*id.* ¶ 12).

**\*5** In their reply, defendants note that plaintiff made "numerous irrelevant references (Docket No. 58, Defs. Atty. Reply Decl. ¶¶ 4, 6) and submitted an unsworn witness statement (*cf.* Docket No. 55, Cepeda Aff. of Truth) that he saw medical personnel walk from plaintiff on March 28, 2012 (Docket No. 58, Defs. Atty. Reply Decl. ¶ 5). Defendants argue that this statement is too vague and conclusory to create a material issue of fact, it does not identify any defendant as the medical personnel involved, and is outside the time period (2009–10) for this action (*id.*). They conclude that plaintiff has failed to raise a material issue of fact to preclude summary judgment (*id.* ¶ 7).

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits or declarations show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Ford v. Reynolds,* 316 F.3d 351, 354 (2d Cir.2003); Fed.R.Civ.P. 56(a), (c)(1) (effective Dec. 2010). The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists. In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant. *Ford, supra,* 316 F.3d at 354. "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Lazard Freres & Co. v. Protective Life Ins. Co.,* 108 F.3d 1531, 1535 (2d Cir.) (quoting *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)), *cert. denied,* 522 U.S. 864 (1997). While the moving party must demonstrate the absence of any genuine factual dispute,

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the party against whom summary judgment is sought, however, "must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (emphasis in original removed); *McCarthy v. American Intern. Group, Inc.,* 283 F.3d 121, 124 (2d Cir.2002); *Marvel Characters v. Simon,* 310 F.3d 280, 285–86 (2d Cir.2002). The opponent to summary judgment may argue that he cannot respond to the motion where it shows, by affidavit, "that, for specified reasons, it cannot present facts essential to justify its opposition," Fed.R.Civ.P. 56(d).

The Local Civil Rules of this Court require that movant and opponent each submit "a separate, short, and concise" statement of material facts, and if movant fails to submit such a statement it may be grounds for denying the motion, W.D.N.Y. Loc. Civ. R. 56(a) (1), (2) (effective Jan. 1, 2011). The movant is to submit facts in which there is no genuine issue, *id.* R. 56(a)(1), while the opponent submits an opposing statement of material facts as to which it is contended that there exists a genuine issue to be tried, *id.* R. 56(a)(2). Each numbered paragraph in the movant's statement will be deemed admitted unless specifically controverted by a correspondingly numbered paragraph in the opponent's statement, *id.* Each statement of material fact is to contain citations to admissible evidence to support the factual statements and all cited authority is to be separately submitted as an appendix to that statement, *id.* R. 56(a)(3).

**\*6** The pleading of a *pro se* plaintiff, however, is to be liberally construed, *see Haines v. Kerner,* 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (per curiam).

> "Federal Rule of Civil Procedure 8(a) (2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' Specific facts are not necessary; the statement need only " 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Bell Atlantic Corp. v. Twombly,* [550 U.S. 544, 555], 127 S.Ct. 1955, 1964, (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In addition, when ruling on a

defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint. *Bell Atlantic Corp., supra,* at [555], 550 U.S. 544, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929, (citing *Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 508, n. 1, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *Neitzke v. Williams,* 490 U.S. 319, 327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989); *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974))."

*Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (per curiam). In *Erickson,* the Court held that the Tenth Circuit departed from the liberal pleading standards of Rule 8(a)(2) by dismissing a *pro se* inmate's claims.

> "The Court of Appeals' departure from the liberal pleading standards set forth by Rule 8(a)(2) is even more pronounced in this particular case because petitioner has been proceeding, from the litigation's outset, without counsel. A document filed *pro se* is 'to be liberally construed,' [*Estelle v. Gamble,* 429 U.S., 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) ], and 'a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers,' *ibid.* (internal quotation marks omitted). *Cf.* Fed. Rule Civ. Proc. 8(f) ("All pleadings shall be so construed as to do substantial justice").

551 U.S. at 94; *see Boykin v. KeyCorp,* 521 F.3d 202, 213–14 (2d Cir.2008). Thus, the *pro se* plaintiff's complaint has to be construed "more liberally" than one filed by counsel, *Boykin, supra,* 521 F.3d at 214.

"An affidavit or declaration used to support or oppose a motion [for summary judgment] must be made with personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated," Fed.R.Civ.P. 56(c)(4) (2010) (formerly Rule 56(e)).

II. Deliberate Indifference Standard

Under the Eighth Amendment, in order to state a claim for inadequate medical treatment, plaintiff must allege that defendants acted with "deliberate indifference to [a] serious

medical need," *LaGrange v. Ryan,* 142 F.Supp.2d 287, 293 (N.D.N.Y.2001); *see Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *see also Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (the Eighth Amendment prohibits infliction of "cruel and unusual punishments" which includes punishments that "involve the unnecessary and wanton infliction of pain.") (citations omitted); *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied sub nom. Foote v. Hathaway,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). "To establish an unconstitutional denial of medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.' " *Hathaway, supra,* 37 F.3d at 66 (quoting *Estelle, supra,* 429 U.S. at 104). Mere negligent treatment or malpractice upon a suspect, however, does not create an Eighth Amendment violation, *see Corby v. Conboy,* 457 F.2d 251, 254 (2d Cir.1972). This claim has two elements, an objective component, that the deprivation must be sufficiently serious; and a subjective component, that the defendant official must act with sufficiently culpable state of mind. *Hathaway, supra,* 37 F.3d at 66. "Sufficiently serious" for the objective component contemplates "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J., dissenting) (quoted in *Hathaway, supra,* 37 F.3d at 66). Plaintiff needs to prove that defendants wantonly intended to cause him to suffer. *Wilson v. Seiter, supra,* 501 U.S. at 302.

### III. Application

#### A. Procedural Grounds

**\*7** Here, plaintiff did not submit his counterstatement of facts providing a point-by-point refutation or adoption of the defense statement of facts. Instead, plaintiff provides in moving papers an attempt to stay the hearing of this motion and in other documents alleging generally that there were contested issues of fact (Docket Nos. 51, 52) or stating specific facts (contested or not) that he is now asserting in response to the motion (Docket Nos. 55, 57). He lists various facts in the latter instances without clearly indicating which fact is material to this motion. Despite his *pro se* status, the fact plaintiff did not state what facts were contested (even if not in a formal counterstatement) and compels this Court to look exclusively at defendants' statement as the conceded facts in this case. Plaintiff does point to some minor discrepancies in facts (for example, Dr. Douglas relying upon medical findings in 2011 while plaintiff was in another facility, Docket No. 55, Pl. Aff. FACT NINE; *but cf.* Docket No. 48, Dr. Douglas Decl. ¶ 11, Ex. A Bates No. 277

(consultation with Dr. Stegamann occurred in *2010* )) but these are not material to oppose the defense motion.

First, plaintiff submits his own and a witness's "Affidavit of Truth" (Docket No. 55), but both are unsworn and not witnessed statements, *cf.* 10B Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2738, at 362–63 (Civil 3d ed.1998) (affidavits submitted for or opposing a summary judgment motion need not be notarized, they may be made under penalty of perjury, but unsworn statements will be rejected). Plaintiff certified and swore "to my unlimited commercial liability that the testimony I give before this court is, to the best of knowledge and understanding, true, correct, and complete, not misleading, the truth, the whole truth, and nothing but the truth, so help me God," and concluded that he declared "under the Laws of the Constitution of the United States of America that the above stated facts are true, correct, and complete to the best of my knowledge and belief. So help me God" (Docket No. 55, Pl. Aff. of Truth at pages 1 of 3 and 3 of 3). Witness Cepeda, a "sovereign American," submits a similar "Affidavit of Truth," declaring that "the facts stated/listed below are true, correct, and complete to the best of my understanding and belief so help me God," concluding that he "declares under the laws of the constitution of the United States of America (1787) as amended (1791) by the Bill of Rights that the above is true, correct, and complete, to the best of my belief and knowledge. And does declare that notary assistance was not possible upon time and date of submitting this Affidavit of Truth. So help me God" (*id.,* Cepeda Aff. of Truth). The handwriting for both Affidavits is similar as is the verbiage. Neither document is a declaration stating expressly that they were made under penalty of perjury, *cf.* 28 U.S.C. § 1746.

**\*8** Nevertheless, given that plaintiff is an inmate proceeding *pro se* and, as indicated by Cepeda, may have lacked notary assistance with these documents, this Court will consider them as part of the opposition to summary judgment. But even considering these papers, Cepeda's Affidavit of Truth is not admissible for the information it contains since it discusses events in 2012 that are beyond the scope of this action as currently plead, *see* 10B Wright, Miller & Kane, *supra,* § 2738, at 330, 341 (court excludes summary judgment affidavit if its irrelevance is clear). As currently plead, this case involves defendants' deficient treatment of plaintiff in 2009–10; plaintiff has not sought to amend this Complaint again to allege continuing harm. Further, Cepeda's statement accuses an unnamed medical staffer for ignoring plaintiff's

pleas for treatment on his shoulder without any connection of that unnamed employee to the named defendants in this case.

Next, this Court addresses the substance of defense arguments.

### B. Deliberate Indifference

As for the objective element of a deliberate indifference Eighth Amendment claim, at worst plaintiff alleges medical malpractice (if that) in not prescribing the medication he desired. He sought narcotic medication while the facility medical staff prescribed Ibuprofen. That allegation is not sufficient to state a constitutional deprivation. Mere negligent treatment or malpractice upon a prisoner does not create an Eighth Amendment violation. *Estelle, supra,* 429 U.S. at 106; *Corby, supra,* 457 F.2d at 254. Plaintiff also exercised his shoulder, engaging in weight lifting and hitting a heavy bag, stressful and strenuous activities on an injured rotator cuff. Defendants' motion for summary judgment on this ground is **granted.**

As for subjective element, plaintiff has not suggested that defendants wantonly wished to cause him to suffer or lay out that defendants had the sufficiently culpable state of mind to establish this element. On this ground, defendants' motion is also **granted.**

### C. Personal Involvement

As alternative ground, defendants motion is **granted** as to certain supervisory defendants because plaintiff fails to establish the personal involvement of supervisory officials retired Superintendent Khahaifa, Austin, Fitts, or Wilson in the denial of the sought medical care. The medical decisions were made by medical staff, in particular defendant Doctors Douglas and Lewis. The administrators named here merely considered grievances raised by plaintiff regarding this care.

To state a § 1983 claim, plaintiff must allege the manner in which defendant was personally involved in depriving plaintiff of his rights, *see Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994); *Al–Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989). There are several ways to allege personal involvement: plaintiff could claim that defendant had direct participation in the event; plaintiff could claim that defendant failed to remedy the violation after it was noticed; defendant created the policy which lead to the violation or allowed the policy to continue; defendant was grossly negligent in managing subordinates which caused the

violation to occur; or defendant exhibited gross negligence or deliberate indifference to plaintiff's rights by failing to act on information indicating that unconstitutional acts were taking place, *Wright, supra,* 21 F.3d at 501. An allegation of personal involvement is a prerequisite for damages under a § 1983 claim in this Circuit, *e.g., Provost v. City of Newburgh,* 262 F.3d 146, 154 (2d Cir.2001).

**\*9** Plaintiff here has not alleged any of these bases for personal involvement of the supervisory defendants. Plaintiff merely claims that they failed to intervene or grant his grievance regarding the quality of medical care he received or that the superintendent had a no narcotics policy for the inmates. He does not refute defendants' contention that the supervisory defendants had no role in the medical decision making for plaintiff's treatment or Khahaifa's denial of having a policy regarding prescribing narcotics to inmates. Defendants' motion for summary judgment on this ground is **granted.**

### D. Qualified Immunity

When confronted by a claim of qualified immunity, one of the first questions for the Court to resolve is do the facts, taken in the light most favorable to the party asserting the injury, show the official's conduct violated a constitutional right. *See Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Under *Saucier,* this Court first considers the constitutional question, then considers the qualified immunity question, *id.* But the Supreme Court, in *Pearson v. Callahan,* 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009), overruled *Saucier* in mandating the order in which trial courts are to consider qualified immunity claims. In *Pearson,* the Court recognized that district and circuit courts had the discretion to determine the order of the *Saucier* steps they would consider first (either the substance of the constitutional claim or the immunity claim), 555 U.S. at 232.

Government officials performing discretionary functions generally are shielded by qualified immunity from liability in their individual capacities, *see Frank v. Reilin,* 1 F.3d 1317, 1327 (2d Cir.1993), "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). "If it was objectively reasonable for the defendant to believe that his act did not violate the plaintiff's constitutional rights, the defendant may nevertheless be entitled to qualified immunity." *Anderson v. Creighton,* 483

U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 568–69 (2d Cir.1996).

Given that no constitutional violation was found, this Court **need not address** defendants' alternative contention that they deserve qualified immunity for their actions.

### IV. Post Script—2012 Allegations

During the pendency of this action, plaintiff has been transferred, first from Orleans to Attica Correctional Facility then to Groveland Correctional Facility and later back to Orleans. Plaintiff has written two letters to this Court and to the grievance officials complaining about conditions following his last transfer to Orleans (letter of plaintiff to Chambers, Apr. 30, 2012; letter of plaintiff to Chambers, Apr. 30, 2012). In these letters (and in other papers he submitted in response to defendants' motion, Docket No. 54; *see also* Docket No. 57), plaintiff claims that he was harassed and beaten by prison guards when he refused to lift his arms for a frisk due to his shoulder injuries. He also alleges that medical staff at Orleans refused to treat him in 2012. In his responding papers, he discusses an April 2012 incident that he seeks the Court to investigate (Docket No. 54; *see also* Docket No. 57).

**\*10** Since these letters and papers allege incidents that occurred in February 23, 2012, and April of that year, well after the incidents alleged in this pending action and unrelated to those in this action, this Court **declines** plaintiff's implied request to amend the Complaint to add these new allegations. Since plaintiff also sent these letters to the grievance authorities, any potential claims may not have been administratively exhausted.

### CONCLUSION

For the reasons stated above, defendants' motion for summary judgment (Docket No. 37) is **granted.** Plaintiff's renewed motion to stay consideration of defendants' motion (Docket No. 57) is **denied** and plaintiff's attempted motion for leave to amend the Complaint to assert claims arising from the April 2012 incident is also **denied.**

The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith, and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States,* 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962). Further requests to proceed on appeal as a poor person should be directed, on motion, to the United States Court of Appeals for the Second Circuit, in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

The Clerk of Court is instructed to close this case.

So Ordered.

### All Citations

Not Reported in F.Supp.2d, 2012 WL 2401574

---

Footnotes

1    In support of this motion, defendants submitted their Memorandum of Law, Docket No. 38; their Statement of Facts, Docket No. 39; the declarations of defendants sergeant Darin Austin, Docket No. 40; inmate grievance resolution program supervisor Brian Fitts, Docket No. 41; retired Superintendent Sibatu Khuhaifa, Docket No. 42; Dr. Dwight Lewis, Docket No. 43; corrections officer Todd Wilson, Docket No. 44; and a declaration of their counsel, with exhibit (videotape of May 7, 2009), Docket No. 45; the declaration of Dr. Winston Douglas with exhibits, plaintiff's medical record, filed under seal, Docket No. 48; their attorney's reply Declaration, Docket No. 58.
        In opposition, plaintiff submits his motion to stay summary judgment and for appointment of counsel and its supporting papers, Docket Nos. 50, 51, 52; his letter to Chambers, dated Apr. 11, 2012, Docket No. 54; and his "Affidavit of Truth Amendment in Opposition to Respondents Summary Judgment," with enclosed Affidavit of Junior Lorenzo Cepeda and exhibit of a grievance, Docket No. 55; his amendment renewed motion for stay of defense motion, Docket No. 57.

2    Plaintiff reviewed the videotape, Docket No. 45, Defs. Atty. Decl., Ex. A, cover letter Feb. 13, 2012 (with written notation "tape reviewed: 2–16–12" and signed by plaintiff).

3    Plaintiff also sought production of his medical records from January 2012 to present, Docket No. 54, Pl. Letter at 3. Docket No. 48 is plaintiff's medical record during the relevant period for this action, from February 13, 2009, to June 1, 2010, *see* Docket No. 48, Dr. Douglas Decl. ¶ 4, Ex. A, at first page, cover letter of April 12, 2011; *see generally id.,* Ex. A.

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

4    Health Insurance Portability and Accountability Act, Pub.L. No. 104–191, 110 Stat.1936 (1996). As recently held by this Court, any violation of medical privacy under HIPAA is limited to enforcement by the Secretary of Health and Human Services, *Wright v. Szczur,* No. 11 CV 140, 2012 U.S. Dist. LEXIS 10872, at *15,2012 WL 268283 (W.D .N.Y. Jan. 30, 2012) (Skretny, Ch. J.). Thus, even if plaintiff were deemed to allege such a claim, it would have to be denied.

---

2013 WL 1500422
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Troy SMITH, Plaintiff,
v.
C. ROSATI, et al., Defendants.

Civil Action No. 9:10–CV–1502 (DNH/DEP).
|
Feb. 20, 2013.

**Attorneys and Law Firms**

Troy Smith, Elmira, NY, pro se.

Hon. Eric T. Schneiderman, New York State Attorney General, Michael G. McCartin, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** *Pro se* plaintiff Troy Smith, a New York State prison inmate, has commenced this action, pursuant to 42 U.S.C. § 1983, against the Commissioner of the New York State Department of Corrections and Community Supervision ("DOCCS") and several DOCCS employees, alleging deprivation of his civil rights. In general terms, plaintiff's amended complaint alleges that two defendants assaulted him at the instruction of other defendants, that one defendant failed to intervene and protect him from the assault, that two defendants failed to provide him with adequate medical care, that several defendants conspired to conceal the assault, and that he was deprived procedural due process at a disciplinary hearing arising from the event.

Currently pending before the court in connection with the action is defendants' motion for the entry of partial summary judgment. Specifically, defendants seek dismissal of all claims against all defendants with the exception of those asserted against defendants Rosati and St. John, who, plaintiff alleges, assaulted him. For the reasons set forth below, I recommend that defendants' motion be granted except as it relates to the failure to intervene claim asserted against

defendant Fraser and the retaliation claim interposed against defendant Goodman.

I. *BACKGROUND* [1]

Plaintiff is a New York State prison inmate currently being held in the custody of the DOCCS. *See generally* Am. Compl. (Dkt. No. 7). Although he is currently confined elsewhere, at all times relevant to this action, Smith was confined in the Great Meadow Correctional Facility ("Great Meadow"), located in Comstock, New York. *Id.* at 1. Two series of events, separately discussed below, give rise to this action.

A. *Mattress Incident*

In January 2010, plaintiff attempted to trade in his old mattress to defendant B. Mars, the laundry supervisor at Great Meadow, in return for a new one. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 9. According to plaintiff, defendant Mars improperly ordered plaintiff to pay the full price for the new mattress because she believed that plaintiff had purposely damaged his old one. *Id.* at 9–10. Defendant Mars issued a misbehavior to plaintiff, and plaintiff filed a grievance against defendant Mars with the Inmate Grievance Resolution Committee ("IGRC"), both as a result of the incident. *Id.* at 10. Defendant Craig Goodman, a corrections captain employed by the DOCCS, presided over the disciplinary hearing that resulted from the misbehavior report issued by defendant Mars. *Id.* at 11; Goodman Decl. (Dkt. No. 79, Attach.12) at ¶ 1. According to plaintiff, at that hearing, defendant Goodman acknowledged that plaintiff's old mattress was damaged as a result of normal wear-and-tear, promised to testify on plaintiff's behalf at the IGRC hearing, and dismissed the misbehavior report. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 11. Plaintiff alleges, however, that defendant Goodman ultimately refused to testify on his behalf at the IGRC hearing, and denied that he told plaintiff his mattress was damaged as a result of normal wear-and-tear. *Id.* at 12. As a result, in January or February 2010, plaintiff filed a grievance with the IGRC alleging that defendant Goodman lied to him. *Id.* at 15, 17.

**\*2** In May 2010, plaintiff tested positive for marijuana use, and was issued a misbehavior report. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 13. Defendant Goodman presided over the ensuing disciplinary hearing and, after finding plaintiff guilty, sentenced him principally to twelve months of disciplinary confinement in the Special Housing Unit ("SHU"). *Id.* at 18, 21. Due to plaintiff's mental health status, however, this sentence was subsequently modified by the facility

superintendent to six months in keeplock confinement. *Id.* at 23. On or about June 11, 2010, plaintiff arrived in keeplock at Great Meadow. *Id.*

### B. *Assault*

On June 18, 2010, defendant Paul Zarnetski, a corrections lieutenant employed by the DOCCS, instructed defendant Craig Rosati, a corrections officer also employed by the DOCCS, to escort plaintiff to his scheduled disciplinary hearing. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 87; Zarnetski Decl. (Dkt. No. 79, Attach.14) at ¶¶ 1, 4. At approximately 12:45 p.m. on the same date, defendant Rosati retrieved plaintiff from his cell for the escort. Am. Compl. (Dkt. No. 7) at 9; Goodman Decl. Exh. (Dkt. No. 79, Attach.15) at 1. As the two entered a nearby stairway, an altercation between them, which resulted in both plaintiff and defendant Rosati falling down the stairs. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 31; Goodman Decl. Exh. (Dkt. No. 79, Attach.15) at 1. Plaintiff alleges that defendant Rosati pushed him down the stairs and then jumped on him. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 31, 35. Defendant Rosati, on the other hand, reported that plaintiff turned toward him in a threatening manner, causing him to use force that consisted of a strike to plaintiff's forehead with a closed fist. Goodman Decl. Exh. (Dkt. No. 79, Attach.13) at 1. It is undisputed, however, that, after plaintiff and defendant Rosati fell down the stairs, defendant Chad St. John, another corrections officer, arrived at the scene. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 35–36; Goodman Decl. Exh. (Dkt. No. 79, Attach.13) at 1. Plaintiff alleges that defendant St. John began kicking him while he was still on the ground. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 35–36. Defendants, however, maintain that defendant St. John used force that consisted only of applying mechanical hand restraints. Goodman Decl. (Dkt. No. 79, Attach.13) at 1.

Shortly after the arrival of defendant St. John, defendant C. Fraser, a corrections sergeant at Great Meadow, also arrived on the scene. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 37; Goodman Decl. Exh. (Dkt. No. 79, Attach.13) at 1. The parties dispute whether defendant Fraser witnessed a further use of force by defendant Rosati when defendant Rosati pushed plaintiff's face into a wall and threatened to kill him. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 38; Defs.' L.R. 7.1 Statement (Dkt. No. 79, Attach.16) at ¶ 9. It is undisputed, however, that defendant Fraser ordered that a video camera be brought to the scene; upon its arrival, a corrections officer began filming plaintiff's escort from the stairway to the Great

Meadow hospital. Lindemann Decl. Exhs. (Dkt. No. 79, Attach.10) (traditionally filed, not electronically filed).

**\*3** Upon his arrival at the hospital, Smith was examined by defendant David Lindemann, a DOCCS registered nurse. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 40; Lindemann Decl. (Dkt. No. 79, Attach.7) at ¶¶ 1, 4. As a result of his examination and interview of plaintiff, defendant Lindemann noted plaintiff's complaints of a sore left shoulder, pain to his left rib area, and facial area pain, but observed no decrease in plaintiff's range of motion in his shoulder and no visible injuries to his rib area. Lindemann Decl. (Dkt. No. 79, Attach.7) at ¶ 5; Lindemann Decl. Exhs. (Dkt. No. 79, Attachs.8, 9). Defendant Lindemann observed a swollen area on plaintiff's head and a laceration of approximately one and one-half inches in length above plaintiff's left eye, for which he referred plaintiff to defendant Nesmith for stitches. *Id.* Defendant Ted Nesmith, a physicians assistant employed by the DOCCS, closed plaintiff's laceration above his left eye with eight stitches. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 79–80; Nesmith Decl. (Dkt. No. 79, Attach.6) at ¶ 5.

As a result of the incident, plaintiff was issued a misbehavior report accusing him of engaging in violent conduct, attempted assault on staff, and refusing a direct order. McCartin Decl. Exhs. (Dkt. No. 79, Attach.5) at 2–3. A Tier III disciplinary hearing was subsequently convened by defendant Andrew Harvey, a commissioner's hearing officer, to address the charges. [2] *Id.* at 2. Plaintiff was assigned a corrections counselor, defendant Torres, to help him prepare his defense at the disciplinary hearing. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 75–79. At the close of that hearing, plaintiff was found guilty on all three counts, and was sentenced to a six-month period of disciplinary SHU confinement, together with a loss of packages, commissary, and telephone privileges for a similar period. *Id.* at 21.

In the months that followed the incident involving defendants Rosati and St. John, both plaintiff and his mother, Linda Terry, wrote letters to defendant Fischer, the DOCCS Commissioner, complaining of the alleged assault. Plf.'s Resp. Exhs. (Dkt. No. 87, Attach.2) at 5, 8–12. On September 15, 2010, defendant Lucien LeClaire, the Deputy DOCCS Commissioner, responded by letter, advising plaintiff that defendant Fischer had referred plaintiff's complaint to him, and that he, in turn, had referred the matter to the Office of Special Housing/Inmate Disciplinary Programs. *Id.* at 6. The next day, defendant Albert Prack, the acting director of the Office of Special Housing/Inmate Disciplinary Programs,

wrote a letter to plaintiff indicating that his letters to defendant Fischer, which he construed as a request for reconsideration of his appeal of the disciplinary conviction, was without merit, and advising plaintiff that "[n]o further administrative action will be taken." *Id.* at 7.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on December 13, 2010, and on February 14, 2011, filed an amended complaint as a matter of right. Dkt. Nos. 1, 7. Those named as defendants in plaintiff's amended complaint include DOCCS Commissioner Brian Fischer; DOCCS Chief Counsel and Deputy Commissioner Anthony J. Annucci; DOCCS Deputy Commissioner Lucien LeClaire, Jr.; DOCCS Inspector General Richard Roy; Deputy Superintendent for Security at Great Meadow Charles Kelly; Deputy Superintendent for Administration at the Great Meadow D. Lindstrand;

Corrections Captains Joseph Carey and Craig Goodman; [3] Corrections Sergeants D. Bebee and C. Fraser; Corrections Lieutenants T. Pray and Paul Zarnetski; [4] Commissioner's Hearing Officer Andrew Harvey; Corrections Counselor Torres; Corrections Officers Craig P. Rosati and Chad W. St. John; Physicians Assistant Ted Nesmith; [5] Register Nurse David Lindemann; [6] Laundry Supervisor B. Mars; and Acting Director of the Office of Special Housing/Inmate Disciplinary Programs Albert Prack. [7]

**\*4** Liberally construed, plaintiff's amended complaint asserts eight causes of action, claiming (1) the use of excessive force by defendants Rosati and St. John; (2) conspiracy to conceal the alleged assault by defendants Rosati and St. John against defendants Rosati, St. John, Fraser, Bebee, Kelly, Lindemann, Nesmith, Lindstrand, Goodman, Torres, and Harvey; (3) deliberate indifference to plaintiff's serious medical needs against defendants Lindemann and Nesmith; (4) retaliation against defendants Goodman, Rosati, and St. John; (5) failure to enforce DOCCS regulations against defendants Fischer, Annucci, Roy, and LeClaire; (6) withholding personal property against defendant Mars and Goodman; (7) procedural due process against defendants Harvey, Torres and Prack; and (8) failure to train and supervise against defendants Fischer, Annucci, LeClaire, Roy, Kelly, and Lindstrand. [8] Am. Compl. (Dkt. No. 7) at 19–20. Plaintiff seeks declaratory and injunctive relief, as well as compensatory and punitive damages.

By decision and order dated June 23, 2011, following an initial review of plaintiff's amended complaint, pursuant to 28 U.S.C. §§ 1915(e) and 1915A, the court *sua sponte* dismissed all of plaintiff's claims against defendants Kelly, Lindstrand, Carey, Bebee, and Pray, without prejudice, as well as plaintiff's equal protection claims against defendants Mars and Goodman, also without prejudice, and otherwise authorized the action to go forward. Dkt. No. 10.

On May 14, 2012, following the close of discovery, defendants moved for the entry of partial summary judgment dismissing the majority of the claims made in plaintiff's amended complaint. Dkt. No. 79. In their motion, defendants argue that (1) defendants Fischer, Annucci, LeClaire, Roy, and Prack are entitled to dismissal based upon the lack of their personal involvement in the alleged constitutional violations; (2) the record fails to support a claim of deliberate medical indifference against defendant Nesmith and Lindemann; (3) the record does not disclose a basis to hold defendant Fraser liable for failure to protect or intervene; (4) plaintiff's claims against defendant Zarnetski are subject to dismissal, based upon his lack of prior knowledge of and involvement in the assault; (5) plaintiff's verbal harassment claim against defendant Goodman is not cognizable under section 1983; (6) plaintiff's procedural due process cause of action against defendant Harvey lacks merit; (7) plaintiff's claim based upon the payment of $65 for a new mattress does not state a cognizable constitutional claim; and (8) in any event, all defendants, except for defendants Rosati and St. John, are entitled to qualified immunity. Defs.' Memo. of Law (Dkt. No. 79, Attach.17). Defendants' motion, to which plaintiff has since responded, Dkt. No. 87, is now ripe for determination and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72(3)(c). *See* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Summary Judgment Standard*

**\*5** Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact

is "material" for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n.4; *Sec. Ins. Co.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324; *Anderson,* 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities and draw all inferences in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

### B. *Personal Involvement*

In their motion, defendants seek dismissal of all claims against defendants Fischer, Annucci, LeClaire, Roy, and Prack based upon lack of personal involvement. Plaintiff responds by arguing that, through his letters, those individuals were or should have been aware of plaintiff's circumstances, but were deliberately indifferent, and additionally were derelict in the performance of their duties and in supervising subordinates, permitting the alleged constitutional deprivations to occur.

"Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991); *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant

and the injuries suffered." *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). It is well established that a supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor because there is no *respondeat superior* liability under section 1983.[9] *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). A supervisor, however, may be held responsible for a civil rights violation when it is established that he (1) has directly participated in the challenged conduct; (2) after learning of the violation through a report or appeal, failed to remedy the wrong; (3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; (4) was grossly negligent in managing subordinates who caused the unlawful event; or (5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty,* 490 F.3d 143, 152–53 (2d Cir.2007), *rev'd on other grounds sub nom., Ashcroft v. Iqbal,* 556 U.S. 662 (2009); *see also Richardson,* 347 F.3d at 435; *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).[10]

### 1. *Defendant Fischer*

**\*6** At his deposition, plaintiff testified that he sued DOCCS Comissioner Fischer for two reasons: (1) he wrote defendant Fischer about the alleged assault by defendants Rosati and St. John, and defendant Fischer failed to respond; and (2) as the DOCCS Commissioner, defendant Fischer is responsible for the actions of his subordinate employees. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 55–57. Neither of these reasons provides an adequate basis for suit under section 1983. *See, e.g., Hernandez v. Keane,* 342 F.3d 137, 144 (2d Cir.2003) ("[S]upervisor liability in a [section] 1983 action ... cannot rest on *respondeat superior."* ); *Parks v. Smith,* No. 08–CV–0586, 2011 WL 4055415, at \*14 (N.D.N.Y. Mar. 29, 2011) (Lowe, M.J.), *adopted by* 2011 WL 4055414 (N.D.N.Y.2011) (McAvoy, J.) ("A prisoner's allegation that a supervisory official failed to respond to a grievance is insufficient to establish that official's personal involvement.").[11] Except for this testimony by plaintiff, there is no other record evidence relating to defendant Fischer. As a result, I find that no reasonable factfinder could conclude, based on the record evidence, that defendant Fischer was personally involved in any of the allegations giving rise to this action.

### 2. *Defendant Annucci*

At his deposition, plaintiff testified that he sued DOCCS Chief Counsel and Deputy Commissioner Annucci in this action for four reasons: (1) he is at the top of the chain

of command as Deputy Commissioner of DOCCS; (2) he failed to investigate the alleged assault on plaintiff; (3) he merely passed the letters from plaintiff and plaintiff's family down the chain of command; (4) he did not do his job. Plf.'s Dep. Tr. (Dkt. No. 79, Attach 3) at 57–59. Plaintiff's argument that defendant Annucci did not do his job by failing to investigate is based on plaintiff's unsupported assumption that defendant Fischer forwarded plaintiff's letter to defendant Annucci and instructed him to investigate. *See id.* at 58 ("[Defendant Annucci] didn't do what I figured he was told to be done by investigating[.]"). Indeed, there is no record evidence, including any testimony from plaintiff, that plaintiff or any members of his family wrote a letter or complaint directly to defendant Annucci. In any event, even assuming that defendant Annucci received plaintiff's letters, defendant Annucci's failure to respond to them is not sufficient to give rise to personal involvement under section 1983. *Parks,* 2011 WL 4055415, at *14 ("A prisoner's allegation that a supervisory official failed to respond to a grievance is insufficient to establish that official's personal involvement."). For these reasons, I find that no reasonable factfinder could conclude, based on the record evidence, that defendant Annucci was personally involved in any of the allegations giving rise to this action.

### 3. *Defendant LeClaire*

At his deposition, plaintiff testified that he sued Deputy DOCCS Commissioner LeClaire because defendant LeClaire forwarded plaintiff's letter addressed to defendant Fischer regarding the alleged assault to the Office of Special Housing/Inmate Disciplinary Programs. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 60; Plf.'s Resp. Exhs. (Dkt. No. 87, Attach.2) at 6. That allegation is insufficient to raise a dispute of material fact as to whether defendant LeClaire is personally involved in any of the allegations giving rise to this action. *See, e.g., Ward v. LeClaire,* No. 07–CV–0026, 2010 WL 1189354, at *5 (N.D.N.Y. Mar. 24, 2010) (Suddaby, J.) ("[I]t is well settled that referring letters and grievances to staff for investigation is not sufficient to establish personal involvement." (internal quotation marks and alterations omitted)). Because there is no other record evidence that relates to defendant LeClaire, I find that no reasonable factfinder could conclude that he was personally involved in any of the allegations giving rise to this action.

### 4. *Defendant Roy*

**\*7** At his deposition, plaintiff stated that he sued defendant Roy because he has not received a response from the Inspector General's Office, where defendant Roy heads the Internal Affairs Department, regarding plaintiff's grievance. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 61. Plaintiff testified that he gave a copy of his grievance regarding the alleged assault to an Internal Affairs employee while at Great Meadow, and was later interviewed regarding the incident, but has not yet received a result of the investigation. *Id.* at 61–64. Importantly, plaintiff testified that he has no personal knowledge that defendant Roy, as the head of Internal Affairs, was ever personally aware of the investigation. *Id.* Because there is no *respondeat superior* liability under section 1983, this evidence is not sufficient to support a claim against defendant Roy. *Hernandez,* 342 F.3d at 144. For that reason, I find that no reasonable factfinder could conclude, based on the record evidence, that defendant Roy was personally involved in any of the allegations giving rise to this action.

### 5. *Defendant Prack*

At his deposition, plaintiff testified that he sued defendant Prack because Prack cursorily reviewed plaintiff's appeal of his disciplinary conviction in his capacity as the acting director of the Office of Special Housing/Inmate Disciplinary Programs. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 92; Plf.'s Resp. Exhs. (Dkt. No. 87, Attach.2) at 7. A review of the record evidence reveals that defendant Prack did, in fact, respond to plaintiff's appeal of his disciplinary conviction, and that defendant Prack indicated in that response that plaintiff's appeal was meritless. Plf.'s Resp. Exhs. (Dkt. No. 87, Attach.2) at 7.

Whether review of an inmate's disciplinary conviction by a person in defendant Prack's position is sufficient to establish personal involvement in section 1983 cases is the subject of debate in this circuit. Some courts have determined that the review and response to an appeal of a disciplinary conviction are sufficient to establish personal involvement because that conduct implicates the second of the five potential grounds for supervisor liability under *Colon.* [12] *See Baez v. Harris,* No. 01–CV–0807, 2007 WL 446015, at *2 (N.D.N.Y. Feb. 7, 2007) (Mordue, C.J.) (finding that the response of "the Director of the Special Housing/Inmate Disciplinary Program" to the plaintiff's appeal is "sufficient to withstand summary judgment on the issue of personal involvement"); *Ciaprazi v. Goord,* No. 02–CV–0915, 2005 WL 3531464, at *16 (N.D.N.Y. Dec. 22, 2005) (Sharpe, J., *adopting report and recommendation by* Peebles, M.J.) (recommending that [the director of Office of Special Housing/Inmate Disciplinary Programs] not be dismissed for lack of personal

involvement because a "review of [the plaintiff's appeal from a disciplinary conviction] sufficiently establishes his personal involvement based upon [the defendant] being positioned to discern and remedy the ongoing effects of any such violations"); *Johnson v. Coombe,* 156 F.Supp.2d 273, 278 (S.D.N.Y.2001) (finding that plaintiff's complaint sufficiently alleged personal involvement of the superintendent and DOCCS commissioner to withstand motion to dismiss because the complaint alleged that both defendants had actual or constructive notice of the alleged constitutional violation that occurred at the disciplinary hearing; *Gilbert v. Selsky,* 867 F.Supp. 159, 166 (S.D.N.Y.1994) ("If a supervisory official learns of a violation through ... an appeal, but fails to remedy the wrong, that may constitute a sufficient basis for liability."); *Cepeda v. Coughlin,* 785 F.Supp. 385, 391 (S.D.N.Y.1992) (holding that, on a motion to dismiss, the allegation that the DOCCS's commissioner "entertained" and "affirmed" the plaintiff's appeal is sufficient to state a claim against the commissioner because "the allegation that supervisory personnel learned of alleged misconduct on appeal yet failed to correct it constitutes an allegation of personal participation").

**\*8** On the other hand, some courts have concluded otherwise, holding that the mere allegation that a defendant reviewed a disciplinary conviction appeal is insufficient to find that defendant personally involved. *See Tafari v. McCarthy,* 714 F.Supp.2d 317 (N.D.N.Y.2010) (Hurd, J., *adopting report and recommendation by* Lowe, M.J .) ("The affirming of a disciplinary conviction does not constitute personal involvement in a constitutional violation."); *Abdur– Raheem v. Selsky,* 598 F.Supp.2d 367, 370 (W.D.N.Y.2009) ("The only allegation concerning [the director of the Special Housing/Inmate Disciplinary Program] ... is that he affirmed the disposition of plaintiff's administrative segregation hearing, pursuant to which plaintiff was confined to SHU. That is not enough to establish [his] personal involvement." (internal citation omitted)); *Odom v. Calero,* No. 06–CV–15527, 2008 WL 2735868, at \*7 (S.D.N.Y. Jul. 10, 2008) (holding that the allegation that the director of the Special Housing/Inmate Disciplinary Program was personally involved as a result his denial of the plaintiff's appeal of his disciplinary conviction was not sufficient to trigger the second category establishing personal involvement under *Colon* because, "[o]nce the [disciplinary] hearing was over and [the defendant's] decision was issued, the due process violation was completed"); *Ramsey v. Goord,* No. 05–CV–0047A, 2005 WL 2000144, at \*6 (W.D.N.Y. Aug. 13, 2005) ("[T]he fact that [the DOCCS commissioner

and SHU director], as officials in the DOC[C]S 'chain of command,' affirmed [a] determination on appeal is not enough to establish personal involvement of their part."); *Joyner v. Greiner,* 195 F.Supp.2d 500, 506 (S.D.N.Y.2002) ("The fact that Superintendent Greiner affirmed the denial of plaintiff's grievance—which is all that is alleged against him—is insufficient to establish personal involvement or to shed any light on the critical issue of supervisory liability, and more particularly, knowledge on the part of the defendant." (internal quotation marks omitted)).

At this time, I am inclined to agree with those courts that have determined that a defendant's review and response to an appeal of a disciplinary conviction is sufficient under *Colon* to find that defendant personally involved. Mindful that on a motion for summary judgment I must view the facts, and draw all inferences, in the light most favorable to the non-movant, I find that a reasonable factfinder could conclude, if plaintiff's testimony is credited, that defendant Prack's review of plaintiff's disciplinary conviction revealed a due process violation, and by defendant Prack dismissing plaintiff's appeal, he failed to remedy that violation. Additionally, because it appears that plaintiff was still serving the sentence imposed at the disciplinary hearing where his alleged due process violation occurred, I find that any violation that may have occurred was ongoing, and defendant Prack was in a position to remedy that violation, at least in part, at the time plaintiff appealed his conviction. All of this is enough to find that there is a dispute of material fact as to whether defendant Prack was personally involved in the allegations giving rise to plaintiff's due process claim by way of the second of the five potential grounds for supervisor liability under *Colon.* Cf. *Black v. Coughlin,* 76 F.3d 72, 75 (2d Cir.1996) ("We disagree, however, with the district court's denial of leave to amend to add [the director of the Special Housing/Inmate Disciplinary Program], who [was] personally involved in [the plaintiff's] disciplinary proceedings[.]"). [13]

**\*9** In summary, I recommend that defendants' motion for summary judgment on the basis of personal involvement be granted with respect to defendants Fischer, Annucci, LeClaire, and Roy, but denied as it relates to defendant Prack.

## C. *Deliberate Indifference Claims Against Defendants Nesmith and Lindemann*

Defendants next seek dismissal of plaintiff's Eighth Amendment deliberate indifference claims against defendants Nesmith and Lindemann, arguing that the record

lacks any evidence of their deliberate indifference to plaintiff's serious medical needs. In his amended complaint, plaintiff contends that defendants Nesmith and Lindemann failed to provide him with proper medical treatment for back pain, blurred vision, and hearing loss resulting from alleged assault by defendants Rosati and St. John on June 18, 2010. Am. Compl. (Dkt. No. 7) at 12.

The Eighth Amendment prohibits punishment that is "incompatible with 'the evolving standards of decency that mark the progress of a maturing society [,]' or which 'involve the unnecessary and wanton infliction of pain [.]' " *Estelle v. Gamble,* 429 U.S. 97, 102–03 (1976) (quoting *Trop v. Dulles,* 356 U.S. 86, 100–01 (1958) and *Gregg v. Georgia,* 428 U.S. 153, 169–73 (1976) (internal citations omitted)). While the Eighth Amendment " 'does not mandate comfortable prisons,' neither does it permit inhumane ones." *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 349 (1981)).

"These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration." *Estelle,* 429 U.S. at 103. Failure to provide inmates with medical care, "[i]n the worst cases, ... may actually produce physical torture or lingering death, [and] ... [i]n less serious cases, ... may result in pain and suffering no one suggests would serve any penological purpose." *Id.*

A claim alleging that prison officials have violated an inmate's Eighth Amendment rights by inflicting cruel and unusual punishment must satisfy both objective and subjective requirements. *Wright v.. Goord,* 554 F.3d 255, 268 (2d Cir.2009); *Price v. Reilly,* 697 F.Supp.2d 344, 356 (E.D.N.Y.2010). To satisfy the objective requirement, the Second Circuit has said that

> [d]etermining whether a deprivation
> is an objectively serious deprivation
> entails two inquiries. The first inquiry
> is whether the prisoner was actually
> deprived of adequate medical care.
> As the Supreme Court has noted,
> the prison official's duty is only to
> provide reasonable medical care ....
> Second, the objective test asks whether
> the inadequacy in medical care
> is sufficiently serious. This inquiry
> requires the court to examine how
> the offending conduct is inadequate

> and what harm, if any, the inadequacy
> has caused or will likely cause the
> prisoner.

*Salahuddin v. Goord,* 467 F.3d 263, 279–80 (2d Cir.2006) (internal citations omitted).

**\*10** The second inquiry of the objective test requires a court to look at the seriousness of the inmate's medical condition if the plaintiff alleges a complete failure to provide treatment. *Smith v. Carpenter,* 316 F.3d 178, 185–86 (2d Cir.2003). "Factors relevant to the seriousness of a medical condition include whether 'a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain." *Salahuddin,* 467 F.3d at 280 (internal quotation marks and alterations omitted).

If, on the other hand, a plaintiff's complaint alleges that treatment was provided but was inadequate, the second inquiry of the objective test is narrowly confined to that specific alleged inadequacy, rather than focusing upon the seriousness of the prisoner's medical condition. *Salahuddin,* 467 F.3d at 280. "For example, if the prisoner is receiving ongoing treatment and the offending conduct is an unreasonable delay or interruption in that treatment, [the focus of the] inquiry [is] on the challenged delay or interruption in treatment, rather than the prisoner's underlying medical condition alone." *Id.* (quoting *Smith,* 316 F.3d at 185) (internal quotations marks omitted).

To satisfy the subjective requirement, a plaintiff must demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.' " *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999). "In medical-treatment cases ..., the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin,* 467 F.3d at 280. "Deliberate indifference," in a constitutional sense, "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result. *Id.* (citing *Farmer,* 511 U.S. at 837); *see also Leach v. Dutrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Farmer* ); *Waldo v. Goord,* No. 97–CV–1385, 1998 WL 713809, at \*2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.) (same). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term

is used in criminal law." *Salahuddin,* 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 839–40).

Here, after carefully reviewing the record evidence, I find that no dispute of material fact exists as to whether defendants Nesmith and Lindemann were deliberately indifferent to plaintiff's medical needs as a result of the alleged assault by defendants Rosati and St. John. More specifically, although plaintiff testified at his deposition that defendant Nesmith did not follow "his procedure as being a physician" and failed to follow-up with plaintiff, plaintiff also testified that defendant Nesmith cleaned plaintiff's laceration and closed it with eight stitches. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 79–80. Importantly, plaintiff testified that, on the date of the alleged assault, defendant Nesmith did everything that plaintiff requested of him. *Id.* at 80, 81. The record also reflects that defendant Lindemann completed an examination of plaintiff upon his arrival at the Great Meadow hospital, and that he completed a two-page "Use of Force Report" and one-page "Alleged Fight Exam" report during his examination of plaintiff. [14] Lindemann Decl. (Dkt. No. 79, Attach.7) at ¶ 4; Lindemann Decl. Exhs. (Dkt. No. 79, Attachs.7, 8); Nesmith Decl. (Dkt. No. 79, Attach.6) at ¶ 4. I have also reviewed the videotape submitted by defendants that recorded the treatment that defendants Nesmith and Lindemann provided plaintiff following the alleged assault by defendants Rosati and St. John. Lindemann Decl. Exhs. (Dkt. No. 79, Attach.10) (traditionally filed, not electronically filed). This recording did not display anything unusual, and, although the recording did not include any sound, it appeared that defendants Lindemann and Nesmith asked plaintiff questions, responded to plaintiff's answers, and provided plaintiff with thorough medical care for his reported injuries. *See generally id.* After carefully reviewing all of this evidence, including plaintiff's testimony, I conclude that no reasonable factfinder could find that the care defendants Nesmith and Lindemann provided plaintiff was inadequate, or that they acted with the requisite deliberate indifference when providing medical treatment to plaintiff.

**\*11** As it relates to plaintiff's allegations that he received inadequate follow-up medical treatment, the record evidence does not support this allegation. Specifically, plaintiff testified that defendant Nesmith removed his stitches. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 83. Additionally, a review of plaintiff's ambulatory health record reveals that plaintiff was subsequently treated by other medical staff members at Great Meadow on several occasions, including on June 20 and 25, 2010; July 1, 6, 20, 23, 27, and 29, 2010; and

August 3, 2010. Lindemann Decl. Exhs. (Dkt. No. 79, Attach 11). While some of those visits reference symptoms that plaintiff now attributes to the alleged assault on June 18, 2010, including a notation that plaintiff was scheduled to see an eye doctor (June 25, 2010), others involved matters unrelated to the alleged assault, including missing dentures (July 20, 2010), bug bites (July 23, 2010) and a request for toenail clippers (July 29, 2010). *Id.* Even considered in the light most favorable to plaintiff, the cumulation of this evidence leads me to find that a reasonable factfinder could not conclude that plaintiff received inadequate follow-up medical care by any of the named-defendants, including defendants Nesmith and Lindemann, or that any of the nameddefendants acted with the requisite deliberate indifference.

In summary, I find that there is no record evidence to support a reasonable factfinder's determination that, objectively, defendants Nesmith and Lindemann provided plaintiff with inadequate treatment for a serious medical need, or that, subjectively, they knew of but disregarded an excessive risk to plaintiff's health or safety. I therefore recommend dismissal of plaintiff's deliberate medical indifference claim against those two defendants.

### D. *Plaintiff's Claims Against Defendant Fraser*

Defendants next seek dismissal of all claims asserted in plaintiff's amended complaint against defendant Fraser. A careful review of plaintiff's amended complaint reveals that it asserts three causes of action against defendant Fraser, including (1) conspiracy to cover-up the alleged assault on June 18, 2010; (2) the issuance of a false misbehavior report; and (3) failure to intervene. In their motion, defendants only specifically seek dismissal of a perceived excessive force claim, and the issuance of a false misbehavior report claim against defendant Fraser. For the sake of completeness, I will nonetheless address all of the claims asserted against defendant Fraser.

To the extent that plaintiff's amended complaint may be construed as asserting an excessive force claim against defendant Fraser, I recommend dismissal of that claim because there is no record evidence that defendant Fraser used any force against plaintiff. Specifically, a review of both plaintiff's amended complaint and his deposition transcript do not reveal an allegation that defendant Fraser used any force against him. Plaintiff only alleges that defendants Rosati and St. John used force, which is not sufficient to support an excessive force claim against defendant Fraser.

**\*12** The remaining claims asserted against defendant Fraser, except for plaintiff's failure to intervene cause of action, are also easily discounted. Plaintiff's conspiracy claim fails against defendant Fraser, as well as defendants Rosati, St. John, Harvey and Torres, Am. Compl. (Dkt. No. 7) at 19, because there is no record evidence that these defendants agreed to violate any of plaintiff's constitutional rights. *See Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999) ("To prove a [section] 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages."). Specifically, plaintiff did not testify at his deposition to the existence of any agreement among those defendants, and the only mention of such an agreement is a conclusory allegation in plaintiff's amended complaint. *See* Am. Compl. (Dkt. No. 7) at 19 ("Defendant[ ]s Fraser, Rosati, St. John, Harvey, and Torres conspired to use Tier III hearing to deflect official misconduct for exercising a protected right[.]"). Mere conclusory allegations that are unsupported by any record evidence are insufficient to give rise to a genuine dispute of material fact. *See, e.g., Hilson v. Maltese,* No. 09–CV–1373, 2012 WL 6965105, at *6 n.10 (N.D.N.Y. Dec. 14, 2012) (Baxter, M.J.), *adopted by* 2013 WL 375489 (N.D.N.Y. Jan. 30, 2013) (Mordue, J.) ("Plaintiff's conclusory assertion ... is not sufficient to establish a material issue of fact[.]" (listing cases)).

Plaintiff's claim that defendant Fraser issued a false misbehavior report against him is not cognizable under section 1983. *See Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) ("[A] prison inmate has no general right to be free from being falsely accused in a misbehavior report.").

The allegations in plaintiff's amended complaint related to defendant Fraser's failure to adhere to DOCCS's regulations or policies, do not give rise to a cognizable claim under section 1983. *See Bolden v. Alston,* 810 F.2d 353, 358 (2d Cir.1987) ("State procedural requirements do not establish federal constitutional rights."); *Barnes v. Henderson,* 628 F.Supp.2d 407, 411 (W.D.N.Y.2009) ("[A] violation of New York State regulations concerning disciplinary hearings does not in itself establish a due process violation.").

Plaintiff's failure to intervene claim against defendant Fraser, however, cannot be dismissed at this juncture. "[A]ll law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994), *accord, Curley v. Village of Suffern,* 268 F.3d 65, 72 (2d Cir.2001); *see also Mowry v. Noone,* No. 02–CV–6257, 2004 WL 2202645, at *4 (W.D.N.Y. Sept. 30, 2004) ("Failure to intercede results in liability where an officer observes the use of excessive force or has reason to know that it will be used."). To establish liability on the part of a defendant under this theory, "the plaintiff must adduce evidence establishing that the officer had (1) a realistic opportunity to intervene and prevent the harm, (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated, and (3) that officer does not take reasonable steps to intervene." *Henry v. Dinelle,* No. 10–CV–0456, 2011 WL 5975027, at *4 (N.D.N.Y. Nov. 29, 2011) (Suddaby, J.) (citing *JeanLaurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008)).

**\*13** Here, a review of the record evidence reveals the existence of a genuine dispute of material fact as to whether defendant Rosati's continued use of force against plaintiff triggered defendant Fraser's duty to intervene. Although defendants cite plaintiff's deposition testimony for the proposition that "no further assault occurred after Defendant Fraser's arrival on the scene," Defs.' L.R. 7.1 Statement (Dkt. No. 79, Attach.16) at ¶ 9, the record does not support this fact. Instead, during two separate lines of questioning, plaintiff testified at his deposition that, after defendant Fraser arrived to the scene, defendant Rosati "pushed" or "mushed" plaintiff's face into the wall and threatened to kill him. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 38, 65. Because this testimony clearly indicates that defendant Fraser was present for this alleged use of force by defendant Rosati, and because the record evidence does not conclusively support a finding that defendant Rosati's additional use of force was unconstitutional,[15] I find that a reasonable factfinder could conclude, based on the record evidence now before the court, that defendant Fraser's duty to intervene was triggered by defendant Rosati's conduct.

In summary, I recommend that all claims against defendant Fraser be dismissed, with the exception of the failure to intervene claim.

### E. *Plaintiff's Claims Against Defendant Zarnetski*

Defendants next seek dismissal of all claims against defendant Zarnetski. Plaintiff's amended complaint alleges that defendant Zarnetski is liable for the force used by

defendant Rosati because he should have predicted that, when he instructed defendant Rosati to escort plaintiff to the disciplinary hearing, defendant Rosati would assault him. Although such an allegation, if properly supported by the record, may give rise to a failure to intervene or conspiracy to use excessive force claim, the evidence in this case does not support either claim.

In his verified amended complaint, plaintiff avers that defendant Zarnetski sent defendant Rosati to escort him to his disciplinary hearing, and on the way to the hearing, defendant Rosati assaulted him. Am. Compl. (Dkt. No. 7) at 17. During his deposition, plaintiff elaborated on this allegation only to the extent of testifying that it is "known" at Great Meadow that defendant Rosati "is a hothead," and, as a result of this common prison knowledge, defendant Zarnetski should have predicted that defendant Rosati would assault plaintiff. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 88–89. Plaintiff also admitted, however, that, in order to attend his disciplinary hearing, he was required to be escorted by a corrections officer. *Id.* at 88. In his affidavit, defendant Zarnetski avers that he "had absolutely no foreknowledge that C.O. Rosati and plaintiff would be involved in a use of force on June 18, 2010." Zarnetski Decl. (Dkt. No. 79, Attach.14) at ¶ 4. Because, in the face of defendant Zarnetski's denial, plaintiff's allegations amount to nothing more than his rank speculation that defendant Zarnetski knew or should have known that defendant Rosati would assault plaintiff, I find that no reasonable factfinder could conclude that defendant Zarnetski had a duty to intervene. *See Henry,* 2011 WL 5975027, at *4 (finding that, to establish liability on the part of a defendant for failure to intervene, "the plaintiff must adduce evidence establishing that the officer had (1) a realistic opportunity to intervene and prevent the harm, (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated, and (3) that officer does not take reasonable steps to intervene."). In addition, because none of this evidence raises a genuine dispute of material fact as to whether defendants Zarnetski and Rosati agreed to use force against plaintiff, I find that no reasonable factfinder could conclude that defendant Zarnetski conspired to violate plaintiff's constitutional rights. *See Pangburn,* 200 F.3d at 72 ("To prove a [section] 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages."). For all of these reasons, I recommend dismissing all of plaintiff's claims against defendant Zarnetski.

## F. *Plaintiff's Claims Against Defendant Lieutenant Goodman*

**\*14** In his amended complaint, plaintiff alleges that defendant Goodman conspired with defendants Rosati and St. John to effectuate the alleged assault on plaintiff because plaintiff successfully modified a disciplinary sentence imposed by defendant Goodman. Am. Compl. (Dkt. No. 7) at 8. Plaintiff supports this contention with a further allegation that, three days after the alleged assault by defendants Rosati and St. John, defendant Goodman said to plaintiff, " 'That is what you get for getting my sentence modified [.]' " *Id.* at 14. Defendants properly construe these allegations as plaintiff's assertion of a First Amendment retaliation claim, and seek its dismissal. Defendants also seek dismissal of plaintiff's verbal harassment claim asserted against defendant Goodman.

### 1. *First Amendment Retaliation*

A cognizable section 1983 retaliation claim lies when prison officials take adverse action against an inmate, which is motivated by the inmate's exercise of a constitutional right, including the free speech provisions of the First Amendment. *See Friedl v. City of New York,* 210 F.3d 79, 85 (2d Cir.2000) ( "In general, a section 1983 claim will lie where the government takes negative action against an individual because of his exercise of rights guaranteed by the Constitution or federal laws."). To state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that (1) the conduct at issue was protected, (2) the defendants took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); *Garrett v. Reynolds,* No. 99–CV–2065, 2003 WL 22299359, at *4 (N.D.N.Y. Oct. 3, 2003) (Sharpe, M.J.).

Here, it is well settled that plaintiff's appeal of defendant Goodman's disciplinary sentence is constitutionally protected conduct, satisfying the first prong of a retaliation claim. *See, e.g., Santiago v. Holden,* No. 11–CV–0567, 2011 WL 7431068, at *5 (N.D.N.Y. Nov. 29, 2011) (Homer, M.J.), *adopted by* 2012 WL 651871 (N.D.N.Y. Feb. 28, 2012) (Suddaby, J.) ("There is no question that [the plaintiff's] conduct in filing grievances and appeals was conduct

protected by the First Amendment."); *Brown v. Bascomb,* No. 05–CV–1466, 2008 WL 4283367, at *6 (N.D.N.Y. Sept. 16, 2008) (Mordue, C.J.). In addition, being assaulted plainly constitutes an adverse action sufficient to satisfy the second prong of a retaliation claim. *See Cole v. N.Y. S. Dep't of Corrs. Svcs.,* 2012 WL 4491825, at *13 (N.D.N.Y. Aug. 31, 2012) (Dancks, M . J.), *adopted by* 2012 WL 4506010 (N.D.N.Y. Sept. 28, 2012) (Mordue, J.) ("An assault by corrections officers is sufficient to chill a person of ordinary firmness from continuing to engage in his First Amendment activity." (internal quotation marks omitted)). Turning to the third requirement for a retaliation claim, requiring that a plaintiff to establish a casual connection between the protected conduct and adverse action, drawing all inferences in favor of plaintiff, I find that both plaintiff's amended complaint and his deposition testimony, if credited by a factfinder, may serve to support the allegation that defendant Goodman did, in fact, conspire with defendants Rosati and St. John to assault plaintiff. More specifically, if plaintiff's testimony regarding defendant Goodman's statements three days after the assault is credited, a reasonable factfinder could conclude that this statement was an admission by defendant Goodman that he orchestrated, in some way, the assault on plaintiff. However, because defendant Goodman explicitly denied conspiring with defendants Rosati and St. John to assault plaintiff, Goodman Decl. (Dkt. No. 79, Attach.12) at ¶¶ 3, 4, I find that a genuine dispute of fact exists as to whether defendant Goodman conspired with defendants Rosati and St. John to retaliate against plaintiff for having exercised his First Amendment rights. For this reason, I recommend that defendants' motion for summary judgment be denied as it relates to plaintiff's retaliation claim against defendant Goodman.

### 2. *Verbal Harassment*

**\*15** To the extent that plaintiff's amended complaint may be construed as asserting a verbal harassment claim against defendant Goodman for allegedly stating to plaintiff, " 'That is what you get for getting my sentence modified,' " Am. Compl. (Dkt. No. 7) at 14, that claim is not cognizable under section 1983. *See, e.g., Moncrieffe v. Witbeck,* No. 97–CV–0253, 2000 WL 949457, at *3 (N.D.N.Y. June 29, 2000) (Mordue, J.) ("A claim for verbal harassment is not actionable under 42 U.S.C. § 1983."). For this reason, I recommend that plaintiff's verbal harassment claim asserted against defendant Goodman be dismissed. [16]

### G. *Plaintiff's Claims Against Defendants Harvey, Torres, and Prack*

Defendants next seek dismissal of plaintiff's procedural due process claims asserted against defendants Harvey, Torres, and Prack. Defendant Harvey served as the hearing officer who presided at plaintiff's Tier III disciplinary hearing arising from the incident on June 18, 2010. Defendant Torres was assigned to assist Smith in his defense at that disciplinary hearing. Plaintiff's amended complaint also alleges that defendants Harvey and Torres conspired with others to use the Tier III hearing to conceal official misconduct. Additionally, as was briefly noted above, plaintiff's amended complaint asserts a due process claim against defendant Prack.

### 1. *Due Process Claims*

To establish a procedural due process claim under section 1983, a plaintiff must show that he (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *See Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000); *Hynes,* 143 F.3d at 658; *Bedoya v. Coughlin,* 91 F.3d 349, 351–52 (2d Cir.1996).

The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are well established, the contours of the requisite protections having been articulated in *Wolff v. McDonnell,* 418 U .S. 539, 564–67 (1974). Under *Wolff,* the constitutionally mandated due process requirements, include (1) advanced written notice of the charges, (2) a hearing in which the inmate is provided the opportunity to appear at a disciplinary hearing and present witnesses and evidence, (3) a written statement by the hearing officer explaining his decision and the reasons for the action being taken, and, in some circumstances, (4) the right to assistance in preparing a defense. *Wolff,* 418 U.S. at 564–70; *see also Eng v. Coughlin,* 858 F.2d 889, 897–98 (2d Cir.1988). In order to pass muster under the Fourteenth Amendment, a hearing officer's disciplinary determination must garner at least "some eviden[tiary]" support. *Superintendent, MA Corr. Inst., Walpole v. Hill,* 472 U.S. 445, 455 (1985).

Here, as it relates to defendant Harvey, plaintiff's amended complaint alleges that defendant Harvey failed to provide plaintiff with a timely hearing. Am. Compl. (Dkt. No. 7) at 13. To the extent that plaintiff bases this claim on an allegation that defendant Harvey violated a state agency's regulation, that claim fails as a matter of law. *See Bolden,* 810 F.2d at 358 ("State procedural requirements do not establish

federal constitutional rights."); *Barnes,* 628 F.Supp.2d at 411 ("[A] violation of New York State regulations concerning disciplinary hearings does not in itself establish a due process violation.").

**\*16** As it relates to defendant Torres, plaintiff's allegation that she failed to call or interview witnesses on his behalf is unsupported by the record evidence. Specifically, plaintiff admitted at his deposition that he has no basis to believe that defendant Torres failed to interview the people identified by plaintiff as potential witnesses to the alleged assault. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 75–76. In addition, plaintiff admitted that defendant Torres returned to plaintiff with a list of witnesses that would or would not testify on his behalf. *Id.* at 77. Finally, plaintiff admitted that he did, in fact, call as witnesses those people that agreed to testify on his behalf. *Id.* at 78. From this record evidence, I find that no reasonable factfinder could conclude that defendant Torres denied plaintiff due process based on a failure to assist plaintiff in identifying and calling witnesses on his behalf.

As it relates to defendant Prack, plaintiff's amended complaint alleges that defendant Prack "failed to stop the torture in SHU." Am. Compl. (Dkt. No. 7) at 19. The court construes this allegation to suggest that, because defendant Prack denied plaintiff's appeal of his disciplinary conviction, he contributed to whatever procedural due process violations occurred during the disciplinary hearing below. The record evidence, however, does not support this conclusion because, as discussed above, defendant was provided the opportunity to investigate and present witnesses on his behalf, and he was appointed a corrections counselor to assist in the preparation of his defense. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 75, 77–78. Moreover, a careful review of the Tier III hearing transcript, submitted by defendants in support of their motion, reveals that plaintiff was provided adequate due process during the disciplinary hearing from which plaintiff appealed to defendant Prack. McCartin Decl. Exhs. (Dkt. No. 79, Attach.5). All of this evidence leads the court to conclude that no reasonable factfinder could find that defendant Prack's determination that plaintiff's appeal contributed to a due process violation.

For all of these reasons, I recommend that plaintiff's procedural due process claim asserted against defendant Harvey, Torres, and Prack be dismissed.

### 2. *Conspiracy Claim*

To the extent it is alleged that defendants Harvey and Torres conspired to conceal the June 18, 2010 assault, such claims are not cognizable under section 1983. *De Ponceau v. Bruner,* No. 09–CV–0605, at \*7 (N.D.N.Y. Feb. 21, 2012) (Peebles, M.J.), *adopted by* 2012 WL 1014821 (N.D.N.Y. Mar. 23, 2012) (Suddaby, J.). In any event, as was discussed above in determining that plaintiff's conspiracy claim asserted against defendant Fraser, there is no record evidence that defendants Harvey and Torres engaged in an agreement to violate any of plaintiff's constitutional rights. For these reasons, I recommend that plaintiff's conspiracy claim asserted against defendants Harvey and Torres be dismissed.

### H. *Plaintiff's Claims Against Defendant Mars*

**\*17** Defendants next seek dismissal of all claims against defendant Mars, including plaintiff's claim that she violated his Fourteenth Amendment rights by making him pay $65 to replace a damaged mattress. The Fourteenth Amendment, however, does not give rise to a claim that a defendant deprived a plaintiff of private property; it only protects a plaintiff's right to due process as a result of a deprivation of private property. *See, e.g., Edwards v. Bezio,* No. 08–CV–0256, 2010 WL 681369, at \*5 (N.D.N.Y. Feb. 24, 2010) (Kahn, J., *adopting report and recommendation by* Treece, M.J.) ("The lynchpin of a due process claim based on a state actor's unauthorized deprivation of private property is the availability of post-deprivation remedies provided by the state, not the deprivation itself .... Plaintiff does not allege that New York State has failed to provide a meaningful post-deprivation remedy, and, in fact, New York provides a venue for challenging such appropriations in the New York State Court of Claims."). For this reason, I recommend that any claim asserted by plaintiff against defendant Mars based on an allegation that she charged him too much money for his new mattress be dismissed.

Defendants also seek dismissal of plaintiff's claim against defendant Mars relating to the issuance of a false misbehavior report. The mere allegation of the issuance of a false misbehavior report against an inmate, however, is not cognizable under section 1983. *See Boddie,* 105 F.3d at 862 ("[A] prison inmate has no general right to be free from being falsely accused in a misbehavior report."). Moreover, even assuming that defendant Mars did issue a false misbehavior report, whatever wrong arose out of that conduct is rectified by the court's finding that plaintiff received adequate due process at the ensuing disciplinary hearing. *See, e.g.,* Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 12–13. *See Jones v. Coughlin,* 45 F.3d 677, 679 (2d Cir.1995) (finding that, where

an alleged false misbehavior report is filed against a prisoner, his "due process rights are protected if he is granted a hearing on the charges and given an opportunity to rebut them").

Finally, defendants seek dismissal of plaintiff's equal protection claim asserted against defendant Mars based on plaintiff's admission that defendant Mars did not single him out or treat him differently than other inmates based on his race. Plaintiff's equal protection claim against defendant Mars, however, was previously dismissed by the court, and it has not been revived by plaintiff's amended complaint. Dkt. No. 10 at 16.

For all of these reasons, I recommend that all of plaintiff's claims asserted against defendant Mars be dismissed.

## I. Qualified Immunity

Because I recommend that one claim against each defendant Fraser and defendant Goodman survive defendants' pending motion for summary judgment, I will only address defendants' defense of qualified immunity as it relates to those two defendants.

**\*18** "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards,* 132 S.Ct. 2088, 2093 (2012); *see also Pearson v. Callahan,* 555 U.S. 223, 231 (2009); *Sudler v. City of New York,* 689 F.3d 159, 174 (2d Cir.2012). The law of qualified immunity seeks to strike a balance between "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson,* 555 U.S. at 231. Government officials are shielded from liability by qualified immunity when making "reasonable mistakes" concerning the lawfulness of their conduct. *Sudler,* 689 F.3d at 174 (citing *Saucier v. Katz,* 533 U.S. 194, 206 (2001), *abrogated on other grounds by Pearson,* 555 U.S. 223).

The determination of whether a government official is immune from suit is informed by two factors. *Doninger v. Niehoff,* 642 F.3d 334, 345 (2d Cir.2011). The inquiry turns on whether the facts alleged, taken in a light most favorable to the plaintiff, show that the conduct at issue violated a constitutional right, and if so, whether that right is clearly established at the relevant time. *Ashcroft v. al-Kidd,* 131 S.Ct. 2074, 2080 (2011); *Nagle v. Marron,* 663 F.3d 100, 114 (2d

Cir.2011); *Doninger,* 642 F.3d at 345 (citing cases). To be clearly established, a right must be sufficiently clear "that every reasonable official would have understood that what he is doing violates that right." *Ashcroft,* 131 S.Ct. at 2083 (internal quotation marks omitted). Until recently, courts were required to analyze qualified immunity by considering the two factors in order. *Doninger,* 642 F.3d at 345 (citing *Saucier,* 533 U.S. at 201). Following the Supreme Court's decision in *Pearson,* however, courts are no longer wedded to the *Saucier* "two step," and instead retain the discretion to decide the order in which the two relevant factors are to be considered. [17] *Id.; see also Okin v. Vill. of Cornwall–On–Hudson Police Dep't,* 577 F.3d 415, 429 n.9 (2d Cir.2009).

To prevail on a qualified immunity defense, a defendant must establish that "(1) the officers' actions did not violate clearly established law, or (2) it was objectively reasonable for the officers to believe that their actions did not violate such law." *Green v. Montgomery,* 219 F.3d 52, at 59 (2d Cir.2000).

### 1. Defendant Fraser

Because the right to be free from excessive force is a clearly established right, the relevant qualified immunity inquiry turns on whether a reasonable officer in defendant Fraser's position would have known that defendant Rosati's conduct amounted to excessive force. *See Green,* 219 F.3d at 59 ("It is beyond dispute that the right to be free from excessive force has long been clearly established."). Defendants have already acknowledged that whether defendant Rosati's use of force against plaintiff constitutes excessive force is a question for the jury, and I agree. As a result, I cannot conclude that defendant Fraser is entitled to qualified immunity as it relates to plaintiff's failure to intervene claim.

### 2. Defendant Goodman

**\*19** As noted earlier, an inmate's right to appeal a disciplinary sentence is protected by the First Amendment. *Santiago,* 2011 WL 7431068, at *5. Therefore, the relevant inquiry is whether a reasonable officer in defendant Goodman's position would have known that conspiring with other corrections officers to have plaintiff assaulted in retaliation for plaintiff appealing the sentence violated his clearly established First Amendment right. Because that answer is clearly, "yes," I cannot conclude that defendant Goodman is entitled to qualified immunity as it relates to plaintiff's retaliation claim.

In summary, I recommend that defendants' motion for summary judgment be denied as it relates to defendants' qualified immunity defense.

## IV. *SUMMARY AND RECOMMENDATION*

At the center of plaintiff's amended complaint in this action is his claim that he was assaulted by defendants Rosati and St. John, two corrections officers stationed at Great Meadow, during an escort from his cell to a disciplinary hearing. While defendants have moved for summary judgment dismissing many of plaintiff's other claims, they do not challenge that cause of action at this juncture, acknowledging that its resolution will undoubtedly turn upon credibility determinations, which are not properly made on a motion for summary judgment.

After carefully reviewing the record evidence in this case, I recommend that all of plaintiff's claims against all of the remaining defendants be dismissed, with the exception of plaintiff's failure to intervene claim against defendant Fraser, and plaintiff's retaliation claim against defendant Goodman. As it relates to those two remaining claims, I conclude that a reasonable factfinder could determine, if plaintiff's testimony is credited, that defendant Fraser's duty to intervene was triggered, and that defendant Goodman conspired with defendants Rosati and St. John to retaliate against plaintiff. Additionally, at this juncture, the record evidence does not establish a basis to find that defendants Fraser or Goodman are entitled to qualified immunity.

Addressing plaintiff's remaining claims, I find that the record before the court fails to establish a proper basis to conclude that defendants Fischer, Annucci, LeClaire, and Roy were personally involved in any of the allegations giving rise to this action. The record also reflects that no reasonable factfinder could conclude that defendant Nesmith and Lindermann are liable for deliberate medical indifference to plaintiff's serious medical needs. Similarly, plaintiff has stated no claim against defendant Zarnetski associated with the assault or otherwise, nor has he stated a cognizable due process claim against defendants Harvey, Torres or Prack. Finally plaintiff's claims against defendant Mars, related to the requirement that he pay $65 to replace a damaged mattress, and the issuance of a false misbehavior report, lack merit. Based upon the foregoing, it is hereby respectfully,

**\*20** RECOMMENDED that defendants' summary judgment motion (Dkt. No. 79) be GRANTED, in part, as it relates to all of plaintiff's claims against all defendants, with the exception of (1) plaintiff's claims against defendants Rosati and St. John, (2) plaintiff's failure to intervene claim against defendant Fraser, and (3) plaintiff's First Amendment retaliation claim against defendant Goodman.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules; and it is further

ORDERED that the clerk is respectfully directed to amend court records to reflect the correct name spellings of defendants Zarnetski, Nesmith, Lindemann, and Prack.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 1500422

## Footnotes

1   In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir.2003).

2   The DOCCS conducts three types of inmate disciplinary hearings. See 7 N.Y.C.R.R. § 270.3; *see also Hynes v. Squillace*, 143 F.3d 653, 655 n.1 (2d Cir.1998). Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges. *Hynes*, 143 F.3d 655 n.1. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the SHU. *Id.* Tier III hearings address the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. *Id.*

3   Plaintiff's amended complaint identifies defendant Goodman as a lieutenant. Am. Compl. (Dkt. No. 7) at 5. In his affidavit submitted in support of defendants' pending motion, however, defendant Goodman states that he is a corrections captain. Goodman Decl. (Dkt. No. 79, Attach.12) at ¶ 1.

4    Defendant Zarnetski's name has been spelled by plaintiff in various ways, and is listed on the court's records as Zaratski. The clerk is respectfully directed to amend the court's records to reflect the correct spelling of this defendant's name as Zarnetski.

5    Defendant Nesmith was sued by plaintiff as "Nesmith (Ted) Fisher, III," Am. Compl. (Dkt. No. 7) at 6, and is listed on the court's records as "Nesmith Fisher." The clerk is respectfully directed to amend the court's records to reflect the correct spelling of this defendant's name as Ted Nesmith.

6    Defendant Lindemann was sued by plaintiff as "D. Lindermann," Am. Compl. (Dkt. No. 7) at 6, and is listed on the court's records as "D. Lindermann." The clerk is respectfully directed to amend the court's records to reflect the correct spelling of this defendant's name as David Lindemann.

7    The record reflects that defendant Prack's name has been spelled in a variety of ways, and is listed on the court's records as "Albert Prach." The clerk is respectfully directed to amend the court's records to reflect the correct spelling of this defendant's name as Albert Prack.

8    At several points in his complaint, as amended, plaintiff alleges that defendants violated various regulations regarding such matters as reporting the requirement of prison medical personnel to assess medical conditions, and the requirement that a disciplinary hearing be held within seven days. It is well-established that the violation of a prison regulation is not redressable in a civil rights action brought pursuant to section 1983. *See* *Bolden v. Alston,* 810 F.2d 353, 358 (2d Cir.1987) ( "State procedural requirements do not establish federal constitutional rights."); *Barnes v. Henderson,* 628 F.Supp.2d 407, 411 (W.D.N.Y.2009) ( "[A] violation of New York State regulations concerning disciplinary hearings does not in itself establish a due process violation."). Plaintiff's complaint also references 18 U.S.C. § 1351, a criminal statute addressing fraud and foreign labor contracting, as well as the Torture Victim Protection Act of 1991, codified at 28 U.S.C. § 1350, and providing a private right of action by an alien for a tort committed in violation of international law or a United States treaty. Those sections do not appear to have any applicability to the facts of this case.

9    Here, the defendants implicated in this portion of the pending motion are principally supervisory DOCCS employees.

10   The Second Circuit has yet to address the impact of the Supreme Court's decision in *Iqbal* on the categories of supervisory liability under *Colon.* Lower courts have struggled with this issue—specifically in deciding whether *Iqbal* effectively calls into question certain categories of supervisor liability in *Colon.* *Sash v. United States,* 674 F.Supp.2d 542–44 (S.D.N.Y.2009); *see also* *Stewart v. Howard,* No. 09–CV0069, 2010 WL 3907227, at *12 n.10 (N.D.N.Y. Apr. 26, 2010) (Lowe, M.J.) ("The Supreme Court's decision in [*Iqbal* ] arguably casts in doubt the continued viability of some of the categories set forth in *Colon."* (citing *Sash* )). In this case, absent any controlling authority to the contrary, the court assumes that all of the *Colon* categories still apply.

11   Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Appended decisions deleted for Westlaw purposes.]

12   *See* *Colon,* 58 F.3d at 873 ("The personal involvement of a supervisory defendant may be shown by evidence that: ... (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong[.]").

13   Based on the record evidence now before the court, I find that defendant Prack could have been personally involved only in plaintiff's procedural due process claim. As discussed more completely below, however, I recommend dismissal of that claim. Therefore, the finding that a dispute of material fact exists as to whether defendant Prack was personally involved in the allegations giving rise to this action is largely academic.

14   These reports do not include any complaints of hearing loss or blurred vision—complaints that plaintiff has alleged are ongoing and long-term effects of the alleged assault. *See generally* Lindemann Decl. Exhs. (Dkt. No. 79, Attachs.7, 8).

15   In their motion, defendants have expressly represented that they do not move for summary judgment on the excessive force claim asserted against defendants Rosati and St. John because "[t]hat claim ... necessarily involves a credibility determination ... [and] remain[s] for trial." Defs.' Memo of Law (Dkt. No. 79, Attach.17) at 3.

16   In the court's initial order, plaintiff's equal protection cause of action was dismissed against defendants Goodman and Mars. Dkt. No. 10 at 16.

17   Because qualified immunity is "an immunity from suit rather than a mere defense to liability," *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985), the Supreme Court has "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in the litigation." *Pearson,* 555 U.S. at 231 (internal quotation marks omitted).

2011 WL 5599587
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Evan WARREN, Plaintiff,

v.

Michael CORCORAN, et al., Defendants.

No. 9:09–CV–1146 (DNH/ATB).
|
Oct. 20, 2011.

**Attorneys and Law Firms**

EVAN WARREN, pro se.

C. Harris Dague, Assistant Attorney General, for Defendants.

## REPORT and RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

**\*1** This matter was referred for Report and Recommendation, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c), by the Honorable David N. Hurd, United States District Judge. Plaintiff alleges that defendants violated his rights under the Eighth and Fourteenth Amendments. (Dkt. No. 1). Plaintiff seeks significant monetary damages. Presently before this court is Defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56(b). (Dkt. No. 33). Plaintiff has not responded to defendants' motion. For the following reasons, the Court recommends granting defendants' motion and dismissing the complaint in is entirety.

### I. *Background*

Plaintiff is an inmate in the custody and control of the New York State Department of Correctional Services ("DOCS"). [1] (Compl.¶ 1). At all times relevant to the allegations in plaintiff's complaint, he was incarcerated at Cayuga Correctional Facility (Cayuga). (Rule 7.1 Statement ¶ 2). [2]

Plaintiff alleges that Defendants violated his Eighth Amendment right to adequate medical care relating to plaintiff's abdominal pain, and infringed his Fourteenth

Amendment right to privacy by disclosing his HIV-positive status to two correctional officers during medical appointments. (Compl.¶¶ 10–26).

### II. *Summary Judgment–Legal Standards*

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. Fed.R.Civ.P. 56 [3]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990). "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude summary judgment." *Salahuddin v. Coughlin,* 674 F.Supp. 1048, 1052 (S.D.N.Y.1987) (citation omitted). A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [fact finder] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In meeting its burden, the party moving for summary judgment bears the initial responsibility of informing the court of the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56(c)(1)(A). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc. .,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 247–48.

**\*2** "[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to "formal pleadings drafted by lawyers." *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (citing, *inter alia, Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (a court is to read a *pro se* party's "supporting papers liberally, and ... interpret them to raise the strongest arguments that they

suggest")). [4] "However, a pro se party's "bald assertion," completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (citing *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)).

### III. *Deliberate Indifference to Medical Needs*

#### A. Legal Standards

In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing inter alia *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

The objective prong of the standard is satisfied "when (a) the prisoner was 'actually deprived of adequate medical care,' meaning prison officials acted unreasonably in response to an inmate health risk under the circumstances, and (b) 'the inadequacy in medical care is sufficiently serious.' " *Bellotto v. County of Orange,* 248 F. App'x 232, 236 (2d Cir.2007) (quoting *Salahuddin v. Goord,* 467 F.3d 263, 279–80 (2d Cir.2006)). If the "unreasonable care" consists of a failure to provide any treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Smith v. Carpenter,* 316 F.3d 178, 185–86 (2d Cir.2003). When a prisoner alleges "a temporary delay or interruption in the provision of otherwise adequate medical treatment," the court must focus on the seriousness of the particular risk of harm that resulted from the challenged delay or interruption, rather than the prisoner's underlying medical condition alone." *Id.* at 185. The standard for determining when a deprivation or delay in a prisoner's medical need is sufficiently serious, contemplates a condition of urgency that may result in degeneration of the patient's condition or extreme pain. *Bellotto v. County of Orange,* 248 F. App'x at 236 (citing *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) and *Smith v. Carpenter,* 316 F.3d at 187 (actual medical consequences are highly relevant)).

The subjective prong of the deliberate indifference test is satisfied when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan,* 511 U.S. 825, 847, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). A plaintiff is not required to show that a defendant acted or failed to act "for the very purpose of causing harm or with knowledge that harm will result," but must show that the official was aware of facts from which one could infer that "a substantial risk of serious harm" exists, and that the official drew that inference. *Id.* at 835, 837. The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer v. Brennan,* 511 U.S. at 844. Thus, the court stated in *Salahuddin,* that the defendant's believe that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin* 467 F.3d at 28.

**\*3** A difference of opinion between a prisoner and prison officials regarding medical treatment does not, as a matter of law, constitute deliberate indifference. *Chance v. Armstrong,* 143 F.3d at 703. Nor does the fact that an inmate feels that he did not get the level of medical attention he deserved, or that he might prefer an alternative treatment, support a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health Services,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001) (citing *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986)). Even negligence in diagnosing or treating an inmate's medical condition does not constitute deliberate indifference. *Farmer v. Brennan,* 511 U.S. at 835. Thus, any claims of medical malpractice, or disagreement with treatment are not actionable under Section 1983. *Ross v. Kelly,* 784 F.Supp. 35, 44–45 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (table).

#### B. Application

Plaintiff argues that defendants were deliberately indifferent to his serious medical needs while he was an inmate at Cayuga in 2007. (Compl.¶¶ 10–21). Plaintiff alleges that on January 22, 2007, correctional officers found him on the floor of his cell complaining of severe pain, nausea, and vomiting. (Compl. ¶ 11). Plaintiff was taken to Cortland Regional Medical Center, where Dr. Theresa Whitt [5] diagnosed plaintiff's abdominal pain as secondary to constipation. (Compl.¶ 12). The Ambulatory Health Record Progress Note (AHR) [6] dated January 22, 2007, indicates that plaintiff was

sent to the emergency room after he was found "writhing on bunk in distress." (Keiser Aff. Ex. A p. 15). The AHR dated January 23, 2007, indicates that an abdominal x-ray showed constipation, and plaintiff was prescribed laxatives, told to increase his fluid intake, and to report any increased abdominal pain. (Keiser Aff. Ex. A p. 15; *see also* Keiser Aff. Ex. B). The AHR dated January 23, 2007, indicates that plaintiff stated he was feeling "better," and an AHR for later the same day indicates that plaintiff had bowel sounds in all four quadrants, appeared to be in no apparent distress, and that plaintiff denied having abdominal pain. (Keiser Aff. Ex. A p. 15).

For the next four months, plaintiff alleges his condition failed to improve. (Compl.¶ 13). Plaintiff alleges that he continued to report his symptoms by signing up for sick call, or report them when he received his medication from defendants Registered Nurse Crull and Registered Nurse Burgin. (Compl.¶ 13). Plaintiff's AHR for January 24, 2007, indicates plaintiff denied any pain or discomfort, and he stated that he felt "okay." (Keiser Aff. Ex. A p. 14). Plaintiff's AHR for January 29, 2007, states that he requested medication for a cold, and made no mention of any abdominal symptoms. (Keiser Aff. Ex. A p. 14).

Plaintiff's AHR entries for February 1, 7, 10, 20, and 28, 2007, indicate that plaintiff reported that he was not eating well, had chapped lips, a dry throat, and was concerned about his weight, but the entries do not mention any complaints of abdominal pain. (Keiser Aff. Ex. A pp. 12–14). Plaintiff's AHR entries for March 6, 17, 22, and 31, 2007, indicate that plaintiff wanted information on his prescriptions and was concerned about his weight loss, but they do not indicate plaintiff complained of any abdominal pain. (Keiser Aff. Ex. A pp. 11–12).

**\*4** In April 2007, plaintiff alleges that he complained to Nurse Crull that his condition had worsened since January, and he had severe abdominal pain, headache, and a fever. (Compl.¶ 14). Plaintiff alleges that Nurse Crull did not examine plaintiff, but scheduled plaintiff with the doctor and prescribed Motrin or Tylenol. (Compl.¶ 14). Plaintiff alleges that the Motrin and Tylenol did not relieve his symptoms, which worsened over the next month. (Compl.¶ 14).

Plaintiff's AHR entries for April 12 and 16, 2007, do not indicate plaintiff complained of abdominal pain. (Keiser Aff. Ex. A p. 10). Plaintiff's AHR entry dated April 23, 2007, indicates that he complained of stomach pain, and Nurse

Biggar's impression was that plaintiff was suffering from constipation. Plaintiff was prescribed Tylenol and Colace [7] and instructed that he should contact medical personnel if he did not have a bowel movement by the next morning or if symptoms worsened or persisted. (Keiser Aff. Ex. A p. 10). Nurse Crull stopped by plaintiff's cell the next day to encourage plaintiff to drink more water. (Keiser Aff. Ex. A p. 9). Nurse Crull noted that plaintiff stated, "I am," and Nurse Crull wrote on the AHR: "continue to monitor" plaintiff. *Id.*

Plaintiff's AHR entries indicate that he was transferred out of Cayuga on May 3, 2007, and did not return until July 5, 2007. (Keiser Aff. Ex. A pp. 7–9; *see also* Keiser Aff. ¶ 18). Plaintiff's AHR entries from Elmira Correctional Facility do not mention abdominal pain or problems. (*See* Keiser Aff. Ex. A pp. 7–9). Plaintiff's AHR entries indicate he returned to Cayuga around July 6, 2007. (Keiser Aff. Ex. A p. 6). Plaintiff's AHR entries for July 10 and 11, 2007, indicate that he complained of gas and told the nurse that his last bowel movement was five days prior. (Keiser Aff. Ex. A p. 5). Plaintiff requested over-the-counter relief and was prescribed Simethacone, Colace, and Dulcolax. [8] *Id.*

Plaintiff's AHR entries dated July 21 and 22, 2007, indicate the plaintiff complained of feeling weak, stomach pains, decreased appetite, and excessive sleep. (Keiser Aff. Ex. A p. 4). Plaintiff requested an appointment with a doctor, and he was scheduled to meet with the doctor on July 23, 2007. *Id.*

Plaintiff alleges that he saw defendant Dr. Keiser in July 2007, complaining of severe abdominal pain, high fever, nausea, vomiting and loss of appetite, and that plaintiff had been ill for over four months. (Compl.¶ 15). Dr. Keiser examined plaintiff on July 23, 2007, and the AHR indicates that Dr. Keiser noted that plaintiff had restarted his HIV antiviral medications in March 2007. (Keiser Aff. Ex. A p. 3; *see also* Keiser Aff. ¶ 22). Dr. Keiser noted that plaintiff was alert upon examination, his vital signs were normal, an abdominal exam revealed nothing abnormal, but Dr. Keiser also noted that plaintiff's weight had dropped from 131 pounds to 113 pounds in one year. (Keiser Aff. Ex. A p. 3; *see also* Keiser Aff. ¶¶ 22–23). Dr. Keiser concluded that plaintiff's abdominal distress could be the result of the antiviral medication plaintiff was taking, so Dr. Keiser referred plaintiff to the infectious disease doctor for follow up via Telemed [9] conference call. (Keiser Aff. ¶ 23). Dr. Keiser prescribed Ensure, a meal supplement drink, and scheduled plaintiff for a weigh-in two weeks later to check if

the Ensure was helping plaintiff's weight. (Keiser Aff. ¶ 23; *see also* Keiser Aff. Ex. A p. 3).

**\*5** Plaintiff alleges that the medication did not relieve his symptoms, and he saw defendant Registered Nurse Biggar later in July 2007. (Compl.¶ 16). Plaintiff alleges that he told Nurse Biggar that he had severe abdominal pain, nausea, and vomiting, and plaintiff alleges that Nurse Biggar refused to examine plaintiff or provide any treatment. (Compl.¶ 16). The AHR entry dated July 27, 2007, [10] states that plaintiff complained of vomiting and told the nurse he had a history of intermittent nausea and vomiting, secondary to taking antiviral drugs. (Keiser Aff. Ex. A p. 3). Nurse Biggar also noted that plaintiff stated that he was "peeing and pooping normal," with his last bowel movement being that same day. *Id.* Nurse Biggar also noted that plaintiff was eating dinner when she reached plaintiff's cell, and she instructed him to drink plenty of fluids and take his medication as directed. *Id.* Plaintiff had a doctor's appointment scheduled for August 2, 2007. *Id.*

Nurse Crull saw plaintiff on July 28, 2007, and noted on the AHR that plaintiff was complaining of severe pain, stating that it was occurring every other day. [11] *Id.* Nurse Crull also noted that plaintiff was in no apparent distress, did not have a fever, and had an appointment with his infectious disease doctor on July 31, 2007. *Id.*

On July 30, 2007, plaintiff alleges that correctional officers found him on the floor of his cell complaining of severe pain and vomiting. (Compl.¶ 17). Plaintiff's AHR entries indicate that a physician, via Telemed, instructed that plaintiff be taken to the emergency room. (Keiser Aff. Ex. A p. 2). Plaintiff was taken to Cortland Regional Medical Center, where he was diagnosed with a small bowel obstruction and possible intussusception. (Keiser Aff. Ex. F). Plaintiff was scheduled for exploratory surgery on July 31, 2007. (Keiser Aff. Ex. F). Plaintiff's AHR entry dated August 7, 2007, indicates that a benign tumor was removed, plaintiff was doing well, and the suture line was intact. (Keiser Aff. Ex. A p. 1).

As detailed above, every time plaintiff had health issues, he received medical care. In January, he was taken to the emergency room and diagnosed with constipation. He was given laxatives and other medication, and the next day plaintiff said that he was feeling better. Plaintiff was seen by medical staff nine times in February and March 2007, getting treatment for numerous concerns, none of which were abdominal pain.

In April, plaintiff again had abdominal pain, and Nurse Biggar gave him Tylenol for his pain and a stool softener. Nurse Crull followed up the next day and encouraged plaintiff to drink plenty of water, and noted that he would be monitored. Plaintiff received medical care for his complaints.

When plaintiff returned to Cayuga in July, he was again treated when he complained of abdominal pain, as evidenced by the AHR entries discussed above. Dr. Keiser examined plaintiff and concluded that plaintiff's weight loss, but "unremarkable physical examination," could be caused by plaintiff's antiviral medication. (*See* Keiser Aff. ¶ 23). Dr. Keiser referred plaintiff to the infectious disease doctor for follow up and prescribed a meal supplement. Dr. Keiser apparently shared this conclusion with plaintiff, because plaintiff told Nurse Biggar that he had a history of intermittent nausea and vomiting, secondary to taking his antiviral medication.

**\*6** Defendants did not withhold care from plaintiff or delay his treatment. [12] Every time plaintiff complained of abdominal pain, he received treatment. Plaintiff used sick call effectively, and received care when he requested it. He obtained treatment for what the medical staff diagnosed as constipation, with varying degrees of success, as evidenced by the AHR entries for the relevant time period. It may have taken the medical personnel until July 2007 to diagnose a small bowel obstruction and perform surgery, but even if defendants' delay in diagnosis could be considered negligence [13], it would not rise to the level of a constitutional violation, and the undisputed facts in the record do not support a finding of deliberate indifference. [14] No issue of fact exists as to whether defendants were deliberately indifferent to plaintiff's serious medical needs. Accordingly, defendants should be granted summary judgment as to plaintiff's medical indifference claims.

## VI. *Disclosure of Medical Information*

### A. Legal Standards

The Due Process Clause of the Fourteenth Amendment protects inmates from the unwanted disclosure of health-related information, such as an inmate's HIV status. *Doe v. City of New York,* 15 F.3d 264, 267 (2d Cir.1994), *cited in Verley v. Goord,* 2004 WL 526740, 2004 U.S. Dist. LEXIS 857, at \*60 (S.D.N.Y. Jan.23, 2004). With respect to the "disclosure" of medical information, the court notes that an

inmate's privacy right varies with the inmate's condition, with a greater interest in preventing the disclosure of highly sensitive conditions. *Webb v. Goldstein,* 117 F.Supp.2d 289, 298 (E.D.N.Y.2000). In *Rodriguez v. Ames,* the court also held that where the information is spread through "humor or gossip," it is more likely that the information's right to privacy will have been violated. 287 F.Supp.2d 213, 220 (citing *Powell,* 175 F.3d at 112). Prison officials may impinge upon that right only to the extent that their actions are "reasonably related to legitimate penological interests." *Powell v. Schriver,* 175 F.3d 107, 112 (2d Cir.1999).

**B. Application**

Plaintiff argues that during his Telemed appointments on June 13, 2009, and July 30, 2009, unnamed correctional officers remained in the examination room while he was discussing his retroviral medications with the infectious disease doctor. (Compl.¶¶ 22–23). Because these correctional officers were in the room, plaintiff alleges that they became aware of plaintiff's HIV positive status. *Id.* Plaintiff claims that because Nurse Burgin and Nurse Johnson failed to order the correctional officers out of the room, they disclosed plaintiff's HIV status, violating his constitutional right to privacy under the Fourteenth Amendment. *Id.* at 22–26.

During the time period in which the two alleged incidents occurred, plaintiff resided in S–Block, where inmates are housed for disciplinary reasons. [15] (*See* Rich Aff. ¶¶ 7–8). Due to the security concerns attendant to inmates in disciplinary housing, medical needs for S–Block inmates are treated in the inmate's cell, if possible. If an inmate must go to the facility's medical unit, he is escorted by two or more correctional officers or sergeants. (Rich Aff. ¶ 12).

**\*7** The correctional officers who were present during plaintiff's Telemed appointments are considered part of the facility's HIPAA [16] "Health Care Component." [17] These transport and health unit correctional officers, as part of their duties, receive protected health information, and are held to stringent HIPAA guidelines protecting that information. (*See* Rich Aff. ¶ 18). These guidelines are the same for the nurses and doctors. (*See* Rich Aff. Ex. C). A Health Care Component may use protected health information for health care operations that are part of its treatment activities. *See* 45 C.F.R. §§ 164.502(a)(1)(ii), 164 .506(c)(2). The Telemed appointment was an integral part of plaintiff's treatment, as only a physician, specializing in infectious diseases, could review and change retroviral medications. *See* Keiser Aff. ¶

24. Correctional officers were present in the room for security purposes during plaintiff's meeting with the infectious disease doctor via Telemed. (*See* Rich Aff. ¶¶ 11–17).

Plaintiff does not allege that his health information was ever disseminated in any way to other inmates or staff, or that it was communicated through humor or gossip. This court does not find these incidents to be similar to those contemplated in *Doe* or *Powell.* There was no direct disclosure by the nurses to the correctional officers, nor was it done for humor or as gossip, as described in *Rodriguez.*

The presence of the correctional officers served a legitimate penological interest: protecting prison personnel from potential threats. *See Schuler v. Brown,* No. 07–CV937, 2009 WL 790973, 2009 U.S. Dist. LEXIS 124791, at \*34 (N.D.N.Y. February 2, 2009) (Lowe, M.J.) (adopted by *Shuler v. Brown,* 2009 WL 790973, 2009 U .S. Dist. LEXIS 23672 (N.D.N.Y. March 23, 2009) (McAvoy, S.J.) (holding that a counselor disclosing to a correctional officer that an inmate had behaved inappropriately toward her during a counseling session was legitimately related to penological purpose. Because of the heightened security threat posed by inmates housed in S–Block, there would be more security concerns in permitting such an inmate to be in close quarters with a civilian staff member in a facility medical unit. [18] (*See* Rich Aff. ¶¶ 10–12). Thus, the correctional officers appropriately remained in the room with plaintiff and the nurse during plaintiff's Telemed appointment with the infectious disease doctor. As part of the Health Care Component that included the nurses and doctors, the officers are also obligated to maintain the confidentiality of the inmate's medical information.

As discussed above, no infringement of plaintiff's privacy right occurred during the alleged incidents, and even if there were an impingement, it was legitimately related to a penological interest. Accordingly, I recommend granting defendants summary judgment on this basis. [19]

**V. *Qualified Immunity***

**\*8** Defendants have asserted that they are entitled to qualified immunity in connection with some or all of plaintiff's claims. In determining whether qualified immunity applies, the court may first consider whether "the facts alleged show the [defendant's] conduct violated a constitutional right." *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), modified by *Pearson v. Callahan,*

555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (holding that, "while the sequence set forth [in *Saucier* ] is often appropriate, it should no longer be regarded as mandatory" in all cases). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier,* 533 U.S. at 201. This court need not address qualified immunity with respect to plaintiff's various causes of action because, as discussed above, he has not established any alleged violations of his constitutional rights.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that Defendants' motion for summary judgment (Dkt. No. 33) be **GRANTED** and the complaint **DISMISSED IN ITS ENTIRETY.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec. of Health & Human Servs.,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 5599587

---

Footnotes

1    On April 1, 2011, DOCS and the New York State Division of Parole were merged into one agency, named the New York State Department of Corrections and Community Supervision. Because the events relevant to this suit occurred before the merger, I will refer to New York State's corrections agency as "DOCS."

2    More recently, he was incarcerated at Southport Correctional Facility and Clinton Correctional Facility. (Stmt. Pursuant to Local Rule 7.1(a)(3) (Rule 7.1 Statement) ¶ 1, Dkt. No. 34; Notice of Change of Address, Dkt. No. 35).

3    Rule 56 was extensively amended, effective December 1, 2010. As the Advisory Committee Notes indicate, "the standard for granting summary judgment remains unchanged." The revised rule explicitly adopts procedures relating to summary judgment motions "consistent with those already used in many courts."

4    In this case, although plaintiff received proper notice of his obligation to respond to defendant's motion in accordance with Local Rules (Dkt. No. 33–1), the plaintiff did not file a statement of undisputed material facts, or any other responsive papers, as required by Local Rule 7.1(a)(3). Consequently, the court may accept the properly supported facts contained in the defendant's Rule 7.1 statement (Dkt. No. 34) as true for purposes of this motion. *Govan v. Campbell,* 289 F.Supp.2d at 295–96. Nonetheless, the court will carefully review the entire record in determining if there are any material facts in dispute.

5    Dr. Whitt is not a named defendant in this action.

6    The AHR is a DOCS document in which an inmate's medical care is recorded, based on the date of the services.

7    A stool softener. (*See* Keiser Aff. ¶ 16).

8    Simethacone is used to treat gas, Colace is a stool softener, and Dulcolax is a laxative. (*See* Keiser Aff. 19–20).

9    Telemed is a video conference system used for plaintiff to conference with his infectious disease doctor who was employed by DOCS at another facility. (Keiser Aff. ¶ 24).

10    The AHR entry is actually dated "7/27/06," but this appears to be inadvertent, as the dates of the other AHR entries on the same page are 2007, and Nurse Biggar's notes refer to a 7/27/07 date. The court assumes the date of the AHR entry was actually July 27, 2007.

11    Nurse Crull used the abbreviation "q.o.d.," a medical abbreviation for every other day.

12    Plaintiff's conclusory claims to the contrary, which are flatly contradicted by medical records documenting the care he received, are insufficient to create a material issue of fact with respect to his claims of deliberate indifference. *See, e.g., Benitez v. Pecenco,* 92 Civ. 7670, 1995 U.S. Dist. LEXIS 10431, 1995 WL 444352 at n. 5, (S.D.N.Y. July 27, 1995) (conclusory claim that plaintiff was never issued medication was directly contradicted by medical records and was insufficient to create a factual dispute on that issue) *(citing Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) ("mere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case")); *Brown v. White,* 9:08–CV–200, 2010 U.S. Dist. LEXIS 23818, 2010 WL 985184, at *8 (N.D.N.Y. Mar.15, 2010) (plaintiff's conclusory suggestion that defendant nurse completely refused to provide any

medical attention on a particular date is insufficient to create a dispute of fact in the face of the sworn declaration and supporting documentary evidence in the record).

13     This court makes *no* such finding.

14     *See, e.g., Estelle v. Gamble,* 429 U.S. at 107 (considering the extensive scope of medical care provided to inmate plaintiff in finding that his claim that "more should have been done by way of diagnosis and treatment" may have indicated medical malpractice, but failed to state an Eighth Amendment cause of action).

15     During this same time period, plaintiff's disciplinary history indicates infractions such as "flammable material," "interference," "direct order," "drug use," and "harassment." (*See* Rich Aff. Ex. B).

16     Health Insurance Portability and Accountability Act, 42 U.S.C. §§ 1320d–1320d–8.

17     DOCS is a "Hybrid Entity" under HIPAA, or a legal entity that performs business activities that are governed by HIPAA as well as business activities that are not governed by HIPAA. 45 C.F.R. § 164.103. Under HIPAA, Hybrid Entities designate components of themselves that, if those components were separate legal entities, they would meet the definition of covered entities. 45 C.F.R. § 164 .105(a)(2)(iii)(C). Here, the "covered entity" would be the DOCS medical unit or the "Health Care Component of DOCS." DOCS has designated "Correctional officers and their relief and supervisors assigned to: Transportation[,] Health Units[, and] Mental Health Units" as part of the Health Care Component of DOCS. (Rich Aff. Ex. C). Health Care Components must comply with the disclosure requirements of HIPAA. 45 C.F.R. § 164.105(a)(2)(ii). Under HIPAA, a covered entity may not use or disclose protected health information, as defined by 45 C.F.R. § 164.105(a)(2)(i)(C), except as permitted by 45 C.F.R. § 164.502(a) or 45 C.F.R. §§ 164.302–.318. 45 C.F.R. § 164.502(a).

18     Deputy Superintendent Rich has personally witnessed security incidents in a facility's medical unit resulting in injury to medical staff, security staff, or inmates. (Rich Aff. ¶ 17).

19     Plaintiff also includes Superintendent Corcoran in his confidentiality claim, alleging that Superintendent Corcoran created the policy that "authorizes correction[al] officers to obtain confidential HIV-related information in the course of providing health service[s] .... " Because the court finds that plaintiff's confidentiality claim has no merit, it need not analyze whether Superintendent Corcoran was personally involved in the alleged violations of plaintiff's constitutional rights.

---

**End of Document**                                           © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2006 WL 1977438
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Steve L. WILLIAMSON, Plaintiff,

v.

Glenn S. GOORD, Commissioner of DOCS;
Leonard Portuondo, Warden, Shawangunk
Corr. Facility; Daniel J. Connolly, Captain,
Shawangunk Corr. Facility; Dr. Forte, Doctor,
Shawangunk Corr. Facility; C. Cornelia, Nurse,
Shawangunk Corr. Facility, Defendants.

Civil No. 9:02-CV-00521 (GLS/GHL).
|
Nov. 30, 2005.
|
July 11, 2006.

**Attorneys and Law Firms**

Steve L. Williamson, Plaintiff, pro se, Walkill, NY, for the
Plaintiff.

Hon. Eliot Spitzer, New York State Attorney General,
Deborah A. Ferro, Kelly L. Munkwitz, Esq., Assistant
Attorney Generals, of counsel, Albany, NY, for the
Defendants.

### *MEMORANDUM-DECISION AND ORDER*

GARY L. SHARPE, U.S. District Judge.

### I. *Introduction*

**\*1** Pending are plaintiff *pro se* Steve Williamson's
objections to Magistrate Judge George Lowe's Report-
Recommendation. Specific objections will be reviewed under
a *de novo* standard, while unspecific objections will be
reviewed under a clearly erroneous standard. Upon careful
consideration of the arguments, the relevant parts of the
record, and the applicable law, the court adopts the Report-
Recommendation in its entirety. [1]

### II. *Procedural History*

Williamson brings this action pursuant to 42 U.S.C. § 1983.
He alleges that the defendants' failure to adequately treat
his knee and ankle injury constituted cruel and unusual
punishment under the Eighth Amendment. *See Compl., Dkt.
No. 1.* On September 29, 2003, the defendants filed a motion
for summary judgment. *See Def. Mot. Summ. J., Dkt. No.
50.* On November 30, 2005, Judge Lowe issued a report
recommending that the defendants' motion be granted. *See
Dkt. No. 69.* Williamson's objections are now pending. *Dkt.
No. 70.*

### III. *Discussion*

**A.** *Standard of Review*
By statute and rule, district courts are authorized to refer
prisoner civil rights case to magistrate judges for proposed
findings and recommendations. *See 28 U.S.C. § 636(b)(1)
(A), (B)*; N.D.N.Y. R. 72.3(c); Gen. Order No. 12, § D(1)(G).

When a report and recommendation is filed, the parties
have ten (10) days from receipt of the report to file
specific, written objections to proposed findings and
recommendations, and ten (10) days from the receipt of
adversary objections to file responses. *See 28 U.S.C. § 636(b)
(1)(C)*; FED.R.CIV.P. 72(b); N.D.N.Y. R. 72.1(c). The local
rules further require that the objections must specify the
findings and recommendations which are the subject of the
objections, and the substantive basis for these objections. *See
N.D.N.Y. R. 72.1(c).*

The district court must review *de novo* those portions of the
Magistrate Judge's findings and recommendations that have
been properly preserved by compliance with the specificity
requirement. *See 28 U.S.C. § 636(b)(1)(C)*; FED.R.CIV.P.
72(b); N.D.N.Y. R. 72.1(c). After review, the district court
"may accept, reject, or modify, in whole or in part, the
findings or recommendations made by the magistrate judge ...
[and] may also receive further evidence or recommit the
matter to the magistrate judge with instructions." 28 U.S.C. §
636(b)(1)(C); FED.R.CIV.P. 72(b).

If a party fails to object in a timely manner, it procedurally
defaults and is not entitled to judicial review. *See Almonte
v. New York State Div. of Parole*, No. 04-CV-484, 2006 WL
149049, at *3 (N.D.N.Y. Jan. 18, 2006)* (citation omitted).

"Although the doctrine of procedural default developed as a circuit appellate rule, it applies in the district courts as long as parties, including those appearing *pro se,* receive clear notice of the consequences of their failure to properly object." *Id; see also Thomas v. Arn,* 474 U.S. 140, 149 & n. 7 (1985). "[T]he notice requirement is satisfied if the report at least states that the failure to object will preclude appellate review [.]" Almonte, 2006 WL 149049, at *3 (citation omitted). [2]

**\*2** Although failure to object or timely object constitutes procedural default, lack of specificity also gives rise to default. *See id.,* at *4. The local rule requires that objections address specific findings and conclusions. *See id.* Therefore, a party that limits its specific objections to a part of a report's findings or recommendations procedurally defaults as to the remainder. *See id.* Frivolous or conclusory objections also fail to satisfy the specificity requirement. *See id.* Furthermore, mere resubmission of the same papers and arguments as submitted to the magistrate judge fails to comply with the specificity requirement and also results in default. *See id.*

The district court must review *de novo* those portions of the magistrate judge's findings and recommendations that have been properly preserved by compliance with the specificity requirement. *See id.,* at *5; *see also* 28 U.S.C. § 636(b)(1)(C); FED.R.CIV.P. 72(b); N.D.N.Y. R. 72.1(c). [3] "*De novo* review requires that the court 'give fresh consideration to those issues to which specific objections have been made.' It will examine the entire record, and make an independent assessment of the magistrate judge's factual and legal conclusions." Almonte, 2006 WL 149049, at *5 (citation omitted). After review, the district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge ... [and] may also receive further evidence or recommit the matter to the magistrate judge with instructions." 28 U.S.C. § 636(b)(1)(C); FED.R.CIV.P. 72(b); *see also* Almonte, 2006 WL 149049, at *3 (citations omitted).

"The more complex question arises when a party procedurally defaults, the court is not statutorily mandated to conduct *de novo* review nor does it elect to do so, but it concludes that some review is in order nonetheless." Almonte, 2006 WL 149049, at *5. Under these circumstances, it is within the court's discretion to elect an appropriate review standard. *See id.*

In the case of procedural default, "28 U.S.C. § 636 and Rule 72(b) of the Federal Rules of Civil Procedure are both

silent on the review standard [.] ..." *Id.* "[D]istrict courts have applied standards with varying names and definitions." *Id.,* at *6. "[S]ome adopt the 'clearly erroneous' standard that is articulated in the statute and federal rule governing review of a magistrate judge's nondispositive orders, and referenced in the 1983 Advisory Committee Note." [4] *Id.* (citations omitted). "Given the definition typically assigned to 'clearly erroneous,' the courts review a report to determine whether the findings are against the clear weight of the evidence, or whether the recommendations cause the court to definitely and firmly conclude that a mistake has been committed." *Id.* "Other courts have adopted a 'contrary to law' standard which means that the report fails to apply, or misapplies, relevant statutes, case law, or rules of procedure." *Id.* (citations omitted). "When excusing procedural default in the interests of justice, the Circuit has reviewed the underlying decision or report for 'plain error.' " *Id.* (citations omitted). "Plain error is one that is clear or obvious and affects substantial rights." *Id.* (citations omitted).

**\*3** "Mindful that district courts retain jurisdictional authority over all dispositive issues, this court routinely reviews reports before entering final judgment whether objections are registered or not." *See* Almonte, 2006 WL 149049, at *6. When the court does so, however, it is aware that the reports are generated by magistrate judges with extraordinary professional and judicial experience." *Id.* "Accordingly, when required by statute or rule or when the court's routine review so dictates, the court will make a *de novo* determination of findings and recommendations." *Id.* "Absent *de novo* review, the court will apply a 'clearly erroneous' standard, and defines that phrase as follows: a report is clearly erroneous if the court determines that there is a mistake of fact or law which is obvious and affects substantial rights." *Id.* "Furthermore, the court will routinely identify issues which have been procedurally defaulted, and articulate the standard of review applied to all issues." *Id.*

**B. *Objections*** [5]

Williamson makes a series of factual objections to specific findings in the record, these objections will be reviewed *de novo.* He contends that Judge Lowe improperly recommended that the defendants' failure to: (1) answer an emergency call, (2) provide him crutches, (3) remove his leg shackles during a visit to an outside facility, and (4) promptly provide surgery for his condition, did not constitute a violation of his Eighth Amendment rights. He also objects

to Judge Lowe's finding of qualified immunity on behalf of defendants Goord and Portuondo.

### 1. *Medical Claims*

The bulk of Williamson's objections are based on his claim that the defendants failed to provide him with proper medical care. The court reviewed the record and concludes that there is no evidence to establish that the defendants' conduct violated Williamson's rights. His objections instead amount to a disagreement with the course of treatment provided by the prison but fail to rise to the level of cruel and unusual punishment as delineated by Eighth Amendment case law.

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. CONST. amend. VIII. "This includes punishments that 'involve the unnecessary and wonton infliction of pain.' " *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (citation omitted). "[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976) (citation omitted). "[T]o prove deliberate indifference ... the prisoner must show that a particular defendant 'knows of and disregards an excessive risk to inmate health or safety.' " *Brock v. Wright,* 315 F.3d 158, 164 (2d Cir.2003) (citation omitted). Deliberate indifference, however is not established when the prisoner's medical needs were adequately treated and the prisoner simply disagrees with the particular course of treatment. *See Chance,* 143 F.3d at 703.

 **\*4** Here, Williamson objects to Judge Lowe's finding that the defendants' failure to answer an emergency call did not constitute a violation of his Eighth Amendment rights.[6] Specifically he contends that (1) he should not have been denied medical assistance on account of a miscommunication between the Corrections Officer on duty and the nurse on call, and (2) the adverse effect of his medication at the time constituted a medical emergency. *See Pl. Objections, p. 2; Dkt. No. 70.* These contentions are without merit. As Judge Lowe noted and this court agrees, Williamson has failed to show that his knee and/or ankle injury constituted a serious medical need. Nevertheless, even if his injuries were serious, he offers no facts to establish that the defendants' decisions rose to the level of deliberate indifference. Accordingly, Williamson's claim on this basis is dismissed.

Moreover, Williamson has failed to show deliberate indifference based on the defendants' failure to (1) renew his crutch permit and (2) promptly schedule surgery for him.[7] First, Williamson specifically argues that the defendants had the authority to renew his crutch permit and did not do so, and he was therefore subjected to pain and discomfort. *See Pl. Objections, p. 3; Dkt. No. 70.* While this may be true, as Judge Lowe noted, there is nothing in the record to show that his ankle and/or knee injury constituted a serious medical need. While defendants' failure to renew his permit may have caused some discomfort, the omission does not rise to the level of deliberate indifference because the defendants' reasonably believed that the permit was for the correct length of time. Accordingly, his claim on this basis is dismissed.

Second, Williamson argues that there was undue delay between his initial consultation and his surgery. Specifically, he contends that (1) he was not allowed to complete his post-surgery follow-up visits, following his surgery with Dr. Katz; (2) the procedures completed by Dr. Rubinovich did not remedy his injury; and (3) he underwent two unsuccessful surgeries that could have been avoided if defendants conducted an Arthogram test, as initially diagnosed by Dr. Katz. *See Pl. Objections, pp. 5-6, Dkt. No. 70.* These contentions are without merit.

As Judge Lowe noted and this court agrees, there is nothing in the record to show that his ankle and/or knee injury constituted a serious medical need or that the defendants' decisions regarding his surgeries rose to the level of deliberate indifference. As Judge Lowe further noted, there is ample evidence in the record that demonstrates that Williamson was treated with prompt medical care, including the fact that he was provided with: successful requests for examinations, procedures, medications and referrals to specialists. Also, as noted above, deliberate indifference is not established when the prisoner's medical needs were adequately treated and the prisoner simply disagrees with the particular course of treatment. *See Chance,* 143 F.3d at 703. Here, Williamson's objections do not establish a violation of his rights but instead voice his disagreement with the course of treatment provided to him. Accordingly, after considering each objection, looking at the record *de novo* and finding no mistake of fact or law, Williamson's Eighth Amendment claim is dismissed.

### 2. *Personal Involvement*

 **\*5** Williamson also objects to Judge Lowe's finding of no personal involvement on behalf of defendants Goord

and Portuondo. "It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Provost v. City of Newburgh,* 262 F.3d 146, 154 (2d Cir.2001) (citations omitted). Moreover, a supervisory official is only liable for constitutional violations if he: (1) directly participated in the violation; (2) failed to remedy the violation after learning of it through a report or appeal; (3) created a custom or policy fostering the violation after learning of it; or (4) was grossly negligent in supervising subordinates who caused the violation. *See Scott v. Coughlin,* 78 F.Supp.2d 299, 312 (S.D.N.Y.2000). Moreover, simply being put on notice of a problem may not be a sufficient basis for liability under § 1983. *See Bodie v. Morgenthau,* 342 F.Supp.2d 193, 203 (S.D.N.Y.2004) (citation omitted) (holding that even if a supervisory official ignores an individual's letter, that fact alone is insufficient to establish personal responsibility).

Here, Williamson specifically contends that Goord and Portuondo may be found liable on the basis of inadequate training of subordinates. *See Pl. Objections, p. 7; Dkt. No. 70.* He also contends that through the grievance system, Goord was put on notice of the delay in treatment yet failed to promptly remedy the situation. See *id.* These contentions are without merit. Williamson offers no facts to support his assertion that either defendant failed to adequately train subordinates. Furthermore, Goord cannot be held liable on the sole fact that a grievance system is in place at the prison, which may have provided notice of a problem. Accordingly, after looking at the record *de novo* and finding no mistake of fact or law, Williamson's objection on this basis is dismissed.

## IV. *Conclusion*

Having reviewed the objected-to portions of the Report-Recommendation *de novo,* the remainder under a clearly erroneous standard, and Williamson's objections, this court accepts and adopts the recommendation of Judge Lowe for the reasons stated in the November, 2005 Report-Recommendation.

WHEREFORE, for the foregoing reasons, it is hereby

ORDERED that defendants' motion for summary judgment *(Dkt. No. 50)* be GRANTED, and the complaint DISMISSED IN ITS ENTIRETY.

ORDERED that the Clerk of the Court provide copies of this Order to the parties.

IT IS SO ORDERED.

GEORGE H. LOWE, U.S. Magistrate Judge.

## *REPORT-RECOMMENDATION*

This matter has been referred to me for Report and Recommendation by the Honorable Gary L. Sharpe, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule N.D.N.Y. 72.3(c). In this *pro se* civil rights complaint brought under 42 U.S.C. § 1983, Inmate Steve L. Williamson alleges that five employees of the New York State Department of Correctional Services were deliberately indifferent to his serious medical needs. Currently before the Court is Defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. (Dkt. No. 50.) For the reasons discussed below, I recommend that Defendants' motion be granted.

*Table of Contents*

| | |
|---|---|
| I. BACKGROUND | 3 |
| II. SUMMARY JUDGMENT STANDARD | 5 |
| III. STATEMENT OF MATERIAL FACTS | 8 |
|     A. Background on Plaintiff's Knee Injury | 11 |

B. Referral of Plaintiff to an Orthopedic Specialist Regarding His Knee Injury ........... 13

C. Alleged Failure to Provide Plaintiff with an MRI Regarding His Knee Injury ........... 16

D. Alleged Failure to Refer Plaintiff to an Orthopedic Specialist Regarding His Ankle Injury ........... 18

E. Alleged Failure to Answer Plaintiff's Medical Emergency Call Regarding His Ankle Injury ........... 21

F. Alleged Failure to Renew Plaintiff's Permit for Crutches ........... 22

G. Restraint of Plaintiff in Leg Shackles During Visit to Orthopedic Specialist on March 11, 2002 ........... 25

H. Consequences of Plaintiff's Not Receiving an Arthrogram or for any Delay Between His Initial Orthopedic Consultation and His Surgery ........... 30

IV. ANALYSIS ........... 33

A. Plaintiff's "First Claim" (for Failing to Answer Emergency Medical Call) ........... 33

B. Plaintiff's "Second Claim" (for Refusing to Renew Permit for Crutches) ........... 36

1. Failure to Establish Claim ........... 37

2. Failure to Exhaust Administrative Remedies ........... 38

C. Plaintiff's "Third Claim" (for Being Restrained in Leg Shackles) ........... 39

| | |
|---|---|
| 1. Failure to Establish Claim | 40 |
| 2. Defendant Connolly's Qualified Immunity | 41 |
| D. Plaintiff's "Fourth Claim" (for Delaying Examination of Plaintiff, Failing to Provide MRI, and Failing to Make Referrals to Specialist) | 43 |
| E. Whether Plaintiff's Claims Against Defendants Goord and Portuondo Should Be Dismissed for Failure to Establish Their Personal Involvement | 45 |

## I. BACKGROUND

**\*6** Generally, Plaintiff alleges that five employees of the New York State Department of Correctional Services ("DOCS") violated his rights under the Eighth Amendment by being deliberately indifferent to his degenerative knee condition and sprained ankle while he was incarcerated at Shawangunk Correctional Facility ("Shawangunk C.F.") Specifically, Plaintiff's Complaint set forth the following **four** claims:

**First Claim:** That DOCS Commissioner Glenn S. Goord, Shawangunk C.F. Superintendent Leonard A. Portuondo, and Shawangunk C.F. Nurse Celeste R. Cornelia violated Plaintiff's rights under the Eighth Amendment by depriving Plaintiff of adequate medical attention on February 1, 2002, when Cornelia did not answer Plaintiff's emergency medical call, despite knowing of Plaintiff's claims of dizziness and vomiting caused by medication, and severe ankle pain (or when Goord and Portuondo knowingly permitted that deprivation to happen);

**Second Claim:** That DOCS Commissioner Glenn S. Goord, Shawangunk C.F. Superintendent Leonard A. Portuondo, and Shawangunk C.F. Nurse Celeste R. Cornelia violated Plaintiff's rights under the Eighth Amendment by depriving Plaintiff of adequate medical attention on February 18, 2002, when Cornelia refused to renew Plaintiff's permit for crutches (or when Goord and Portuondo knowingly permitted that deprivation to happen);

**Third Claim:** That DOCS Commissioner Glenn S. Goord, Shawangunk C.F. Superintendent Leonard A. Portuondo, and Shawangunk C.F. Captain Daniel Connolly violated Plaintiff's rights under the Eighth Amendment by depriving Plaintiff of adequate medical attention on March 11, 2002, when Connolly ordered officers to keep Plaintiff restrained in leg shackles during a medical visit, thereby making it impossible for an orthopedic specialist to adequately examine Plaintiff (or when **Goord** and **Portuondo** knowingly permitted that deprivation to happen); and

**Fourth Claim:** That DOCS Commissioner Glenn S. Goord, Shawangunk C.F. Superintendent Leonard A. Portuondo, Shawangunk C.F. Health Services Director Anthony Forte, M.D., and Shawangunk C.F. Nurse Celeste R. Cornelia violated Plaintiff's rights under the Eighth Amendment by depriving Plaintiff of adequate medical attention from January to March of 2002, when Forte and/or Cornelia (1) delayed in seeing Plaintiff, (2) failed to provide an MRI for Plaintiff, and (3) failed to refer Plaintiff to an orthopedic specialist in connection with injuries to Plaintiff's left knee and left ankle (or when Goord and Portuondo knowingly permitted those deprivations to happen). (Dkt. No. 1.)

Generally, Defendants' motion for summary judgment (Dkt. No. 50), which Plaintiff has opposed (Dkt. No. 59), raises **five** issues:

**(1)** Whether Plaintiff's "First Claim" as described above (i .e. his claim against Defendants Goord, Portuondo, and Cornelia for failing to answer Plaintiff's emergency medical call on February 1, 2002) should be dismissed because of Plaintiff's

failure to establish a deliberate indifference to a serious medical need under the Eighth Amendment;

**\*7** **(2)** Whether Plaintiff's "Second Claim" as described above (i.e. his claim against Defendants Goord, Portuondo, and Cornelia for refusing to renew Plaintiff's permit for crutches on February 18, 2002) should be dismissed because of Plaintiff's failure to establish a deliberate indifference to a serious medical need under the Eighth Amendment and/or because of Plaintiff's failure to exhaust administrative remedies;

**(3)** Whether Plaintiff's "Third Claim" as described above (i .e., his claim against Defendants Goord, Portuondo, and Connolly for restraining Plaintiff in leg shackles during a medical visit on March 11, 2002) should be dismissed because of Plaintiff's failure to establish a deliberate indifference to a serious medical need under the Eighth Amendment and/or because of Defendant Connolly's qualified immunity; and

**(4)** Whether Plaintiff's "Fourth Claim" as described above (i.e. his claim against Defendants Goord, Portuondo, Forte, and Cornelia for delaying in seeing Plaintiff, failing to order an MRI, and failing to refer Plaintiff to an orthopedic specialist from January to March of 2002) should be dismissed because of Plaintiff's failure to establish a claim for deliberate indifference to a serious medical need under the Eighth Amendment; and

**(5)** Whether each of Plaintiff's claims against Defendants Goord and Portuondo should be dismissed because of Plaintiff's failure to establish the personal involvement of Defendants Goord or Portuondo in any of the alleged constitutional violations. (Dkt. No. 51.)

For the reasons discussed below, I conclude that each of the above questions is answered in the affirmative. As a result, I recommend that Defendants' motion for summary judgement be granted.

## II. SUMMARY JUDGMENT STANDARD

Under Fed.R.Civ.P. 56(c), summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of

material [1] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) (citation omitted); *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citation omitted).

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87 (1986). The nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 477 U.S. 574, 585-86 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986). "A dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Ross v. McGinnis,* 00 Civ. 0275, 2004 WL 1125177, *8 (W .D.N.Y. March 29, 2004)* [internal quotations omitted] [emphasis added].

**\*8** Imposed over this general burden-shifting framework is the generous perspective with which the Court must view a *pro se* plaintiff's pleadings. "[I]n actions in which one of the parties appears *pro se,* this Court is faced with the ... responsibility of granting significant liberality in how *pro se* pleadings are construed." *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 467 (S.D.N.Y.1998); *see Haines v. Kerner,* 404 U.S. 519, 520-21 (1972) *(per curiam) (pro se* pleadings held "to less stringent standards than formal pleadings drafted by lawyers."); *Ortiz v. Cornetta,* 867 F.2d 146, 148 (2d Cir.1989). For example, where a plaintiff is proceeding pro se, and the defendant has filed a dispositive motion, the Court must construe the plaintiff's complaint and opposition papers liberally so as to raise the strongest arguments that they suggest. *See Weixel v. Bd. of Ed. of City of New York,* 287 F.3d 138, 146 (2d Cir.2002) (motion to dismiss in civil rights case); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (motion for summary judgment in civil rights case); *Thomas v. Irving,* 981 F.Supp. 794, 799 (W.D.N.Y.1997) (motion for summary judgment in civil rights case).

However, although "[t]he work product of *pro se* litigants should be generously and liberally construed, ... [a *pro se* litigant's] failure to allege either specific facts or particular laws that have been violated renders [an] attempt to oppose defendants' motion ineffectual." *Kadosh v. TRW, Inc.,* No.

91 Civ. 5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994). In other words, "[p]roceeding pro se does not otherwise relieve a [party] from the usual requirements to survive a motion for summary judgment ." *Bussa v. Aitalia Line Aeree Italiane S.p.A.,* 02-CV-10296, 2004 WL 1637014, at *4 (S.D.N.Y. July 21, 2004) (citations omitted), *accord, Durran v. Selsky,* 251 F.Supp.2d 1208, 1211 (W.D.N.Y.2003) (citations omitted).

### III. STATEMENT OF MATERIAL FACTS

The facts set forth in a defendant's Rule 7.1(a)(3) Statement of Material Facts will be taken as true to the extent those facts are supported by the evidence in the record [2] and are not specifically controverted by the plaintiff. [3]

To "specifically controvert[ ]" each of the statements of material fact in a defendant's Rule 7.1(a)(3) Statement of Material Facts, a plaintiff must file a *response* to the Statement of Material Facts that "mirror[s] the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs" *and* that "set[s] forth a specific citation to the record where the factual issue arises." [4]

Portions of the record sufficient to create a "factual issue" include affidavits or a verified complaint. [5] However, such an affidavit or verified complaint must, among other things, be based "on personal knowledge." [6] An affidavit or verified complaint is not based on personal knowledge if, for example, it is based on mere suspicion, rumor, hearsay, or secondhand information. [7] Similarly, such an affidavit or verified complaint must not be general and conclusory. [8]

**\*9** Here, in addition to filing a memorandum of law, Plaintiff has filed only affirmations in opposition to each of the four affirmations filed by Defendants in support of their motion for summary judgment. (Dkt. No. 59, Part 1 [Plf.'s Opp. Affirmations].) These affirmations do not comprise the "response to the Statement of Material Facts" that is required by Local Rule 7.1. *Compare* N.D.N.Y. L.R. 7.1(a)(2) (describing "affidavits") *with* N.D.N.Y. L.R. 7.1(a)(2) (describing "response to the Statement of Material Facts," which must be supported by evidence such as affidavits). The same is true with respect to Plaintiff's Verified Complaint, which (as mentioned above) has the effect of an affidavit.

The Court has no duty to assiduously search the record for evidence creating a dispute of material fact, where a plaintiff has failed to file a response to a Statement of Material Facts. [9] However, even if the Court were to treat Plaintiff's four affidavits (and Verified Complaint) as comprising a "response" under Local Rule 7.1(a)(3), the Court would find that, overwhelmingly, Plaintiff has failed to specifically controvert the facts set forth in the Defendants' Rule 7.1 Statement. This is because Plaintiff's affidavits often (1) assert facts that are non-responsive to Defendants' Rule 7.1 Statement and/or simply immaterial to Defendants' motion, (2) fail to deny Defendants' factual assertions, and/or (3) fail to support Plaintiff's denials with citations to (non-conclusory) evidence in the record. (Dkt. No. 59, Part 1 [Plf.'s Responses to Defs.' Affidavits].)

The following material facts, even when viewed most favorably to Plaintiff, are supported by evidence in the record, and not specifically controverted by Plaintiff:

#### Background on Plaintiff's Knee Injury

1. In 1986, Plaintiff injured his left knee in an automobile accident. [10] Over the following years, this injury helped contribute to the onset of chronic pain and instability in Plaintiff's left knee. [11]

2. For example, in March of 1998, while an inmate at Attica Correctional Facility ("Attica C.F."), Plaintiff was diagnosed with arthrosis in his left knee. [12] Arthrosis is a chronic, degenerative condition that may cause inflammation and pain. [13]

3. At approximately this time, Plaintiff began being treated with Indocin for his arthrosis. [14] Indocin is a non-steroidal, anti-inflammatory drug used to alleviate the pain, swelling, inflammation and stiffness often associated with degenerative joint disease. [15] Notwithstanding the Indocin, Plaintiff continued to complain of pain in his left knee, particularly after running or playing basketball. [16]

4. On or about May 21, 2001, Plaintiff fell and injured his left knee while playing basketball at Attica C.F.. [17] He was examined by an Attica C.F. medical care provider. (Dkt. No. 56 at 48 [Ex. A to Forte Aff.].)

5. On or about May 22, 2001, Plaintiff was taken to an emergency room for treatment of the injury he sustained the day before. [18]

**\*10** 6. Between May 22, 2001, and July 24, 2001, Plaintiff continued to play basketball. [19]

7. On July 24, 2001, Plaintiff complained of knee pain and swelling to an Attica C.F. medical care provider. [20] After a medical examination, Plaintiff was advised to play less basketball. [21]

8. It is the medical opinion of Defendant Rubinovich that the wear and tear on Plaintiff's knee from basketball most likely helped contribute to the degeneration of Plaintiff's knee (which had first been injured in 1986). [22]

### Referral of Plaintiff to an Orthopedic Specialist Regarding His Knee Injury

9. On or about September 10, 2001, Plaintiff was transferred from Attica C.F. to Shawangunk C.F. [23]

10. On or about September 19, 2001, Plaintiff complained of left knee pain to a Shawangunk C.F. medical care provider. [24] Plaintiff was examined by Defendant Forte. [25] As a result of this medical examination, Plaintiff continued to receive Indocin for the pain and swelling of his left knee. [26] In addition, Plaintiff continued to use a "knee sleeve," which had been given to him at Attica C.F. [27]

11. Based on Defendant Forte's examination of Plaintiff on September 19, 2001, it appeared to Defendant Forte that Plaintiff's complaints about his left knee occurred most frequently after he had run or played basketball. [28]

12. Due to Plaintiff's continued complaints of pain in his left knee, on October 5, 2001, Defendant Forte submitted a request to have Plaintiff's knees examined by x-ray. [29]

13. On October 5, 2001, Plaintiff's knees were examined by x-ray. [30]

14. After receiving the results of Plaintiff's x-ray examinations, Defendant Forte reviewed those results. [31] The x-ray examinations revealed to Defendant Forte that Plaintiff had (1) mild degenerative joint disease in his right knee and (2) progressive moderate degenerative joint disease in his left knee. [32] This was consistent with Plaintiff's 1998 diagnosis of arthrosis. [33]

15. On October 30, 2001, in response to Plaintiff's continued complaints of pain in his left knee, Defendant Forte (1) ordered a knee brace for Plaintiff (to be given to Plaintiff when it became available), and (2) replaced Plaintiff's prescription for Indocin with a prescription for Feldene. [34] Feldene is a non-steroidal, anti-inflammatory drug used to alleviate the pain, swelling, inflammation, and stiffness associated with degenerative joint disease. [35]

16. At some point between September 10, 2001, and December 4, 2001, Plaintiff came to disagree with Defendant Forte's diagnosis and treatment. [36]

17. On December 4, 2001, Plaintiff filed a grievance requesting to be seen by an orthopedic specialist. [37] Plaintiff did not want to be seen by Defendant Forte because Defendant Forte was not an orthopedic specialist. [38]

18. However, on November 30, 2001, Defendant Forte had already recommended that Plaintiff be seen by an orthopedic specialist. [39]

**\*11** 19. As a result, on December 19, 2001, Plaintiff was seen by an orthopedic specialist, Dr. Maxwell Alley, M.D. [40] Dr. Alley recommended that Plaintiff receive either a magnetic resonance imaging examination ("MRI") or an anthrogram. [41] Plaintiff has acknowledged that this examination satisfied the complaint he made in his December 4, 2001, grievance. [42]

### Alleged Failure to Provide Plaintiff with an MRI Regarding His Knee Injury

20. On December 26, 2001, based on Dr. Alley's recommendation, Defendant Forte submitted a request for an MRI of Plaintiff. [43] (Defendant Forte does not have discretion to simply refer inmates to outside entities for special services without permission. [44])

21. However, on January 16, 2002, Dr. Alley advised Defendant Forte that an MRI was not possible because Plaintiff had dental bridgework (whose metal components apparently may interfere with the MRI).[45] Dr. Alley, therefore, recommended an arthrogram.[46]

22. On January 18, 2002, Defendant Forte submitted a request for Plaintiff to receive an arthrogram.[47]

23. Between January 18, 2002, and March 11, 2002, Plaintiff was scheduled for three orthopedic appointments, which were cancelled for reasons beyond Defendants' control.[48] (In early 2002, getting appointments for inmates was difficult because DOCS was having trouble retaining orthopedic specialists who were willing to provide services for inmates.[49])

### Alleged Failure to Refer Plaintiff to an Orthopedic Specialist Regarding His Ankle Injury

24. Meanwhile, on January 7, 2002, Plaintiff injured his left ankle playing basketball.[50] (At his deposition, Plaintiff testified that, until January 7, 2002, he was still playing basketball at least twice a week.[51]) That evening, Plaintiff was seen by the medical department at Shawangunk C.F.[52] Plaintiff was provided ice and an Ace bandage.[53] In addition, he was provided a no-duty pass for the dates January 8, 2002, to January 13, 2002.[54]

25. On January 14, 2002, Plaintiff sought further medical treatment for his ankle injury.[55] An appointment was scheduled with Defendant Forte for January 18, 2002.[56]

26. On January 18, 2002, Dr. Forte (1) examined Plaintiff, (2) referred Plaintiff for x-ray examinations to rule out a fracture, (3) prescribed another no-duty pass for Plaintiff, this one for a one-month period, and (4) prescribed Naprosym for Plaintiff for the treatment of pain and swelling.[57]

27. On January 23, 2002, Plaintiff filed a grievance requesting to be seen by a specialist to determine the extent of his ankle injury.[58]

28. On January 30, 2002, Superintendent Portuondo responded to Plaintiff's grievance, stating, "Grievance is accepted to the extent that the grievant will be seen by an orthopedic specialist at the proper time."[59]

29. Between January 7, 2002 (the date of Plaintiff's initial injury), and February 1, 2002, Plaintiff was seen by the Shawangunk C.F. medical department with respect to his ankle injury on at least four occasions.[60]

**\*12** 30. At some point, Plaintiff was scheduled for a follow-up appointment with Defendant Forte to be held on February 8, 2002.[61]

31. On February 8, 2002, Plaintiff was examined by Defendant Forte.[62] Defendant Forte continued Plaintiff's Naprosym prescription and recommended that Plaintiff be seen by an orthopedic specialist.[63]

32. On March 20, 2002, and April 23, 2002, Plaintiff's ankle was examined by one or more orthopedic specialists, who diagnosed Plaintiff with a left ankle sprain.[64]

### Alleged Failure to Answer Plaintiff's Medical Emergency Call Regarding His Ankle Injury

33. Meanwhile, on February 1, 2002, Plaintiff apparently experienced simultaneous (1) pain in his left knee and left ankle and (2) nauseousness and dizziness that he claims resulted from an adverse interaction between two of his prescribed medications.[65] As a result, Plaintiff made an emergency medical call to Corrections Officer Horton ("C.O.Horton").[66] At the time of this emergency medical call, Defendant Cornelia was not advised by C . O. Horton (or anyone) that Plaintiff's medical emergency call was based on nausea and dizziness due to his medications.[67]

34. Defendant Cornelia declined to see Plaintiff on February 1, 2002, because she believed that she was unable to provide additional medical treatment for Plaintiff.[68] Specifically, prior to February 1, 2002, Plaintiff had been treated for the ankle injury, was receiving medication for the ankle injury, and was scheduled for a follow-up appointment with Defendant Forte.[69] That follow-up appointment occurred on February 8, 2002 (referenced above).[70]

**Alleged Failure to Renew Plaintiff's Permit for Crutches**

35. On January 18, 2002, Dr. Forte prescribed crutches for Plaintiff for a certain period of time. [71]

36. Defendants have introduced evidence that this period of time was for one month, while Plaintiff has introduced evidence that this period of time was for two months. [72] (Apparently, Dr. Forte instructed Plaintiff to use crutches for a two-month period, but issued Plaintiff a permit to use crutches for only a one-month period.) [73] In any event, I find that this dispute of fact is not material to Defendants' motion, for reasons discussed below in the Analysis section of this Report-Recommendation: in short, even if Plaintiff is correct that Dr. Forte prescribed crutches for Plaintiff for a two-month period of time, that fact would not confer liability on Defendants Cornelia, Goord, and Portuondo for their alleged failure to renew Plaintiff's permit for crutches on or about February 18, 2002.

37. Prior to February 18, 2002, Plaintiff had never sought a renewal of his crutches permit. [74]

38. On February 18, 2002, Plaintiff was apparently informed by a corrections officer that his crutches permit had expired, and he was escorted to the Shawangunk C.F. medical department to discuss the permit. [75] At some point during his visit to the medical department, Plaintiff complained to Defendant Cornelia that he wanted to see a specialist for his knee and ankle. [76] Defendant Cornelia explained to Plaintiff that Shawangunk C.F. was making an effort to refer Plaintiff to a specialist, but that the facility was having difficulty finding a health care provider. [77] At the time, orthopedic consults were virtually at a standstill in the absence of a medical emergency. [78] Plaintiff was upset at being denied an outside appointment. [79]

*13 39. As to Plaintiff's permit for crutches, Defendant Cornelia believed that Plaintiff's permit, issued on January 18, 2002, was for a one-month period of time. [80] She based this belief on her understanding that (1) while Plaintiff's "Medical No-Duty Status" document notes that Plaintiff shall use the crutches for two months, Plaintiff's actual "Medical Equipment Pass" permitted Plaintiff to use the crutches for only one month, and (2) Plaintiff's "Ambulatory Health Record" for January 18, 2002, indicates that Plaintiff was

prescribed crutches for only one month. [81] (The parties dispute whether, despite this belief, Defendant Cornelia offered to renew Plaintiff's crutches permit for another month, and, if so, whether Plaintiff declined that offer. [82] However, again, I find this dispute not material to Defendants' motion, for the reasons discussed below in the Analysis section of this Report-Recommendation: in short, even if Plaintiff is correct that Defendant Cornelia did not offer to renew his crutches permit for another month, that fact would not confer liability on Defendants Cornelia, Goord, and Portuondo.)

40. As of February 18, 2002, Plaintiff was able to perform his daily activities without restriction. [83]

**Restraint of Plaintiff in Leg Shackles During Visit to Orthopedic Specialist on March 11, 2002**

41. On March 11, 2002, Plaintiff was scheduled to be seen at the Orthopedic Group in Albany, New York. [84] Defendant Connolly was responsible for authorizing Plaintiff's transfer to the Orthopedic Group. [85]

42. Before authorizing the transportation of an inmate, Defendant Connolly considers various factors including (1) the type of crime for which the inmate is incarcerated, (2) the sentence the inmate is serving, (3) the physical size of the inmate, (4) any escape attempts by the inmate, (5) any misbehavior reports concerning the inmate, and (6) any contacts the inmate may have in the area to which the inmate is being transported. [86] In the absence of an emergency, Defendant Connolly does not lightly modify plans with respect to inmate transportation. [87]

43. In this case, Defendant Connolly considered the fact that (1) Plaintiff's appointment in Albany was geographically close to Rensselaer County, (2) Plaintiff was convicted in Rensselaer County, (3) Plaintiff's wife still resides in Rensselaer County, and (4) Plaintiff is six feet nine inches tall. [88] In addition, Defendant Connolly believed that Plaintiff was serving a life sentence without the possibility of parole for killing his 27-year-old sister-in-law and beating her three-year-old daughter. [89]

44. Based upon these considerations, Defendant Connolly approved Plaintiff's transportation on the condition that

Plaintiff remain restrained with handcuffs, leg irons, a waist chain, and a black box .[90]

45. At the time Defendant Connolly approved Plaintiff's transportation, Defendant Connolly was not advised by a health care provider that Plaintiff's restraints had to be removed.[91] Accordingly, Defendant Connolly directed the correctional officers detailed to transport Plaintiff (the "transportation officers") not to remove any of Plaintiff's restraints without first contacting the Watch Commander.[92]

**\*14** 46. At the Orthopedic Group, a health care provider asked the transportation officers to remove Plaintiff's restraints.[93] Accordingly, the transportation officers contacted Defendant Connolly.[94]

47. Because Plaintiff's March 11, 2002, medical appointment was not made on an emergency basis, Defendant Connolly had no reason to believe that Plaintiff suffered from a serious injury or that Plaintiff would be harmed by any delay.[95] On the other hand, Defendant Connolly was well aware of the risks associated with removing Plaintiff's restraints.[96] For these security reasons, Defendant Connolly directed the transportation officers to keep Plaintiff fully restrained, and that, if the health care providers at the Orthopedic Group could not treat Plaintiff while he wore his restraints, the officers were to return Plaintiff to Shawangunk C.F.[97]

48. Rather than make a quick decision with respect to removing Plaintiff's restraints, Defendant Connolly desired to exercise caution.[98] He felt that his decision permitted him to gather all of the necessary information, analyze the risks and benefits, and determine a course of action that accommodated Plaintiff's needs while ensuring the least threat to public safety.[99]

49. At some point between March 11, 2002, and March 20, 2002, Defendant Connolly spoke to a health care provider at the Orthopedic Group and advised him or her of the risks associated with removing Plaintiff's restraints.[100] In light of these risks, a health care provider at the Orthopedic Group advised Defendant Connolly that only one of Plaintiff's restraints required removal.[101] Thereafter, Plaintiff was scheduled for an appointment to be held on March 20, 2002, which was nine days after his initial appointment (on March 11, 2002).[102]

50. On March 20, 2002, during Plaintiff's transportation to his appointment at the Orthopedic Group, the conditions of Plaintiff's transportation were modified so as to permit the transportation officers to remove one of Plaintiff's leg restraints and connect that shackle to Plaintiff's waist chain.[103] (The shackled leg would still be restrained because it would be connected to the waist chain.[104]) The rescheduled appointment took place; and, during that appointment, Dr. Alley was able to examine Plaintiff and recommend an arthrogram.[105]

### Consequences of Plaintiff's Not Receiving an Arthrogram or for any Delay Between His Initial Orthopedic Consultation and His Surgery

51. On April 9, 2002, Defendant Forte requested that Plaintiff receive an arthrogram.[106]

52. On April 23, 2002, Plaintiff was seen by Howard Katz, M.D., an orthopedic surgeon.[107] Rather than perform an arthrogram, Dr. Katz recommended Plaintiff for arthroscopic surgery.[108]

53. On April 24, 2002, Defendant Forte submitted a request for Plaintiff to receive arthroscopic surgery.[109]

54. On or about June 13, 2002, Dr. Katz performed arthroscopic surgery on Plaintiff's left knee, including a "partial lateral meniscectomy, shaving chondroplasty, subtotal synovectomy and debridement of a partially torn approximately ½ ACL [anterior cruciate ligament]."[110] During this arthroscopic surgery, Dr. Katz noted damage to Plaintiff's ACL.[111]

**\*15** 55. Based on the aforementioned notation by Dr. Katz, and based on Plaintiff's subsequent request to receive reconstructive surgery on his left knee, on or about June 11, 2003, Dr. Forte referred Plaintiff to R. Mitchell Rubinovich, M.D., an orthopedic surgeon, to determine whether Plaintiff required ACL reconstruction.[112]

56. At some point between June 11, 2003, and July 17, 2003, Dr. Rubinovich concluded that ACL construction was not appropriate based on (1) the progression of Plaintiff's condition, (2) the fact that ACL reconstruction is generally

not a required surgery, and that depending on age, lifestyle, and level of activity, many patients with torn or ruptured ACLs opt not to undergo surgery, (3) Dr. Rubinovich's medical opinion that Plaintiff's complaints were caused by osteoarthritis rather than his ACL, and (4) Dr. Rubinovich's medical opinion that osteotemy was more appropriate. [113]

57. On or about July 22, 2003, Dr. Forte submitted a request for Plaintiff to receive the surgery that Dr. Rubinovic recommended (i.e ., osteotemy surgery on Plaintiff's left knee). [114]

58. It appears that, on or about October 22, 2003 (after Defendants filed the instant motion for summary judgment), Dr. Rubinovich performed osteotemy surgery on Plaintiff's left knee. [115]

59. It is Dr. Rubinovich's medical opinion that Plaintiff has suffered no harm as a result of not receiving an arthrogram (recommended by Dr. Alley on March 20, 2002, and requested by Defendant Forte on April 9, 2002) or for any delay between his initial orthopedic consultation (on December 19, 2001) and his arthroscopic surgery (on or about June 13, 2002). [116]

60. With regard to his left-knee condition, Plaintiff has received (1) anti-inflammatory medications, (2) knee braces, (3) physical therapy, and (4) two surgeries (i.e., arthroscopic surgery on or about June 13, 2002, and osteotemy surgery on or about October 22, 2003). [117]

## III. ANALYSIS

### A. Whether Plaintiff's "First Claim" Should Be Dismissed Because of His Failure to Establish a Claim for Deliberate Indifference to a Serious Medical Need

In their memorandum of law, Defendants argue that Plaintiff's "First Claim" (for allegedly failing to answer his emergency medical call on February 1, 2002) should be dismissed because Plaintiff has failed to establish either of the two elements of a medical indifference claim under the Eighth Amendment. (Dkt. No. 51 at 14-17 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) the high level of pain he was experiencing gave rise to a *serious medical need,* and (2) Defendants Goord, Portuondo, and Cornelia acted *deliberately* because they were aware of that pain. (Dkt. No. 59, Part 2 at 10-12 [Plf.'s Mem. of Law].)

"To establish an unconstitutional denial of medical care [under the Eighth Amendment], a plaintiff must prove a deliberate indifference to serious medical needs." *Evering v. Lt. Rielly,* 98-CV-6718, 2001 U.S. Dist. LEXIS 15549, at *29 (S.D.N.Y. Sept. 25, 2001) (citing *Estelle v. Gamble,* 429 U.S. 97 [1976] and *Chance v. Armstrong,* 143 F.3d 698, 702 [2d Cir.1998] ). This claim's first prong (serious medical need) is objective while the claim's second prong (deliberate indifference) is subjective. *Evering,* 2001 U.S. Dist. LEXIS 15549 at *29 (citing *Hathaway v. Coughlin,* 37 F.3d 63, 66 [2d Cir.1994] ).

**\*16** With regard to the first prong, Judge Sharpe (while a magistrate judge) has stated:

While there is no exact definition of a 'serious medical condition' in this circuit, the Second Circuit has indicated some of the factors to be considered when determining if a serious medical condition exists, including '[t]he existence of any injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.'

*Crosswell v. McCoy,* 01-CV-0547, 2003 WL 962534, at *6 (N.D.N.Y. March 11, 2003) (Sharpe, M.J.) (citing *Chance,* 143 F.3d at 702-703); *see also Evering,* 2001 U.S. Dist. LEXIS at *29 ("To be sufficiently serious the deprivation must contemplate 'a condition of urgency, one that may produce death, degeneration or extreme pain.' ") (quoting *Hathaway,* 27 F.3d at 66 [citation omitted] ).

With regard to the second prong, a plaintiff must show that the charged official acted with "a sufficiently culpable state of mind." *Evering,* 2001 U.S. Dist. LEXIS 15549 at *30 (citing *Wilson v. Seiter,* 501 U.S. 294, 298 [1991] ); *Hathaway,* 37 F.3d at 66 (citation omitted). " 'The required state of mind, equivalent to criminal recklessness, is that the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; and he must also draw the inference.' " *Evering,* 2001 U.S. Dist. LEXIS 15549 at *30 (quoting *Hemmings v. Gorczyk,* 134 F.3d 104, 108 [2d Cir.1998] ); *see also Chance,* 143 F.3d at 702 (citing *Farmer v.. Brennan,* 511 U.S. 825, 837 [1994] ).

In short, to satisfy this second prong, "[t]he conduct alleged must be 'repugnant to the conscience of mankind.' "

*Tomarkin v. Ward,* 534 F.Supp. 1224, 1230 (S.D.N.Y.1982) (quoting *Estelle,* 429 U.S. at 104). "It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance,* 143 F.2d at 703 (citing *Dean v. Coughlin,* 804 F.2d 207, 215 [2d Cir.1986] ); *see also Evering,* 2001 U.S. Dist. LEXIS 15549 at *33-34 (citations omitted); *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.1992) (citations omitted). "[N]egligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim ." *Chance,* 143 F.3d at 703 (citing *Estelle,* 429 U.S. at 105-06).

Here, Plaintiff has failed to establish the first prong of the above test. The evidence in the record does not indicate that Plaintiff's medical condition was "urgent" under *Hathaway v. Coughlin,* 37 F.3d 63 (2d Cir.1994). (*See, supra,* Statement of Fact Nos. 34-35.) Specifically, even if assumed to be true, Plaintiff's allegations of pain in his left knee and ankle, and his nausea and dizziness, did not threaten to produce *death or degeneration,* or produce *extreme* pain under the law. *See Baczkowski v. N.Y. State Dept. of Corr.,* 04-CV-6192, 2004 U.S. Dist. LEXIS 12229, at *12-15 (W.D.N.Y. June 24, 2004) ("cold sweats, nausea and vomiting" resulting from medications, combined with "discomfort" resulting from slip on wet floor, did not constitute a serious medical need). [118]

*17 Even if Plaintiff has established the first prong of the above test, he has failed to establish the second prong of that test. No evidence exists suggesting that Defendants Goord, Portuondo, and Cornelia, acted with criminal recklessness with regard to Plaintiff's medical needs. (*See, supra,* Statement of Fact Nos. 34-35.) For example, it is an undisputed fact that, at the time of Plaintiff's emergency medical call on February 1, 2002, Defendant Cornelia was not advised by C.O. Horton (or anyone) that Plaintiff's medical call was based on nausea and dizziness due to his medications. (*See, supra,* Statement of Fact No. 33.) As a result, the reason that Defendant Cornelia declined to see Plaintiff on February 1, 2002, was not because of any deliberate indifference but because she believed that she was unable to provide additional medical treatment for Plaintiff (other than what had already been, and what was going to be, provided). (*See, supra,* Statement of Fact No. 34.)

As a result, I recommend that the Court dismiss Plaintiff's "First Claim."

**B. Whether Plaintiff's "Second Claim" Should Be Dismissed Because of His Failure to Establish a Claim for Deliberate Indifference to a Serious Medical Need and/or Because of His Failure to Exhaust His Administrative Remedies**

In their memorandum of law, Defendants argue that Plaintiff's "Second Claim" (for allegedly refusing to renew his permit for crutches on February 18, 2002) should be dismissed because (1) Plaintiff has failed to establish either of the two elements of a medical indifference claim under the Eighth Amendment, and (2) Plaintiff failed to exhaust his administrative remedies. (Dkt. No. 51 at 14-19 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) the high level of pain he was experiencing gave rise to a serious medical need, and (2) Defendants Goord, Portuondo, and Cornelia acted deliberately because they were aware of that pain. Noticeably absent from Plaintiff's response is any argument regarding his failure to exhaust administrative remedies. (Dkt. No. 59, Part 2 at 10-12 [Plf.'s Mem. of Law].)

**1. Failure to Establish Claim**

As explained above, to establish an unconstitutional denial of medical care under the Eighth Amendment, a plaintiff must prove that the defendant acted with (1) "deliberate indifference" (a subjective element) to the plaintiff's (2) "serious medical need" (an objective element).

Here, the evidence in the record does not indicate that Plaintiff's medical condition was "urgent" under *Hathaway v. Coughlin,* 37 F.3d 63 (2d Cir.1994). Specifically, even if Plaintiff's allegations are true that, on February 18, 2002, Defendant Correia refused to renew (or continue) Plaintiff's permit for crutches for a period of one month, that refusal did not threaten to produce *death or degeneration,* or produce *extreme* pain, under the circumstances. (*See, supra,* Statement of Fact Nos. 35-40.)

*18 Even if Plaintiff has established a serious medical need, no evidence exists suggesting that Defendants Goord, Portuondo, and Cornelia, acted with criminal recklessness with regard to that need. (*See, supra,* Statement of Fact Nos. 35-40; *see also Pittman v.. Forte,* 01-CV-0100, 2002 U.S. Dist. LEXIS 19944, at *13 (N.D.N.Y.2002) (Sharpe, M.J.) (denial of walking aid did not constitute deliberate indifference to serious medical need where there was no evidence that walking aid was withheld "for the sole purpose

of causing plaintiff unnecessary pain"). For example, on February 18, 2002, Defendant Cornelia *reasonably* believed that Plaintiff's permit for crutches, issued on January 18, 2002, was for a one-month period of time-even if Defendant Cornelia was factually mistaken in holding that belief. (*See, supra,* Statement of Fact No. 39.)

As a result, I recommend that the Court dismiss Plaintiff's "Second Claim."

**2. Failure to Exhaust Administrative Remedies**

The Second Circuit has recently held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the Prison Litigation Reform Act ("PLRA"). *See Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004). First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citations omitted). Third, if the remedies were available and some of the defendants did not forefeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* (citations and internal quotations omitted).

I conclude that, for the purposes of this motion, (1) administrative remedies were "available" to Plaintiff with regard to his denial-of-crutches claim, (2) Defendants have not forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it (nor have Defendants' actions estopped them from arguing that Plaintiff failed to exhaust his administrative remedies), and (3) Plaintiff has not established facts indicating that "special circumstances" exist justifying his failure to exhaust his available administrative remedies. I base these conclusions, in part, on (1) the fact that Plaintiff admitted in his Complaint that, during the time in question, Shawangunk C.F. had a prisoner grievance procedure (Dkt. No. 1 at ¶ 4.a.), (2) the fact that Plaintiff admitted in his deposition that he did not grieve the crutches issue, although he grieved other issues against Defendant Cornelia (Dkt. No.

50 at 28-29 [Ex. A to Munkwitz Aff.] ), and (3) the fact that Plaintiff does not controvert Defendants' failure-to-exhaust argument in his response papers (*see, e.g.,* Dkt. No. 59 at 10-12 [Part 2 to Plf.'s Response] ). [119]

**\*19** As a result, I recommend that, in the alternative, the Court dismiss Plaintiff's "Second Claim" on the grounds of Plaintiff's failure to exhaust his administrative remedies as to that claim.

**C. Whether Plaintiff's "Third Claim" Should Be Dismissed Because of His Failure to Establish a Claim for Deliberate Indifference to a Serious Medical Need and/or Because of Defendant Connolly's Qualified Immunity**

In their memorandum of law, Defendants argue that Plaintiff's "Third Claim" (for continuing to restrain Plaintiff in leg shackles during a medical visit on March 11, 2002) should be dismissed because (1) Plaintiff has failed to establish either of the two elements of a medical indifference claim under the Eighth Amendment, and (2) even if Plaintiff had established those two elements, Defendant Connolly would be protected from liability by the doctrine of qualified immunity. (Dkt. No. 51 at 14-17, 19-20 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) the high level of pain he was experiencing gave rise to a serious medical need, and (2) Defendants Goord, Portuondo, and Connolly acted deliberately because they were aware of that pain. (Dkt. No. 59, Part 2 at 6-7, 8-10, 12-14 [Plf.'s Mem. of Law].)

**1. Failure to Establish Claim**

As explained above, to establish an unconstitutional denial of medical care under the Eighth Amendment, a plaintiff must prove that the defendant acted with (1) "deliberate indifference" (a subjective element) to the plaintiff's (2) "serious medical need" (an objective element).

Here, the evidence in the record does not indicate that Plaintiff's medical condition was "urgent" under *Hathaway v. Coughlin,* 37 F.3d 63 (2d Cir.1994). Specifically, Defendant Connolly's order to corrections officers to keep Plaintiff in leg shackles during his medical visit on March 11, 2002, did not threaten to produce *death or degeneration,* or produce *extreme* pain, under the law. (*See, supra,* Statement of Fact Nos. 41-50, 59.) [120]

Even if Plaintiff has established a serious medical need, no evidence exists suggesting that Defendants Goord, Portuondo, and Connolly, acted with criminal recklessness with regard to that need. (*See, supra,* Statement of Fact Nos. 41-50.) The evidence does not even suggest that they acted negligently. For example, the evidence is clear that Defendant Connolly (1) scheduled the initial appointment for Plaintiff, (2) cancelled that appointment because the resulting security concern was, in his opinion, greater than Plaintiff's medical need, and (3) rescheduled the appointment when the security concern was alleviated. (*Id.*) This care was adequate for Eighth Amendment purposes. As the Second Circuit has explained:

> It must be remembered that the State is not constitutionally obligated, much as it might be desired by inmates, to construct a perfect plan for [medical] care that exceeds what the average reasonable person would expect or avail herself of in life outside the prison walls. The [Bedford Hills] correctional facility is not a health spa, but a prison in which convicted felons are incarcerated. Common experience indicates that the great majority of [Bedford Hills] prisoners would not in freedom or on parole enjoy the excellence in [medical] care which the plaintiffs understandably seek on their behalf. We are governed by the principle that the objective is not to impose upon a state prison a model system of [medical] care beyond average needs but to provide the minimum level of [medical] care required by the Constitution.

**\*20** *Dean v. Coughlin,* 804 F.2d 207, 215 (2d. Cir.1986) (internal quotations and citation omitted).

As a result, I recommend that the Court dismiss Plaintiff's "Third Claim."

### 2. Defendant Connolly's Qualified Immunity

"Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have

known.' " *Williams v. Smith,* 781 F.2d 319, 322 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 [1982] ). Regarding the issue of whether a particular right was *clearly established,* courts in this Circuit consider three factors:

(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) (citations omitted), *cert. denied,* 503 U.S. 962 (1992). [121] Regarding the issue of whether *a reasonable person would have known* he was violating such a clearly established right, this "objective reasonableness" [122] test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." *Malley v. Briggs,* 475 U.S. 335, 341 (1986); *see also Malsh v. Corr. Officer Austin,* 901 F.Supp. 757, 764 (S.D.N.Y .1995) (citing cases); *Ramirez v. Holmes,* 921 F.Supp. 204, 211 (S.D.N.Y.1996). As the Supreme Court explained,

[T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law.

... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized.

*Malley,* 475 U.S. at 341. Furthermore, courts in the Second Circuit recognize that "the use of an 'objective reasonableness' standard permits qualified immunity claims to be decided as a matter of law." *Malsh,* 901 F.Supp. at 764 (citing *Cartier v. Lussier,* 955 F.2d 841, 844 [2d Cir.1992] [citing Supreme Court cases] ).

Here, even if Plaintiff had a "right" to be free of leg shackles during the medical visit in question, that right was not "clearly established" such that Defendant Connolly should have known he was violating that right through his actions. As shown above, Defendant Connolly's actions were well-reasoned, reasonably prompt, and wholly free from any suggestion of animus or bad faith. (*See, supra,* Statement of Fact Nos. 41-50.) As a result, absolutely no facts

exist indicating that Defendant Connolly was either "plainly incompetent" or in *knowing* violation of any law. At the very least, officers of "reasonable competence" could have disagreed on the legality of Defendant Connolly's actions.

**\*21** As a result, I recommend that, in the alternative, the Court dismiss Plaintiff's "Third Claim" on the ground of qualified immunity.

### D. Whether Plaintiff's "Fourth Claim" Should Be Dismissed Because of His Failure to Establish a Deliberate Indifference to a Serious Medical Need

In their memorandum of law, Defendants argue that Plaintiff's "Fourth Claim" (for allegedly failing, between January 2002 and March 2002, to promptly see Plaintiff, provide him with an MRI, and refer him to an orthopedic specialist in connection with Plaintiff's injuries to his left knee and left ankle) should be dismissed because Plaintiff has failed to establish either of the two elements of a medical indifference claim under the Eighth Amendment. (Dkt. No. 51 at 14-17 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) the high level of pain he was experiencing gave rise to a serious medical need, and (2) Defendants Goord, Portuondo, and Forte acted deliberately because they were aware of that pain. (Dkt. No. 59, Part 2 at 6-10 [Plf.'s Mem. of Law].)

As explained above, to establish an unconstitutional denial of medical care under the Eighth Amendment, a plaintiff must prove that the defendant acted with (1) "deliberate indifference" (a subjective element) to the plaintiff's (2) "serious medical need" (an objective element).

Here, the evidence in the record does not indicate that Plaintiff's medical condition was "urgent" under *Hathaway v. Coughlin,* 37 F.3d 63 (2d Cir.1994). Specifically, even if Plaintiff's allegations are true, that, between January 2002 and March 2002, Defendants Forte and/or Cornelia delayed in seeing Plaintiff, failed to provide an MRI for Plaintiff, and failed to refer Plaintiff to an orthopedic specialist in connection with injuries to Plaintiff's left knee and left ankle, those failures did not threaten to produce *death or degeneration,* or produce *extreme* pain, under the law. (*See, supra,* Statement of Fact Nos. 20-34, 59.) [123]

Even if Plaintiff has established a serious medical need, no evidence exists suggesting that Defendants Goord, Portuondo, Forte, or Cornelia acted with criminal

recklessness with regard to that need. (*See, supra,* Statement of Fact Nos. 20-34.) For example, the evidence demonstrates that Defendant Forte acted promptly and dutifully in requesting medical procedures for Plaintiff, examining Plaintiff, referring Plaintiff for x-ray examinations, and prescribing medications for Plaintiff. (*See, supra,* Statement of Fact Nos. 20-22, 25-26, 30-31.) Defendant Portuondo acted appropriately and in good faith regarding Plaintiff's grievance requesting to be seen by a specialist to determine the extent of his ankle injury. (*See, supra,* Statement of Fact Nos. 23, 27-29, 32 .) As explained earlier, Defendant Cornelia acted reasonably and in good faith regarding Plaintiff's emergency medical call on February 1, 2002. (*See, supra,* Statement of Fact Nos. 33-34.) Finally, no evidence exists that Defendant Goord knew anything about the alleged misconduct, much less took part in it. (*See, supra,* Statement of Fact Nos. 20-34.) Simply stated, Defendants' actions, while perhaps frustrating from Plaintiff's point of view, were adequate for Eighth Amendment purposes.

**\*22** As a result, I recommend that the Court dismiss Plaintiff's "Fourth Claim."

### E. Whether Plaintiff's Claims Against Defendants Goord and Portuondo Should Be Dismissed Because of Plaintiff's Failure to Establish Those Defendants' Personal Involvement in Any of the Alleged Constitutional Violations

In their memorandum of law, Defendants argue that Plaintiff's claims against Defendants Goord and Portuondo should be dismissed because of Plaintiff's failure to establish their personal involvement in the alleged constitutional violations. (Dkt. No. 51 at 22-24 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that Defendants Goord and Portuondo were personally involved in creating and allowing unconstitutional practices to occur. (Dkt. No. 59, Part 2 at 15 [Plf.'s Mem. of Law].)

A defendant's personal involvement in the alleged unlawful conduct is a prerequisite for a finding of liability in a Section 1983 action. *See Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994); *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). If the defendant is a supervisory official, such as a DOCS Commissioner or a prison superintendent, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct. *Richardson v. Goord,* 347 F.3d 431,

435 (2d Cir.2003); *Ayers v.. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985).

Rather, in order for a supervisory official to be personally involved in unlawful conduct, he or she must have (1) directly participated in that violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986).

Here, I find that Defendants Goord and Portuondo were not personally involved in the alleged constitutional violations. Plaintiff attempts to make Defendants Goord and Portuondo personally involved by citing letters he sent to them and grievances he appealed to them. [124] However, Defendant Goord's and Defendant Portuondo's responses to Plaintiff's various letters and grievances are not sufficient, *under the circumstances,* to establish such personal involvement. [125] This is because a careful review of the evidence in the record reveals that either (1) Plaintiff's various letters and grievances failed to notify Defendants Goord and Portuondo of any of the constitutional violations alleged in Plaintiff's Complaint, or (2) if those letters or grievances did contain such a notice, no evidence exists suggesting that Defendants Goord and Portuondo responded improperly to those letters

or grievances. [126] Furthermore, no evidence exists that Defendants Goord or Portuondo created (or allowed to continue) a policy or custom under which the alleged violations occurred, or that they were grossly negligent in supervising any subordinates who allegedly caused those violations. [127]

**\*23** As a result, I recommend that, at the very least, the Court dismiss Plaintiff's claims against Defendants Goord and Portuondo due to their lack of personal involvement in the alleged violations.

ACCORDINGLY, it is

RECOMMENDED that Defendants' motion for summary judgment (Dkt. No. 50) be *GRANTED.*

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Svcs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

### All Citations

Not Reported in F.Supp.2d, 2006 WL 1977438

---

Footnotes

1  The Clerk is directed to append Judge Lowe's Report-Recommendation to this decision, and familiarity is presumed.

2  The following statement accompanies all magistrates' reports issued in this district: "[P]ursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the [c]lerk of [c]ourt. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW .**" *See* 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 72, 6(a), 6(e); *see Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1983); *Small v. Sec'y of Health & Human Services,* 892 F.2d 15, 16 (2d Cir.1989).

3  The decision to use procedural default is in the discretion of the district court. *See Almonte,* 2006 WL 149049, at \*4 (citation omitted). "Such discretion is based on, among other factors, whether the defaulted argument has substantial merit or, put otherwise, whether the magistrate judge committed plain error in ruling against the defaulted party." *Id.* (citation omitted). "As the Supreme Court has observed:

'[T]he district court ... must exercise supervision over the magistrate. Even ... [if a procedural default rule permits a] ... district judge ... to refuse to review a magistrate's report absent timely objection ... [t]he rule merely establishes a procedural default that has no effect on the ... court's jurisdiction. The district judge has jurisdiction over the case at all times. He retains full authority to decide whether to refer a case to the magistrate, to review the magistrate's report, and to enter judgment. Any party that desires plenary consideration need only ask. Moreover, while the statute does not require the judge to review an issue *de novo* if no objections are filed, it does not preclude further review, *sua sponte* or at the request of a party, under a *de novo* or any other standard.' " *Id.* (quoting *Thomas v. Arn,* 474 U.S. 140, 154 (1985)).

4    "The Rule 72(b) Advisory Committee Note suggests that the court will review for 'clear error,' stating:
'When no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.' " FED.R.CIV.P. 72(b) advisory committee's note (1983) (citations omitted); *see also Almonte,* 2006 WL 149049, at *5 (citations omitted).

5    Williamson generally objects to Judge Lowe's factual summary. He does not make specific objections to findings of fact or law, but instead reasserts his original arguments that are addressed later in the report. He has therefore procedurally defaulted. Since the court finds no clear error in Judge Lowe's reiteration of the facts as cited from the record, Williamson's objections on this basis are denied.

6    On February 1, 2002, Williamson experienced pain from his ankle injury as well as nausea and dizziness, which he claims resulted from an adverse reaction to his medications. Defendant Cornelia, the nurse on duty, did not respond to the call because she was not informed by the Corrections Officer on duty that Williamson was experiencing nausea and/or dizziness. Cornelia instead believed that Williamson only experienced ankle pain. Based on this belief, she scheduled him for a follow-up appointment with Dr. Forte but did not immediately respond to the emergency call. *See Report-Recommendation, p. 21; Dkt. No. 69.*

7    Williamson's additional objection pertains to his belief that a defendant Corrections Officer should have removed his leg shackles during a medical appointment outside the prison. Second, Williamson argues that defendants should have removed his leg shackles during a visit to an outside facility and that the subsequent cancellation of the appointment adversely affected his health. He specifically contends that the Corrections Officer in charge arbitrarily used unfounded safety concerns as a reason not to remove the shackles, with knowledge that Williamson would not be able to get examined with them on. *See Pl. Objections, pp. 3-5; Dkt. No. 70.* As Judge Lowe noted, defendant Connolly's actions were protected under the doctrine of qualified immunity. *See Poe v. Leonard,* 282 F.3d 123, 132-33 (2d Cir.2002). More specifically, Williamson did not have a clearly established right to be free from leg shackles. *See id.* As Judge Lowe further noted, even if he did, however, the officer's actions were reasonable because prisoners possess a risk of flight and/or danger to the community when outside the correctional facility. The court finds no evidence in the record to the contrary. Accordingly, Williamson's claim based on this ground is dismissed.

1    A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986).

2    *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004) (citations omitted).

3    *See* Local Rule 7.1(a)(3) (*"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."*).

4    Local Rule 7.1(a)(3); *see, e.g., Jones v. Smithkline Beecham Corp.,* 309 F.Supp.2d 343, 346 (N.D.N.Y.2004) (McAvoy, J.) ("[W]here Plaintiff has failed to provide specific references to the record in support of her denials or has otherwise failed to completely deny Defendant's assertions of fact, those assertions will be taken as true."); *Lee v. Alfonso,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *15 (N.D.N.Y. Feb. 10, 2004) (Scullin, C.J.) ("Plaintiff does not offer any facts to support his claims that would raise an issue of fact. Nor has he overcome his failure to respond to Defendants' Rule 7.1(a)(3) Statement. Therefore, Defendants' version of the facts remains uncontroverted."); *Margan v. Niles,* 250 F.Supp.2d 63, 67 (N.D.N.Y.2003) (Hurd, J.) ("Plaintiff's Rule 7.1(a)(3) statement, which contains numerous denials, does not contain a single citation to the record. Because plaintiff's response Rule 7.1(a)(3) statement does not comply with the local rules, it has not been considered."); *Mehlenbacher v. Slafrad,* 99-CV-2127, 2003 U.S. Dist. LEXIS 9248, at *4 (N.D.N.Y. June 4, 2003) (Sharpe, M.J.) ("Since the [plaintiff] has failed to respond to the defendant's statements of material fact, the facts as set forth in the defendants' Rule 7.1 Statement ... are accepted as true."); *Adams v. N.Y. State Thruway Auth.,* 97-CV-1909, 2001 U.S. Dist. LEXIS 3206, at *2, n. 1 (N.D.N.Y. March 22, 2001) (Mordue, J.) ("[T]o the extent plaintiff's responses violate Local Rule 7. 1, and are not properly admitted or denied, the Court will deem defendant's statement of fact admitted by plaintiff.").

5    *See Patterson v. County of Oneida,* 375 F.2d 206, 219 (2d. Cir.2004) ("[A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson,* 251 F.3d 345, 361 (2d Cir.2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied,* 536 U.S. 922 (2002); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") (citations omitted); Fed.R.Civ.P. 56(c) ("The judgment sought shall be rendered forthwith if the ... affidavits ... show that there is no genuine issue as to any material fact....").

6    Fed.R.Civ.P. 56(e) (requiring "personal knowledge"); *see also U.S. v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.,* 44 F.3d 1082, 1084 (2d Cir.1995) (citations omitted), *cert. denied sub nom, Ferrante v. U.S.,* 516 U.S. 806 (1995).

7   *Applegate v. Top Assoc., Inc.,* 425 F.2d 92, 97 (2d Cir.1970) (rejecting affidavit made on "suspicion ... rumor and hearsay"); *Spence v. Maryland Cas. Co.,* 803 F.Supp. 649, 664 (W.D.N.Y.1992) (rejecting affidavit made on "secondhand information and hearsay"), *aff'd,* 995 F.2d 1147 (2d Cir.1993).

8   *See Patterson v. County of Oneida,* 375 F.2d 206, 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") (citations omitted); *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting "conclusory" statements in opposing affidavit); *Applegate,* 425 F.2d at 97 (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings"); Fed.R.Civ.P. 56(e) (requiring more than "mere allegations or denials of ... [a pleading] ... but ... specific facts showing that there is a genuine issue for trial").

9   N.D.N.Y. L.R. 7.1(a)(3); *Smithkline Beecham,* 309 F.Supp.2d at 346 ("The Local Rules require the litigant, not the Court, to sift through the record and bring to the Court's attention the pertinent information."); *see also Amnesty America v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") (citations omitted); *Monahan v. N.Y. City Dep't of Corrections,* 214 F.3d 275, 291 (2d Cir.2000) (noting that the local rules are "designed to place the responsibility on the parties to clarify the elements of the substantive law which remain at issue because they turn on contested facts.... While the trial court has discretion to conduct an assiduous review of the record in an effort to weigh the propriety of granting a summary judgment motion, it is not required to consider what the parties fail to point out.") (internal quotations and citations omitted).

10   (Dkt. No. 53, ¶ 4 [Rubinovich Aff.]; Dkt. No. 56, ¶ 8 [Forte Aff.]; Dkt. No. 56 at 44, 73, 177 [Ex. A to Forte Aff.].)

11   (Dkt. No. 53, ¶¶ 3-4 [Rubinovich Aff.]; Dkt. No. 56, ¶ 8 [Forte Aff.]; Dkt. No. 56 at 44, 73, 177 [Ex. A to Forte Aff.]; Dkt. No. 1, Attach. at 1 [Plf.'s Verified Compl.]; *see also* Dkt. No. 59, Part 1, ¶ 8 [Plf.'s Response to Forte Aff., not citing any evidence in denying this fact]; Dkt. No. 59, Part 1, ¶ 4 [Plf.'s Response to Rubinovich Aff., not citing any evidence in denying this fact].)

12   (Dkt. No. 56, ¶ 10 [Forte Aff.]; Dkt. No. 56 at 65, 194, 197, 204, 218 [Ex. A. to Forte Aff.]; Dkt. No. 59, Part 1, ¶ 10 [Plf.'s Response to Forte Aff., admitting this fact]; *see also* Dkt. No. 1, Attach. at 1 [Plf.'s Verified Compl.].)

13   (Dkt. No. 56, ¶ 10 [Forte Aff.]; Dkt. No. 56 at 65, 194, 197, 204, 218 [Ex. A. to Forte Aff.]; Dkt. No. 59, Part 1, ¶ 10 [Plf.'s Response to Forte Aff., admitting this fact].)

14   (Dkt. No. 56, ¶ 10 [Forte Aff.]; Dkt. No. 59, Part 1, ¶ 10 [Plf.'s Response to Forte Aff., admitting this fact]; *see also* Dkt. No. 1, Attach. at 1 [Plf.'s Verified Compl.].)

15   (Dkt. No. 56, ¶ 10 [Forte Aff.]; Dkt. No. 59, Part 1, ¶ 10 [Plf.'s Response to Forte Aff., admitting this fact].)

16   (Dkt. No. 56, ¶ 11 [Forte Aff.]; Dkt. No. 56 at 42 [Ex. A. to Forte Aff.]; *see also* Dkt. No. 59, Part 1, ¶ 11 [Plf.'s Response to Forte Aff., not citing any evidence in denying this fact].)

17   (Dkt. No. 56 at 48 [Ex. A. to Forte Aff.]; Dkt. No. 52, ¶ 17 [Defs.' Rule 7.1 Statement]; Dkt. No. 59, Part 1 [Plf.'s Rule 7.1 Response, not specifically controverting this fact].)

18   (Dkt. No. 56 at 48 [Ex. A to Forte Aff.].)

19   (Dkt. No. 56 at 46, 48 [Ex. A to Forte Aff.]; Dkt. No. 52, ¶ 18 [Defs.' Rule 7.1 Statement]; Dkt. No. 59, Part 1 [Plf.'s Rule 7.1 Response, not specifically controverting this fact]; Dkt. No. 50 at 17-18 [Ex. A to Munkwitz Aff.]; *cf.* Dkt. No. 52, ¶ 11 [Defs.' Rule 7.1 Statement; Dkt. No. 59, Part 1 [Plf.'s Rule 7.1 Response, not specifically controverting this fact].)

20   (Dkt. No. 56 at 46 [Ex. A to Forte Aff.]; Dkt. No. 52, ¶ 18 [Defs.' Rule 7.1 Statement]; Dkt. No. 59, Part 1 [Plf.'s Rule 7.1 Response, not specifically controverting this fact]; Dkt. No. 1, Attach. at 1 [Plf.'s Verified Compl.].)

21   (Dkt. No. 56 at 46 [Ex. A to Forte Aff.]; Dkt. No. 52, ¶ 18 [Defs.' Rule 7.1 Statement]; Dkt. No. 59, Part 1 [Plf.'s Rule 7.1 Response, not specifically controverting this fact].)

22   (Dkt. No. 53, ¶ 8 [Rubinovich Aff.]; Dkt. No. 59, Part 1, ¶ 8 [Plf.'s Response to Rubinovich Aff., not citing any evidence contradicting this fact].)

23   (Dkt. No. 56, ¶ 8 [Forte Aff.]; Dkt. No. 59, Part 1, ¶ 8 [Plf.'s Response to Forte Aff., not specifically controverting this fact]; Dkt. No. 1, Attach. at 1 [Plf.'s Verified Compl.].)

24   (Dkt. No. 56, ¶ 8 [Forte Aff.]; Dkt. No. 59, Part 1, ¶ 8 [Plf.'s Response to Forge Aff., not specifically controverting this fact]; Dkt. No. 50 at 9 [Ex. A to Munkwitz Aff.]; Dkt. No. 1 at 1 [Plf.'s Verified Compl.].)

25   (Dkt. No. 56 at 44 [Ex. A to Forte Aff.].)

26   (Dkt. No. 56, ¶ 10 [Forte Aff.]; Dkt. No. 56 at 43-44 [Ex. A to Forte Aff.]; Dkt. No. 59, Part 1, ¶ 10 [Plf.'s Response to Forte Aff., admitting this fact]; Dkt. No. 50 at 11 [Ex. A to Munkwitz Aff.].)

27   (Dkt. No. 50 at 11-12 [Ex. A to Munkwitz Aff.].)

28    (Dkt. No. 56, ¶ 11 [Forte Aff.]; Dkt. No. 56 at 42 [Ex. A to Forte Aff.]; Dkt. No. 59, Part 1, ¶ 11 [Plf.'s Response to Forte Aff., not specifically controverting this fact].)

29    (Dkt. No. 56, ¶ 11 [Forte Aff.]; Dkt. No. 56 at 42 [Ex. A to Forte Aff.]; Dkt. No. 59, Part 1, ¶ 11 [Plf.'s Response to Forte Aff., not specifically controverting this fact].)

30    (Dkt. No. 56 at 41-42 [Ex. A to Forte Aff.]; Dkt. No. 2 [Ex. B to Plf.'s Verified Compl.].)

31    (Dkt. No. 56 at 41 [Ex. A to Forte Aff.].)

32    (Dkt. No. 56, ¶ 11 [Forte Aff.]; Dkt. No. 59 at 179 [Ex. A to Forte Aff.]; Dkt. No. 59, Part 1, ¶ 11 [Plf.'s Response to Forte Aff., not citing any evidence in denying this fact].)

33    (Dkt. No. 56, ¶ 11 [Forte Aff.]; Dkt. No. 59, Part 1, ¶ 11 [Plf.'s Response to Forte Aff., not citing any evidence contradicting this sworn medical opinion].)

34    (Dkt. No. 56, ¶ 12 [Forte Aff.]; Dkt. No. 56 at 41 [Ex. A to Forte Aff.]; Dkt. No. 59, Part 1, ¶ 12 [Plf.'s Response to Forte Aff., not specifically controverting this fact].)

35    (Dkt. No. 56, ¶ 12 [Forte Aff.]; Dkt. No. 59, Part 1, ¶ 12 [Plf.'s Response to Forte Aff., not specifically controverting this fact].)

36    (Dkt. No. 50 at 14-15 [Ex. A to Munkwitz Aff.].)

37    (Dkt. No. 50 at 14 [Ex. A to Munkwitz Aff.]; Dkt. No. 2 [Ex. C to Plf.'s Verified Compl.].)

38    (Dkt. No. 50 at 14-15 [Ex. A to Munkwitz Aff.]; Dkt. No. 2 [Ex. C to Plf.'s Verified Compl.].)

39    (Dkt. No. 56, ¶ 13 [Forte Aff.]; Dkt. No. 56 at 40, 177 [Ex. A to Forte Aff.]; Dkt. No. 59, Part 1, ¶ 13 [Plf.'s Response to Forte Aff., admitting this fact].)

40    (Dkt No. 56, ¶ 14 [Forte Aff.]; Dkt. No. 59, Part 1, ¶ 14 [Plf.'s Response to Forte Aff., not specifically controverting this fact]; Dkt. No. 50 at 15 [Ex. A to Munkwitz Aff.].)

41    (Dkt. No. 56, ¶ 14 [Forte Aff.]; Dkt. No. 59, Part 1, ¶ 14 [Plf.'s Response to Forte Aff., not specifically controverting this fact]; Dkt. No. 53, ¶ 10 [Rubinovich]; Dkt. No. 50 at 15-16 [Ex. A to Munkwitz Aff.].)

42    (Dkt. No. 50 at 15-16 [Ex. A to Munkwitz Aff.].)

43    (Dkt. No. 56, ¶ 15 [Forte Aff.]; Dkt. No. 56 at 175 [Ex. A to Forte Aff.].)

44    (Dkt. No. 56, ¶ 13 [Forte Aff.]; Dkt. No. 59, Part 1, ¶ 13 [Plf.'s Response to Forte Aff., admitting this fact].)

45    (Dkt. No. 56, ¶ 15 [Forte Aff.]; Dkt. No. 56 at 173 [Ex. A to Forte Aff.]; Dkt. No. 59, Part 1, ¶ 15 [Plf.'s Response to Forte Aff., not citing any evidence contradicting this fact].) I note that it appears that subsequently (on December 10, 2002) an MRI examination was in fact taken of Plaintiff (i.e., of his left ankle). (Dkt. No. 56 at 13 [Ex. A to Forte Aff.].) Of course, this fact does not contradict the fact asserted above, since Dr. Alley could have been mistaken, or the MRI in question could have been taken in error.

46    (Dkt. No. 56, ¶ 15 [Forte Aff.]; Dkt. No. 56 at 173 [Ex. A to Forte Aff.]; Dkt. No. 59, Part 1, ¶ 15 [Plf.'s Response to Forte Aff., not specifically controverting this fact].)

47    (Dkt. No. 56, ¶ 16 [Forte Aff.]; Dkt. No. 56 at 172 [Ex. A to Forte Aff.]; Dkt. No. 59, Part 1, ¶ 16 [Plf.'s Response to Forte Aff., not specifically controverting this fact].)

48    (Dkt. No. 56, ¶ 17 [Forte Aff.]; Dkt. No. 50 at 16-17 [Ex. A to Munkwitz Aff.]; Dkt. No. 59, Part 1, ¶ 17 [Plf.'s Response to Forte Aff., not specifically controverting this fact].)

49    (Dkt. No. 56, ¶ 16 [Forte Aff.]; Dkt. No. 59, Part 1, ¶ 16 [Plf.'s Response to Forte Aff., not citing any evidence contradicting this fact].)

50    (Dkt. No. 56, ¶ 26 [Forte Aff.]; Dkt. No. 56 at 37, 39 [Ex. A to Forte Aff.]; Dkt. No. 59, Part 1, ¶ 26 [Plf.'s Response to Forte Aff., not specifically controverting this fact]; Dkt. No. 50 at 18-19 [Ex. A to Munkwitz Aff.]; Dkt. No. 53, ¶ 12 [Rubinovich Aff.]; Dkt. No. 59, Part 1, ¶ 12 [Plf.'s Response to Rubinovich Aff., not specifically controverting this fact]; Dkt. No. 55, ¶ 4 [Cornelia Aff.]; Dkt. No. 59, Part 1, ¶ 4 [Plf.'s Response to Cornelia Aff., admitting this fact].)

51    (Dkt. No. 50 at 17-18 [Ex. A to Munkwitz Aff.].)

52    (Dkt. No. 56, ¶ 26 [Forte Aff.]; Dkt. No. 56 at 39 [Ex. A to Forte Aff.]; Dkt. No. 50 at 20-21 [Ex. A to Munkwitz Aff.]; Dkt. No. 59, Part 1, ¶ 26 [Plf.'s Response to Rubinovich Aff., not specifically controverting this fact].)

53    (Dkt. No. 56, ¶ 26 [Forte Aff.]; Dkt. No. 56 at 39 [Ex. A to Forte Aff.]; Dkt. No. 50 at 20-21 [Ex. A to Munkwitz Aff.]; Dkt. No. 59, Part 1, ¶ 26 [Plf.'s Response to Forte Aff., admitting this fact].)

54    (Dkt. No. 56, ¶ 26 [Forte Aff.]; Dkt. No. 50 at 20-21 [Ex. A to Munkwitz Aff.]; Dkt. No. 59, Part 1, ¶ 26 [Plf.'s Response to Forte Aff., citing no evidence contradicting this fact].)

55    (Dkt. No. 56, ¶ 27 [Forte Aff.]; Dkt. No. 50 at 37-39 [Ex. A to Munkwitz Aff.]; Dkt. No. 59, Part 1, ¶ 27 [Plf.'s Response to Forte Aff., not specifically controverting this fact and not citing any evidence contradicting this fact].)

56  (Dkt. No. 56, ¶ 27 [Forte Aff.]; Dkt. No. 50 at 37-39 [Ex. A to Munkwitz Aff.]; Dkt. No. 59, Part 1, ¶ 27 [Plf.'s Response to Forte Aff., not specifically controverting this fact and not citing any evidence contradicting this fact].)

57  (Dkt. No. 56 at 37 [Ex. A to Forte Aff.]; Dkt. No. 50 at 25-27 [Ex. A to Munkwitz Aff.].)

58  (Dkt. No. 1 at 2 [Plf.'s Verified Compl.]; Dkt. No. 2 [Ex. E to Plf.'s Verified Compl.].)

59  (Dkt. No. 2 [Ex. E to Plf.'s Verified Compl.].)

60  (Dkt. No. 55, ¶ 4 [Cornelia Aff.]; Dkt. No. 59, Part 1, ¶ 4 [Plf.'s Response to Cornelia Aff., admitting this fact].)

61  (Dkt. No. 56, ¶ 29 [Forte Aff.]; Dkt. No. 59, Part 1, ¶ 29 [Plf.'s Response to Forte Aff., not specifically controverting this fact and not citing any evidence contradicting this fact]; Dkt. No. 55, ¶ 5 [Cornelia Aff.]; Dkt. No. 59, Part 1, ¶ 5 [Plf.'s Response to Cornelia Aff., not specifically controverting this fact and not citing any evidence contradicting this fact].)

62  (Dkt. No. 56, ¶ 29 [Forte Aff.]; Dkt. No. 56 at 36 [Ex. A to Forte Aff.]; Dkt. No. 59, Part 1, ¶ 29 [Plf.'s Response to Forte Aff., not specifically controverting this fact and not citing any evidence contradicting this fact].)

63  (Dkt. No. 56, ¶ 29 [Forte Aff.]; Dkt. No. 50 at 32 [Ex. A to Munkwitz Aff.]; Dkt. No. 59, Part 1, ¶ 29 [Plf.'s Response to Forte Aff., not specifically controverting this fact and not citing any evidence contradicting this fact].)

64  (Dkt. No. 56, ¶ 31 [Forte Aff.]; Dkt. No. 56 at 169, 172 [Ex. A to Forte Aff.]; Dkt. No. 59, Part 1, ¶ 31 [Plf.'s Response to Forte Aff., not specifically controverting this fact and not citing any evidence contradicting this fact]; Dkt. No. 53, ¶ 12 [Rubinovich Aff.]; Dkt. No. 59, Part 1, ¶ 12 [Plf.'s Response to Rubinovich Aff., not specifically controverting this fact and not citing any evidence contradicting this fact].)

65  (Dkt. No. 50 at 72-74 [Ex. A to Munkwitz Aff.]; Dkt. No. 1, Attach. at 2 [Plf.'s Verified Compl.]; Dkt. No. 59, Part 1, ¶ 3 [Plf.'s Response to Cornelia Aff.].)

66  (Dkt. No. 55, ¶ 3 [Cornelia Aff.]; Dkt. No. 59, Part 1, ¶ 3 [Plf.'s Response to Cornelia Aff.]; Dkt. No. 50 at 72-74 [Ex. A to Munkwitz Aff.]; Dkt. No. 1, Attach. at 2 [Plf.'s Verified Compl.]; Dkt. No. 2 [Ex. D to Plf.'s Verified Compl.].)

67  (Dkt. No. 55, ¶ 8 [Cornelia Aff.]; Dkt. No. 59, Part 1, ¶ 8 [Plf.'s Response to Cornelia Aff., not specifically controverting this fact and not citing any evidence contradicting this fact]; Dkt. No. 50 at 74 [Ex. A to Munkwitz Aff., attaching Plaintiff's deposition testimony, in which Plaintiff admits that he has no knowledge of this fact].)

68  (Dkt. No. 55, ¶ 7 [Cornelia Aff.]; Dkt. No. 59, Part 1, ¶ 7 [Plf.'s Response to Cornelia Aff., not specifically controverting this fact and not citing any evidence contradicting this fact].)

69  (Dkt. No. 55, ¶ 7 [Cornelia Aff.]; Dkt. No. 59, Part 1, ¶ 7 [Plf.'s Response to Cornelia Aff., not specifically controverting this fact and not citing any evidence contradicting this fact].)

70  (Dkt. No. 56, ¶ 29 [Forte Aff.]; Dkt. No. 56 at 36 [Ex. A to Forte Aff.]; Dkt. No. 59, Part 1, ¶ 29 [Plf.'s Response to Forte Aff., not specifically controverting this fact and not citing any evidence contradicting this fact].)

71  (Dkt. No. 56, ¶ 28 [Forte Aff.]; Dkt. No. 50 at 25-27 [Ex. A to Munkwitz Aff.] Dkt. No. 56 at 37 [Ex. A to Forte Aff.]; Dkt. No. 2 [Exs. H and I to Plf.'s Verified Compl.]; Dkt. No. 59, Part 1, ¶ 28 [Plf.'s Response to Forte Aff., admitting this fact].)

72  (*See* Dkt. No. 56, ¶ 28 [Forte Aff.] [sworn statement that Dr. Forte "prescribed plaintiff crutches for month"]; Dkt. No. 56 at 37 [Ex. A to Forte Aff.] ["Ambulatory Health Record" signed by Dr. Forte and dated 1/18/02, indicating that the crutches were "ordered" and "permitted" for "1 mo."]; Dkt. No. 2 [Ex. I to Plf.'s Verified Compl.] ["Medical Equipment Pass" signed by Dr. Forte and dated 1/18/02, stating that Plaintiff was "issued" crutches on 1/18/02, with an "expiration date" of 2/18/02]; *but see* Dkt. No. 59, Part 2 at ¶ 4 [Ex. 6 to Plf.'s Mem. of Law] [Defs.' Response to Plf.'s Request for Admissions, admitting that "Dr. Forte ordered plaintiff to use crutches for two months."]; Dkt. No. 59, Part 2 [Ex. 2 to Plf.'s Mem. of Law] ["Medical No-Duty Status" document signed by Dr. Forte and dated 1/18/02, containing "special instructions from M.D." that Plaintiff shall "use crutches for 2 mo."].)

73  (*Id.*)

74  (Dkt. No. 50 at 43-44 [Ex. A to Munkwitz Aff.]; *cf.* Dkt. No. 52, ¶ 75 [Defs.' Rule 7.1 Statement, asserting that "Plaintiff did not seek a further No-Duty pass in connection with his ankle injury" after the expiration of his January 18, 2001, No-Duty pass, which pass Plaintiff alleges permitted him to use crutches]; Dkt. No. 59 [Plf.'s Rule 7.1 Response, not specifically controverting this fact].)

75  (Dkt. No. 59, Part 1, ¶ 12 [Plf.'s Response to Cornelia Aff.]; Dkt. No. 1, Attach. at 2-3 [Plf.'s Verified Complaint].)

76  (Dkt. No. 55, ¶ 12 [Cornelia Aff.]; Dkt. No. 59, Part 1, ¶ 12 [Plf.'s Response to Cornelia Aff., not specifically denying this fact and not citing contrary evidence].)

77  (Dkt. No. 55, ¶ 12 [Cornelia Aff.]; Dkt. No. 59, Part 1, ¶ 12 [Plf.'s Response to Cornelia Aff., not specifically denying this fact and not citing contrary evidence].)

78  (Dkt. No. 55, ¶ 12 [Cornelia Aff.]; Dkt. No. 59, Part 1, ¶ 12 [Plf.'s Response to Cornelia Aff., not specifically denying this fact and not citing contrary evidence].)

**79** (Dkt. No. 55, ¶ 12 [Cornelia Aff.]; Dkt. No. 59, Part 1, ¶ 12 [Plf.'s Response to Cornelia Aff., not specifically denying this fact and not citing contrary evidence].)

**80** (Dkt. No. 55, ¶ 11 [Cornelia Aff., stating, among other things that, "even though plaintiff was only prescribed the crutches for one month, I offered to renew his permit for another month"].)

**81** (*See* Dkt. No. 55, ¶ 10 [Cornelia Aff., stating the reasons that she believes that the crutches permit was for one month]; Dkt. No. 59, Part 1, ¶ 10 [Plf.'s Response to Cornelia Aff., not specifically controverting this fact]; Dkt. No. 55, ¶ 11 [Cornelia Aff., stating, "Had I refused to renew plaintiff's crutches after one month, I would have been acting within the scope of the facility medical directors orders"]; Dkt. No. 59, Part 1, ¶ 11 [Plf.'s Response to Cornelia Aff., not specifically controverting this fact and not citing any evidence contradicting this fact].) I note that, because the fact in question has to do with Defendant Cornelia's *belief* about the crutches permit, not whether the permit was indeed for one month, Plaintiff's other assertions (that the permit was for two months) are immaterial to the fact in question.

**82** (*Compare* Dkt. No. 55, ¶ 11 [Cornelia Aff., testifying "I offered to renew his permit for another month" but citing no other record evidence] *with* Dkt. No. 59, Part 1, ¶¶ 11-12 [Plf.'s Response to Cornelia Aff., testifying, "At no time did defendant offer[ ] to renew plaintiff's crutches." but citing no other record evidence].)

**83** (Dkt. No. 50 at 43-47 [Ex. A to Munkwitz Aff.]; Dkt. No. 52, ¶ 74 [Defs.' Rule 7.1 Statement]; Dkt. No. 59 [Plf.'s Rule 7.1 Response, not specifically controverting this fact].)

**84** (Dkt. No. 54, ¶ 5 [Connolly Aff.]; Dkt. No. 56, ¶ 18 [Forte Aff.]; Dkt. No. 50 at 37 [Ex. A to Munkwitz Aff.]; Dkt. No. 59, Part 1, ¶ 5 [Plf.'s Response to Connolly Aff., not specifically controverting this fact]; Dkt. No. 59, Part 1, ¶ 18 [Plf.'s Response to Forte Aff., not specifically controverting this fact].)

**85** (Dkt. No. 54, ¶ 5 [Connolly Aff.]; Dkt. No. 59, Part 1, ¶ 5 [Plf.'s Response to Connolly Aff., not citing any evidence contradicting this fact].)

**86** (Dkt. No. 54, ¶ 4 [Connolly Aff.]; Dkt. No. 59, Part 1, ¶ 4 [Plf.'s Response to Connolly Aff., not citing any evidence contradicting this fact].)

**87** (Dkt. No. 54, ¶ 14 [Connolly Aff.]; Dkt. No. 59, Part 1, ¶ 14 [Plf.'s Response to Connolly Aff., not specifically controverting this fact and not citing any evidence contradicting this fact].)

**88** (Dkt. No. 54, ¶ 5 [Connolly Aff.]; Dkt. No. 50 at 5 [Ex. A to Munkwitz Aff.]; Dkt. No. 59, Part 1, ¶ 5 [Plf.'s Response to Connolly Aff., not citing any evidence contradicting this fact].)

**89** (Dkt. No. 50 at 76 [Ex. A to Munkwitz Aff.]; Dkt. No. 54, ¶ 5 [Connolly Aff.]; Dkt. No. 59, Part 1, ¶ 5 [Plf.'s Response to Connolly Aff., not citing any evidence contradicting this fact].) I note that Plaintiff denies being convicted of beating the three-year-old child. (Dkt. No. 59, ¶ 5 [Plf.'s Response to Connolly Aff.].) As an initial matter, I do not read Defendants' factual assertion as implying that Plaintiff was in fact *convicted* of beating the three-year-old child, only that he was serving a life sentence due, in part, to the fact that he had beaten the child. (Dkt. No. 54, ¶ 5 [Connolly Aff.].) This asserted fact would be supported by the reference to a plea agreement, crime victims assistance fee, and final order of protection contained in Exhibit 9 to Plaintiff's memorandum of law. (Dkt. No. 59, Part 2 [Ex. 9 to Plf.'s Mem. of Law].) It would also be supported by Plaintiff's deposition testimony, in which he admits that he had been charged with the assault of his niece along with first-degree murder of his sister-in-law. (Dkt. No. 50 at 77 [Ex. A to Munkwitz Aff.].) In any event, any factual dispute about whether Plaintiff beat the child, or was convicted of beating the child, would be immaterial to the instant motion. This is because the fact that there had been no such beating or conviction would not contradict the fact in question, which concerns what Defendant Connolly *believed,* on or about March 11, 2002, about Plaintiff's having beaten a child. In other words, Defendant Connolly could have been mistaken.

**90** (Dkt. No. 54, ¶ 6 [Connolly Aff.]; Dkt. No. 59, Part 1, ¶ 6 [Plf.'s Response to Connolly Aff., not specifically controverting this fact].)

**91** (Dkt. No. 54, ¶ 7 [Connolly Aff.]; Dkt. No. 59, Part 1, ¶ 7 [Plf.'s Response to Connolly Aff., not specifically controverting this fact and not citing any evidence contradicting this fact].)

**92** (Dkt. No. 54, ¶ 7 [Connolly Aff.]; Dkt. No. 59, Part 1, ¶ 7 [Plf.'s Response to Connolly Aff., not specifically controverting this fact].)

**93** (Dkt. No. 54, ¶ 8 [Connolly Aff.]; Dkt. No. 59, Part 1, ¶ 8 [Plf.'s Response to Connolly Aff., admitting this fact].)

**94** (Dkt. No. 54, ¶ 8 [Connolly Aff.]; Dkt. No. 59, Part 1, ¶ 8 [Plf.'s Response to Connolly Aff., admitting this fact].)

**95** (Dkt. No. 54, ¶ 9 [Connolly Aff.]; Dkt. No. 59, Part 1, ¶ 9 [Plf.'s Response to Connolly Aff., not specifically controverting this fact and not citing any evidence contradicting this fact].)

**96** (Dkt. No. 54, ¶ 9 [Connolly Aff.]; Dkt. No. 59, Part 1, ¶ 9 [Plf.'s Response to Connolly Aff., not specifically controverting this fact and not citing any evidence contradicting this fact].)

**97** (Dkt. No. 54, ¶ 10 [Connolly Aff.]; Dkt. No. 59, Part 1, ¶ 10 [Plf.'s Response to Connolly Aff., not specifically controverting this fact and not citing any evidence contradicting this fact].)

**98** (Dkt. No. 54, ¶ 14 [Connolly Aff.]; Dkt. No. 59, Part 1, ¶ 14 [Plf.'s Response to Connolly Aff., not specifically controverting this fact and not citing any evidence contradicting this fact].)

**99** (Dkt. No. 54, ¶ 14 [Connolly Aff.]; Dkt. No. 59, Part 1, ¶ 14 [Plf.'s Response to Connolly Aff., not specifically controverting this fact and not citing any evidence contradicting this fact].)

**100** (Dkt. No. 54, ¶ 11 [Connolly Aff.]; Dkt. No. 59, Part 1, ¶ 11 [Plf.'s Response to Connolly Aff., not specifically controverting this fact and not citing any evidence contradicting this fact].)

**101** (Dkt. No. 54, ¶ 11 [Connolly Aff.]; Dkt. No. 59, Part 1, ¶ 11 [Plf.'s Response to Connolly Aff., not specifically controverting this fact and not citing any evidence contradicting this fact].)

**102** (Dkt. No. 54, ¶ 12 [Connolly Aff.]; Dkt. No. 59, Part 1, ¶ 12 [Plf.'s Response to Connolly Aff., admitting this fact].)

**103** (Dkt. No. 54, ¶ 12 [Connolly Aff.]; Dkt. No. 59, Part 1, ¶ 12 [Plf.'s Response to Connolly Aff., not specifically controverting this fact and not citing any evidence contradicting this fact].)

**104** (Dkt. No. 54, ¶ 12 [Connolly Aff.]; Dkt. No. 59, Part 1, ¶ 12 [Plf.'s Response to Connolly Aff., not specifically controverting this fact and not citing any evidence contradicting this fact].)

**105** (Dkt. No. 56, ¶ 18 [Forte Aff.]; Dkt. No. 50 at 38-39 [Ex. A to Munkwitz Aff.]; Dkt. No. 59, Part 1, ¶ 18 [Plf.'s Response to Forte Aff., not specifically controverting this fact and not citing any evidence contradicting this fact].)

**106** (Dkt. No. 56, ¶ 18 [Forte Aff.]; Dkt. No. 56 at 169 [Ex. A to Forte Aff.]; Dkt. No. 59, Part 1, ¶ 18 [Plf.'s Response to Forte Aff., not specifically controverting this fact and not citing any evidence contradicting this fact].)

**107** (Dkt. No. 56, ¶ 19 [Forte Aff.]; Dkt. No. 56 at 169 [Ex. A to Forte Aff.]; Dkt. No. 59, Part 1, ¶ 19 [Plf.'s Response to Forte Aff., not specifically controverting this fact and not citing any evidence contradicting this fact].)

**108** (Dkt. No. 56, ¶ 19 [Forte Aff.]; Dkt. No. 59, Part 1, ¶ 19 [Plf.'s Response to Forte Aff., not specifically controverting this fact and not citing any evidence contradicting this fact].)

**109** (Dkt. No. 56, ¶ 19 [Forte Aff.]; Dkt. No. 56 at 168 [Ex. A to Forte Aff.]; Dkt. No. 59, Part 1, ¶ 19 [Plf.'s Response to Forte Aff., not specifically controverting this fact and not citing any evidence contradicting this fact].)

**110** (Dkt. No. 56, ¶ 20 [Forte Aff.]; Dkt. No. 56 at 159-163 [Ex. A to Forte Aff.]; Dkt. No. 59, Part 1, ¶ 20 [Plf.'s Response to Forte Aff., not specifically controverting this fact and not citing any evidence contradicting this fact, but admitting the fact that Dr. Katz performed arthroscopic surgery on Plaintiff's left knee in June of 2002]; Dkt. No. 59, Part 1, ¶ 19 [Plf.'s Response to Forte Aff., admitting the fact that Dr. Katz performed arthroscopic surgery on Plaintiff's left knee]; Dkt. No. 53, ¶ 10 [Rubinovich Aff.]; Dkt. No. 59, Part 1, ¶ 10 [Plf.'s Response to Rubinovich Aff., not specifically controverting this fact and not citing any evidence contradicting this fact, but admitting the fact that Dr. Katz performed the referenced procedure on Plaintiff's left knee].)

**111** (Dkt. No. 56, ¶ 20 [Forte Aff.]; Dkt. No. 56 at 159-163 [Ex. A to Forte Aff.]; Dkt. No. 59, Part 1, ¶ 20 [Plf.'s Response to Forte Aff., not specifically controverting this fact and not citing any evidence contradicting this fact, but apparently admitting the fact that Dr. Katz's surgery resulting in a finding that Plaintiff's ACL was " ½ torn"].)

**112** (Dkt. No. 56, ¶ 20 [Forte Aff.]; Dkt. No. 56 at 84 [Ex. A to Forte Aff.]; Dkt. No. 59, Part 1, ¶ 20 [Plf.'s Response to Forte Aff., not specifically controverting this fact and not citing any evidence contradicting this fact, but apparently admitting the fact that Dr. Forte "sent plaintiff to Dr. Rubinovich"].)

**113** (Dkt. No. 53, ¶ 11 [Rubinovich Aff.]; Dkt. No. 56 at 84 [Ex. A to Forte Aff.]; Dkt. No. 59, Part 1, ¶ 4 [Plf.'s Response to Rubinovich Aff., not specifically denying these facts]; Dkt. No. 56, ¶ 20 [Forte Aff.]; Dkt. No. 59, Part 1, ¶ 20 [Plf.'s Response to Forte Aff., not specifically controverting this fact and not citing any evidence contradicting this fact, but admitting the fact that Dr. Rubinovich opted for an osteotemy over an ACL reconstruction].)

**114** (Dkt. No. 56, ¶ 21 [Forte Aff.]; Dkt. No. 56 at 82 [Ex. A to Forte Aff.]; Dkt. No. 59, Part 1, ¶ 20 [Plf.'s Response to Forte Aff., not specifically controverting this fact and not citing any evidence contradicting this fact].)

**115** (Dkt. No. 59, Part 1, ¶ 20 [Plf.'s Response to Forte Aff., admitting this fact]; Dkt. No. 59, Part 1, ¶¶ 7, 10 [Plf.'s Response to Rubinovich Aff., admitting this fact].)

**116** (Dkt. No. 53, ¶ 10 [Rubinovich Aff.]; Dkt. No. 59, Part 1, ¶ 10 [Plf.'s Response to Rubinovich Aff., not specifically controverting this fact and not citing any evidence contradicting this fact, but apparently admitting the fact that this was Dr. Rubinovich's medical opinion].)

**117** (Dkt. No. 53, ¶ 9 [Rubinovich Aff.]; Dkt. No. 59, Part 1, ¶ 9 [Plf.'s Response to Rubinovich Aff., not specifically controverting this fact and not citing any evidence contradicting this fact, but effectively admitting this fact]; Dkt. No. 59, Part 1, ¶ 20 [Plf.'s Response to Forte Aff., admitting that he received osteotemy surgery on his left knee on October 22, 2003]; Dkt.

No. 59, Part 1, ¶¶ 7, 10 [Plf.'s Response to Rubinovich Aff., admitting that he received osteotemy surgery on his left knee on October 22, 2003].)

118 *See also Qader v. New York,* 05-CV-0052, 2005 U.S. Dist. LEXIS 26958, at *8 (S.D.N.Y. Oct. 31, 2005) (plaintiff's dizziness and "terrible headache" did not constitute a serious medical need); *Gill v. Jones,* 95-CV-9031, at *23, 2001 U.S. Dist. LEXIS 17674 (S.D.N.Y. Nov. 1, 2001) ("headaches, earaches, and dizziness [experienced] intermittently for a maximum of four days" in conjunction with "facial bruising" did not constitute a serious medical need).

119 By failing to oppose Defendants' legal argument, Plaintiff is deemed to have "consented" to that legal argument. *See Beers v. GMC,* 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y.1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendant in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendant with regard to the claims that the arguments regarded, under Local Rule 7.1[b] [3] ).

120 *See Taylor v. Kurtz,* 00-CV-0700, 2004 WL 2414847, at *3 (W.D.N.Y. Oct. 28, 2004) (no "serious injury" where plaintiff suffered re-tear of surgically repaired ACL, tear of lateral meniscus ligament, and moderate to severe degenerative changes in knee); *Espinal v. Coughlin,* 98-CV-2579, 2002 WL 10450, at *4 (S.D.N.Y. Jan. 3, 2002) (no "serious medical need" where plaintiff suffered from ruptured ACL and knee surgery was delayed for three years while he underwent less invasive treatment); *Culp v. Koenigsmann,* 99-CV-9557, 2000 WL 995495, at *4 (S.D.N.Y. July 19, 2000) (no "serious injury" where plaintiff suffered from torn meniscus and knee surgery was delayed for approximately one year).

121 *See also Calhoun v. New York State Division of Parole,* 999 F.2d 647, 654 (2d Cir.1993); *Prue v. City of Syracuse,* 26 F.3d 14, 17-18 (2d Cir.1994).

122 *See Anderson v. Creighton,* 107 S.Ct. 3034, 3038 (1987) ( "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' ") (quoting *Harlow,* 457 U.S. at 819); *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

123 *See Taylor,* 2004 WL 2414847, at *3 (no "serious injury" where plaintiff suffered re-tear of surgically repaired ACL, tear of lateral meniscus ligament, and moderate to severe degenerative changes in knee); *Espinal,* 2002 WL 10450, at *4 (no "serious medical need" where plaintiff suffered from ruptured ACL and knee surgery was delayed for three years while he underwent less invasive treatment); *Culp,* 2000 WL 995495, at *4 (no "serious injury" where plaintiff suffered from torn meniscus and knee surgery was delayed for approximately one year).

124 (Dkt. No. 59, Part 2 at 15 [Plf.'s Mem. of Law]; Dkt. No. 59, Part 2 [Exs. 4, 11, 12, 13, and 14 to Plf.'s Mem. of Law.].)

125 (*Id.*) I recognize the conflict in this Circuit between district courts regarding whether a supervisor's denial of a grievance is sufficient to establish that supervisor's personal involvement in an alleged constitutional violation. *Compare McKenna v. Wright,* 01-CV-6571, 2004 WL 102752, at *6 (S.D.N.Y. Jan. 21, 2004) (discussing conflict, and concluding that such denial does establish personal involvement) *with Villante v. N.Y. State Dep't of Corr. Servs.,* 96-CV-1484, 2001 U.S. Dist. LEXIS 25208, at 16-17 (N.D.N.Y. Oct. 25, 2001) (Homer, M.J.) (concluding that "[t]he fact that [Superintendent] Mann denied the [two] grievances does not establish any personal involvement by defendant Mann in the alleged denial of adequate medical care"), Report and Recommendation *adopted by* 2002 U.S. Dist. LEXIS 26279 (N.D.N.Y. March 28, 2002) (Mordue, J.), *aff'd,* 2003 U.S.App. LEXIS 2709 (2d Cir. Feb. 13, 2003) (unpublished decision cited herein only to show subsequent history of district court decision). However, I need not resolve this conflict in order to conclude that Defendants Goord and Portuondo were not personally involved in any alleged constitutional violations, because (as described above) I find that (1) Plaintiff's various letters and grievances did not notify Defendants Goord and Portuondo of one of the constitutional violations alleged in Plaintiff's Complaint, and (2) in any event, Defendants Goord and Portuondo did not fail, in any way, in responding to Plaintiff's letters and grievances.

126 (Dkt. No. 59, Part 2 at 15 [Plf.'s Mem. of Law]; Dkt. No. 59, Part 2 [Exs. 4, 11, 12, 13, and 14 to Plf.'s Mem. of Law.].) *See also, supra,* Statement of Fact Nos. 23, 27-29, 32.

127 (*See, e.g.,* Dkt. No. 59, Part 2 at 15 [Plf.'s Mem. of Law] [failing to allege specifics of such a policy or custom, and failing to even argue negligent supervision].)

---

**End of Document** © 2016 Thomson Reuters. No claim to original U.S. Government Works.

 © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 1033395
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

James Martin WITZENBURG, Plaintiff,

v.

Charles Herman JURGENS, individually and as
Executor of the Estate of Louise Jurgens, Defendant.

No. CV–05–4827 (SJF)(AKT).
|
April 14, 2009.

West KeySummary

**1**    **Executors and Administrators**

👉   Time for making distribution

In a dispute between relatives, the executor of the decedent's estate did not breach his fiduciary duties by failing to distribute estate assets on the ground that he was not required to distribute the assets under New York law until there was a final accounting. The executor made certain distributions to beneficiaries of the decedent's will. The executor had not made any distributions to himself or taken any fees. It was the conduct of the cousin bringing the suit, including his failure to pay the outstanding judgment that he owed to the estate totally over $750,000, that prevented the executor from conducting a final accounting and in turn making the final distributions under the will. McKinney's EPTL 11–1.5(c).

Cases that cite this headnote

**Attorneys and Law Firms**

James Martin Witzenburg, Kemah, TX, League City, TX, pro se.

**OPINION & ORDER**

FEUERSTEIN, District Judge.

**\*1** Before the Court are objections by plaintiff to a Report and Recommendation of United States Magistrate Judge A. Kathleen Tomlinson dated March 16, 2009 ("the Report") that recommends: (1) granting defendant's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure and dismissing plaintiff's amended complaint in its entirety; (2) denying plaintiff's motion to amend the amended complaint to add Patrick McCarthy, Esq. as a defendant; and (3) denying plaintiff's motion to compel discovery responses and to impose sanctions upon defendant. For the reasons stated herein, the Report of Magistrate Judge Tomlinson is accepted in its entirety.

I

Rule 72 of the Federal Rules of Civil Procedure permits magistrate judges to conduct proceedings on dispositive pretrial matters without the consent of the parties. Fed.R.Civ.P. 72(b). Any portion of a report and recommendation on dispositive matters, to which a timely objection has been made, is reviewed de novo. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b). The court, however, is not required to review the factual findings or legal conclusions of the magistrate judge as to which no proper objections are interposed. See, Thomas v. Arn, 474 U.S. 140, 150, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985). To accept the report and recommendation of a magistrate judge to which no timely objection has been made, the district judge need only be satisfied that there is no clear error on the face of the record. See, Fed.R.Civ.P. 72(b); Baptichon v. Nevada State Bank, 304 F.Supp.2d 451, 453 (E.D.N.Y.2004), aff'd, 125 Fed.Appx. 374 (2d Cir.2005); Nelson v. Smith, 618 F.Supp. 1186, 1189 (S.D.N.Y.1985). Whether or not proper objections have been filed, the district judge may, after review, accept, reject, or modify any of the magistrate judge's findings or recommendations. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b).

II

Plaintiff contends that Magistrate Judge Tomlinson erred, inter alia, in: (1) not understanding that he is a "double first cousin once removed," to the decedent Louise Jurgens ("decedent"), (Plaintiff's Opposition to Report and Recommendation [Plf. Obj.], ¶ 1); (2) finding that the

purported false will was filed in New York Surrogate's Court, as opposed to New York Supreme Court, (Plf Obj., ¶ 2); (3) finding that plaintiff moved to Texas on or about April 17, 2002, when he actually moved on August 22, 2003, (*id.*); (4) failing to recognize that he was willing to be deposed in Texas, or by remote means, but not in New York because he has a "genuine fear for his safety [which] precluded [his] attendance in New York," (Plf.Obj., ¶ 3); (5) assuming that he had access to the records of the Suffolk County Supreme Court and received a copy of the final accounting, (Plf.Obj., ¶¶ 4, 11); (6) failing to recognize that he "moved in Federal court [for relief from the final accounting] as soon as [he] could," (Plf. Obj .,¶ 5); (7) finding that defendant did not breach his fiduciary obligation to decedent's estate notwithstanding (a) that defendant did not require McCarthy, the guardian of decedent's property, to reconcile his final account with the inventory of assets prepared by defendant, which showed a monetary difference in excess of eight hundred thousand dollars ($800,000.00), and (b) that defendant did not account for and identify "the properties returned to the Estate from Federated Securities," (Plf.Obj., ¶¶ 6–8, 11); (8) finding that defendant "pays for the various law suits and the proceedings in which the estate is involved," (Plf.Obj., ¶ 7); (9) discounting the "Jurgens Conspiracy" theory he asserts in his amended complaint, (Plf.Obj., ¶ 9); (10) finding that because defendant had no authority to oversee or supervise McCarthy, as decedent's property guardian, he had a right to abandon his fiduciary duty to account for and locate assets of the estate, (Plf.Obj., ¶ 10); and (11) "rendering [her] decision on facts which are not proven, not evidence in this case and beyond the power of [the] court to consider under the doctrine of judicial notice but on figments of the Courts [sic] imagination," (Plf.Obj., ¶ 13).

**\*2** Upon *de novo* review of the Report and consideration of plaintiff s objections and defendant's response thereto, plaintiff's objections are overruled and the Report is accepted in its entirety as an order of the Court. [1]

II. Conclusion

Upon *de novo* review of the Report, plaintiff's objections are overruled, the Report is accepted in its entirety, defendant's motion for summary judgment is granted and the amended complaint is dismissed in its entirety with prejudice. Plaintiff's motions to amend the amended complaint and to compel discovery responses or to impose sanctions are denied. The Clerk of the Court is directed to enter judgment in favor of defendant and against plaintiff and to close this case.

SO ORDERED.

### *REPORT AND RECOMMENDATION*

A. KATHLEEN TOMLINSON, United States Magistrate Judge.

This action arises out of the role of Defendant Charles Herman Jurgens ("Defendant" or "Jurgens") as Executor of the Estate of Louise Jurgens ("Louise" or "Decedent"). Several motions are presently before the Court. Plaintiff James Martin Witzenburg ("Plaintiff" or "Witzenburg"), a beneficiary of Louise's estate, brought this action against Defendant for, *inter alia,* (1) breach of fiduciary duty, seeking to recover damages in the amount of his inheritance under Louise's Will, (2) alleged mismanagement and/or conversion of funds of Louise's estate, and (3) interest and costs. Defendant moves here for summary judgment seeking dismissal of the remaining claims. By separate motion, Plaintiff moves to add a party defendant, namely, Patrick McCarthy, Esq., who served as a court-appointed property guardian of Louise's property for thirteen months before her death. Finally, Plaintiff moves to compel Defendant to respond to outstanding document requests and interrogatories and for the imposition of sanctions. District Judge Feuerstein has referred these three matters to me for a Report and Recommendations.

### I. *BACKGROUND*

**A.** *Factual Background*

The facts of this case are set forth in substantial detail in Judge Feuerstein's March 1, 2007 Order granting in part and denying in part Defendant's motion to dismiss [DE 73]. Only the facts necessary for the analysis contained in this Report will be recited here.

Plaintiff and Defendant are apparently both cousins, in varying degrees, of the Decedent Louise Jurgens ("Louise" or the "Decedent"). [1] In and around July 1999, Jurgens obtained a "full" power of attorney from Louise. On September 9, 1999, Defendant Jurgens commenced a guardianship proceeding on behalf of Louise in the Supreme Court, Suffolk County, pursuant to Article 81 of the New York Mental Hygiene Law (*Jurgens v. Jurgens,* Index No. 20414–99) (the

"Suffolk Supreme Court Action"). (Schmidt Decl. [2] ¶ 4.) On December 28, 1999, the Suffolk Supreme Court appointed non-party attorney Patrick McCarthy ("McCarthy") as guardian of Louise's property and named Jurgens as Louise's personal needs guardian (*id.*; Jurgens Aff. [3] ¶ 3; Def.'s 56.1 Stat. [4] ¶ 2). As Louise's personal guardian, Jurgens attended to her medical and personal needs. (Jurgens Aff. ¶ 3; Def.'s 56.1 Stat. ¶ 5.) However, during the period from December 1999 until Louise's death in January 2001 (the "guardianship period"), Jurgens did not have any control over Louise's finances or property, as those were under the control of Attorney McCarthy as the property guardian. (Jurgens Aff. ¶ 11; Schmidt Decl. ¶ 28; Def.'s 56.1 Stat. ¶ 5.) Moreover, Jurgens had no authority to oversee or supervise McCarthy's conduct as property guardian. (Jurgens Aff. ¶ 10; Schmidt Decl. ¶ 25; Def.'s 56.1 Stat. ¶ 25.)

**\*3** Pursuant to the April 14, 2000 order of the Supreme Court, Suffolk County, McCarthy retained two Smith Barney stockbrokers as independent financial consultants to advise McCarthy with respect to managing Louise's portfolio, among other things [DE 73 at 3]. In general, McCarthy's conduct as property guardian was supervised and reviewed by the Suffolk County Supreme Court. McCarthy accounted for his actions as property guardian in a formal accounting filed with that Court (the "McCarthy Accounting"), in which he was represented by counsel. That Accounting was reviewed by McCarthy's representatives, the attorney for the Estate, the Supreme Court's accounting department, the Supreme Court Examiner, and a bonding company. (Jurgens Aff. ¶ 10; Schmidt Decl. ¶ 26; Def.'s 56.1 Stat. ¶ 26.) Although Jurgens received a copy of McCarthy's Accounting, he had no role in its preparation. (Jurgens Aff. ¶ 10; Schmidt Decl. ¶ 27; Def.'s 56.1 Stat. ¶ 27.)

On January 6, 2001, Louise died and both guardianships ceased. (Jurgens Aff. ¶ 4; Schmidt Decl. ¶ 6; Def.'s 56.1 Stat. ¶ 6.) Jurgens was appointed Preliminary Executor of Louise's estate (the "Estate") on January 30, 2001, and was appointed Permanent Executor on December 30, 2001. (Jurgens Aff. ¶ 4; Def.'s 56.1 Stat. ¶ 9.) Thereafter, Jurgens filed Louise's Last Will and Testament dated October 16, 1995 and Codicil dated July 28, 1998 (together, the "Will") (Jurgens Aff. ¶ 13; Def.'s 56.1 Stat. ¶ 6.) Upon reviewing the Will, Witzenburg executed a Wavier and Consent thereto dated October 22, 2001. (Jurgens Aff. ¶ 13, Ex. A; Def.'s 56.1 Stat. ¶ 8.) The Will was admitted to probate by the Suffolk County Surrogate's Court on December 3, 2001. (Schmidt Decl. ¶ 6; Jurgens Aff. ¶ 13.)

In his capacity as Executor of Louise's Estate, Jurgens took steps to liquidate her assets and sell her house, all of which was accomplished within a few months. Thereafter, Jurgens continued to work to ensure that all bills and taxes, including personal, fiduciary and estate taxes were paid. (Jurgens Aff. ¶ 4; Def.'s 56.1 Stat. ¶ 10.) In the course of performing his duties as Executor, which included locating and accounting for various assets of the Estate, Jurgens discovered that Witzenburg had withheld certain of Louise's money and personal property valued at $789,039.04, which Witzenburg had obtained through specific withdrawals, transfers and check negotiations between March 1997 and June 2000. (Jurgens Aff. ¶ 5; Schmidt Decl. ¶ 7; Def.'s 56.1 Stat. ¶ 11.)

Following this discovery, on December 5, 2001, Jurgens, in his capacity as Executor, commenced a special proceeding in Suffolk County Surrogate's Court, pursuant to Section 2103 of New York Surrogate's Court Procedure Act, alleging that money and personal property belonging to Louise, valued at $789,039.04, had been withheld by Plaintiff (the "Surrogate's Court Action") (Jurgens Aff ¶ 5; Schmidt Decl. ¶ 7; Def.'s 56.1 Stat. ¶ 12.) On January 14, 2002, Jurgens filed an affirmation with the Surrogate's Court identifying the specific withdrawals, transfers and check negotiations in which Plaintiff had engaged between Marcy 1997 and June 2000. (Schmidt Decl. ¶ 7.)

**\*4** On June 13, 2003, Suffolk County Surrogate, Honorable John M. Czygier, Jr., granted Jurgens' motion (made on behalf of Louise's Estate) for summary judgment on the grounds that no triable issue of fact existed as to whether Witzenburg was in wrongful possession of specific assets belonging to the Estate. (Jurgens Aff ¶ 6; Schmidt Decl. ¶ 10; Def.'s 56.1 Stat. ¶ 17.) By Decree and Judgment entered on August 22, 2003 (the "Judgment"), Witzenburg was ordered to deliver such assets, if in his possession or control, or to pay Jurgens, as the Executor, $789,039.04, representing the total amount of withdrawals and transfers of Louise's assets resulting from the transactions conducted by Plaintiff between March 1997 and June 2000. (Jurgens Aff. ¶ 6; Schmidt Decl. ¶ 10, Ex. A; Def.'s 56.1 Stat. ¶ 17.) Moreover, in the Judgment granting the Estate's motion for summary judgment, Surrogate Czygier stated as follows:

> Sufficient concerns having been raised before this Court to question the nature of the subject transfers it is further ORDERED, ADJUDGED AND DECREED that the Clerk of the

Surrogate's Court is directed to serve a
copy of the Court's decision upon the
Suffolk County District Attorney for
further investigation[.]"

(Schmidt Decl. ¶ 11, Ex. A; Def.'s 56.1 Stat. ¶ 18.) The
Judgment is a final judgment and was not appealed by
Witzenburg. (Schmidt Decl., Ex. A; Def.'s 56.1 Stat. ¶ 20.)

Jurgens alleges, upon information and belief, that Witzenburg
left New York shortly after entry of the Judgment on August
22, 2003. (Schmidt Decl. ¶ 12.) To date, Witzenburg has
not made any payment to satisfy the Judgment, and it is
Jurgens' understanding that Witzenburg has resisted all efforts
to enforce the Judgment. (Jurgens Aff. ¶ 6; Def.'s 56.1 Stat. ¶
19.) However, once the Estate files its final accounting (which
it cannot do until after resolution of the instant action), it
will ultimately be able to offset the amount of the Judgment
against Witzenburg's share. (Jurgens Aff. ¶ 12.; Schmidt Decl.
¶ 12.)

Since his preliminary appointment in January 2001 and
continuing through the present date, Jurgens, in his capacity
as Executor, avers that he has consistently acted in the
interests of the Estate. (Jurgens Aff. ¶¶ 7, 15; Schmidt Decl. ¶¶
22, 31; Def.'s 56.1 Stat. ¶ 22.) For example, Jurgens maintains
the Estate accounts, files and pays fiduciary taxes, and assists
and pays for the various lawsuits and proceedings in which
the Estate is involved. (Jurgens Aff. ¶ 7; Def.'s 56.1 Stat.
¶ 23.) In addition, Jurgens oversaw certain distributions of
Louise's Will to beneficiaries during the period December
2001 through January 2004, pending a final accounting in
Surrogate's Court. Jurgens has not made any distribution
to himself personally and has not taken any Executor fees.
(Jurgens Aff. ¶ 7; Schmidt Decl. ¶¶ 23, 24.)

To date, the Estate remains open, pending the outcome
of the instant action. Once this case is resolved, Jurgens
intends to render a final accounting of the Estate's property
(the proceeds of which are currently held in the Estate
accounts at Citibank or Smith Barney) in Surrogate's Court.
(Jurgens Aff. ¶ 16; Schmidt Decl. ¶ 16.) As part of the
final accounting, Witzenburg's share of the Estate will be
determined, against which the Suffolk County Judgment can
be applied. Then, according to Jurgens, the Estate can render
final distributions of the Estate property and he can close
the Estate in Surrogate's Court and complete his duties as
Executor. (Jurgens Aff. ¶¶ 8, 12, 16.)

**B.** *Procedural Background*
**\*5** The procedural background of this action is also
set forth in substantial detail in Judge Feuerstein's March
1, 2007 Order [DE 73] granting in part and denying in
part Defendant's motion to dismiss. Only the procedural
background germane to this Report will be repeated here.

On December 21, 2004, Plaintiff filed the instant action
against Defendant Jurgens, individually and as Executor
of the Estate, as well as against Merrill Lynch Pierce
Fenner & Smith, Inc. (Merrill Lynch) and Solomon Smith
Barney Citigroup ("Smith Barney") in the United States
District Court for the Southern District of Texas. On
April 27, 2005, Plaintiff filed a First Amended Verified
Complaint (the "Amended Complaint"). With respect to
Jurgens, Plaintiff alleges that Jurgens and his attorneys
were a "corrupt enterprise" and that they depleted Louise's
assets, converted assets, committed "frauds" and breached
a "fiduciary duty." (Amended Complaint, dated April 27,
2005 ("Am.Compl."), at 4.) On September 15, 2005, Jurgens'
motion to transfer venue was granted and the action was
transferred to this Court [DE 45].

**1.** *Defendant's Prior Motion To Dismiss*
By motion dated February 3, 2006 [DE 62–65], Defendant
Jurgens moved to dismiss the Complaint as against him
on the grounds that the Court: (1) lacked subject matter
jurisdiction under the *Rooker–Feldman* doctrine and the
probate exception to diversity jurisdiction; or in the
alternative, (2) should abstain from hearing this dispute
because it concerns the administration of an estate; or in the
alternative, (3) should dismiss the amended complaint for
failure to comply with Rule 8 of the Federal Rules of Civil
Procedure.

By Order dated March 1, 2007 [DE 73], Judge Feuerstein
held that, "pursuant to the *Rooker–Feldman* doctrine, the
Court lacks subject matter jurisdiction over plaintiff's claims
relating to the alleged conversion or improper removal of
assets from the Merrill Lynch, Federated Securities or First
Securities Investors brokerage accounts and those claims
are dismissed" [DE 73 at 8]. Moreover, Judge Feuerstein
explained that, to the extent Plaintiff seeks damages resulting
from a diminished inheritance, he lacks standing because
"legatees and beneficiaries thereof have no independent cause
of action either in their own right or in the estate to recover
estate property." (*Id.* at 21 (citing cases).)

On the other hand, Judge Feuerstein did not dismiss Plaintiff's claims for breach of fiduciary duty and mismanagement of assets, holding that those claims were not directly addressed in the Surrogate's Court proceeding and are not "inextricably intertwined" with the prior state court determination and. thus, are not barred by the *Rooker–Feldman* doctrine. (*Id.* at 8–9.) In addition, Judge Feuerstein held that the probate exception to diversity jurisdiction does not apply to Plaintiff's breach of fiduciary duty claims. (*Id.* at 12). In sum, the Court found that to the extent Plaintiff requests damages "to the heirs of the estate of Louise" and for "the depletion of the estate of Louise" based upon causes of action for breach of fiduciary duty, mismanagement of assets and fraud, the probate exception does not deprive this Court of subject matter jurisdiction over those claims. (*Id.* at 12 (citing cases)).

**\*6** Likewise, the Court denied the portion of Jurgens' motion requesting that the federal court abstain from exercising jurisdiction on the grounds that, even if the Court were to assume the existence of parallel proceedings in this Court and Surrogate's Court, the balance of factors nonetheless weighs against abstention. (*Id.* at 14–17.)

The Court also denied the portion of Jurgens' motion seeking dismissal of the Amended Complaint pursuant to Rule 8 of the Federal Rules of Civil Procedure on the grounds that Plaintiff's *pro se* complaint, although "not a model of clarity or brevity," satisfied the requirements of Rule 8(a) by providing fair notice of what plaintiff's claims are and the grounds upon which they rest. (*Id.* at 17–19.)

With regard to Plaintiff's claims against Smith Barney and Citibank, the Court granted Smith Barney's motion and dismissed the Amended Complaint as against it in its entirety, and *sua sponte* dismissed the entirety of the Amended Complaint against Merrill Lynch for lack of subject matter jurisdiction. (*Id.* at 19–22, n .6.)

In sum, the only claim against Jurgens which is before this Court on summary judgment is whether Jurgens, in his capacities as power of attorney and executor, breached his fiduciary duties to Louise's Estate, including whether he mismanaged Louise's or the Estate's funds, thereby causing "the depletion of the estate of Louise" and causing harm "to the heirs of the estate of Louise" [DE 73 at 12].

## 2. The Preclusion Order Against Plaintiff

On multiple occasions during the course of the present action, specifically between October 2007 and February

2008, Plaintiff failed to appear for his properly-noticed deposition, despite the Court's denial of his two motions for protective orders [DE 90, 100] and several opportunities to appear. (Schmidt Decl. ¶ 19.) During this time, the Court explicitly warned Plaintiff as to the consequences of his failure to appear for deposition. By Order dated February 4, 2008 [DE 100], Judge Boyle cautioned Plaintiff that

> [s]hould he fail to be deposed in this action on or before February 27, 200 [8] he faces a preclusion order barring him from filing any affidavit in favor or in opposition to any motion for summary judgment, and further barring him from testifying at trial."

[DE 100.] Between February 4 and February 25, 2008, Defendant made several attempts to schedule Plaintiff's deposition, but Plaintiff nonetheless refused to appear. (DE 106, 107; Schmidt Decl. ¶ 21.) As a result, by Order dated March 4, 2008 (the "Preclusion Order") [DE 109], Judge Boyle held that

> [c]onsistent with the cautionary advice set forth in the order dated February 4, 2008, the *pro se* plaintiff, James Witzenburg, is hereby precluded from offering any affidavit in support of or in opposition to any motion for summary judgment and is also precluded from testifying at trial in this action unless, within ten (10) business days, he submits to a deposition at a mutually agreed date and time at the placed noticed by counsel for the defendants.

**\*7** [DE 109.]

On March 4, Defendant's counsel sent a letter to Plaintiff by fax, e-mail, and regular mail, enclosing a copy of the Court's March 4, 2008 Order, and offering to depose Plaintiff on March 7, 12, 14, 17, or 18, 2008. (Schmidt Decl. ¶ 22.) Plaintiff did not respond to the letter of Defendant's counsel in any traditional or electronic medium. Moreover, Plaintiff did not appear for his deposition by March 18 as directed by Judge Boyle's March 4 Order. (DE 106, 107; Schmidt Decl. ¶ 22; Def.'s 56.1 Stat. ¶ 33.) Accordingly, by operation of the March 4, 2008 Order, Plaintiff is precluded from offering any affidavit in opposition to the current summary judgment

motion and from offering any testimony at trial. Judge Boyle's decision on this issue is now the law of the case.

### C. Summary Of Plaintiff's Allegations

In the Amended Complaint, Plaintiff seeks monetary damages as follows: (1) $106,714.43 for funds converted by Jurgens, acting alone or in concert with others, and the Merrill Lynch and Smith Barney brokers, from a brokerage account allegedly owned by Plaintiff; (2) $2,293,225 for which Jurgens is liable "to the heirs of the estate of Louise Jurgens, including Plaintiff," for breach of fiduciary duties to the Estate and/or conversion of Louise's assets; (3) $1,299,175 for which Jurgens is liable because "[b]y placing an unwarranted guardianship on Louise ... Jurgens initiated the frenzy of activity that resulted in ... depletion of the estate of Louise ..." in that amount; (4) $350,000 in inheritance to which Plaintiff is allegedly entitled pursuant to Louise's "true will," including a $300,000 specific bequest and $50,000 which he claims is his share of the residual value of the Estate (his inheritance per stirpes via his mother's inheritance of 40% of the residual value of the Estate); and (5) interests and costs. (Am. Compl. at 33–34).[5]

As discussed above, in the Order granting in part Defendant's motion to dismiss, Judge Feuerstein found that "pursuant to the *Rooker–Feldman* doctrine, the Court lacks subject matter jurisdiction over plaintiff's claims relating to the conversion or improper removal of assets from the Merrill Lynch, Federated Securities or First Securities Investors brokerage accounts and those claims are dismissed." [DE 73 at 8.] Moreover, Judge Feuerstein explained that to the extent Plaintiff is seeking damages resulting from a diminished inheritance, he has no standing to do so because "legatees and beneficiaries thereof have no independent cause of action either in their own right or in the estate to recover restate property," [DE 73 at 21 (citing cases).] Accordingly, Plaintiff's claims for $106,714.43 for funds allegedly converted by Jurgens and the Merrill Lynch and Smith Barney brokers (No. (1) listed above) and $1,299,175 for depletion of Louise's assets during the guardianship period (No. (3) listed above) were dismissed pursuant to Judge Feuerstein's Order and need not be considered here. Likewise, Plaintiff's claim for $2,293,225 (No. (2) listed above) was dismissed to the extent it was based on alleged conversion of Louise's assets. The issues remaining before this Court are whether Jurgens breached his fiduciary duties to the Estate and is thus liable to Louise's heirs for $2,293,225 (No. (2) above), and whether Plaintiff is entitled to $350,000, or any

portion thereof, in inheritance, pursuant to Louise's "true will" (No. (4) listed above).

**\*8** Insofar as the allegations in the Amended Complaint relate to Defendant Jurgens and are currently before this Court, Plaintiff alleges that Jurgens, in his capacity as executor of Louise's Estate, "committed five separate acts of fraud and many breaches of fiduciary duty." (Am. Compl. at 20). These acts of fraud and breaches of fiduciary duty, as distilled by the Court from the Amended Complaint, are as follows:

- Jurgens knowingly filed a false Last Will and Testament of Louise, which was prepared by Jurgens' counsel in the Surrogate's Court Action, thereby causing the Suffolk Supreme Court Action and/or the Surrogate's Court Action to be "premised upon the filing of a false document which was a fraud on the court," as well as on Louise, her estate, and her beneficiaries, including Plaintiff. (*Id.* at 20–21, Exs. 7, 8.)

- McCarthy was not an independent property guardian and he, together with the Smith Barney experts, "mismanaged" Louise's assets, and filed a false final accounting in the Suffolk Supreme Court Action. (*Id.* at 21–22, Ex. 1.)

- Jurgens' counsel in the Surrogate's Court Action hired a forensic accounting firm to prepare "a report" for which the Estate paid a fee of $53,428.94. However, no such report appears in the files of the Suffolk County Supreme Court or Surrogate's Court Actions. Thus, the $53,428.94 "expense" "is a fraud and unlawful conversion against Louise Jurgens, Plaintiff, and all other heirs of the estate of Louise Jurgens." (*Id.* at 24.)

- Jurgens' counsel in the Surrogate's Court Action caused the final accounting prepared by McCarthy, which was sent by the Court to the forensic accounting firm, to be sent to a non-existent person at the firm so that the firm would not be in the position of having to approve McCarthy's fraudulent final accounting. (*Id.* at 24–25.)

- In arranging the Estate's sale of Louise's residence, Jurgens did not conduct the sale as an "arm's length" transaction; the only appraisal submitted was from a company allegedly "under the exclusive control of Patrick McCarthy, even though McCarthy was no longer actively serving as property manager." (*Id.* at 25.) Moreover, Jurgens submitted an affidavit to the Surrogate's Court affirming that the sale was an "arm's

length" transaction. (*Id.*) Jurgens' conduct constituted a breach of his fiduciary duty to Louise's Estate. (*Id.*)

- Jurgens filed a fraudulent bond with the Surrogate's Court and such bond does not actually exist, thereby conferring a fraud on the court and Louise's beneficiaries. (*Id.* at 25–26, Ex. 9.)

In addition, Plaintiff alleges that the difference of $897,115.27 between the listed value of assets contained in Jurgens' Inventory dated October 12, 2001 (filed on November 7, 2001) and McCarthy's Final Accounting (filed in August 2002), both of which pertain to the value of Louise's assets as of the date of her death (January 6, 2001), and Jurgens' alleged failure to address this discrepancy, reveal that Jurgens committed some type of unspecified fraud and that he "continues to act in concert with all parties ... to deplete and convert the assets of" Louise's Estate. (*Id.* at 9.) Finally, Plaintiff claims that Jurgens brought the Suffolk Supreme Court Action against him "to conceal and obfuscate the conversion of the property" of Louise and her Estate during the period in which Jurgens and McCarthy served as Louise's guardians. (*Id.*)

## II. *THE SUMMARY JUDGMENT MOTION*

### A. *Standard of Review*

**\*9** In reviewing a motion for summary judgment, the Court is guided by the tenets set forth in Federal Rule of Civil Procedure 56(c), which provides, in part:

> ... The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law ....

Fed.R.Civ.P. 56; *Globecon Group, LLC v. Hartford Fire Ins. Co. .,* 434 F.3d 165, 170 (2d Cir.2006); *Gray v. Lutheran Social Servs. of Metro. New York., Inc.,* No. 04–2843, 2006 WL 1982859, at \*3 (E.D.N.Y. Jul.13, 2006). The moving party bears the burden of meeting this exacting standard. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). In addition, to determine whether the moving party has satisfied this burden, the Court is required to view the evidence and all factual inferences arising from

that inference in the light most favorable to the non-moving party. *Id .* at 157; *Fischl v. Armitage,* 128 F.3d, 50, 55 (2d Cir.1997).

Where the movant shows prima facie entitlement to summary judgment, "the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact." *Salahuddin v. Goord,* 467 F.3d 263, 273 (2d Cir.2006). "[T]he nonmovant cannot rest on allegations in the pleadings and must point to specific evidence in the record to carry its burden on summary judgment." *Id. See also McPherson v. N.Y. City Dep't Of Educ.,* 457 F.3d 211, 215 n. 4 (2d Cir.2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment."); *Byrnie v. Town of Cromwell, Bd. Of Educ.,* 243 F.3d 93, 101 (2d Cir.2001) ("[e]ven where facts are disputed, in order to defeat summary judgment, the non-moving party must offer enough evidence to enable a reasonable jury to return a verdict in its favor").

"If there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." *Fischl,* 128 F.3d at 56 (citing *Hetchkop v. Woodlawn at Grassmere, Inc.,* 116 F.3d 28, 33 (2d Cir.1997)). On the other hand, Rule 56 provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to material fact and that the movant is entitled judgment as a matter of law." *Fed.R.Civ.P. 56(e)(2).* In other words, summary judgment is mandated if the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Dobbs v. Dobbs,* No. 06 CV 6104, 2008 WL 3843528, at \*5 (S.D.N.Y. Aug. 14, 2008) (the Court's goal should be to "isolate and dispose of factually unsupported claims ...").

**\*10** However, because Plaintiff is proceeding *pro se,* the Court is compelled to "read [*pro se* plaintiff's] supporting papers liberally, and ... interpret them to raise the strongest arguments they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). Nevertheless, "the nonmoving party may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that its version of the events is not wholly fanciful." *Morris v. Lindau,* 196 F.3d 102, 109 (2d Cir.1999) (quotation omitted).

## B. *Procedural Issues*

On June 17, 2008, Defendant Jurgens served his motion for summary judgment on Plaintiff Witzenburg by e-mail and regular mail [DE 122]. With his summary judgment motion, Defendant also served Plaintiff with a cover letter providing the requisite Notice to *Pro Se litigant* which, in accordance with Local Rule of the Eastern District of New York 56.2, stated:

> [y]ou are required to serve any opposition papers on my office ***within 10 days of my service of this motion,*** without filing any of your opposition papers with the Court .... Accordingly, to the extent you intend to oppose this motion, please send me within the requisite 10 days a service copy of your papers as well as an additional copy of your papers for me to send to the Court.

[DE 126] Plaintiff did not file any opposition papers or attempt any communication with Defendant or the Court by the June 27, 2008 due date. By letters dated July 1 and July 14, 2008, Defendant asked the Court to grant the summary judgment motion without opposition [DE 128, 133].

By Order To Show Cause dated July 15, 2008, the Court gave Plaintiff one final opportunity to demonstrate why Defendant's motion for summary judgment should not be treated as unopposed. The Court directed Defendant (i) to submit a written explanation to the Court no later than August 6, 2008 setting forth good cause why Plaintiff had failed to oppose Defendant's summary judgment motion; and (ii) to file any opposition papers to Defendant's summary judgment motion no later than August 6, 2008 [DE 134].

Plaintiff served his opposition to Defendant's motion for summary judgment on August 5, 2008 [DE 136], but did not submit a written explanation why he had failed to file his opposition by the original due date. (Schmidt Reply Dec.[6] ¶ 2.) Plaintiff's opposition, styled "Plaintiff's Response in Opposition to Defendant Charles Jurgens' Motion for Summary Judgment" (the "Response"), is, in effect, an unsworn affidavit. Unsworn affidavits are not competent summary judgment evidence unless they meet the requirements of [28 U.S.C. § 1746](#) or, at minimum, "substantially compl[y] with the[ ] statutory requirements of [28 U.S.C. § 1746](#) ...." *LeBoeuf, Lamb, Greene & MacRae,*

*LLP v. Worsham,* [185 F.3d 61, 65 (2d Cir.1999)](#); *see also Nissho–Iwai Amer. Corp. v. Kline,* 845 F.3d 1300, 1306 (5th Cir.1988). Although Plaintiff signed the Response, it is not a sworn affidavit. Likewise, there is no statement that the contents are "true and correct" or made "under penalty of perjury" as required under [28 U.S.C. § 1746](#) and Second Circuit case law.

**\*11** Moreover, Plaintiff is precluded from submitting any affidavits in support of his opposition to Defendant's motion for summary judgment based upon Judge Boyle's March 4, 2008 Order, which the Court finds is law of the case on this issue. Under the "law-of-the-case doctrine, a court has discretion to re-examine an issue in certain circumstances." *Public Employees Retirement Association of New Mexico v. PriceWaterhouseCoopers LLP,* [No. 07–3756–cv, 2009 WL 27704, at \* 3 (2d Cir. Jan.6, 2009)](#). However, "[c]ourts are understandably reluctant to reopen a ruling once made, especially when one judge or court is asked to consider the ruling of a different judge." *Ali v. Mukasey,* [529 F.3d 478, 490 (2d Cior.2008)](#) A court's decision whether to apply law-of-the-case is "informed principally by the concern that disregard of an earlier ruling not be allowed to prejudice the party seeking the benefit of the doctrine." *Prisco v. A & D Carting Corp.,* [168 F.3d 593, 607 (2d Cir.1999)](#) (internal quotation marks omitted).

With regard to law-of-the-case doctrine, the Second Circuit has noted that

> [t]he law of the case doctrine ... while not binding, counsels a court against revisiting its prior rulings in subsequent stages of the same case absent cogent and compelling reasons such as an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.

*ATSI Communications, Inc. v. the Shaar Fund, Ltd.,* [547 F.3d 109, 112 n. 3 (2d Cir.2008)](#) (citing *Ali v. Mukasey,* [529 F.3d at 490](#)). I find that the law-of-the-case doctrine applies in the current circumstances. Plaintiff has provided no argument or rationale here that there has been some "intervening development of law or fact that renders reliance on [Judge Boyle's] earlier ruling inadvisable." *Calabrese v. CSC Holdings, Inc.,* [No. 02–CV–5171, 2009 WL 425879, at \* 6 (E.D.N.Y. Feb. 19, 2009)](#). Plaintiff has never presented any good faith reason for his failure to show up at his duly noticed

deposition, in the face of specific Orders from the court to do so. The law of the case will be disregarded "only when the court has a 'clear conviction of error' with respect to a point of law on which its previous decision was predicated." *Fogel v. Chestnutt,* 668 F.2d 100, 109 (2d Cir.1991) (quoting *Zdanok v. Glidden,* 327 F.2d 944, 953 (2d Cir.1964)). Here, Plaintiff presents no new evidence or facts to serve as any reasonable justification for his prior conduct or any basis whatsoever to disturb Judge Boyle's prior rulings.

In addition to the applicability of the law-of-the-case doctrine here, the Court also observes that because Plaintiff's Response constitutes an unsworn declaration, it is inadmissible for purposes of Rule 56 and cannot be considered by the Court in rendering a decision on the present motion. *Nissho–Iwai Amer. Corp.,* 845 F.3d at 1306; *Hale Propeller LLC v. Ryan Marine Prods. Pty., Ltd.,* 151 F.Supp.2d 183, 200–01 (D.Conn.2001) (disregarding affidavit where it failed to conform to the standard for unsworn declarations set forth by 28 U.S.C. § 1746); *compare LeBoeuf, Lamb, Greene & MacRae, LLP,* 185 F.3d at 65–66 (defendant's unsworn affidavit could be considered on summary judgment where it stated that "under penalty of perjury I make the statements contained herein" and was signed and dated). Accordingly, Plaintiff's Response cannot be considered on this motion.[7]

**\*12** In addition, Plaintiff did not include in the Response a contravention of Defendant's Statement of Undisputed Material Facts [DE 125] or a separate statement of additional material facts for which there exists a genuine dispute, as required under Local Civil Rule 56.1(b).[8] Pursuant to Local Rule 56.1(c), each numbered paragraph in the moving party's statement of material facts "will be deemed admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." Accordingly, for purposes of this motion, the statements contained in Defendant's Statement of Undisputed Material Facts [DE 125] are hereby deemed admitted as unopposed.

Nevertheless, where, as here, the motion for summary judgment is unopposed, "the district court is not relieved of its duty to decide whether the movant is entitled to judgment as a matter of law ." *Vermont Teddy Bear Co. v. Beargram Co.,* 373 F.3d 241, 242 (2d Cir.2004); *Layachi v. Minolta Bus. Sys., Inc.,* 00 Civ. 731, 2001 WL 1098008, at \*3 (S.D.N.Y. Sept.18, 2001) (where "non-moving *pro se* party has failed to submit papers in opposition, summary judgment should not

be granted automatically") (internal citations omitted). The Second Circuit has stated:

> the failure to oppose a motion for summary judgment alone does not justify the granting of summary judgment. Instead, the district court must still assess whether the moving party has fulfilled its burden of demonstrating that there is no genuine issue of material fact and its entitlement to judgment as a matter of law.

*Vermont Teddy Bear Co.,* 373 F.3d at 244. Plaintiff's failure to oppose summary judgment in any legally meaningful way allows the Court to accept Defendant's factual assertions as true; however, the court "must be satisfied that the citation to evidence in the record supports the assertion." *Id.*

## C. *Breach of Fiduciary Duty Claims*

As discussed above, Plaintiff seeks monetary damages against Jurgens in the amount of $2,293,225 on the grounds that, in his role as executor of Louise's Estate, Jurgens breached his fiduciary duties through various acts, including mismanaging the Estate's assets. New York law vests executors of estates with broad powers to dispose of and manage the decedent's interests in real property. Specifically, under the Fiduciaries' Powers Act, "every fiduciary is authorized" *inter alia:*

- • with respect to any property ... owned by an estate ... to sell the same at public or private sale, and on such terms as in the opinion of the fiduciary will be most advantageous to those interested therein;

- • to employ any bank or trust company incorporated in New York, any national bank located in New York or any private banker duly authorized to engage in business in New York as custodian of any stock or other securities held as a fiduciary, and the cost thereof;

**\*13** • to cause any stock or other securities (together, "securities") held by any bank or trust company to be registered and held in the name of a nominee of such bank or trust company without disclosure of the fiduciary relationship; and to direct any bank or trust company incorporated in New York, any national bank located in New York or any private banker duly authorized to engage in business in New York to register

and hold any securities deposited with such bank, trust company or private banker in the name of a nominee of such bank; and

- to contest, compromise or otherwise settle any claim in favor of the estate, or in favor of third person and against the state.

*See* N.Y. EPTL § 11–1.1(5)(B), (9), (10), (13).

Notwithstanding this broad authority, the Fiduciaries' Powers Act also requires executors to strictly adhere to their fiduciary duties. The following is a brief review of executors' fiduciary duties as relevant to the present case.

Pursuant to the duties of loyalty, care and safekeeping, an executor must collect and preserve the assets of the estate. *In re Estate of Donner,* 82 N.Y.2d 574, 584, 606 N.Y.S.2d 137, 141, 626 N.E.2d 922 (N.Y.1993) (noting that the executors "were fiduciaries who owed a duty of undivided loyalty to the decedent and had a duty to preserve the assets that she entrusted to them") (citing *Meinhard v. Salmon,* 240, N.Y. 458, 464 (N.Y.1928)); *Bender v. City of Rochester,* 765 F.2d 7, 12 (2d Cir.1985) (administrator of an estate has "the legal duty to collect and preserve [decedent's] assets, [and] to pay [decedent's] debts"); *In re Estate of Skelly,* 284 A.D.2d 336, 725 N.Y.S.2d 666, 667 (2d Dep't 2001) (executor "has a duty to preserve the assets of the estate ....") (internal citation omitted). Likewise, an executor is prohibited from commingling estate assets with any other assets. *See* N.Y. EPTL § 11–1.6 ("[e]very fiduciary shall keep property received as fiduciary separate from his individual property"). The Fiduciary Powers Act authorizes an executor to protect the estate's assets by employing "any broker-dealer which is registered with the [SEC] and the department of law in the state of New York ... as a custodian for a fiduciary of any stock or other securities ... [and] to register such securities in the name of such broker." N.Y. EPTL § 11–1.10.

An executor's duty of diligence and prudence requires him to administer and manage the estate assiduously in the interest of the beneficiaries. This includes "employing such diligence and prudence in the care and management of the estate assets and affairs as would a prudent person of average discretion and intelligence." *In re Robinson,* 282 A.D.2d 607, 724 N.Y.S.2d 424, 426 (2d Dep't 2001) (finding no basis to deny executors' commissions where executors adequately explained reasons for waiting to sell decedent's property and objectant did not present any evidence to refute the explanations) (internal citations omitted); *In re Bello,* 227

A.D.2d 553, 554, 642 N.Y.S.2d 953, 954 (2d Dep't 1996) (concluding that executor met the standard of care under difficult circumstances); *In re Scott,* 234 A.D.2d 551, 651 N.Y.S.2d 592, 593 (2d Dep't 1996 (finding executors' delay in paying tax deficiencies, where resulting accrued interest exceeded amount earned by the estate, constituted breach of duty of diligence and care).

**\*14** The duties of diligence and prudence also relate to the executor's authority to invest the assets of an estate. Under the Prudent Investment Act,[9] the executor must make investment decisions pursuant to the prudent investor standard, which requires the executor to "exercise reasonable care, skill and caution to make and implement investment and management decisions as a prudent investor would for the entire portfolio, taking into account the purposes and terms and provisions of the governing instrument." N.Y. EPTL § 11–2.3(b)(2). The Prudent Investment Act sets out specific requirements for an executor's investment strategy. N.Y. EPTL § 11–2.3(b)(3). For example, executors are required to "pursue an *overall* investment strategy to enable the trustee to make appropriate present and future distributions to or for the benefit of the beneficiaries under the governing instrument, in accordance with risk and return objectives reasonably suited to the *entire* portfolio." *In re Heller,* 6 N.Y.3d 649, 653, 2006 Slip Op 3469, at \*3 (N.Y.2006) (emphasis in original) (quoting N.Y. EPTL § 11–2.3(b)(3)(A)). The statute also provides, in relevant part, as follows:

> [t]he prudent investor rule requires a standard of conduct, not outcome or performance. Compliance with the prudent investor rule is determined in light of facts and circumstances prevailing at the time of the decision or action of a trustee. A trustee is not liable to a beneficiary to the extent the trustee acted in substantial compliance with the prudent investor standard or in reasonable reliance on the express terms and provisions of the governing instrument.

N.Y. EPTL § 11–2.3(b)(1). Moreover, an executor is obligated to "diversify assets unless the trustee reasonably determines that it is in the interests of the beneficiaries not to diversify, taking into account the purposes and terms and provisions of the governing instrument." N.Y. EPTL § 11–2.3(b)(3)(C) (quoted in *In re Janes,* 90 N.Y.2d 41, 49, 659 N.Y.S.2d 165, 169, 681 N.E.2d 332 (N.Y.1997).

Also, under New York law, an executor has discretion whether to pay any testamentary disposition or distributive share before the completion of the publication of notice

to creditors or, if no such notice is published, before the expiration of seven months from the time letters testamentary or of administration are granted. Thereafter, the executor is required to pay any testamentary disposition or distributive share no more than seven months following the date the letters testamentary are granted. N.Y. EPTL § 11–1.5(a). If the executor fails to make such disposition, an heir may bring a proceeding against the executor. However, for the purpose of computing the time for the heir to commence the proceeding against the executor, the cause of action does not accrue until the executor's account "is judicially settled." N.Y. EPTL § 11–1.5(c).

Typically, the determination of whether the executor's conduct "measures up to the appropriate standards of prudence, vigilance, and care" is an issue of fact to be decided by the court. *Donner,* 82 N.Y.2d at 585, 606 N.Y.S.2d at 142, 626 N.E.2d 922; *Janes,* 90 N.Y.2d at 50, 659 N.Y.S.2d at 169, 681 N.E.2d 332 (internal citations omitted).

### III. *DISCUSSION*

**\*15** The issue to be decided by this Court is whether there exists any genuine issue of material fact which would preclude summary judgment in favor of Defendant on Plaintiff's claims that (1) Defendant, in his role as executor of Louise's estate, breached his fiduciary duties through various acts, including mismanaging the Estate's assets, thereby depleting the Estate's assets and harming Louise's heirs; and (2) Plaintiff is entitled to an inheritance in the amount of $350,000 pursuant to Louise's "true will."

In determining whether there are any genuine issues of material fact, the Court remains mindful of Judge Boyle's Preclusion Order which prohibited Plaintiff from submitting "any affidavit in support of or in opposition to any motion for summary judgment" [DE 109]. The Court is also cognizant that, based upon Plaintiff's failure to oppose Defendant's motion for summary judgment in a substantively meaningful way, including his failure to submit a Local Rule 56.1(b) statement contravening Defendant's statement of undisputed facts, Defendant's factual assertions must be accepted as true. *See* Local Rule 56.1(c).

#### A. *Jurgens' Conduct As Executor*

Accepting Jurgens' Rule 56.1 Statement as admitted facts, as the Court must, the record shows that Jurgens fulfilled his fiduciary duties as executor of Louise's estate. Pursuant to the duties of loyalty, care and safekeeping, Jurgens was

required to collect and preserve the assets of the estate. *See, e.g. Donner,* 82 N.Y.2d at 584, 606 N.Y.S.2d at 141, 626 N.E.2d 922. Thus, following his appointment as Executor of Louise's Estate, Jurgens took steps to liquidate Louise's assets and sell her house, all of which were accomplished within a few months. Thereafter, Jurgens continued to work to ensure that all bills and taxes, including personal, fiduciary and estate taxes were paid. (Jurgens Aff. ¶ 4; Def.'s 56.1 Stat. ¶ 10.) In addition, since his appointment, Jurgens has continued to maintain the Estate accounts, has filed and paid fiduciary taxes, and has assisted and paid for the various lawsuits and proceedings involving the Estate. (Jurgens Aff. ¶ 7; Def.'s 56.1 Stat. ¶ 23 .)

Although Plaintiff alleges that Jurgens has breached his fiduciary duties by failing to distribute the assets of the Estate, Jurgens is not actually required to do so until there is a final accounting. Jurgens made certain distributions to beneficiaries of Louise's Will between December 2001 and January 2004. (Jurgens Aff. ¶ 7; Def.'s 56.1 Stat. ¶ 24.) Moreover, Jurgens has not made any distributions to himself or taken any Executor fees to date. (*Id.*)

Jurgens will only be required to distribute the Estate's assets when the Estate "is judicially settled." *See* N.Y. EPTL § 11–1 .5(c). In fact, it is Plaintiff's conduct, including the failure to pay the outstanding Surrogate's Court Judgment against him in the amount of $789,039.04, that has prevented Jurgens from conducting a final accounting and in turn making the final distributions under the Will. (Jurgens Aff. ¶ 8; Def.'s 56.1 Stat. ¶ 24.)

#### B. *Breach Of Fiduciary Duty Claims*

##### 1. *The Purported False Will*

**\*16** Plaintiff alleges that Jurgens knowingly filed a false Last Will and Testament of Louise, thus committing fraud on the court, Louise, her estate, and her beneficiaries, including Plaintiff. (Am. Compl. at 20–21, Exs. 7, 8.) Furthermore, Plaintiff claims that pursuant to Louise's "true will," he is entitled to an inheritance in the amount of $350,000.

Contrary to Plaintiff's assertions, Defendant Jurgens states that in his role as executor of the Estate, following Louise's death, he duly filed Louise's Last Will and Testament dated October 16, 1995 as well as the Codicil dated July 28, 1998 (together, the "Will") (Jurgens Aff. ¶ 13; Def.'s 56.1 Stat. ¶ 6.) The Will was admitted to probate by the Suffolk County

Surrogate's Court on December 3, 2001. (Schmidt Decl. ¶ 6; Jurgens Aff. ¶ 13.)

Moreover, prior to the admission of the Will to probate, Plaintiff reviewed the Will and executed a Wavier and Consent thereto dated October 22, 2001. (Jurgens Aff. ¶ 13, Ex. A; Def.'s 56.1 Stat. ¶ 8.) The Waiver and Consent provides that Plaintiff "consents that the court admit to probate the decedent's Last Will and Testament dated October 16, 1995 (and codicils, if any, dated July 28, 1998), a copy of each which testamentary instrument has been received by me and that Letters Testamentary issue to Charles Jurgens." (Jurgens Aff., Ex. A). Notably, at no time during the Surrogate's Court proceedings did Plaintiff raise any objection to the Will, despite having had ample opportunity to do so. Plaintiff raised this issue for the first time only upon bringing this action, long after the admission of the Will to probate.

If Plaintiff were seeking to withdraw his Waiver and vacate the decree admitting Louise's Will to probate in order to contest the Will (for which he has not so moved), such motion would have to be made before the Surrogate's Court, where the Waiver was entered. It is well-established that the jurisdiction to administer the probate of wills, including entry of waivers, falls within the ambit of the Surrogate's Court. *See Groman v. Cola,* 07 CV 2635, 2007 WL 3340922, at *4 (S.D.N.Y. Nov.7, 2007) (noting that federal jurisdiction is barred under the probate exception if the action requires "the probate or annulment of a will [or] the administration of a decedent's estate") (citing *Marshall v. Marshall,* 547 U.S. 293, 311–12, 126 S.Ct. 1735, 164 L.Ed.2d 480 (2006)); *Lefkowitz v. Bank of N.Y .,* 528 F.3d 102,106 (2d Cir.2007) (affirming dismissal of certain tort claims against executor because "[w]ith these claims, Plaintiff seeks to mask in claims for federal relief her complaints about the maladministration of her parent's estates, which have been proceeding in probate courts) (citation omitted); *see also* DE 73 at 10. Here, any request by Plaintiff to set aside his Waiver must properly be made before the Surrogate's Court and such request would be subject to the applicable statute of limitations in that court.

However, even if Plaintiff were to make such a motion, it is unlikely he would succeed based on the record currently before this Court. Under New York law, "[a] party seeking to set aside a probate decree entered upon his consent must show that such consent was obtained by fraud or overreaching, [or] was the product of misrepresentation or misconduct, or that newly-discovered evidence, clerical error or other sufficient cause justifies the reopening of the decree." *Moser v. Pollin,* 294 F.3d 335, 342 (2d Cir.2000) (overruled on other grounds by *Marshall v. Marshall,* 547 U.S. 293, 126 S.Ct. 1735, 164 L.Ed.2d 480 (2006)) (quoting *In re Hall,* 185 A.D.2d 322, 322, 586 N.Y.S.2d 285, 286 (2d Dep't 1992)); *In re Coccia,* 2008–0802, 2009 N.Y. Slip Op 1477, 2009 App. Div. LEXIS 1463, at *1 (citations omitted). In other words, the party challenging the probate decree must establish "sufficient cause ... to justify reopening the decree." *Coccia,* 2009 App. Div. LEXIS 1463, at *2 ("appellant's unsubstantiated and conclusory allegations that he did not appreciate or understand the significance of the waiver and consent were insufficient to satisfy this standard").

**\*17** Here, not only has Plaintiff not moved to set aside the Waiver, but he has not even addressed the fact that he submitted the Waiver to the Surrogate's Court. Moreover, based on the record now before this Court, no evidence has been introduced which would allow a court to determine that Jurgens had a fraudulent will admitted to probate. Nowhere does Plaintiff submit any evidence showing that he signed the Waiver as a result of fraud, overreaching, misrepresentation or misconduct on the part of any party involved in the Surrogate's Court proceeding. Neither has Plaintiff submitted newly-discovered evidence, or evidence of a clerical error or other sufficient cause which would justify the reopening of the decree. In fact, the extent of Plaintiff's assertions on this point, other than in the Amended Complaint, is found in his Summary Judgment Response, where he takes issue with Paragraph 6 of the Schmidt Declaration for, among other things, not addressing "the presence of 2 wills" which were annexed to the Amended Complaint. (Pl. Opp'n Summ. J. at 4.)

In sum, there no evidence that Plaintiff's Waiver was fraudulently obtained and should be withdrawn or that Jurgens had a false will admitted to probate. Accordingly, the Court finds that there is no genuine issue of material fact as to whether Defendant breached his fiduciary duty as Executor in regard to the admission of the Will to probate. Likewise, Plaintiff's claim that he is entitled to an inheritance in the amount of $350,000 under a will other than the Will that was admitted to probate in the Surrogate's Court Action is without merit.

### 2. McCarthy's Final Accounting

Plaintiff alleges that Jurgens breached his fiduciary duty because the court-appointed property guardian for Louise, Patrick McCarthy, was not functioning independently and McCarthy, together with the Smith Barney experts,

"mismanaged" Louise's assets, ultimately filing a false Final Accounting in the Suffolk Supreme Court Action. (Am. Compl. at 21–22.)

However, Jurgens has stated that he had "absolutely no authority to oversee, let alone supervise, [McCarthy's] actions while he served as Louise's property guardian." (Jurgens Aff. ¶ 10; Def.'s 56.1 Stat. ¶ 25.) Specifically, during the guardianship period, Jurgens did not have any control over Louise's finances or property. (Jurgens Aff. at ¶ 11; Def.'s 56.1 Stat. ¶ 28.) Moreover, at the conclusion of the guardianship period, McCarthy accounted for his actions as Louise's Property Guardian in a formal accounting which was approved by the Suffolk County Supreme Court. (Jurgens Aff. ¶ 10.) Despite having had ample opportunity to do so, Plaintiff at no time objected to McCarthy's Final Accounting and only raises this issue for the first time in the current action, several years after the entry of McCarthy's Final Accounting.

If Plaintiff had been seeking to challenge McCarthy's Final Accounting (for which he has not so moved), he would necessarily have had to bring that information to the attention of the Suffolk County Supreme Court, which previously approved the Final Accounting. *See, e.g., In re Hunter,* 4 N.Y.3d 260, 270, 794 N.Y.S.2d 286, 292, 827 N.E.2d 269 (N.Y.2005) (Explaining that res judicata principles "apply with equal force to judicially settled accounting decrees. As a general rule, an accounting decree is conclusive and binding with respect to all issues raised and as against all persons over whom Surrogate's Court obtained jurisdiction.") (citations omitted).

**\*18** Notwithstanding these purported facts, however, this allegation does not pertain to Jurgens, as he played no role in McCarthy's conduct as guardian. (Jurgens Aff. ¶ 11.) In fact, the conduct at issue here occurred before Louise's death, and thus prior to Jurgens' appointment as executor of Louise's estate and prior to his undertaking the corresponding fiduciary duties which Plaintiff claims were breached. (*Id.*) Moreover, McCarthy is not a party to this action.

Because this allegation relates solely to events that occurred prior to Jurgens' appointment as executor of Louise's Estate, the Court finds that there is no genuine issue of material fact as to whether Defendant breached his fiduciary duties in regard to McCarthy's conduct as Property Guardian and/or McCarthy's Final Accounting.

### 3. The Purported Fraudulent Forensic Accounting Report

Plaintiff contends that, in either the Suffolk Supreme Court Action or the Surrogate's Court Action, Jurgen's attorney hired a forensic accounting firm to prepare "a report" for which Louise's Estate was billed $53,428.94. Plaintiff contends that no such report appears in the files of the Suffolk County Supreme Court or Surrogate's Court Actions and thus, Plaintiff argues, the $53,428.94 "expense" ... "is a fraud and unlawful conversion against Louise Jurgens, Plaintiff, and all other heirs of the estate of Louise Jurgens." (Am. Compl. at 24.)

At first glance, it is unclear whether Plaintiff is alleging that the fraudulent forensic accounting report was prepared during the guardianship period in the course of the Suffolk Supreme Court Action, or following Louise's death in the course of the Surrogate's Court Action. However, based on Plaintiff's assertion that the accountant who was hired to prepare this report informed Plaintiff's attorney (presumably in one of these earlier actions) that he did not know McCarthy, the Court concludes that the conduct alleged here occurred during the guardianship period, because that is the only time McCarthy was involved with Louise. Specifically, Plaintiff contends that the accountant stated that "he did not know the property manager Patrick McCarthy had never spoken with Patrick McCarthy, and was hired by James Klein." (Am. Compl. at 24.) Plaintiff also adds that the accountant made this statement "after he was paid" for the report. (*Id.*)

Insofar as this allegation pertains to the guardianship period, there is no claim against Jurgens and thus nothing for the Court to consider because this conduct occurred prior to Jurgens' appointment as executor of Louise's estate—and prior to his assuming the corresponding fiduciary duties which Plaintiff claims were breached. (*Id.*)

Even if the Court were to presume that this claim alleges conduct which occurred following Louise's death—and thus while Jurgens was the executor—there is no support, beyond Plaintiff's conclusory and unsubstantiated statements, to show that Jurgens fraudulently billed the Estate for an accounting report that was not received. Thus, the Court finds that there is no genuine issue of material fact whether Defendant caused his counsel to hire a forensic accounting firm to prepare a fraudulent report or to pay an impermissible fee to such firm.

### 4. The Alleged Non–Existent Forensic Accountant

**\*19** Plaintiff alleges that in the Surrogate's Court Action, Jurgens, through his counsel, caused the Final Accounting prepared by McCarthy to be sent by the Court to a non-

existent person at a forensic accounting firm so that the accounting firm would not be in the position of having to approve McCarthy's fraudulent Final Accounting. (Am. Compl. at 24–25.) However, as noted above, Jurgens did not play any role in McCarthy's conduct as the property guardian. Moreover, beyond these conclusory and unsubstantiated allegations, the only evidence offered by Plaintiff is a copy of an envelope addressed to "Ernest Patrick Smith, CPA" at a street address in Melville. Contrary to Plaintiff's proffer, the envelope does not indicate that it is directed to the accounting firm of Callahan Nawrocki. (*Id.* at 25, 794 N.Y.S.2d 286, 827 N.E.2d 269.) Further, the envelope was returned by the post office bearing the stamped notation "Attempted Unknown" (not "addressee unknown" as stated by Plaintiff). (*Id .;* Am. Compl. Ex. 11.)

Because there is no evidence of Jurgens having played any role in this alleged conduct, the Court finds that Plaintiff has failed to raise a genuine issue of material fact to support his contention that Jurgens caused McCarthy's Final Accounting to be sent to a non-existent forensic accountant.

### 5. Sale Of Decedent's Residence As An Arm's Length Transaction

With regard to the sale of Louise's residence, Plaintiff alleges that Jurgens breached his fiduciary duties as executor because the only appraisal obtained for Louise's house was from a company allegedly "under the exclusive control of Patrick McCarthy, even though McCarthy was no longer actively serving as property manager[,]" and thus the sale was not an "arm's length" transaction. (Am. Compl. at 25.) As noted above, the New York Fiduciary Powers Act provides the executor with broad authority with regard to the sale of decedent's property. The applicable statutory provision authorizes an executor "with respect to any property ... owned by an estate ... to sell the same at public or private sale, and on such terms as in the opinion of the fiduciary will be most advantageous to those interested therein." N.Y. EPTL § 11–1.1(5).

Plaintiff's only support for his claim that Jurgens breached his fiduciary duty in the sale of the residence is his assertion that the appraisal was submitted by a company with whom McCarthy had ties, thereby resulting in a transaction which was not at arm's length. However, Plaintiff does not specify McCarthy's connection to that company or offer any proof to show that any unlawful conduct occurred as a result of this purported connection. Nor does Plaintiff offer any proof to

show that Jurgens knew or believed this sale was not "most advantageous" to Louise's beneficiaries, as required under New York law.

Significantly, by Order dated February 21, 2001, the Surrogate's Court granted Jurgens' application for permission to sell Louise's home in accordance with the terms of the contract which Jurgens had provided to the Court (Am.Compl., Ex. 9). In the Order, the Surrogate noted that Jurgens had "proffered a copy of a contract of sale for $270,000.00 and state[d] that the sale of the premises minimizes the estate's obligation to pay taxes and carrying charges on the property during the pendency of the probate proceeding." (*Id.*) The Surrogate found that Jurgens had satisfied his fiduciary duties with regard to the sale of Louise's home, and Plaintiff has not presented any evidence here to convince this Court otherwise. Accordingly, the Court finds there is no genuine issue of material fact regarding Defendant's conduct in the sale of Louise's home.

### 6. The "Fraudulent Bond" Allegation

**\*20** Plaintiff maintains that Jurgens filed a fraudulent bond with the Surrogate's Court and that no true bond actually exists, thereby resulting in a fraud on the court and Louise's beneficiaries. (Am. Compl. at 25–26, Ex. 9.) In support of this allegation, Plaintiff claims that, pursuant to the order of the Surrogate's Court requiring Jurgens to file a bond on his performance, Jurgens filed "several unbound unexecuted pages purporting to represent an executor's performance bond underwritten by Fidelity and Deposit Company of Maryland" ("F & DC"), and that in 2003, an F & DC representative informed him that "no bond exists or ever existed on the performance of Charles H. Jurgens." (*Id.* at 25–26, 794 N.Y.S.2d 286, 827 N.E.2d 269.)

In his summary judgment motion, Jurgens explains that F & DC insured Louise's Estate for $3,353,000, based on Jurgens' preliminary estimate of the value of the Estate at the time he filed the Preliminary Executor's Bond with the Surrogate's Court. (Jurgens Aff. ¶ 14; Def.'s 56.1 Stat. ¶ 29.) The value of the Estate was ultimately determined to be higher than the face value of the bond. However, by the time that determination was made, the Will had already been admitted to probate and an increase in the bond was not necessary. (Jurgens Aff. ¶ 14; Def.'s 56.1 Stat. ¶ 30.)

In support of his allegation that Jurgens breached his fiduciary duties by filing a false bond, Plaintiff cites to Exhibit 9 annexed to the Amended Complaint. (Am. Compl. at 25–26.)

However, Exhibit 9 is neither the purported bond nor any document even suggesting that Jurgens fraudulently obtained the bond. Rather, Exhibit 9 consists of the FD & C's power of attorney dated August 25, 2000, F & DC's statement of financial condition dated May 24, 2000, and FD & C's New York State Insurance Certificate dated April 12, 2001. These documents do not in any way support Plaintiff's contention that Jurgens committed fraud in obtaining the bond, thereby breaching his fiduciary duties.

As a result, Defendant has provided no more than conclusory allegations here regarding the supposed fraudulent nature of the bond, and those allegations are not supported by the irrelevant papers included in Exhibit 9. Accordingly, the Court finds that Plaintiff has failed to carry his burden to establish a genuine issue of material fact regarding the bond filed by Jurgens with the Surrogate's Court.

### 7. Purported Accounting Discrepancies

Plaintiff alleges that the difference of $897,115.27 between the listed value of assets contained in Jurgens' Inventory dated October 12, 2001 (filed on November 7, 2001) and McCarthy's Final Accounting (filed in August 2002), both of which pertain to the value of Louise's assets as of the date of her death (January 6, 2001), and Jurgens' alleged failure to address this discrepancy, reveal that Jurgens committed some type of unspecified fraud and that he "continues to act in concert with all parties ... to deplete and convert the assets of" Louise's Estate. (Am. Compl. at 9.)

**\*21** The conduct alleged here refers to actions taken during the guardianship period. As explained above, during this time, Jurgens had no authority over McCarthy, who was solely in charge of managing Louise's assets. Moreover, Plaintiff had ample opportunity to challenge McCarthy's accounting, including this alleged discrepancy, during the course of the Suffolk Supreme Court Action. Because this allegation relates solely to events that occurred prior to the commencement of Jurgens' role as executor of Louise's Estate, the Court finds that there is no genuine issue of material fact regarding any alleged breach by Jurgens of his fiduciary duties as Executor.

### 8. Jurgens' Purported Improper Motives

Finally, Plaintiff claims that Jurgens brought the Suffolk Surrogate's Court action against Plaintiff "to conceal and obfuscate the conversion of the property" of Louise and her Estate during the period in which Jurgens and McCarthy

served as Louise's guardians. (Am. Compl. at 9.) Plaintiff explained that, following his appointment as preliminary executor of Louise's estate in January 2001:

> In the course of performing my duties as executor, I attempted to locate and preliminarily account for various assets of the Estate. In that capacity, I learned that Plaintiff had withheld certain of Louise's money and personal property valued at $789,039.04, obtained through specific withdrawals, transfers and check negotiations in which Plaintiff engaged during the period prior to Louise's death from March 1997 through the time that Mr. McCarthy was appointed as Louise's property guardian. As a result, I commenced a special proceeding in Suffolk County Surrogate's Court in my capacity as Executor, seeking to discover property withheld by Plaintiff.

(Jurgens Aff. ¶ 5.)

On June 13, 2003, Suffolk County Surrogate, Honorable John M. Czygier, Jr. granted Jurgen's motion for summary judgment (made on behalf of Louise's Estate) on the grounds that no triable issue of fact existed as to whether Witzenburg was in wrongful possession of specific assets belonging to the Estate. (Jurgens Aff ¶ 6; Schmidt Decl. ¶ 10; Def.'s 56.1 Stat. ¶ 17.) By Decree and Judgment entered on August 22, 2003 (the "Judgment"), Witzenburg was ordered to deliver such assets, if in his possession or control, or to pay Jurgens, as the Executor, $789,039.04, representing the total amount of withdrawals and transfers of Louise's assets resulting from the transactions conducted by Plaintiff between March 1997 and June 2000. (Jurgens Aff. ¶ 6; Schmidt Decl. ¶ 10, Ex. A; Def.'s 56.1 Stat. ¶ 17.) Moreover, in the Judgment granting the Estate's motion for summary judgment, Surrogate Czygier stated as follows:

> sufficient concerns having been raised before this Court to question the nature of the subject transfers it is further ORDERED, ADJUDGED AND DECREED that the Clerk of the Surrogates' Court is directed to serve a copy of the Court's decision upon the

Suffolk County District Attorney for further investigation[.]"

**\*22** (Schmidt Decl. ¶ 11, Ex. A; Def.'s 56.1 Stat. ¶ 18.) The Judgment is a final judgment and was not appealed by Plaintiff. (Schmidt Decl., Ex. A; Def.'s 56.1 Stat. ¶ 20.)

Jurgens believes that shortly after entry of the Judgment in August 2003, Plaintiff left New York. (Schmidt Decl. ¶ 12.) To date, Plaintiff has not made any payment to satisfy the Judgment, and it is Jurgens' understanding that Plaintiff has resisted all efforts to enforce the Judgment. (Jurgens Aff. ¶ 6; Def.'s 56.1 Stat. ¶ 19.) However, once the Estate files its final accounting (which it cannot do until after resolution of the present action), it will ultimately be able to offset the amount of the Judgment against Plaintiff's share. (Jurgens Aff. ¶ 12.; Schmidt Decl. ¶ 12.)

Notwithstanding that the history of the Surrogate's Court Action strongly suggests that Plaintiff brought the instant case in an effort to further elude the Judgment entered in Surrogate's Court, Jurgens, as Executor, was well within his authority to bring that case against Plaintiff. The New York Fiduciary Powers Act specifically provides that "every fiduciary is authorized ... [t]o contest, compromise or otherwise settle any claim in favor of the estate ...." N.Y. EPTL § 11–1.1(13). Thus, once Jurgens obtained information that Plaintiff had withheld funds which properly belonged to Louise's Estate, he acted properly in brining the Surrogate's Court Action against Plaintiff to recover those funds.

### C. *Conclusion*

For the foregoing reasons, Plaintiff has not provided any evidentiary basis which would enable this Court to find that Jurgens breached his fiduciary duties in his role as executor of Louise's Estate and that Jurgens' actions caused Witzenburg or any other beneficiary to incur damages. Accepting Jurgens' Rule 56.1 Statement as admitted facts, as the Court must, the record shows that Jurgens' conduct as executor "measures up to the appropriate standards of prudence, vigilance, and care" as required by New York law. *See Donner,* 82 N.Y.2d at 585, 606 N.Y.S.2d at 142, 626 N.E.2d 922.

Having reviewed all of the papers submitted in support of and in opposition to Defendant's Motion for Summary Judgment on the remaining claims in this action, and reviewing the evidence in the light most favorable to Plaintiff as the non-moving party, the Court concludes that Defendant has met his burden of showing that there is no genuine issue of material fact to be tried in this case regarding Plaintiff's claims that Defendant breached his fiduciary duties to the Estate of Louise Jurgens and that he mismanaged the Estate's assets.

Accordingly, I respectfully recommend to Judge Feuerstein that Defendant's motion for summary judgment on the remaining claims be GRANTED and that the Amended Complaint be dismissed in its entirety.

### IV. *PLAINTIFF'S MOTION TO AMEND THE COMPLAINT*

Plaintiff Witzenburg also moves to amend the Amended Complaint pursuant to Fed.R.Civ.P. 15 to add Patrick McCarthy, Esq. as a party defendant. McCarthy served as the court-appointed property guardian of Louise's property for thirteen months before her death. Defendant's motion papers [DE 117] do not include a proposed Second Amended Complaint containing the requested changes. Counsel for Patrick McCarthy filed a letter [DE 119] requesting permission to oppose the motion and to extend the time to submit his opposition. By Order dated June 20, 2008 [DE 120], Judge Boyle granted McCarthy's motion without objection from Plaintiff and extended the deadline for the opposition to July 15, 2008. Defendant Jurgens has not filed papers in opposition to Witzenburg's motion to amend.

**\*23** Plaintiff seeks to amend his pleading for a second time on the grounds that, as guardian of Louise's property, McCarthy "created a false business document identified as 'The Final Accounting,' and filed said false business document with the New York State Supreme Court." [DE 117] Because the deadline to amend the pleadings has expired, [10] the amendment is permissible only if it "relates back" to the original Complaint as defined in Rule 15(c). Under Rule 15(c)(1), an amendment "relates back" to the original pleading when, *inter alia,*

> (B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading; or

> (C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:

(i) received such notice of the action that it will not be prejudiced in defending on the merits; and

(ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Thus, subsection (C) governs the relation back of newly added parties, as opposed to newly added claims and claims and defenses, which is governed by subsection (B) (although under the terms of (C), Plaintiff must also satisfy (B).) *See Sidney v. Wilson,* 228 F.R.D. 517, 520 (S.D.N.Y.2005).

In order for Plaintiff to amend the Amended Complaint to add McCarthy as a party Defendant, he must show that McCarthy originally would have been named as a defendant "but for a mistake concerning the proper party's identity." Under Second Circuit law, "a 'mistake' in identifying a defendant occurs for purposes of Rule 15(c) when it is the result of 'misnomer or misidentification' " or when a plaintiff omits the individual defendant altogether in the erroneous belief that suing a government department will suffice. *Messer v. Fahnestock & Co. Inc.,* 03–4989, 2008 WL 4934608, at *20 (E.D.N.Y. Nov.18, 2008) (internal citation omitted) (quoting *Barrow v. Wethersfield Police Dep't,* 66 F.3d 466, 469–70 (2d Cir .1995)); *Colombo v. S.C. Dep't of Soc. Servs.,* 221 F.R.D. 374, 376 (E.D.N.Y.2004). "However, the relation-back doctrine does not apply where defendants were not originally named merely 'because plaintiff did not know their identities.' " *Colombo,* 221 F.R.D. at 376 (quoting *Tapia–Ortiz v. Doe,* 171 F.3d 150, 152 (2d Cir.1999)). Nor does the relation-back doctrine apply where plaintiff does not allege he would have sued the proposed defendant in the original complaint but for a mistake in identity. *See Cornwell v. Robinson,* 23 F.3d 694, 705 (2d Cir.1994) (amendment to add defendants did not relate back where plaintiff knew at the time of her original complaint the "identities of the ... employees who she contended had harassed and discriminated against her;" plaintiff's failure to name defendants thus "must be considered a matter of choice, not mistake"); *see also* Fed.R.Civ.P. 15(c) (3) [11] Advisory Committee's note (1991 Amendment) (this provision was revised to address "the problem of the misnamed defendant").

 **\*24** In his motion papers, Plaintiff asserts that the proposed amendment "asserts a claim that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Plaintiff further contends that McCarthy will not be prejudiced because he "knew or

should have known that this action would have been brought against him but for a mistake concerning the proper party's identity ...." [DE 117] Other than these conclusory statements, however, Plaintiff gives no explanation as to any mistake on his part concerning McCarthy's identity. There is no evidence that Defendant's failure to name McCarthy as a defendant in the original Complaint was a result of a "misnomer or misidentification," as required under Second Circuit law. *See, e.g., Messer,* 2008 WL 4934608, at *20, *Colombo,* 221 F.R.D. at 376. In addition, given the history of the related Suffolk Supreme Court and Surrogates' Court Actions that occurred before Plaintiff filed the Complaint in the present case, it is implausible for Plaintiff to assert that he was uncertain of Patrick McCarthy's identity. Rather, Plaintiff chose not to name McCarthy as a defendant in the present action— a mistake which does not allow the proposed amendment to "relate back" to the Complaint. *See Cornwell,* 23 F.3d at 705 (amendment to add defendants did not relate back where plaintiff knew at the time of her original complaint the "identities of the ... employees who she contended had harassed and discriminated against her;" plaintiff's failure to name defendants thus "must be considered a matter of choice, not mistake").

Moreover, even if the Court were to accept Plaintiff's contention that McCarthy "knew or should have known that the action would have been brought against [him], but for a mistake concerning the proper party's identity [,]" Plaintiff must show that McCarthy received timely notice of this action so as to avoid prejudice in defense of the action on the merits. *See* Fed.R.Civ.P. 15(c)(2)(C) (ii); *Colombo,* 221 F.R.D. at 377. To this end, Plaintiff states:

> [a]t Patrick McCarthy was represented by Donald J. Farrinacci when he was the Guardian of Louise Jurgens' Property, as Donald J. Farrinacci had been employed at Cozin O'Conner and is an associate of Michael Schmidt, attorney for Charles H. Jurgens, Patrick McCarthy knew or should have know that this action would have been brought against him, but for a mistake concerning the proper party's identity ....'

[DE 117] The Court understands Plaintiff's assertion to mean that McCarthy was on notice of the present action, and therefore will not be prejudiced by being added as a defendant, because, for at least some portion of the time

he served as Louise's property guardian (December 1999–January 2001), he was represented by counsel who at one time had worked with Jurgens' current counsel.

Rule 15(c) requires a showing that the defendant who is to be added to the complaint "received such notice of the action that it will not be prejudiced in defending on the merits[.]" Rule 15(c) (2)(C)(ii). Knowledge of the pendency of the action may be imputed to a party to be added as a defendant to that action where there has been "some showing that the proposed defendant's attorney knew that the additional defendant would be added to the existing suit." *Colombo,* 221 F.R.D. at 377 (granting motion to add individual defendants under *Rule 15(c)* where county attorney's office represented the named defendants, including county police department and correctional facility, and was also counsel for the proposed defendants, including individual police and correction officers, the attorneys "should have known that, despite the deficiencies in the original complaint, these individual officers should have been named, and would be added when the mispleading became evident"); *Gleason v. McBride,* 869 F.2d 688, 693 (2d Cir.1989) (holding that notice of a lawsuit cannot be imputed to a proposed defendant based on sharing of counsel with a named defendant; "there must be some showing that the attorney(s) knew that the additional defendants would be added to the existing suit") (citation omitted).

**\*25** Plaintiff's allegation that McCarthy was on notice of the present action because he was, in a prior case, represented by counsel who had at one time worked with Jurgens' current counsel, is insufficient to constitute notice under Rule 15(c)(2)(C)(ii). Plaintiff does not provide the Court with any evidence regarding the relationship between McCarthy's attorney and Jurgens' former attorney. [12] Moreover, Plaintiff has not made any showing that McCarthy or his attorney knew that McCarthy would be added to the existing suit before Plaintiff filed this motion. For the foregoing reasons, Plaintiff has not satisfied the requirements of Rule 15(c) and therefore should not be permitted to amend his pleading for a second time for this purpose. Accordingly, I respectfully recommend to Judge Feuerstein that Plaintiff's motion to add Patrick McCarthy as a party defendant be DENIED.

## V. *PLAINTIFF'S MOTION TO COMPEL*

Plaintiff also moves to compel Defendant to respond to outstanding discovery requests. By motion dated June 26, 2008 [DE 130], Plaintiff requests an order requiring Defendant to respond to outstanding document requests and interrogatories, which Defendant has previously refused to answer on the grounds that the application of the *Rooker–Feldman* doctrine excused them from doing so. The motion is titled "Plaintiff's Motion & Notice of Motion For Sanctions," but nowhere in the body of the motion does Plaintiff request the imposition of sanctions or provide a legal basis for doing so. Accordingly, the Court will treat this request for relief as a motion to compel and to impose sanctions upon Defendant.

By letter dated July 8, 2008 [DE 131], Defendant states that, to the extent the meaning of Plaintiff's motion can be discerned, and to the extent the motion seeks to compel Defendant's further responses to discovery requests, Defendant opposes the motion on the grounds that (1) the Court had already denied an earlier motion to compel by Plaintiff, and (2) there is no basis for an award of sanctions against Defendant.

In a previous motion filed on January 31, 2008 [DE 95–97], Plaintiff moved to compel Defendant "to file adequate responses to Plaintiff's discovery requests." Specifically, Plaintiff objected to Defendant's responses to Interrogatories 4, 6, 13, and 14, and Requests for Admissions ("RFAs") numbered 1, 8, 9, 16, and 17 as being "incomplete," and requested that the Court order Defendant to respond further to the Interrogatories and to deem as admitted the specified RFAs [DE 96]. In opposition, Defendant filed the Declaration of Michael C. Schmidt, dated February 4, 2008 [DE 99], objecting to Plaintiff's motion to compel. By Order dated February 4, 2008 [DE 100], Judge Boyle ruled that, after reviewing the motion to compel, he found Defendant's response[s] "adequate." The Order also stated that the "plaintiff is advised that he may further pursue those request[s] which do not relate to dismissed parties and causes of action, at the deposition of defendant Jurgens."

**\*26** Thus, Judge Boyle unequivocally denied Plaintiff's motion to compel on the grounds that Plaintiff's responses were sufficient and any further information could be obtained by deposing Defendant. Plaintiff's current motion to compel is essentially a more vague repetition of his earlier motion. However, Plaintiff does not provide any basis, let alone a legally sufficient one, for reconsidering Judge Boyle's Order denying that motion, and the Court declines to do so. For all of the reasons stated previously in this Report, Judge Boyle's February 4, 2008 Order on this topic is also law-of-the-case and Plaintiff has not met any of the criteria to exempt that Order from such a finding.

To the extent Plaintiff's motion seeks the imposition of sanctions upon Plaintiff, the Court interprets the motion to be requesting sanctions for "Failure to Disclose, to Supplement an Earlier Response, or to Admit," under Rule 37(c). Here, Judge Boyle previously determined that Defendant's responses were adequate. Since that time, Plaintiff has not served any additional discovery requests and Defendant has not incurred any additional obligation to respond to the original discovery requests. Consequently, there is no basis for the Court to impose sanctions on Defendant.

For the foregoing reasons, I respectfully recommend to Judge Feuerstein that Plaintiff's motion to compel and for sanctions be DENIED.

**V. CONCLUSION**

For the reasons discussed above, I respectfully recommend to Judge Feuerstein that: (1) Defendant's motion for summary judgment on the remaining claims be GRANTED and that Plaintiff's Amended Verified Complaint be dismissed in its entirety; (2) Plaintiff's motion to amend the Amended Complaint to add Patrick McCarthy, Esq. as a party defendant be DENIED; and (3) Plaintiff's motion to compel discovery responses and to impose sanctions upon Defendant be DENIED.

Pursuant to 28 U.S.C. § 636(1)(C) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report and Recommendation to file written objections. *See also* Fed.R.Civ.P. 6(a), (e). Such objections shall be filed with the Clerk of the Court via ECF, *except in the case of a party proceeding pro se. Pro Se Plaintiff James Witzenberg must file his objections in writing with the Clerk of the Court within the prescribed time period noted above. A courtesy copy of any objections filed is to be sent to the chambers of the Honorable Sandra J. Feuerstein, and to my chambers as well. Any requests for an extension of time for filing objections must be directed to Judge Feuerstein prior to the expiration of the (10) day period for filing objections. Failure to file objections will result in a waiver of those objections for purposes of appeal.* Thomas v. Arn, 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); Beverly v. Walker, 118 F.3d 900, 901 (2d Cir.), *cert. denied,* 522 U.S. 883, 118 S.Ct. 211, 139 L.Ed.2d 147 (1997); Savoie v. Merchants Bank, 84 F.3d 52, 60 (2d Cir.1996).

**\*27** Defendants' counsel is directed to serve a copy of this Report and Recommendation forthwith upon Plaintiff *Pro Se* by overnight mail and first class mail at Plaintiff's last known address. Defendant's counsel is further directed to file proof of service of the same upon ECF.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 1033395

---

**Footnotes**

1   Plaintiff has not objected to the branches of Magistrate Judge Tomlinson's Report as recommended denying his motions to amend the amended complaint and to compel discovery responses or impose sanctions. Upon review of those branches of the Report, the Court is satisfied that the Report is not facially erroneous. Accordingly, the Court accepts and adopts those branches of the Report.

1   The record is unclear as to Plaintiff's exact relationship with Louise, as it is variously stated that he is her first cousin once removed (Compl. at 2; Jurgens Aff., Ex. A), her second cousin (Jurgens Aff. ¶ 1), or her nephew (Schmidt Decl. ¶ 4).

2   Citations to "Schmidt Decl." are to the June 17, 2008 Declaration of Michael C. Schmidt, Esq., in Support of Defendant Jurgens' Motion for Summary Judgment [DE 123].

3   Citations to "Jurgens Aff." are to the June 10, 2008 Affidavit of Charles Herman Jurgens in support of Motion for Summary Judgment [DE 124].

4   Citations to "Def.'s 56.1 Stat." are to the Defendant's Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 [DE 125].

5   The Amended Complaint does not contain separately numbered paragraphs and does not identify specific "causes of action." Accordingly, citations are to page numbers within the Amended Complaint. Moreover, the Court affords the Amended Complaint, filed by *pro se* Plaintiff "as liberal a reading as circumstances permit." *Hardie v. Grenier,* No. 84 Civ. 4710, 1987 U.S. Dist. LEXIS 12664, at \*6 (S.D.N.Y. Jan. 15, 1988); *see also* Lerman v. Board of Elections in the City of N.Y., 232 F.3d 135, 140 (2d Cir.2000).

6    Citations to "Schmidt Reply Decl." are to the August 7, 2008 Reply Declaration of Michael C. Schmidt, Esq., in Further Support of Defendant Jurgens' Motion for Summary Judgment [DE 137].

7    Even if Plaintiff's Response were considered, the substance of the Response falls far short of the threshold necessary to support a showing of genuine issue of material fact with regard to the remaining claims. Rather, the Response contains conclusory and unsubstantiated statements, most of which purport to address "the numerous factual inaccuracies and misleading statements" in the Schmidt Declaration [DE 136 at 3], and none of which provide any evidentiary support for Plaintiff's claims.

8    Local Rule 56.1(b) provides: "The papers opposing a motion for summary judgment shall include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried."

9    The Prudent Investor Act applies to investments "made or held" by a trustee on or after January 1, 1995, and thus applies to the present matter. *See In re Estate of Janes,* 90 N.Y.2d 41, 49, 659 N.Y.S.2d 165, 169, 681 N.E.2d 332 (N.Y.1997) (citing N.Y. EPTL § 11–2.3(b) (3)(C).)

10   Pursuant to the Scheduling Order [DE 22] in this action, the deadline to amend the pleadings was May 6, 2005.

11   Although numbered differently from the current version of Rule 15(c), the wording is the same.

12   In addition, the Court notes that, based on preliminary research, Plaintiff's statement appears to be incorrect. No attorney by the name of Donald J. Farrinacci presently works at the law firm of Cozen O'Connor, where Jurgens' attorney, Michael J. Schmidt, currently works. However, Schmidt's biography on the Cozen O'Connor website states that until 2005, Schmidt worked at Fischbein Badillo Wagner Harding, a firm that represented McCarthy for at least some portion of his tenure as guardian. *See* http://www.cozen.com/attorney_detail.asp?d=1 & atid=835.